# United States Court of Appeals

*for the*

# Third Circuit

Case No. 25-2390

CHRISTOPHER FABRICANT; MALIKA FABRICANT,

*Plaintiffs-Appellants,*

— v. —

INTAMIN AMUSEMENT RIDES INT CORP. EST; INTERNATIONAL AMUSEMENTS INC; ING-BURO STENGEL CMBH; MARTIN & VLEMINCKX LTD; MARTIN & VLEMINCKX USA, LLC; JOHN DOES 1-20; ABC CORPORATIONS 1-10; SIX FLAGS THEME PARKS INC,

*Defendants,*

INTARIDE, also known as Intamin Ltd; SIX FLAGS GREAT ADVENTURE, LLC; INTAMIN LTD.,

*Defendants-Appellees.*

ON APPEAL FROM AN ORDER OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY

## SUPPLEMENTAL APPENDIX

CHRISTOPHER A. GULLA (NJ 062262013)
MURPHY SANCHEZ
*Attorneys for Defendant-Appellee*
  *Six Flags Great Adventure, LLC*
309 Fellowship Road, Suite 200
Mount Laurel, New Jersey 08054
(267) 367-5503
cgulla@murphysanchez.com

BENJAMIN I. WILKOFF (NJ 082832019)
ROBERT S. CLARK (NJ 426082023)
COZEN O'CONNOR, P.C.
*Attorneys for Defendants-Appellees*
  *Intamin, Ltd. and Intaride, LLC*
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, Pennsylvania 19103
(215) 665-2000

CP COUNSEL PRESS    (800) 4-APPEAL • (387619)

# TABLE OF CONTENTS

**Page**

Defendant's Rule 56.1 Statement in Support of Its
    Motion for Summary Judgment and to Preclude
    Plaintiffs' Experts, dated July 30, 2024
    (Omitted Herein)

Exhibit J to Rule 56.1 Statement -
Deposition Transcript of Christopher James
Fabricant, dated April 5, 2021 ............................... SA1

Exhibit K to Rule 56.1 Statement -
Deposition Transcript of Christopher James
Fabricant, dated June 3, 2021 ............................... SA230

Exhibit L to Rule 56.1 Statement -
Treatment Records of Dr. Brian Halpern............... SA364

Exhibit M to Rule 56.1 Statement -
Treatment Records of Jersey Shore University
Medical Center........................................................ SA370

Exhibit N to Rule 56.1 Statement -
Treatment Records of Dr. Todd Albert................... SA380

Exhibit P to Rule 56.1 Statement -
Notice of Service of Process of Complaint of
4/29/2019 ............................................................... SA383

Exhibit T to Rule 56.1 Statement -
Report of Defendant's Expert, Joseph Sala, of
3/9/2022 ................................................................. SA385

Exhibit BB to Rule 56.1 Statement -
Photographs of Select Ride Rule Signs for
Kingda Ka............................................................... SA398

**Page**

Statement Of Undisputed Material Facts in Support
of Defendants Intamin Ltd. And Intaride, LLC's
Motion for Summary Judgment to Dismiss
Plaintiffs' Complaint Pursuant to Fed.R.C.P.56,
dated July 31, 2024 .................................................. SA402

Plaintiff's Brief in Opposition to Intamin
Defendants' Motion for Summary Judgment,
dated September 16, 2024...................................... SA420

Plaintiffs' Response to Intamin Defendants'
"Statement of Undisputed Material Facts", dated
September 16, 2024 ................................................ SA449

Response To Plaintiff's Counter-Statement of
Material Facts in Opposition to Summary
Judgment Motion of Defendant, Six Flags Great
Adventure, LLC, dated September 30, 2024
(Omitted Herein)

Exhibit 1 to Response -
American National Standard Environmental and
Facility Safety Signs .............................................. SA471

Exhibit 3 to Response -
Treatise: Human Factors Perspectives on
Warnings ................................................................ SA524

EXHIBIT "J"

# Cited Portions of Deposition of Plaintiff,

Christopher Fabricant, of 4/5/2021

```
 1          UNITED STATES DISTRICT COURT
 2            DISTRICT OF NEW JERSEY
 3                 -  -  -
 4

    CHRISTOPHER FABRICANT, :   CIVIL ACTION
 5  M.D., and MALIKA        :
    FABRICANT, Husband and  :
 6  Wife,                    :
            Plaintiffs,      :
 7                           :
            v.               :   NO.
 8                           :   3:19-cv-12900
    SIX FLAGS GREAT          :   -AET-LHG
 9  ADVENTURE, LLC, et       :
    al.,                     :
10          Defendants.      :
11
                 -  -  -
12
                 April 5, 2021
13
                 -  -  -
14
15          Remote Videotape deposition
    of CHRISTOPHER JAMES FABRICANT, conducted
16  at the location of the witness in Red
    Bank, New Jersey, commencing at 10:08
17  a.m., on the above date, before Kimberly
    A. Cahill, a Federally Approved
18  Registered Merit Reporter, Certified
    Court Reporter, and Notary Public.
19
20               -  -  -
21
22       GOLKOW LITIGATION SERVICES
      877.370.3377 ph | 917.591.5672 fax
23          deps@golkow.com
24
```

SA2

```
1    APPEARANCES:
2
     THE LAW OFFICES OF G. MARTIN MEYERS,
3    P.C.
     BY:  G. MARTIN MEYERS, ESQUIRE
4    35 West Main Street
     Suite 106
5    Denville, New Jersey 07834
     (973) 625-0838
6    gmm@gmeyerslaw.com
     Representing the Plaintiffs
7
8    SPECTOR GADON ROSEN VINCI, P.C.
     BY:  HEATHER M. EICHENBAUM, ESQUIRE
9    Seven Penn Center
     1635 Market Street, 7th Floor
10   Philadelphia, Pennsylvania 19103
     (215) 241-8888
11   heichenbaum@sgrvlaw.com
     Representing the Defendant, Six
12   Flags Great Adventure LLC
13
     COZEN O'CONNOR
14   BY:  F. BRENDEN COLLER, ESQUIRE
     One Liberty Plaza
15   1650 Market Street, Suite 2800
     Philadelphia, Pennsylvania 19103
16   (215) 665-5518
     BColler@cozen.com
17   Representing the Defendants, Intamin
     Ltd. and Intaride, LLC
18
19   VIDEOTAPE TECHNICIAN:
        Chris Johnson
20
21   ALSO PRESENT:
        Jamie Holness, Paralegal
22      Spector Gadon Rosen Vinci P.C.
23
24                  -  -  -
```

SA3

```
1                    -   -   -
2                 I N D E X
3                    -   -   -
4
5   Testimony of:
    CHRISTOPHER JAMES FABRICANT
6
     By Ms. Eichenbaum              7
7
8                    -   -   -
9               E X H I B I T S
10                   -   -   -
11
    NO.             DESCRIPTION           PAGE
12
13   C.             Photograph           129
     Fabricant-1
14
     C.             Rules Sign at        131
15   Fabricant-2    Kingda Ka
16   C.             Overhead Sign in     134
     Fabricant-3    Station of Kingda
17                  Ka
18   C.             Notice on Seatbacks 135
     Fabricant-4    of Kingda Ka
19
20   (NOT ATTACHED, RETAINED BY COUNSEL)
21
22
23
24
```

SA4

Christopher James Fabricant

```
 1                        -   -   -
 2              DEPOSITION SUPPORT INDEX
 3                        -   -   -
 4
 5    Direction to Witness Not to Answer
 6    Page Line     Page Line       Page Line
 7
 8    Request for Production of Documents
 9    Page Line     Page Line       Page Line
10     18   10       19   11         56    21
       164  19
11
12
      Stipulations
13
      Page Line     Page Line       Page Line
14
15
16    Question Marked
17    Page Line     Page Line       Page Line
18
19
20
21
22
23
24
```

SA5

Christopher James Fabricant

```
1                    -  -  -

2            THE VIDEO TECHNICIAN:  We

3      are now on the record.  My name is

4      Chris Johnson.  I am a

5      videographer for Golkow Litigation

6      Services.  Today's date is Monday,

7      April 5th, 2021.  The time on the

8      video monitor is approximately

9      10:09 a.m.

10            This remote video deposition

11     is being held in the matter of

12     Fabricant versus Six Flags Great

13     Adventure, LLC, et al, in the

14     United States District Court for

15     the District of New Jersey, Civil

16     Action No. 3:19-cv-12900-AET-LHG.

17     The deponent is Christopher

18     Fabricant.

19            All parties to this

20     deposition are appearing remotely

21     and have agreed to the witness

22     being sworn in remotely.  Due to

23     the nature of remote reporting,

24     please pause briefly before
```

SA6

1          speaking to ensure all parties are

2          heard completely.

3                  Will all counsel present

4          please identify themselves?

5                  MS. EICHENBAUM:  Is Gary

6          frozen?

7                  MR. MEYERS:  I'm sorry?

8                  THE VIDEO TECHNICIAN:  I

9          asked will all counsel present

10         please identify themselves?

11                 MR. MEYERS:  Oh, I'm sorry.

12         I'm sorry.  Gary Meyers, appearing

13         for the plaintiffs.

14                 MS. EICHENBAUM:  Good

15         morning.  Heather Eichenbaum on

16         behalf of Defendant Six Flags

17         Great Adventure, LLC.

18                 MR. COLLER:  Brenden Coller

19         on behalf of Intaride, LLC and

20         Intamin Limited.

21                 THE WITNESS:  I did not

22         catch the name, counselor?

23                 MR. COLLER:  Brenden Coller.

24                 THE WITNESS:  Thank you.

SA7

Christopher James Fabricant

```
 1              THE VIDEO TECHNICIAN:  The

 2         court reporter today is Kim Cahill

 3         and will now swear in the witness,

 4         then we may proceed.

 5                   -  -  -

 6              CHRISTOPHER JAMES FABRICANT,

 7         after having been duly sworn, was

 8         examined and testified as follows:

 9                   -  -  -

10              EXAMINATION

11                   -  -  -

12    BY MS. EICHENBAUM:

13         Q.    Sir, as you just heard, my

14    name is Heather Eichenbaum.  I represent

15    Six Flags Great Adventure, LLC in a

16    lawsuit that you have filed against my

17    client as well as Intamin Limited and

18    Intaride, LLC relating to an incident or

19    injury that you allege resulted from a

20    ride on Kingda Ka back in April of 2017.

21              Is it fair to assume you're

22    generally familiar with what I'm

23    referring to?

24         A.    Yes.
```

SA8

Christopher James Fabricant

```
1        Q.    Have you ever given a
2   deposition before?
3        A.    Yes.
4        Q.    How many times?
5        A.    Once that I recall.
6        Q.    Let me start then with some
7   instructions to try to move this along as
8   easily and efficiently as possible.
9        A.    Thank you.
10        Q.    The point of a deposition is
11   simply to allow the attorneys the
12   opportunity to ask you questions about
13   what you claim occurred and how you claim
14   it has affected or impacted your life.
15            So all of my questions will
16   be verbal, and even though you are on
17   video and we can see you, just as my
18   questions need to be verbal, so do your
19   answers.  Certainly it's customary to nod
20   or shake the head or use hand gestures in
21   everyday conversation and you can do
22   that, but you also need to enunciate your
23   responses.
24            Do you understand?
```

SA9

Christopher James Fabricant

```
 1        A.     Yes.
 2        Q.     If at any point I ask a
 3   question and you don't know the answer,
 4   your appropriate answer is "I don't
 5   know."  If I should ask a question and
 6   you don't recall the answer, the
 7   appropriate answer is that you don't
 8   recall.
 9               With that said, if I ask a
10   question and you can't be certain of a
11   definitive answer, but you can
12   approximate, we'll ask that you give that
13   approximated answer and just let us know
14   that it's an approximation.
15               Do you understand?
16        A.     I do.
17        Q.     If at any point I ask a
18   question and you don't hear me or don't
19   understand my question, it's very
20   important that you let me know that and I
21   will repeat or rephrase the question
22   until you're certain that you did hear
23   and understand it.
24               Do you understand?
```

SA10

Christopher James Fabricant

1    A.    I do.

2    Q.    If at any point during the

3 deposition your attorney makes an

4 objection to one of my questions or

5 another attorney's questions, hold off on

6 answering until we resolve that

7 objection, and at that point, one of us

8 will let you know whether you should

9 answer or if the questioning attorney

10 will be asking a new question.

11          Do you understand?

12   A.    I do.

13   Q.    If you need a break for any

14 reason during the deposition, let us

15 know.  I'm happy to accommodate.  The

16 only thing we will ask is that you not

17 speak with anyone during the break

18 regarding the deposition or the topic of

19 the deposition or any of the questions

20 that are being asked or answers given.

21 And if there is a question pending at the

22 time you ask to take a break, you'll need

23 to answer that question before we take

24 the break.

SA11

1          Do you understand?

2     A.    Yes, thank you.

3          MS. EICHENBAUM:  Counsel,

4     any additional instructions?

5     Gary, Brenden?

6          MR. MEYERS:  Not at this

7     time.

8          MR. COLLER:  (Attorney

9     shakes head.)

10    BY MS. EICHENBAUM:

11        Q.    Sir, your full legal name is

12    Christopher James Fabricant?

13        A.    Correct.

14        Q.    Have you ever been known by

15    any other names or nicknames?

16        A.    No.

17        Q.    Your date of birth is March

18    17, 1965?

19        A.    Yes.

20        Q.    And your Social Security

21    number ends in 0356?

22        A.    It does.

23        Q.    Are you currently taking any

24    medications?

SA12

```
1           A.    No.

2           Q.    Are you having any

3   difficulty hearing or understanding me so

4   far?

5           A.    So far, so good.

6           Q.    Are there any medications

7   that you take on a regular basis that you

8   did not take today?

9           A.    No.

10          Q.    Your current address is 35

11  Rector Place in Red Bank, New Jersey; is

12  that correct?

13          A.    Yes, that's correct.

14          Q.    And for how many years have

15  you lived at that address?

16          A.    Between 15 and 20 years.

17          Q.    My understanding is that you

18  live with your wife Malika and your two

19  sons Nicolas and Thibaut; is that

20  correct?

21          A.    Yeah, I want to backtrack to

22  the last question, how long have I lived

23  there -- lived here, about 15 years.  It

24  certainly wasn't 20, so about 15 years.
```

SA13

Christopher James Fabricant

```
 1   And, yes, I do live at 35 Rector Place
 2   with my family, including my wife Malika
 3   and my two boys, Nico and Thibaut.
 4         Q.    And Nico is short for
 5   Nicolas; is that correct?
 6         A.    For -- that's correct, yes.
 7         Q.    At any point in time since
 8   2015, has anyone lived at that address
 9   with you and your family other than your
10   wife and two children?
11         A.    No, no one else has lived
12   here.
13         Q.    You indicated that you've
14   given a deposition once before.  What was
15   the context of that deposition?
16         A.    There was a medical
17   malpractice claim against another
18   physician.  The patient who filed the
19   claim against the physician had seen me
20   after having had surgery with the other
21   physician and I performed surgery to help
22   her.
23               So the context was, I
24   reported my involvement in her case
```

SA14

Christopher James Fabricant

1  following the incident where she alleged

2  a physician had acted negligently.

3       Q.    And you were not a defendant

4  in that case?

5       A.    That's right.

6       Q.    Have you ever been a

7  defendant in a medical malpractice case?

8       A.    There have been -- I think I

9  have a -- an answer to that in the

10  Interrogatories.

11            There have been three cases

12  where I was named as a defendant.  One of

13  those cases occurred while I was -- or

14  the event occurred while I was a

15  physician in training on Long Island at

16  the State University of New York Stony

17  Brook Hospital.  I was dropped from that

18  case before it proceeded.  That was one

19  case.

20            Two cases were filed against

21  me early on after I began clinical

22  practice.  In both of those cases,

23  judgment was rendered in my favor before

24  trial.

SA15

Christopher James Fabricant

1    Q.    And you did not give a

2  deposition in any of those three cases?

3    A.    My best recollection is

4  that, no, I did not give a deposition in

5  any of those cases.

6    Q.    Where were those cases

7  filed?

8    A.    In New Jersey -- well, the

9  one was filed in New York when I was a

10 physician in training and shortly after

11 being named as a defendant along with, as

12 I recall, 10 or 15 other individuals,

13 many of the individuals named in the

14 initial complaint were dropped and I was

15 among those who were dropped.

16        The other two claims were

17 filed in New Jersey.  Where in New

18 Jersey, I don't -- I don't know.  I don't

19 have a recollection.

20        I can -- my attorney for the

21 cases in New Jersey was Richard Amdur who

22 practices in Eatontown or Ocean.  It's --

23 it's on Route 35, not far from my home.

24 He would have the details of the two

SA16

1   cases and he represented me as an

2   employed physician for Meridian Health.

3            Q.     How long ago was the

4   deposition you gave in the case where you

5   were not a defendant, but you were only a

6   subsequent treating surgeon?

7            A.     June of 2017 is when I gave

8   the deposition.

9            Q.     Did you have an attorney

10  representing you for that deposition?

11           A.     Richard Amdur.

12           Q.     Is that A-M-D-E-R, as it

13  sounds?

14           A.     No.  That's A-M-D-U-R.

15           Q.     Did you review any

16  documents, photographs, or video footage

17  to prepare for your testimony in this

18  case?

19           A.     I reviewed the -- you said

20  documents, video -- I reviewed -- the

21  answer is, yes, I did review items before

22  this -- this session today.

23           Q.     What did you review?

24           A.     I reviewed, though not --

SA17

1    though not in recent days, I have

2    reviewed the video and still photos of

3    the amusement park that were captured on

4    my camera or cameras and reviewed the

5    Interrogatories that -- or my answers to

6    the Interrogatories, and lastly reviewed

7    the medical record or at least items from

8    the medical record that I have in my

9    possession.

10         Q.    You indicated that you

11   reviewed a video, singular.  Did you

12   review only one video or did you review

13   all of the video footage that is in your

14   possession?

15         A.    I reviewed all of the video

16   from my HERO camera that was used to

17   record at the park.

18         Q.    What portion of your medical

19   record did you review?

20         A.    What I reviewed is what I

21   have in my possession and I have a folder

22   with those items here.  If you want me to

23   go through each page of the folder, I'll

24   be happy to do that for you.

SA18

Christopher James Fabricant

```
 1          Q.    No, we're not going to
 2    expend the time to do that; however,
 3    normally, when we would proceed with
 4    depositions, we would be in person.
 5          A.    Yes.
 6          Q.    So typically I would have
 7    you hand that across the table so that I
 8    could look at it.
 9          A.    Yes.
10              MS. EICHENBAUM:  That is
11          very time consuming and
12          inefficient on a Zoom deposition,
13          so I will make a request that you
14          delineate or somehow mark the
15          items that you reviewed to prepare
16          for your testimony --
17              THE WITNESS:  I have two --
18          I'm sorry, counselor.  Excuse me.
19          I have two binders.  One is a
20          green binder and the other is a
21          yellow binder.  The green binder
22          has the answers to the
23          Interrogatories (Indicating).  The
24          yellow binder has the medical
```

SA19

1    records (Indicating) from HSS and

2    from the emergency room at Jersey

3    Shore.

4         I added a few tabs giving

5    dates -- giving dates and

6    physicians.  So this tab says

7    Brian Halpern, May the 3rd, 2017,

8    just to allow me to efficiently go

9    to the appointment with Brian

10   Halpern on that date.

11        MS. EICHENBAUM:  So what I

12   was going to say was that we'll

13   ask that you delineate in some

14   fashion the items that you

15   reviewed and provide those to your

16   counsel so he can provide them to

17   us.

18        THE WITNESS:  Very good.

19        MS. EICHENBAUM:  If you --

20   if you reviewed everything in each

21   binder, then we'll ask that you

22   produce the contents of each

23   binder.

24        THE WITNESS:  Understood.

SA20

1   BY MS. EICHENBAUM:

2        Q.    Did you review anything

3   other than what is contained in those two

4   binders, the videos, and the still

5   photographs?

6        A.    I did not.

7        Q.    Did you have any discussion

8   with anyone other than your counsel to

9   prepare for your deposition?

10       A.    I did not.

11       Q.    Have you had any discussion

12  with your wife or your son Thibaut about

13  their depositions and the substance of

14  those depositions?

15       A.    No, I have not.

16       Q.    My understanding is that

17  you've been married since June of 2003;

18  is that correct?

19       A.    To be honest, counselor, I

20  don't remember the year.

21       Q.    Where were you married?

22       A.    I was married in a

23  courthouse in Lakewood, New Jersey for

24  the legal marriage and we traveled to the

SA21

Christopher James Fabricant

1    south of France for a ceremony.

2         Q.    Did the legal marriage at

3    the courthouse precede the ceremony?

4         A.    It did, yes.

5         Q.    Have you ever been separated

6    from your wife?

7         A.    I have not.

8         Q.    Have you and your wife ever

9    attended any marriage counseling or

10   family counseling?

11        A.    No, we have not.

12        Q.    Do you have any children

13   other than Nicolas and Thibaut?

14        A.    I do not.

15        Q.    How tall are you?

16        A.    6, 2 and -- and a fraction.

17        Q.    Has your height changed --

18        A.    That's 6 feet, 2 inches and

19   a fraction.

20        Q.    Has your height changed at

21   all since April 23rd of 2017?

22        A.    Shortly after April the

23   23rd, used a measuring device in my

24   office for work and my height was less

SA22

1    than 6 feet, 2 inches.

2         Q.    So have you grown taller

3    since shortly after April 23rd of 2017?

4         A.    No, but I did have surgery

5    to place bone graft between ruptured and

6    collapsed discs.

7         Q.    Is it your belief that that

8    has resulted in your height increasing?

9         A.    There's no doubt that it

10   did.

11        Q.    How tall were you on April

12   23rd of 2017?

13        A.    Before riding the roller

14   coaster, my height was probably between 6

15   feet, 2 inches and a quarter and 6 feet,

16   2 inches and a half.

17        Q.    How does that vary from 6

18   foot, 2 inches and a fraction?

19        A.    They're one and the same.

20        Q.    Okay.  I thought you just

21   went through and indicated that your

22   height has changed since April 23rd of

23   2017.

24        A.    Oh, yeah.  I understand,

SA23

1   counselor.  I don't know what my height

2   is today.  I haven't measured my height

3   any time in the recent past, so -- so --

4   so I guess I can't tell you exactly what

5   my height is today because I haven't

6   taken a height measurement in memory.

7          Q.    So the only thing you can

8   say about your height with certainty is

9   that shortly after April 23rd of 2017,

10  when you measured your own height, you

11  were somewhere between 6 foot, 2 1/4

12  inches and 6 foot, 2 1/2 inches; is that

13  correct?

14         A.    Yes, that's right.

15         Q.    What was your approximate

16  weight on April 23rd of 2017?

17         A.    190 pounds, approximately.

18         Q.    What is your approximate

19  weight today?

20         A.    I don't know.  It's perhaps

21  185, if I were going to make an estimated

22  guess.

23         Q.    Have you ever been convicted

24  of a crime?

SA24

Christopher James Fabricant

1    A.    No.

2    Q.    Have you ever pled guilty or

3 no contest to a crime?

4    A.    No.

5    Q.    Do you have a primary care

6 physician or family doctor?

7    A.    I have seen a primary care

8 physician in the past.

9    Q.    Who was that?

10    A.    Bela Bhuskute.

11    Q.    When is the last time you

12 saw Dr. Bhuskute?

13    A.    I don't recall.  Many years

14 ago.  Last time was probably in 2017.

15    Q.    Do you believe that you saw

16 Dr. Bhuskute in 2017 before April 23rd or

17 at some point after?

18    A.    Can't say.  I'd have to

19 review the medical record and I do not

20 have the medical record relating to my

21 last visit with Dr. Bhuskute.

22    Q.    Do you recall what that last

23 visit to Dr. Bhuskute was for?

24    A.    I do not.

SA25

Christopher James Fabricant

```
1          Q.    In your adult life, is there
2    any other -- excuse me -- primary care
3    physician that you have seen?
4          A.    I don't believe so.
5          Q.    Are you able to approximate
6    how many times you've seen Dr. Bhuskute?
7          A.    I'm going to backtrack to
8    the last question.  So in my adult life,
9    that's a long time, so if I'm in my mid
10   50's, that would be more than 30 years.
11              So I -- I don't have a
12   recollection of seeing a primary care
13   doctor, though I'm sure that my memory
14   could be refreshed perhaps if I did see
15   one many years ago.
16              What was the question,
17   counselor?
18         Q.    I don't believe there was
19   one pending.
20         A.    Okay.  Thank you.
21         Q.    Whether they are currently
22   filled or not, do you currently have any
23   prescriptions for medications?
24         A.    No.
```

SA26

Christopher James Fabricant

```
 1          Q.    When is the last time you
 2    filled any prescription?
 3          A.    I filled a prescription for
 4    prednisone in 2021.
 5          Q.    What was that for?
 6          A.    Prednisone?  It's an
 7    anti-inflammatory.  It was because I was
 8    having a flare of myelopathic symptoms.
 9          Q.    What month was that
10    prescription filled?
11          A.    I believe it was January.
12          Q.    Was that prescribed by Dr.
13    Todd Albert?
14          A.    That's correct.
15          Q.    Was that one course of
16    prednisone?
17          A.    Yes.
18          Q.    When did you complete that
19    course?
20          A.    I'd have to look at the
21    prescription to see how many days the
22    prescription lasted.
23          Q.    Do you have any recollection
24    whether it was a week, two weeks, a
```

SA27

Christopher James Fabricant

1 month, more?

2        A.    It would -- it would have

3 been on the order of a week.

4        Q.    Prior to filling that

5 prescription for prednisone, when is the

6 last time you had filled any

7 prescription?

8        A.    I don't recall.

9        Q.    Can you recall if you filled

10 any prescription -- any other

11 prescriptions in this calendar year,

12 2021?

13        A.    I don't recall any.

14        Q.    Do you recall filling any

15 prescriptions in 2020?

16        A.    I do not recall.

17        Q.    Since April 23rd of 2017,

18 have you had any other prescriptions

19 other than the one for prednisone in

20 2021?

21        A.    Can you say that again,

22 please, counselor?

23        Q.    At any time since April 23rd

24 of 2017, have you had any prescriptions

SA28

1  other than that one for prednisone in

2  2021?

3      A.    I did have a prescription

4  for a steroid that was or that was like

5  prednisone in the weeks after April the

6  23rd, 2017, when my symptoms were

7  progressing.

8      Q.    Any others?

9      A.    Not that I recall.

10     Q.    So at no point in time since

11 April 23rd of 2017 have you been

12 prescribed any NSAID or muscle relaxer or

13 pain medication; is that correct?

14     A.    After my surgeries, I

15 certainly was prescribed pain medications

16 during the period of recovery.  After my

17 first surgery, I, too, if memory serves,

18 was prescribed a muscle relaxant.

19     Q.    Did you fill each of those

20 prescriptions only once?

21     A.    Yes, that's the best of my

22 -- that's the best -- my best

23 recollection, that just once.

24     Q.    What pharmacy did you use to

SA29

Christopher James Fabricant

```
1   fill the prednisone prescription in
2   January of this year?
3           A.    I can make an educated
4   guess.  There is a Rite Aid on Water
5   Street that the family uses, so I suspect
6   that it was the Rite Aid on Water Street
7   here in Red Bank, but I -- I don't know
8   for sure.
9           Q.    Did you personally pick up
10  the prescription or did someone pick it
11  up for you?
12          A.    I don't recall.
13          Q.    What pharmacy did you use to
14  fill the prescription for the steroid
15  that may or may not have been prednisone
16  that you were given in the weeks after
17  April 23rd of 2017?
18          A.    It likely was the same
19  pharmacy.
20          Q.    And the same question with
21  regard to the pain medication and/or
22  muscle relaxer that you indicated you
23  were given after each of your two
24  surgeries, where were those filled?
```

SA30

Christopher James Fabricant

1       A.    Likely at the same pharmacy,

2  the Rite Aid on Water Street.

3       Q.    Is there any other pharmacy,

4  whether brick and mortar or online, that

5  you have used at any time since 2015 to

6  fill any prescription?

7       A.    I can't say.  I don't recall

8  any.

9       Q.    Have you taken any other

10  prescription medications since 2015 that

11  you haven't told me about?

12       A.    Since -- since what year?

13       Q.    2015.

14       A.    The only prescription that

15  comes to mind is Viagra.

16       Q.    When is the last time you

17  filled that prescription?

18       A.    I don't recall.  Not in the

19  recent past.

20       Q.    What is the recent past to

21  you?

22            MR. MEYERS:  Object to the

23       form.

24            But you can answer it if you

SA31

Christopher James Fabricant

```
 1           can answer.
 2                THE WITNESS:  Yeah, not --
 3           not within the past six months,
 4           let's say.
 5    BY MS. EICHENBAUM:
 6           Q.    What pharmacy do you use for
 7    your Viagra prescription?
 8           A.    I -- I would guess that it
 9    would be the same, Rite Aid.
10           Q.    I certainly don't want you
11    to guess, but do you pick up your own
12    prescriptions?
13           A.    Sometimes I do and sometimes
14    my wife would pick them up.
15           Q.    Who prescribes you Viagra?
16           A.    I prescribe that to myself.
17           Q.    Do you prescribe yourself
18    any other medications?
19           A.    I certainly would or do
20    depending on circumstances.
21           Q.    What other prescriptions
22    have you prescribed for yourself?
23           A.    I don't recall.
24           Q.    For what conditions have you
```

SA32

Christopher James Fabricant

1  prescribed yourself medications?

2        A.    I -- I can't recall,

3  counselor, but I would prescribe myself a

4  medication for -- for pharyngitis or for

5  otitis media or for routine matters that

6  could be managed with prescription

7  medication.

8        Q.    Have you ever prescribed

9  yourself any medications other than

10  antibiotics and your Viagra?

11        A.    Not that I recall, though I

12  believe this record is available to you,

13  counselor.  Do you have -- you could

14  refresh my memory.

15        Q.    The point of my questions is

16  to find out your recollection, so the

17  records will speak for themselves.

18        A.    Very good.

19        Q.    And we're not going to spend

20  the time trying to go through the paper

21  records.  It's too time consuming in a

22  deposition.

23        A.    Thank you.

24        Q.    Were you taking any

SA33

Christopher James Fabricant

```
 1   prescription medications on April 23rd,
 2   2017?
 3        A.    No.
 4        Q.    Were you taking any
 5   over-the-counter medication that day?
 6        A.    No.
 7        Q.    Had you taken any controlled
 8   substance on April 23rd, 2017?
 9        A.    Certainly not.
10        Q.    Do you drink alcohol?
11        A.    Rarely.
12        Q.    Do you use any other
13   recreational products?
14        A.    Can you be more specific?
15        Q.    Sure.  Marijuana, for
16   instance.
17        A.    No.
18        Q.    Nicotine.
19        A.    No.
20        Q.    Have you ever?
21        A.    I smoked a cigarette in high
22   school.  I never smoked marijuana.
23        Q.    I see that you wear glasses.
24   For what period of time have you worn
```

SA34

Christopher James Fabricant

```
1  glasses?
2        A.    I -- I acquired my first
3  pair of glasses in high school.
4        Q.    Do you require corrective
5  lenses for close up or distance?
6        A.    These are bifocals, so I've
7  worn bifocals for some years.  So they
8  correct both distance and up-close
9  viewing.
10       Q.    Did you have bifocals before
11 April 23rd of 2017?
12       A.    Yes.
13       Q.    Were you wearing them on
14 that day?
15       A.    Yes.
16       Q.    Do you also have contact
17 lenses?
18       A.    I do not.
19       Q.    Have you ever?
20       A.    In college, I had contacts.
21       Q.    When you rode Kingda Ka, did
22 you leave your glasses on?
23       A.    Yes, to the best of my
24 recollection.  I would -- I would not
```

SA35

1  have had any reason to take off my

2  glasses, I don't believe.

3          Q.     Do you have any diagnosed

4  vision problems other than needing

5  glasses to see clearly?

6          A.     No.  Do you have an example

7  of another condition?

8          Q.     Cataracts.

9          A.     Oh, no.  So last -- no, I

10  have an astigmatism and I have a -- and I

11  have nearsightedness and farsightedness.

12          Q.     Do you have any difficulty

13  seeing or distinguishing colors?

14          A.     No, I do not.

15          Q.     What is your educational

16  background?

17          A.     I attended high school and

18  my primary education was here in New

19  Jersey, high school was Saint Rose, a

20  Catholic high school in Belmar, New

21  Jersey.  I then went to college at

22  Georgetown.  I then went to medical

23  school at Georgetown.

24                 I then completed residency

SA36

1  training in obstetrics and gynecology

2  before fellowship training in what is

3  commonly referred to as urogynecology.

4       Q.    What year did you graduate

5  high school?

6       A.    I'm not sure I remember.

7       Q.    What year did you graduate

8  medical school?

9       A.    Medical school, I believe,

10 was -- yeah, so I think medical school

11 was '94, 1994.

12      Q.    Are you currently employed?

13      A.    I am, yes.

14      Q.    By whom?

15      A.    Hackensack Meridian Health.

16      Q.    At what location?

17      A.    I'm presently at Hope Tower

18 and it's a new office building next door

19 to the hospital.

20      Q.    Next to which hospital?

21      A.    Jersey Shore University

22 Medical Center.

23      Q.    Have you been working at

24 Jersey Shore -- let's go off the record,

SA37

1   please.

2              THE VIDEO TECHNICIAN:

3        Counselor, do you still want to go

4        off the record?  I noticed the

5        doctor is back now.

6              MS. EICHENBAUM:  No, that's

7        fine.

8              THE VIDEO TECHNICIAN:  Thank

9        you.

10             MS. EICHENBAUM:  Sir, your

11       video just cut out.  Do you know

12       why?

13             THE WITNESS:  There was a

14       calling coming in on my cellphone

15       and I declined to answer the call

16       and then the video came back.

17  BY MS. EICHENBAUM:

18       Q.    Have you been employed at

19  the Jersey Shore University Medical

20  Center since 2010?

21       A.    Yes, since 2002, I believe.

22       Q.    Do you hold any positions

23  with Jersey Shore University Medical

24  Center?

SA38

Christopher James Fabricant

```
 1          A.     "Positions."  I've been a
 2   faculty member at Jersey Shore.  I've
 3   been an assistant professor at Robert
 4   Wood Johnson and an assistant professor
 5   at Seton Hall Medical Schools.
 6          Q.     Do you serve on any boards
 7   or committees for either Jersey Shore or
 8   Hackensack Meridian Health?
 9          A.     I do not.
10          Q.     Have you ever?
11          A.     I've been on a research
12   committee at Jersey Shore.
13          Q.     When was that?
14          A.     Beg your pardon?
15          Q.     When was that?
16          A.     Oh, probably a -- probably
17   2016 or '17.
18          Q.     What was that committee?
19          A.     Research committee for the
20   Department of Obstetrics and Gynecology.
21          Q.     Was there a particular
22   research project that you served on that
23   committee for?
24          A.     There -- I was a participant
```

SA39

1   in several industry-sponsored research

2   projects.  The chairman at the time was

3   Mark Martens, who put together a research

4   committee, but the committee did not have

5   a long life, so the committee did not --

6   did not persist for an extended interval.

7        Q.    Prior to April 23rd of 2017,

8   had you been diagnosed with any health

9   conditions?

10        A.    Yes.

11        Q.    What had you been diagnosed

12   with?

13        A.    I've been diagnosed with

14   ruptured intervertebral discs of the

15   cervical spine --

16        Q.    Let me stop you.  I don't

17   want to interrupt, but the question was

18   before April 23rd of 2017.

19        A.    Sorry, counselor.  Before

20   2017, no, I wasn't diagnosed with any

21   medical problems.

22        Q.    So just to be clear, no

23   issues with blood pressure, cholesterol,

24   anything along those lines?

SA40

Christopher James Fabricant

```
 1          A.    That's correct.
 2          Q.    Are there any genetic
 3  dispositions that run in your family that
 4  you're aware of?
 5          A.    No.
 6          Q.    Prior to April 23rd of 2017,
 7  had you been involved in any accidents of
 8  any kind in your adult life?
 9          A.    I was in a motor vehicle
10  accident.  I think we -- we included that
11  in the Answers to the Interrogatories.
12  So I struck a deer in my -- in my
13  Lincoln.
14               In my teen or early 20
15  years, I was involved in several minor
16  automobile accidents.
17          Q.    Since you specifically
18  mentioned -- you indicated you hit a deer
19  in your Lincoln, your Lincoln what?
20               Sir, I'm going to ask -- let
21  me stop you for a second.  I'm actually
22  going to ask that you answer from your
23  recollection.
24          A.    Okay.
```

SA41

Christopher James Fabricant

```
 1         Q.   And if you need to reference
 2    documentation, we can talk about that,
 3    but the interest is in finding out what
 4    you recall.
 5         A.   Yeah, the -- the Lincoln was
 6    a Lincoln Crown Victoria and the accident
 7    occurred on the Garden State Parkway when
 8    I was traveling north, just prior to Exit
 9    109.  A deer ran in front of the car.  I
10    struck the deer and the airbag was
11    deployed and I called the police, who
12    arrived at the scene and called a tow
13    truck to take the car and me home.
14         Q.   What year was that motor
15    vehicle accident?
16         A.   I don't recall.
17         Q.   Do you recall if it was
18    within a year or two before 2017?
19         A.   I don't recall.
20         Q.   Did you seek any medical
21    attention of any kind following that
22    accident?
23         A.   No, I did not.
24         Q.   Did you prescribe yourself
```

SA42

Christopher James Fabricant

1 any medications after that accident?

2           A.    No, I did not -- well, no

3 medications relating to the accident,

4 let's say.

5           Q.    Do you have a recollection

6 of something you did prescribe yourself

7 after that accident?

8           A.    No.  I was returning to my

9 previous answer where I said I don't have

10 a specific recollection of prescribing

11 medications for myself, so -- so after

12 the accident where I struck the deer, I

13 had no problems and had no need to

14 prescribe myself any -- any medications.

15          Q.    You mentioned several other

16 accidents in your late teens or early

17 20's.  Did you seek medical attention

18 following any of those accidents?

19          A.    No, I did not.

20          Q.    And I'll be frank, I forget

21 exactly when airbags became customary, so

22 I'll ask the question:  Did any vehicle

23 involved in any of those accidents back

24 in your teens or early 20's involve

SA43

1  airbag deployment?

2        A.    No.  And -- and the

3  accidents were in the line of

4  fender-benders more than -- more than

5  major accidents.

6        Q.    Did you have health

7  insurance in April of 2017?

8        A.    I did, yes.

9        Q.    Was that through Meridian

10 Health, your employer?

11       A.    Yes, since 2002, my health

12 insurance has been through my employer.

13       Q.    That's QualCare?

14       A.    In -- in 2017, I believe it

15 was QualCare.

16       Q.    And in 2019 --

17       A.    Well, actually, let me --

18 let me -- let me add some -- some detail

19 there, counselor.  So QualCare

20 administered -- administered the

21 healthcare plan, but I believe Meridian

22 at the time was self-insured.

23       Q.    And in 2019, am I correct

24 that your insurance changed to Horizon

SA44

1  Blue Cross/Blue Shield?

2       A.    Well, the administrator

3  changed.  The primary insurer, I believe,

4  was still the employer.

5       Q.    Is Meridian still your

6  primary provider of insurance at present?

7       A.    Meridian is now known as

8  Hackensack Meridian and, yes, it is.

9       Q.    And is that insurance still

10 administered by Horizon Blue Cross/Blue

11 Shield?

12      A.    Yes.

13      Q.    Could you list for me all of

14 the medical providers that you have seen

15 since April 23rd, 2017, for any reason?

16      A.    I may have seen Bela

17 Bhuskute.  I did see Brian Halpern.  I

18 did see Todd Albert.  I did see the

19 physician named Buchalter or Buchalter.

20 I did see more recently -- more recently

21 a physician named Feinberg.  I did see

22 more recently a physician named Osei and

23 have an upcoming appointment, tomorrow,

24 as a matter of fact, with a physician

SA45

Christopher James Fabricant

```
 1   named Manning.

 2            Also saw a neurologist named

 3   Fitzpatrick, saw an emergency room

 4   physician named Patel, another

 5   neurologist named Sultan.

 6        Q.    Are there any others?

 7        A.    None that I recall.

 8        Q.    Dr. Sultan, what is his or

 9   her first name?

10        A.    Richard.

11        Q.    Is he part of the HSS

12   system?

13        A.    No.

14        Q.     Is he part of the Meridian

15   Health or Hackensack Meridian Health

16   system?

17        A.     I don't know if he's an

18   employed physician, but he certainly

19   practices within the Hackensack Meridian

20   Health network.

21        Q.    Brian Halpern is at HSS;

22   correct?

23        A.    That's correct.

24        Q.    As is Todd Albert?
```

SA46

Christopher James Fabricant

```
 1          A.     Yes.
 2          Q.     Did you see Dr. Sultan at
 3   Jersey Shore?
 4          A.     I saw him in the emergency
 5   room at Jersey Shore and then later I saw
 6   him in his -- in his office.
 7          Q.     Is his office at Jersey
 8   Shore, Hope Tower?
 9          A.     No, it's -- it's on Route 33
10   across the street from Hope Tower.  Or at
11   least it was then.  I don't know where it
12   is now.
13          Q.     Dr. Patel, you indicated you
14   saw at the ER.  That's Jersey Shore?
15          A.     That's right, yes.
16          Q.     What is his first name or
17   her?
18          A.     Raj, R-A-J, I believe.
19          Q.     Did you know Dr. Patel
20   before you saw him?
21          A.     I did.  I had him as a -- as
22   part of my activities as a physician
23   working at Jersey Shore, I did have
24   occasion to go to the emergency room
```

SA47

1  where I came to know Dr. Patel.

2       Q.    Did Dr. -- strike that.

3             Was Dr. Patel, the emergency

4  room physician, on duty when you

5  presented to the ER or did you request to

6  see him when you went?

7       A.    He was the physician on duty

8  who happened to see me that day.

9       Q.    And Dr. Sultan, you

10  indicated you saw in the ER at Jersey

11  Shore.  Did you know Dr. Sultan before

12  you treated with him?

13       A.    I did not.

14       Q.    Did he just happen to be an

15  emergency room physician at Jersey Shore

16  when you presented for attention?

17       A.    He's not an emergency room

18  physician.  He was a -- he's a

19  neurologist and he happened to be on call

20  that day.

21       Q.    Who called him in?

22       A.    Raj Patel.

23       Q.    And Dr. Fitzpatrick, what is

24  Dr. Fitzpatrick's first name?

SA48

1      A.    I don't recall Dr.

2  Fitzpatrick's first name.  Dr.

3  Fitzpatrick is a neurologist who

4  practices at the same location as Dr.

5  Sultan, so when Raj Patel in the

6  emergency room reached out for a

7  neurologist, I suspect I suggested to him

8  that he reach out to Dr. Fitzpatrick, who

9  I had seen recently at the time of my

10  visit to the emergency room.

11           And if Dr. Fitzpatrick was

12  not available, Dr. Sultan may have been

13  the covering physician, so that's

14  probably the reason that Dr. Sultan saw

15  me on that day.

16      Q.    For what reason had you

17  recently seen Dr. Fitzpatrick?

18      A.    I saw Dr. Fitzpatrick

19  because of the problems that I was having

20  after the roller coaster injury.

21      Q.    So on your first visit to

22  Jersey Shore's ER, was Dr. Fitzpatrick

23  called in?

24      A.    I -- my recollection is that

SA49

Christopher James Fabricant

1  I put a call in to Dr. Fitzpatrick

2  because I was having trouble and that I

3  didn't get a call back, went to the

4  emergency room, related my problems to

5  Dr. Patel, said that I had a relationship

6  with Dr. Fitzpatrick, and Dr. Patel, I

7  believe, would have reached out to Dr.

8  Patel -- or to Dr. Fitzpatrick and the

9  service may have put the call to the

10  covering physician on that date, which I

11  suspect was Dr. Sultan.

12          Q.    In your lifetime, how many

13  times have you seen Dr. Fitzpatrick?

14          A.    I believe I saw him once.

15          Q.    Did you have a relationship

16  with Dr. Fitzpatrick before you saw him

17  that once?

18          A.    No, I did not.

19          Q.    Well, I thought you just

20  indicated that you had a prior

21  relationship with Dr. Fitzpatrick so

22  asked that they reach out to him.

23          A.    At the time of my emergency

24  room visit, at the time of my visit, the

SA50

1  one and only neurologist that I had seen

2  in my lifetime was -- I think it's John

3  Fitzpatrick -- and I had seen him very

4  recently or a very short time interval

5  before my visit to the emergency room.

6              So when I went to the

7  emergency room, my neurologist was John

8  Fitzpatrick and he was my neurologist

9  based upon one visit with him, probably

10  the week before, if not just days before.

11              I could -- and I could piece

12  it -- I could piece it together probably.

13  If I was -- it was -- it was within about

14  a week of my visit to the emergency room

15  that I would have seen Fitzpatrick.  I

16  probably saw Fitzpatrick the week prior.

17       Q.    Before going to HSS, how

18  many times had you gone to the emergency

19  room?

20       A.    I hadn't gone to the

21  emergency room.

22       Q.    How many times had you seen

23  Dr. Fitzpatrick before you were first

24  seen at HSS?

SA51

1    A.    I hadn't seen Dr.

2  Fitzpatrick.

3    Q.    Had you seen any physician

4  before you were first seen at HSS?

5    A.    No.

6    Q.    Did you self-refer yourself

7  to HSS?

8    A.    Yes.

9    Q.    Have your visits to the

10  emergency room at Jersey Shore been only

11  since your first surgery?

12    A.    You referred to visits,

13  plural.  I recall one visit to the

14  emergency room at Jersey Shore occurring

15  on or about May the 13th, 2017.

16    Q.    And you had already been

17  seen at Hospital for Special Surgery at

18  that time?

19    A.    Yes.

20    Q.    How many times?

21    A.    Twice, I believe.  I saw

22  Brian Halpern and then I saw Todd Albert.

23    Q.    We'll come back to this in

24  more detail later.

SA52

Christopher James Fabricant

1     Dr. Buchalter, what is his

2  or her first name?

3     A.    Shall I refer to the notes

4  that I have here, counselor?

5     Q.    Only if you need to.  While

6  you're looking, where is Dr. Buchalter

7  affiliated with, if anywhere?

8     A.    HSS.

9     Q.    What type of physician is he

10  or she?

11     A.    An internal medicine

12  physician.  I believe he did the

13  preoperative -- yeah, it's Buchalter,

14  B-U-C-H-A-L-T-E-R, and the appointment

15  was May the 21st, 2019.  It was a

16  preoperative clearance, I believe, before

17  my second surgery.

18     Q.    And Dr. Feinberg, what is

19  his or her first name?

20     While you're looking, is Dr.

21  Feinberg also with HSS?

22     A.    That's correct.  It's Joseph

23  Feinberg and -- did you have a question

24  about Dr. Feinberg besides his first

SA53

Christopher James Fabricant

 1  name?

 2          Q.    What type of physician is

 3  he?

 4          A.    He is a -- he's the

 5  physician who performed EMG studies and

 6  he is -- the exact name of his specialty,

 7  I don't know.

 8          Q.    What is Dr. Osei's

 9  specialty?

10          A.    He's a hand specialist, hand

11  surgeon, orthopedic doctor.

12          Q.    You said you have seen Dr.

13  Osei or you have an appointment to see

14  him?

15          A.    I have seen Dr. Osei.

16          Q.    What is Dr. Osei's first

17  name?

18          A.    Daniel.

19          Q.    Where is he located?

20          A.    HSS.

21          Q.    And Dr. Manning, what is his

22  or her first name?

23          A.    I believe the first name is

24  Erin and it's a -- it's a -- it's a she.

SA54

Christopher James Fabricant

1  Erin is a female doctor.

2      Q.    Where is she located?

3      A.    She's at HSS and she is a

4  neurologist.

5      Q.    What is Dr. Halpern's

6  specialty?

7      A.    He's a primary sports

8  medicine physician.

9      Q.    Are there any medical

10  providers of any kind that you currently

11  have an appointment to see, but have not

12  yet seen?

13      A.    Erin Manning is one, and a

14  second appointment that I have upcoming

15  is for ultrasound imaging of my upper

16  extremity and the doctor's name escapes

17  me.

18      Q.    You indicated that your

19  appointment with Dr. Manning is tomorrow?

20      A.    Correct.

21      Q.    When was that appointment

22  made?

23      A.    It was made after my most

24  recent appointment with Brian Halpern.

SA55

Christopher James Fabricant

1    Q.    Which was when?

2    A.    I don't recall exactly.

3    Q.    Was it this month?  Was it

4  -- or March?

5    A.    Yeah, within the -- within

6  the past couple of months.

7    Q.    Have you seen Dr. Halpern

8  since you were prescribed prednisone in

9  January?

10   A.    Yes.

11   Q.    Did you see Dr. Halpern in

12  March?

13   A.    As I said, I don't recall

14  when my first recent appointment with

15  Brian Halpern was.  I saw Brian Halpern

16  once before I saw Todd Albert and before

17  I saw Joseph Feinberg and -- and before I

18  saw Daniel Osei.

19         So Brian Halpern suggested

20  to me that I see these other physicians.

21  After having done so, I returned to Brian

22  Halpern.  Whether it was February or

23  March, I don't recall.

24   Q.    Did someone refer you to Dr.

SA56

Christopher James Fabricant

```
 1   Manning?
 2        A.    Dr. Halpern at the most
 3   recent visit.
 4        Q.    And the appointment for the
 5   ultrasound, you indicated you can't
 6   recall the name of the provider.  Where
 7   is that appointment?
 8        A.    HSS.
 9        Q.    When is that appointment?
10        A.    End of April, so end of this
11   month.
12        Q.    Are you in your work office
13   or at home or somewhere else?
14        A.    I'm at home.
15        Q.    Do you have any
16   documentation at home that would provide
17   the name of that physician that you're
18   seeing in -- at the end of this month?
19        A.    Yeah, I believe I have the
20   referral form upstairs.
21             MS. EICHENBAUM:  I'm not
22        going to take a break now, but I'm
23        sure we will be sometime shortly,
24        so I'll ask that on that break you
```

SA57

1          take a look so you can provide

2          that physician's name, please.

3               THE WITNESS:  Yes.

4    BY MS. EICHENBAUM:

5          Q.    And you indicated that that

6    is an ultrasound of your upper extremity?

7          A.    Yes.

8          Q.    Which one?

9          A.    Right side.

10         Q.    Were you referred by someone

11   for that ultrasound?

12         A.    Yes, Dr. Osei, Daniel Osei.

13         Q.    Are there any other

14   appointments that you currently have made

15   that you haven't told me about?

16         A.    No.

17         Q.    Are there any other medical

18   providers that you are considering seeing

19   but have not yet made an appointment?

20         A.    No.  At my last --

21         Q.    Have you had any --

22         A.    Sorry -- sorry, counselor.

23   At my last visit with Brian Halpern, he

24   suggested an appointment not only with a

SA58

1  neurologist, but also suggested that I

2  consider seeing a physical therapy

3  physician, but -- but have not -- have

4  not scheduled an appointment with a

5  physical therapy physician and I don't

6  have any immediate plan to do so.

7       Q.    Did have any medical

8  provider suggest to you trying physical

9  therapy at any point in time before when

10  Dr. Halpern did as you've just indicated?

11       A.    I don't believe so.

12       Q.    Have you had any imaging

13  studies done of any part of your body --

14       A.    Or -- or counselor --

15  counselor, further consideration, so --

16  so -- regarding your last question --

17  when I first saw Brian Halpern back in

18  2017, he may have -- or maybe at another

19  time -- Brian Halpern may have suggested

20  physical therapy to me prior to this most

21  recent visit when he -- when he mentioned

22  it as an option.

23       Q.    Is there a reason that you

24  have not tried physical therapy?

SA59

Christopher James Fabricant

 1          A.     Presently, I'm waiting to

 2   meet with a neurologist to have her weigh

 3   in on my present state of affairs before

 4   I would move forward with consideration

 5   of seeing a physical therapist.

 6          Q.     And you just indicated that

 7   Dr. Halpern may have recommended physical

 8   therapy at some prior time --

 9          A.     I think recommend -- I think

10   "recommended" may be too strong a word.

11   When options are offered to a patient,

12   sometimes options are offered without the

13   option being offered as a recommendation

14   or something that the physician thinks

15   should be done, but rather is offered as

16   an option that may be considered, but

17   alternatively may not be considered.

18               So to this point, I don't

19   believe that any physician has told me

20   that you should pursue physical therapy,

21   but Brian Halpern has told me that I may

22   consider physical therapy.

23          Q.     And when Dr. Halpern

24   indicated to you that you may consider

SA60

1  physical therapy, for what reason did you

2  not pursue that avenue?

3      A.    At the same -- at the same

4  encounter that Dr. Halpern suggested that

5  I may consider physical therapy, he

6  suggested that a visit with a neurologist

7  may be helpful, so I'm trying to follow

8  what in my mind is a logical sequence and

9  a step-wise approach to my condition and

10  the next step would be to see the

11  neurologist for evaluation and

12  understanding before moving forward with

13  management.

14      Q.    Did any physician discuss

15  with you the option of physical therapy

16  at any time before your first surgery?

17      A.    As I mentioned a moment ago,

18  at my first visit with Brian Halpern, a

19  little more than a week after the --

20  excuse me -- the injury, Brian Halpern

21  may have mentioned physical therapy as

22  something that may be pursued.

23      Q.    And for what reason did you

24  opt not to pursue that option at that

SA61

1   time?

2          A.    My circumstance was so

3   rapidly deteriorating that physical

4   therapy was not a viable option.

5          Q.    Is that what Dr. Halpern

6   told you?

7          A.    No, my situation became

8   rapidly deteriorating after I visited

9   with Dr. Halpern in his office at HSS.

10         Q.    So did you intend to pursue

11  physical therapy when that was discussed

12  with Dr. Halpern, but ruled it out

13  subsequently?

14         A.    Did I intend?  I think I

15  intended to digest my new diagnosis of

16  three damaged discs in the cervical spine

17  before deciding how best to move forward.

18         Q.    Did you ever have a

19  discussion with Dr. Halpern after that

20  first visit and before your first surgery

21  about whether or not physical therapy was

22  still a viable option before your first

23  surgery?

24         A.    I don't believe there was

SA62

1   any conversation to that effect.  The

2   events dictated the course and the course

3   was not physical therapy.

4        Q.   At any point in time between

5   your first and second surgeries, did any

6   physician discuss with you physical

7   therapy as an option?

8        A.   I don't -- I don't believe

9   so.

10       Q.   Did any physician recommend

11  or discuss with you the option of

12  physical therapy following either of your

13  surgeries?

14       A.   I believe I just mentioned

15  that Brian Halpern did.

16       Q.   My question was perhaps

17  unclear.  I'm referring to a pretty

18  standard course of physical therapy

19  following, within a reasonable timeframe,

20  the immediate recovery from a surgery.

21       A.   Okay.  So -- so this

22  question then would -- would be one that

23  would be within the purview of Todd

24  Albert and Todd Albert did not recommend

SA63

Christopher James Fabricant

1  physical therapy.

2         So -- so your -- so your

3  assertion, counselor, that physical

4  therapy is standard after surgery, is

5  that your assertion?

6      Q.   Sir, I'm not the deponent

7  here.  So --

8      A.   Well, I don't -- I don't --

9  if that's your question that -- that did

10 you do the standard physical therapy

11 after surgery, I don't believe that

12 physical therapy is standard after a

13 surgery as I have had that surgery.

14     Q.   Have you had any imaging

15 studies done anywhere other than Jersey

16 Shore University Medical Center or HSS

17 since 2015?

18     A.   No.

19         MS. EICHENBAUM:  Counsel, I

20     want to just take five minutes if

21     you don't mind.

22         MR. MEYERS:  Not at all.

23         MS. EICHENBAUM:  Come back

24     at 11:35, just so it's an even

SA64

Christopher James Fabricant

1    number.  It's seven minutes.

2    Thank you.

3              THE WITNESS:  Thank you.

4              THE VIDEO TECHNICIAN:  The

5    time is 11:27 a.m.  We're going

6    off the record.

7              (A recess was taken from

8    11:27 a.m. to 11:36 a.m.)

9              THE VIDEO TECHNICIAN:  The

10   time is 11:36 a.m.  We are back on

11   the record.

12   BY MS. EICHENBAUM:

13       Q.    Sir, I assume you remember

14   your visit to Six Flags Great Adventure

15   on April 23rd, 2017?

16       A.    That's right.

17             Before we move on,

18   counselor, you did ask for the name of

19   the physician who later in the month will

20   perform the ultrasound study.  So the

21   physician's name is Nwawka, spelled

22   N-W-A-W-K-A.  I don't know the first

23   name.

24       Q.    You indicated that physician

SA65

Christopher James Fabricant

¹ is at HSS; correct?

²     A.   That's right.  It's a

³ radiologist at HSS specializing in

⁴ ultrasound.

⁵     Q.   What were you wearing at Six

⁶ Flags on April 23rd, 2017?

⁷     A.   I don't recall.  I had a hat

⁸ on.  I had my glasses on.  I could guess,

⁹ but I really don't recall.

¹⁰     Q.   Do you recall what you were

¹¹ wearing for footwear?

¹²     A.   I would be surprised if I

¹³ was not wearing sneakers.  I usually am

¹⁴ wearing sneakers when I'm dressed

¹⁵ casually.

¹⁶     Q.   What time did you get to the

¹⁷ park that day?

¹⁸     A.   Probably -- probably around

¹⁹ midday or early afternoon.

²⁰     Q.   My understanding is that you

²¹ were with your wife, your two sons and

²² your sons' two friends, Audrey and Sidney

²³ Yan; is that correct?

²⁴     A.   That's correct.

SA66

Christopher James Fabricant

```
 1          Q.    Had you ever been to Great
 2    Adventure before?
 3          A.    Yes.
 4          Q.    How many times?
 5          A.    I've lived my life in New
 6    Jersey, so during my childhood or
 7    adolescent years, we did have occasion to
 8    go to the amusement park.
 9                But in general, I've been an
10    infrequent guest at the park.
11          Q.    Had you been to Great
12    Adventure in your adult lifetime at any
13    time before April 23rd of 2017?
14          A.    I may have been.
15          Q.    Do you recall one way or the
16    other?
17          A.    So my adult life, after the
18    age of 18, did I ever go to Great
19    Adventure?  I don't recall any occasions,
20    but I wouldn't be surprised if I -- if I
21    had gone to Great Adventure.
22          Q.    Was April 23rd, 2017 your
23    first visit to Great Adventure with your
24    two sons?
```

SA67

1          A.    I don't believe so.  I

2   recall -- I recall being at the park when

3   my boys were very small.  My recollection

4   is that my boys, when they were quite

5   young, enjoyed the portion of the park

6   devoted to young children and they

7   enjoyed it because there were characters

8   from Looney Tunes or one of these

9   cartoons that were present at the park

10  that they could interact with.

11         Q.    So is my interpretation of

12  your answer correct then that you recall

13  being at Great Adventure one time with

14  your sons before April 23rd, 2017 and it

15  was when they were very small?

16         A.    Yes, counselor.

17         Q.    Had you ever ridden Kingda

18  Ka at any time before April 23rd, 2017?

19         A.    Certainly not, no.

20         Q.    On any of your prior visits

21  to Great Adventure, had you had any

22  problems or complaints?

23         A.    Could you be more specific?

24         Q.    Not really.  My question is

SA68

1  whether --

2       A.    Did I have -- did I have any

3  complaints relating to the park?

4       Q.    Yes.

5       A.    I don't think I would call

6  -- no, not to the park.

7       Q.    On any prior visits to Great

8  Adventure prior to April 23rd, 2017, did

9  you have any concerns about safety?

10      A.    No, though when I was a

11 child or adolescent, I did take a roller

12 coaster at the park named Lightnin' Loops

13 and the coaster did have a malfunction.

14      Q.    Approximately what year was

15 that?

16      A.    If 40 years ago.

17      Q.    Do you know if that ride is

18 still in the park?

19      A.    I believe it is.

20      Q.    What was the malfunction, as

21 you've called it?

22      A.    The loop -- Lightnin' Loops,

23 it makes a -- it makes a somersault, so

24 the -- so the coaster makes a loop that

SA69

Christopher James Fabricant

1   inverts the passengers and the

2   malfunction was, the force of the launch

3   was not sufficient to allow the coaster

4   to -- to make it all the way over the

5   loop, so it started upward, but then

6   didn't have enough momentum to carry it

7   over the top, so it teetered back and

8   forth and came to rest at a position near

9   the ground where the passengers were

10  escorted from the car -- from the -- from

11  the infield or from the field where the

12  -- where the low point of the coaster was

13  present.

14        Q.    Were you injured at all in

15  that ride?

16        A.    No, I was not.

17        Q.    Have you ridden Kingda Ka at

18  any time since April 23rd of 2017?

19        A.    No, counselor.

20        Q.    On your one prior visit with

21  your boys that you can recall, did you

22  ride any coasters?

23        A.    No, counselor.

24        Q.    On April 23rd, 2017 itself,

SA70

Christopher James Fabricant

1  did you ride any coasters other than

2  Kingda Ka?

3         A.    No.

4         Q.    Is it fair to say then that

5  in the last 15 years -- strike that.  How

6  old is Thibaut?

7         A.    Thibaut is --

8         Q.    16 1/2 --

9         A.    -- 16 1/2?  Does that sound

10 right?  16 1/2.  And Nico is about to be

11 15.

12        Q.    So I'll stick with the

13 timeframe I was.  In the last 15 years,

14 you've been to Great Adventure twice,

15 including April 23rd, 2017, up until that

16 date -- up until that date?

17        A.    Can you say it -- can you

18 ask the question again?

19        Q.    From 2002 to 2017, April

20 23rd, you were at Great Adventure twice;

21 is that correct?

22        A.    Twice that I recall.

23        Q.    And the only coaster in that

24 approximate 15-year timeframe that you

SA71

```
1   have ever ridden is Kingda Ka; is that
2   correct?
3          A.    I -- I couldn't say that.  I
4   don't -- I wouldn't want to say that I
5   did not ride a coaster when I simply
6   don't recall having done so.
7          Q.    You indicated that you did
8   not ride any coasters on the one visit
9   when your boys were very small and you
10  took them; is that correct?
11         A.    I didn't say that.
12         Q.    The transcript will speak
13  for itself, but do you want to -- do you
14  want to --
15         A.    I would -- I would be
16  surprised if I had ridden a coaster on
17  that day.  I'm not a coaster aficionado.
18  I was at the park for the entertainment
19  of my boys.
20         Q.    And you are certain that on
21  April 23rd, 2017, Kingda Ka is the only
22  coaster that you rode; is that correct?
23         A.    That's right.  I also rode
24  SkyScreamer, which is not a coaster, so
```

SA72

Christopher James Fabricant

1   those were the two -- the two attractions

2   that I -- that I participated in.

3        Q.    Did your boys go on other

4   coasters at Great Adventure on April

5   23rd, 2017?

6        A.    I don't know.

7        Q.    Have you been on any roller

8   coaster at Great Adventure or anywhere

9   else since April 23rd of 2017?

10       A.    Oh, no.

11       Q.    Have you been to any

12  amusement parks, carnivals, fairs, family

13  entertainment centers other than Great

14  Adventure since April 23rd of 2017?

15       A.    At Point Pleasant Beach,

16  there's a -- there's a pier with carnival

17  type of attractions, but I -- sometimes

18  the boys want to go to the arcade.  So I

19  certainly haven't ridden any other

20  carnival attractions since April the

21  23rd, 2017.

22       Q.    Other than the pier in Point

23  Pleasant, have you been to any other

24  amusement parks since April 23rd, 2017?

SA73

1        A.    I don't believe so, no.

2        Q.    You have --

3        A.    Wait, wait, wait, wait.  So

4   -- I'm sorry, counselor.  So I -- so I

5   returned to Great Adventure after April

6   the 23rd, 2017, but I did not ride any of

7   the attractions.

8        Q.    Understood.  And I will get

9   to that visit.  My understanding is that

10  you have been back to the park once since

11  April 23rd, 2017; is that correct?

12       A.    Twice.  Two times come to

13  memory.

14       Q.    What were those two dates?

15       A.    I don't know the dates, but

16  I can approximate.  So one -- one date, I

17  believe, was during the fall of 2017 and

18  the more recent visit was springtime of

19  2019.  And I could be off by a year with

20  the -- with the fall visit.  My -- as I

21  recall, my son Thibaut and his friends

22  wanted to go to the park.

23       Q.    On April 23rd, 2017, did you

24  have any problems or complaints at the

SA74

Christopher James Fabricant

1  park other than, I understand you

2  complain about your ride on Kingda Ka,

3  but did you have any other problems or

4  complaints about that day?

5        A.    None.

6        Q.    Were you with your family

7  the entire time you were at Great

8  Adventure on April 23rd, 2017?

9        A.    I was separated from my

10 family for most of the time.

11       Q.    Why was that?

12       A.    The kids were participating

13 in activities within the park.  My wife

14 was serving as their chaperone and I was

15 passing the time in the park with myself.

16       Q.    Why did you go if it wasn't

17 to spend time with your family?

18       A.    I did spend time with the

19 family.

20       Q.    You just indicated that you

21 spent the majority of your time by

22 yourself.

23       A.    That's -- that's correct.

24       Q.    How long after you arrived

SA75

Christopher James Fabricant

1  did you separate from the rest of the

2  group?

3        A.    I don't recall how long

4  after we arrived I became separated from

5  the group.

6        Q.    Become separated from them

7  or did you choose to separate from them?

8        A.    I -- I don't -- I don't --

9  we were at the park -- the family was at

10  the park and my wife was following the

11  kids, carrying their coats when they

12  would go on a ride.

13            And I was tagging along and

14  between rides would wander off here or

15  there and -- and became separated at some

16  point.  And in my mind, we were out for a

17  day at the park and I would circle back

18  and rejoin the group and would allow that

19  to happen in due course as it would

20  happen.

21            So there's -- there was no

22  big event where I made an announcement

23  that I was going to leave the group.  I

24  think that as everyone was participating

SA76

1    in their activities, members of the group

2    would go off and do their own thing and

3    if members became separated, then they

4    would join with one another in due

5    course.

6            So it was a -- it was not

7    unlike other occasions where we would be

8    participating in activities as a -- as a

9    group, but within the course of the

10   activities, members of the group might

11   separate only to return later.

12           I've done this with the boys

13   on other occasions.  I would leave them

14   at the arcade and go wander around the

15   park or go to the restroom.  So there's

16   -- there's no planning involved with my

17   separation from the group.  Rather, it's

18   -- it's an occurrence that happens and

19   that is allowing for individual pursuit

20   even within the -- even within the group

21   activity.

22           Q.    So you were okay if your

23   boys and their friends who were

24   approximately 11 and 13 -- no.  No, no,

SA77

1   no -- 9 and 11 at the time --

2           A.    I don't think it -- was it

3   9?  So three years -- if Nico is almost

4   15, and that's four years ago, that would

5   be 11 or almost 11, so he was a -- he was

6   the youngest in the group, I believe, so

7   11, 12, 13 would have been the ages of

8   the -- of the children.

9           Q.    Right.  And you were okay

10  with them being without an adult in the

11  park?

12          A.    No, my wife -- my wife was

13  the adult chaperone.  My wife -- my wife

14  is very attentive to the children during

15  excursions.

16          Q.    So your wife was with them

17  the entire time.  You are the only one

18  who split off; correct?

19          A.    Well, if I split off, and I

20  couldn't say for sure, but I would be

21  very surprised if my wife were to let the

22  children out of her view during the --

23  during the visit.

24          Q.    What time did you leave the

SA78

Christopher James Fabricant

1   park that day?

2        A.     Late afternoon-early

3   evening.  Can't -- can't be more specific

4   than that.

5              Before dark.

6        Q.     So it just so happens that

7   we're at approximately the same time of

8   year as this visit, so it's getting dark

9   at approximately 7:30.  Do you have a

10  recollection of whether you were at the

11  park right up until it was getting dark?

12       A.     I don't have a recollection,

13  but I would be surprised if we stayed

14  until sunset.

15       Q.     So you were there from

16  midday or early afternoon, 12, 1 o'clock

17  to somewhere in the vicinity of 5

18  o'clock, 6 o'clock?

19       A.     Yeah, probably arrived 1 or

20  2 o'clock in the afternoon if I were to

21  make an educated guess and probably

22  departed the park between 5:00 and 7:00.

23       Q.     What percentage of that time

24  were you with the group versus on your

SA79

Christopher James Fabricant

1  own?

2      A.    Probably between half and

3  three-quarters of the time, I was on my

4  own.   I was with them at the beginning of

5  the day, became separated, and then I

6  rejoined them toward the end of the day.

7  And -- and probably was away from them

8  longer than I would have anticipated

9  because our paths didn't cross as -- as

10  maybe they would have been expected to.

11      Q.    During that visit, once you

12  were separated, did you ever reach out to

13  your wife or either of your sons and ask

14  where they were?

15      A.    I don't recall the

16  circumstances that reunited the group, so

17  -- and I don't recall whether I reached

18  out by phone to the group during the day

19  to report my whereabouts and my

20  activities, so I can't say.

21      Q.    Do you recall receiving any

22  call or text with regard to meeting back

23  up?

24      A.    I do not.

SA80

Christopher James Fabricant

1  Q.    Did you rejoin the group in

2  the few minutes before the ride on Kingda

3  Ka?

4  A.    I don't recall.

5  Q.    During the hours that you

6  were on your own in the park, did you

7  ride any attractions?

8  A.    SkyScreamer.

9  Q.    And you rode that by

10 yourself?

11 A.    I did.

12 Q.    Were you taking any

13 photographs or video footage as you were

14 walking around the park by yourself that

15 day?

16 A.    I would be very surprised if

17 I were taking any -- any videos or

18 photographs.  I'm not -- I'm not a person

19 who takes many photographs.

20 Q.    Do you know if anyone else

21 in your group took any photographs or

22 video footage that day?

23 A.    I don't, no.  I -- I do

24 recall being asked by counsel to ask the

SA81

Christopher James Fabricant

```
 1  boys whether they had anything on their
 2  phone from the visit, so -- we looked for
 3  it, so if you have received anything, it
 4  means we found it, but I don't believe
 5  there was anything that was found.
 6       Q.    Was there anything in
 7  particular that you were looking at as
 8  you walked around the park by yourself?
 9       A.    Nothing in particular.
10       Q.    Were you reading any of the
11  signage at the park?
12       A.    Sure, I did.  I read -- I
13  went -- went around the park.  I read the
14  -- read the map that was in my hand, read
15  signs that were posted in the park, and I
16  observed the rides from a distance and
17  retraced pathways from my youth when
18  Great Adventure used to have attractions
19  that involved water events or rodeo type
20  of events and spent some time with my
21  memories of the dolphin show with
22  memories of the water-skiing show on the
23  lake, with memories of the rodeo show in
24  the -- in the arena from my youth, and
```

SA82

Christopher James Fabricant

1  did -- I did -- did think back fondly of

2  those occasions where as an audience

3  member would have these -- have these

4  attractions.

5       Q.    Were there any particular

6  signs that you recall reading that day as

7  you were walking around by yourself?

8       A.    "Any particular signs."  No.

9  No, sitting here today before you, there

10  were no particular signs that I -- that I

11  have a specific or particular

12  recollection of reading.

13       Q.    Was there a particular type

14  of sign that you were reading or was it

15  simply if something caught your

16  attention, you might read it?

17       A.    Yes, if something caught my

18  attention, I might read it.

19       Q.    But you don't recall what

20  any of those signs were; correct?

21       A.    I wasn't out to do a survey

22  of signs in the park.  I was out to pass

23  the time and to occupy my mind with

24  activities until I became reunited with

SA83

1  the group, so walking around the park,

2  stopping and reading signs and -- and

3  having a soda at the -- at the concession

4  area, these were the types of activities

5  that I was engaged in.

6        Q.    You indicated that you read

7  the park map that you were holding.

8        A.    Yes.

9        Q.    Were you reading that with

10 the purpose of deciding where to walk

11 around, what areas to visit?

12       A.    Yeah, that's fair.  I would

13 have read the map to look for an area of

14 interest to visit.

15             I would have been happy to

16 -- I would have been happy to have a

17 newspaper and a shady area under a tree,

18 but none were -- none were available,

19 newspapers anyway.

20       Q.    Did you read the entirety of

21 the park map and guide during your time

22 by yourself that day?

23       A.    Well, it's not a -- it's not

24 a large document and I did have a fair

SA84

Christopher James Fabricant

1  amount of time, so I suspect that I read

2  through much, if not most, of the -- of

3  the contents of the map.

4       Q.    Do you have a specific

5  recollection, without assuming or

6  guessing, whether you read the entire

7  park map and guide as you were walking

8  around that day?

9       A.    I do have a recollection of

10 going through the map and whether it's

11 the entire map and every last detail, I

12 couldn't say, but I -- I had the one

13 document in my possession that I was

14 walking around with and I was trying not

15 to become bored, so I had opportunity to

16 sit on a bench or on a -- or on a raised

17 area that was suited for seating in a

18 shady location and I had the map in my

19 hand, so -- so, sure, I read the map.

20      Q.    Did you read all of the

21 print on the map as opposed to -- map and

22 guide as opposed to just the map of the

23 park?

24      A.    So I did more than look at

SA85

¹ pictures.  I did read text.

²        Q.    Did you read all of the

³ text?

⁴        A.    That's a big word, "all."  I

⁵ read -- I read the map.  I had it in my

⁶ hand and I read the map.  Did I read

⁷ every word on the map?  I can't say,

⁸ counselor.

⁹        Q.    Did you stop and read every

¹⁰ sign that you came across that day?

¹¹        A.    That -- that seems doubtful.

¹²        Q.    In your course of travel

¹³ that day, do you believe that you walked

¹⁴ around the entire park?

¹⁵        A.    Probably not.  It's a large

¹⁶ park.

¹⁷        Q.    You were there for several

¹⁸ hours, so I don't know how fast you walk,

¹⁹ but --

²⁰        A.    I wasn't -- I wasn't in a

²¹ rush and I wasn't out to conduct a

²² survey.  I was out to pass -- pass the

²³ day.

²⁴        Q.    At any point in time, did

SA86

1    you walk up to the entrance area, the

2    main fountain area?

3         A.    The main entrance area has

4    portions outside and inside the gated

5    area at the park, so -- so are you

6    referring to a fountain inside the gated

7    area?

8         Q.    There is no fountain outside

9    the gated area, so yes.

10        A.    Thank you.  Thank you.  So

11   -- so, yeah, the entrance area doesn't

12   have much in the way of attractions.  It

13   has some shops.  I wasn't in the -- I

14   wasn't in the market for a hat or a

15   T-shirt, so I think my activities would

16   have been mostly beyond the fountain area

17   if -- if the fountain area is just beyond

18   the entrance gates.

19             I'm -- I'm trying to picture

20   in my mind's eye where the fountain area

21   is and I'm not sure I recall.

22        Q.    So your answer is you don't

23   recall?

24        A.    I don't recall what?

SA87

Christopher James Fabricant

1    Q.    Whether you visited the area

2    where the fountain is within the park

3    while you were walking around that day

4    passing time.

5    A.    That's right, I don't

6    recall.  I don't recall a fountain area.

7    Q.    Were there any particular

8    types of signs that you were making a

9    point to read or that caught your

10   attention so you read them?

11   A.    I wasn't making a -- making

12   it a point to -- to read signs.  I was --

13   I was out to pass -- pass the time of

14   day, so I would read signs that -- that

15   were before me as I was strolling the

16   park on a day of leisure.

17   Q.    Did you stop and read signs

18   regarding rules for particular rides?

19   A.    I may have.

20   Q.    Do you recall?

21   A.    I don't -- I don't recall,

22   no.

23   Q.    Let me just remind you, this

24   isn't a memory test, so if you don't

SA88

Christopher James Fabricant

1   remember, you can simply say you don't

2   remember.  There's no suggestion either

3   way whether you should or shouldn't

4   remember something, but I don't want you

5   to guess.

6            So when you say "I may

7   have," it's really not a useful answer

8   because it's not yes or no.  You're free

9   to say that you don't remember if you

10  don't remember something that I ask you

11  about --

12       A.    I -- well, I -- I certainly

13  did read signs that day.  I could -- I

14  could be sure of that because how do you

15  pass time if you're in a park?  You walk

16  around and you look at what's in front of

17  you and, depending on where you're

18  located, there are signs and banners and

19  -- and announcements and things that are

20  present before you.

21            So I was an observer of my

22  environment with the primary purpose of

23  my activity passing the time of day and

24  waiting for my reunion with the family.

SA89

Christopher James Fabricant

1    Q.    What type of ride is the

2    SkyScreamer?

3         A.    It is a ride where you sit

4    in a chair that has -- that is suspended

5    like a swing is suspended.  Then the ride

6    spins so that the chair with the center

7    fleeing force of a -- of a rotation is

8    carried away from the center and -- and

9    toward -- toward the side, so the chair

10   tilts and is rotated in circles and --

11   and the passengers experience being

12   suspended in a chair by chains and

13   rotating in a circle while their body

14   moves away from the center portion of the

15   rotating element.

16        Q.    Essentially, they're swings.

17        A.    Swings that rotate in a

18   circle, that's right.

19        Q.    What made you decide to go

20   on the SkyScreamer as opposed to any

21   other rides at the park that day?

22        A.    I wonder.  Could it have

23   been that there was no line?  I wonder.

24   Could it have been that it seemed like a

SA90

1   way to relax and pass the time?  I

2   wonder.

3           Q.    All right.  So you don't

4   remember; correct?

5           A.    It seemed an attraction that

6   would allow me to pass the time.

7           Q.    Did you read any of the

8   signage at SkyScreamer before you went on

9   it?

10          A.    None that I recall.

11          Q.    Where in the park did you

12  end up reuniting with the rest of your

13  group?

14          A.    I don't recall.

15          Q.    Was it in the general area

16  of Kingda Ka or somewhere else?

17          A.    It was not in the general

18  area of Kingda Ka, because when the

19  decision was made to ride Kingda Ka, the

20  children and I had to -- had to walk.

21          Q.    Approximately how --

22          A.    To -- to arrive to --

23  approximately how far, I -- there is a --

24  we may have become -- I think that when

SA91

1  we went to Kingda Ka, we went there

2  from -- from -- I believe the area nearby

3  to the free-climbing wall and the area

4  nearby to that -- that automobile track

5  that I think is behind the free-climbing

6  wall.

7          Q.    By automobile track, you're

8  referring to the go-carts?

9          A.    Yeah, I've never -- I've

10 never ridden the go-carts, so I -- so

11 I've only seen that ride from a distance,

12 so I don't know what I'm referring to,

13 but the free-climbing wall is -- is -- is

14 I think nearby to the location where the

15 decision was made to ride Kingda Ka.

16         Q.    Whose suggestion or request

17 was it to ride Kingda Ka?

18         A.    My son and the two girls

19 wanted to ride Kingda Ka.

20         Q.    Did one of them ask you to

21 go on it with them?

22         A.    My best recollection is that

23 my son Nico wanted to ride on Kingda Ka,

24 but did not want to do so without a --

SA92

Christopher James Fabricant

1    without a chaperone or without me

2    accompanying him.

3         Q.    Did you agree to ride Kingda

4    Ka with Nico while you were still in the

5    area of the climbing wall and then begin

6    to walk over?

7         A.    Yes, that sounds right.

8         Q.    When you got to Kingda Ka,

9    was there a line?

10        A.    "Was there a line."  There

11   was a -- there was not a long line.  So

12   there's always a line, but there -- but

13   the line was not filled with -- with many

14   people.

15        Q.    Do you recall how long you

16   waited to board Kingda Ka from the time

17   you got into line?

18        A.    It was not a long line, so

19   it was not an excessive wait.

20        Q.    Can you tell me if it was

21   more or less than five minutes?

22        A.    Oh, probably more than five

23   minutes.

24        Q.    More or less than ten

SA93

Christopher James Fabricant

1  minutes?

2       A.     Probably more than 10

3  minutes.  It was probably between 10 and

4  15 minutes would be my estimate.

5       Q.     Did you have a FLASH Pass or

6  SpeedPass that day?

7       A.     I'm not sure I know what a

8  -- what those are.  Can you -- can you

9  tell me what those are?

10      Q.     Did you notice that at most

11 or at least many of the attractions,

12 there are two separate lines, one is for

13 the guests who pay for a separate pass

14 that is intended to result in shorter

15 wait times versus the standard line for

16 those who do not have that added benefit

17 on their admission?

18      A.     No, I don't believe I

19 noticed that.

20      Q.     Who purchased the admission

21 to the park that day?

22      A.     My wife may have purchased

23 some of the tickets online and we may

24 have purchased some of the tickets at the

SA94

1    -- at the entry gate.  But -- but having

2    had several visits to the park, one --

3    the events of one visit sometimes bleed

4    into the events of another.

5               So -- so we did provide

6    record of our purchase of tickets to the

7    park.  Those records, if I reviewed them,

8    might be able to refresh my memory.

9         Q.    And, again, if you don't

10   remember, you can simply say you don't

11   remember.

12        A.    I'm sorry, counselor.  I'm

13   trying to be -- I'm trying to be helpful.

14   Maybe I'm -- I'm not to do so.  I'll --

15   I'll try and answer more briefly.

16        Q.    Thank you.  And, frankly,

17   the only reason it matters is because

18   unless we seek request or permission from

19   the Court, we're limited in time that we

20   have for your deposition, so it is more

21   efficient for things that you don't

22   recall just to say that you don't recall.

23   We do have records so can reference

24   those.

SA95

1        A.      Okay.  Thank you.

2        Q.      When you got to Kingda Ka,

3   were you able to enter the queue line and

4   get right to the station or the stairs up

5   to the station?

6              MR. MEYERS:  I'm going to

7        object to the form.

8              But you can answer it.

9              THE WITNESS:  The -- as I

10        recall, there was not a long line,

11        so we were able to move to the

12        station without -- without being

13        delayed in line or move very near

14        to the station, if not to the

15        station.

16   BY MS. EICHENBAUM:

17        Q.      Did you or any of the

18   children sit in the seat at the entrance

19   to Kingda Ka before you entered?

20        A.      I don't recall.

21        Q.      Did you read the signage at

22   the entrance to Kingda Ka before you

23   entered the queue line?

24        A.      I don't recall.

SA96

1    Q.    Once you were in the

2    station, did you read --

3    A.    Well, let me -- let me back

4    up on that last question.  So I may have

5    read signage at Kingda Ka during my

6    travels in the park solo before reuniting

7    with the group.

8         After reuniting with the

9    group, I don't recall stopping to read

10   signs.

11   Q.    And we already established

12   that you don't recall what signs you read

13   during your travels through the park;

14   correct?

15   A.    That's right.

16   Q.    So you may have, you may not

17   have, so let's move on to the signage in

18   the station.

19        Did you read the signage in

20   the station while you were waiting to

21   board the train?

22   A.    I'm sure I did.

23   Q.    Do you actually recall that?

24   A.    Yeah, there's overhead signs

SA97

1    that are -- that are demanding attention,

2    so overhead signs that -- that are --

3    that are few and that provide concise

4    instructions.

5              I don't remember what those

6    instructions were, but I remember that

7    there were just a few signs overhead --

8    or one sign overhead.  I don't know.

9    There was -- there was something to view

10   and to -- and to take notice of it before

11   you get onto the ride and you follow the

12   directions.

13        Q.    Were there also verbal

14   instructions given while you were in the

15   station area of Kingda Ka?

16        A.    Yes.  Yes.

17        Q.    Do you recall what any of

18   those verbal instructions were?

19        A.    The -- when seated in the

20   car before the car is launched, there are

21   instructions about -- about how to

22   conduct yourself.

23        Q.    Do you recall what any of

24   them are?

SA98

Christopher James Fabricant

1       A.    I wouldn't -- I wouldn't

2  state my life on what they were, but --

3  but hold the -- hold the harness or put

4  your head back, sit up straight, things

5  like this.  I don't -- I don't recall

6  exactly what they were, but for a person

7  seated in the car, they are given these

8  final instructions just before launch.

9       Q.    Up until the point where you

10 reunited with your group near the

11 climbing wall, were you considering going

12 on Kingda Ka that day?

13      A.    No, I was not, no interest.

14      Q.    When you were walking around

15 the park, did you stop and watch Kingda

16 Ka and its operation that day?

17      A.    I probably would have.  I

18 watched the operation of the large

19 coasters in my travels to entertain

20 myself.

21      Q.    Do you have a specific

22 recollection of watching Kingda Ka in

23 operation before you decided to go on it?

24      A.    I do, yes.

SA99

1    Q.    And when you -- strike that.

2          When the kids indicated to

3    you when you were in the area of the

4    climbing wall that they wanted to go on

5    Kingda Ka, did you express any concerns

6    or reservation?

7    A.    No.

8    Q.    My understanding from your

9    wife's deposition is that this was the

10   last activity for the day and then the

11   group was leaving; correct?

12   A.    That's correct.

13   Q.    Approximately how tall were

14   the kids?  And I guess the reason I'm

15   asking is, was there any concern about

16   whether they met height requirements for

17   any of the attractions that day or were

18   they all tall enough that that wasn't a

19   concern for anything?

20   A.    Yeah, they were tall, pretty

21   -- pretty tall kids.

22   Q.    I mean, obviously you're

23   tall.  I don't think I asked your wife

24   her height because there was just no

SA100

1   relevance, but --

2           A.    I think I -- yeah, so -- so

3   -- so, no, that wasn't a -- that wasn't a

4   subject of discussion or -- or that I

5   recall.  I mean, it may have been.  I

6   mean, the map has -- has height

7   requirements and I may have -- I mean,

8   what's the -- what's the height

9   requirement for Kingda Ka?  Is it 54?

10  I'd have to look at the map.

11              Do you know, counselor, what

12  the height requirement -- the minimum

13  listed one is?

14          Q.    It doesn't matter for the

15  purposes of my question.

16          A.    Okay.  So for the purposes

17  of the question, all the kids were kind

18  of tall and were -- and were certainly

19  above the minimum height requirement as

20  posted on the map.

21          Q.    Had you checked the map for

22  the specific height requirement for

23  Kingda Ka or did you just know that they

24  were all tall enough it hadn't been an

SA101

Christopher James Fabricant

1   issue for any of the attractions?

2           A.    I had been -- I had been

3   reading the map all day, counselor, so

4   the -- so the height listings on the map

5   certainly were something that were in my

6   mind on the day of the ride.

7                 I'd been walking through the

8   park for a couple hours reading the map

9   and the -- and the rides show height

10  minimums or maximums or -- or other --

11  other details, and that would have been

12  present in my mind on the day that we

13  took the ride.

14          Q.    Are you suggesting that when

15  the kids asked about going on Kingda Ka,

16  you had an independent recollection of

17  the height requirements for Kingda Ka?

18          A.    I suspect that I did.

19          Q.    Did you memorize all of the

20  height requirements for all of the

21  attractions that were listed on the park

22  map and guide?

23          A.    Counselor, I spent --

24  counselor, I spent several hours in the

SA102

Christopher James Fabricant

1  park by myself with a map in hand looking

2  at the map.  If -- if -- if I had seen

3  the map in the very recent past and had

4  read it, then numbers like that would

5  have been most likely in my mind and the

6  children's heights would have been at

7  least approximately available to me just

8  -- just by observation.

9              So -- so, yes, so height

10 requirements are something that are

11 checked before you get onto a ride.

12      Q.    Did you check the kids'

13 height requirements or the employees did?

14      A.    I don't have a specific

15 recollection of employees checking the

16 kids' heights.

17      Q.    Do you have a specific

18 recollection of you checking their

19 heights?

20      A.    I didn't have a yardstick,

21 counselor.  I'm not trying to be silly

22 here, but -- but if the boys and girls

23 wanted to take a ride and if the height

24 requirements for the ride are listed in

SA103

Christopher James Fabricant

1  the map, then you take notice of what the

2  heights are, approximately, what the

3  specifications are in the map, and do you

4  fall within the height range for the

5  ride.

6              This comes up all the time

7  when you have kids.  As the kids grow,

8  they're able to -- they're able to ride

9  bigger attractions because they reach

10  height where the larger attraction is

11  available to them.

12         Q.    That's all well and good,

13  sir, but you weren't with your group for

14  three-quarters of that day, so you don't

15  know what was done for checking their

16  heights when you weren't with them;

17  correct?

18         A.    That wasn't the question.

19  So -- so that's certainly true.  I don't

20  know what was done when I wasn't with

21  them.

22         Q.    And when you were with them,

23  going on Kingda Ka, you indicated that

24  you don't recall one way or the other

SA104

Christopher James Fabricant

1 whether you or an employee checked their

2 heights; is that correct?

3      A.    I didn't -- I didn't measure

4 the kids with the yardstick, but I would

5 have known that their heights were within

6 the range where they would be able to

7 take the ride based upon the posted --

8 the posted height requirements for the

9 ride.

10      Q.    And when you say posted,

11 you're referring to what's in the park

12 map and guide?

13      A.    Yes.

14           MR. MEYERS:  Before we go on

15      --

16           THE WITNESS:  If not -- if

17      not what's at the entrance, so

18      there -- there may be at the

19      entrance height -- height

20      postings, also, but -- but it

21      would have been the map -- it

22      would have been the map that would

23      have guided me in that regard,

24      having a -- having had the map all

SA105

1        day and then having reunited with

2        the children who wanted to go on

3        the ride.

4              MR. MEYERS:  Heather, it's

5        about 12:31.  Do we want to take a

6        -- I'd like to take a short break

7        for lunch.  Do you have any time

8        limit in mind that you would...

9              MS. EICHENBAUM:  What time

10       do you want to come back?  I mean,

11       we already know we're not

12       finishing today, so it's your

13       call.  Do you want to take a half

14       an hour and eat lunch, take a half

15       an hour and each lunch.  I don't

16       know how long you need.

17             MR. MEYERS:  I guess -- I

18       guess we might as well take a half

19       hour.  Is that all right with you,

20       Dr. Fabricant?

21             THE WITNESS:  Yes.

22             MR. MEYERS:  All right.  Why

23       don't we do that.

24             MS. EICHENBAUM:  Come back

SA106

Christopher James Fabricant

1    at 1 o'clock.

2             MR. MEYERS:  Okay.

3             THE WITNESS:  Thank you.

4             MS. EICHENBAUM:  By way of

5    reminder, before we go off the

6    record, please do not have any

7    discussion with anyone during this

8    half-hour break, including your

9    counsel and your family.

10            THE WITNESS:  Yes.

11            MS. EICHENBAUM:  Thank you.

12            THE VIDEO TECHNICIAN:  The

13   time is 12:32 p.m.  We're going

14   off the record.

15            (A luncheon recess was taken

16   from 12:32 p.m. to 1:03 p.m.)

17            THE VIDEO TECHNICIAN:  The

18   time is 1:05 p.m.  We are back on

19   the record.

20   BY MS. EICHENBAUM:

21       Q.   Sir, when you were wandering

22   around the park on April 23rd, 2017, did

23   you go to guest services?

24       A.   I don't recall.

SA107

Christopher James Fabricant

1    Q.   When you were walking around

2   the park on April 23rd, 2017, did you go

3   to the ride information center?

4    A.   Oh, guest services, yeah,

5   ride information -- so -- so I'm quite

6   sure, to revise the last answers, that I

7   did not go to guest services on that day.

8        The ride information center

9   is within the part of the park where I

10  was walking, so I may have stopped into

11  the ride information center, but I can

12  say that, no, I would not have gone to

13  the guest services for any reason.

14   Q.   Do you have a specific

15  recollection of going to the ride

16  information center that day?

17   A.   No.  It's like a -- it's

18  like most of -- you can assign

19  probabilities or likelihoods to

20  activities, so did I read a specific sign

21  at a specific location or specific word

22  on a map, well, I can't say that I have a

23  specific recollection of this or that.

24       But I can say with a high

SA108

1   degree of likelihood or with less

2   likelihood that I would have engaged in a

3   particular activity.

4          Q.    Okay.  So I'm going to

5   reiterate again that I don't want you to

6   assume or guess about anything.  If you

7   remember, fine.  If you don't, just say

8   you don't remember, please.

9              Did you walk past guest

10  services on April 23rd, 2017?

11         A.    There's little doubt that I

12  walked past guest services.  It's located

13  centrally within the park.

14         Q.    Did you walk past the ride

15  information center that day?

16         A.    Oh, guest services, no, I'm

17  mistaking one for the other again.  So --

18  so there's little doubt that I walked

19  past the ride information center.

20             It seems unlikely that I

21  would have known where guest services was

22  located or that I would have walked past

23  it except for coming nearby on entry or

24  exit to the park without having much

Christopher James Fabricant

1   interest in -- in visiting the site.

2       Q.    Do you remember for certain

3   either way?

4       A.    Which one?

5       Q.    Either one.  Do you remember

6   with certainty whether you walked past

7   either of them that day?

8       A.    Well, anyone who walks in

9   the park walks past guest services, so I

10  don't have a specific recollection of

11  doing so, but anyone who walks into the

12  park, just given the location of guest

13  services, walks past guest services.

14      Q.    Do you know where guest

15  services was that day?

16      A.    I know where -- no, I don't

17  -- I can't say with certainty where guest

18  services was located because I didn't

19  visit guest services on that day.

20      Q.    Well, you had studied the

21  park map and guide.  Right?

22      A.    "Studied" is not the word

23  that I would have used.

24      Q.    Okay.  Well, you've made a

SA110

Christopher James Fabricant

1  point to detail that you read the vast

2  majority of the park map and guide as you

3  were walking around.

4         A.    Correct.

5         Q.    Did you make note of where

6  guest services was?

7         A.    I suspect that I would have.

8         Q.    Do you remember?

9         A.    Do I have a specific

10 recollection of taking notice of guest

11 services, no.

12        Q.    What about the ride

13 information center; did you note where

14 that was on the park map and guide?

15        A.    I don't recall.

16        Q.    Did you go into the ride

17 information center on April 23rd, 2017?

18        A.    I don't recall.  I probably

19 did.

20        Q.    What makes you believe that

21 you probably did?

22        A.    That's true.

23        Q.    I said what makes you

24 believe that you probably did if you

SA111

1  don't have a recollection of doing it?

2        A.    I wandered the park for

3  several hours occupying myself with the

4  sights, sounds, and entertainments in the

5  park from a distant without -- without

6  participating in any of the

7  entertainments except for one ride,

8  SkyScreamer.

9             While I was doing so, I

10  covered a lot of ground within the park

11  and had plenty of time and opportunity to

12  see the various sites within the park.

13             The -- the ride information

14  center was one of the those sights within

15  the park centrally located within a

16  corridor that I no doubt traversed and --

17  and that I probably stopped in and

18  visited, as I was looking to entertain

19  myself without participating in the

20  amusements.

21        Q.    But you are quite certain

22  that you didn't travel past or go into

23  guest services.

24        A.    I think I said that when you

SA112

Christopher James Fabricant

1   enter or exit the park, you travel past

2   it, but that I would not have been likely

3   to have gone to the park entrance where

4   guest services is located and to have

5   wandered there.

6        Q.    Where is the ride

7   information center in relation to guest

8   services?

9        A.    I think the ride information

10  center is nearby to the fountain that you

11  mentioned before.

12       Q.    Where's the fountain in

13  relation to guest services?

14       A.    The fountain is beyond the

15  corridor with the shops.  So you come

16  through the entry gate, you go through a

17  corridor with shops for selling various

18  items, and then you get to the fountain

19  which is on one of the main thoroughfares

20  within the park.

21            So the thoroughfares take

22  you to the various areas of the park

23  where different themed -- or different

24  activities according to theme are

SA113

1    located.  Excuse me.

2          Q.    In your wandering around the

3    park, did you see the first aid center?

4          A.    Certainly not.

5          Q.    Did you make note of where

6    the first aid center was when you were

7    reviewing the park map and guide?

8          A.    I may have.

9          Q.    Did you go in that area at

10   all while you were wandering around the

11   park?

12         A.    Nope.  And I'm sure you're

13   aware, counselor, the first aid site is

14   located in a -- an area not frequented by

15   the pedestrian traffic in the park.  You

16   would have to seek out that location,

17   travel behind a restaurant and along a

18   pathway where the only destination for --

19   of that pathway, the only destination is

20   the first aid center, so if you didn't

21   have a reason to go there, you wouldn't

22   pass it by chance.

23         Q.    I'm not going to agree with

24   your statement, but that's really

SA114

1  irrelevant, just so that it's on the

2  record.

3          At any point in time that

4  day before going on Kingda Ka, did you

5  have any reason to need the first aid

6  center?

7      A.    No.

8      Q.    Did anyone else in your

9  group?

10     A.    No.

11     Q.    Is the first aid center on

12  the park map and guide?

13     A.    It certainly is.

14     Q.    So anyone with a park map

15  and guide, if they needed first aid,

16  could simply reference that map and guide

17  and know where it was located; correct?

18     A.    Yes.

19     Q.    Or they could ask an

20  employee and an employee could direct

21  them to first aid; correct?

22     A.    I would assume.

23     Q.    When you were approaching

24  Kingda Ka with your two sons and their

SA115

Christopher James Fabricant

1  friends, were you walking directly toward

2  the entrance or did you come from behind

3  the entrance?

4       A.    You can't come from behind

5  the entrance.

6       Q.    Did you walk --

7       A.    If you're behind -- if

8  you're behind the entrance, you're beyond

9  the entrance in line.

10      Q.    There is a walkway that runs

11 parallel to the queue line.  Did you as

12 you approached Kingda Ka walk straight

13 ahead into the queue line or did you come

14 from the back side of that queue line,

15 turn to your right, and then enter the

16 queue line area?

17      A.    I don't think I'm going to

18 agree with you that there's a walkway or

19 that the line is parallel to the entrance

20 path.  The line beyond the entryway --

21 beyond the entryway, the line has a

22 winding course, so a portion of the line

23 might be parallel to one pathway or

24 another, so I'm -- I'm a little bit lost

1   here.

2              So -- so we approached

3   Kingda Ka from the area of the

4   free-climbing wall.  As we approached the

5   entrance to the ride, we would have -- if

6   we didn't go to the entrance, we would

7   have passed the entrance on our left-hand

8   side because we were traveling within the

9   park toward -- toward -- oh, I'd have to

10  look at the map.

11             If you give me a map, I'll

12  be able to show you directly on the map

13  what our likely route was to Kingda Ka,

14  so do you have a picture of the map so

15  that I can -- I can indicate for you,

16  counselor, the direction that we took

17  going to Kingda Ka?

18       Q.    How about if you just answer

19  my original question, which was, as you

20  approached Kingda Ka, were you walking

21  straight toward the entrance or did you

22  come from around a corner?

23             MR. MEYERS:  I'm going to --

24       I'm going to object to the form of

SA117

Christopher James Fabricant

1    the question.

2             But if you can answer it.

3             THE WITNESS:  I -- I don't

4    -- I don't understand the

5    question.

6   BY MS. EICHENBAUM:

7        Q.    Was the entrance to the

8   queue line for Kingda Ka directly in

9   front of you as you were approaching the

10  ride?

11       A.    The entrance to the queue

12  line funnels people to a very narrow

13  entry point.  So as you approach, you are

14  being funneled or channeled to a narrow

15  area across which you traverse to get

16  into the line.

17            So there's really no

18  opportunity to be on one side or the

19  other because you're channeled to a

20  specific point of entry.

21       Q.    Was that point of entry

22  directly in front of you as you were

23  approaching Kingda Ka?

24       A.    Ultimately, yes.

SA118

1        Q.    And you indicated that if

2    you didn't enter the queue line for

3    Kingda Ka, you would have stayed to the

4    right of that entrance and continued

5    walking such that that entrance would be

6    on your left-hand side; correct?

7        A.    Yes.

8        Q.    Did you put anything in the

9    lockers at Kingda Ka before riding?

10       A.    I don't believe so, no.

11       Q.    Did any of the children with

12   you sit in the test seat at Kingda Ka?

13       A.    I don't -- I don't recall

14   any of us sitting in the test seat.  I

15   don't recall seeing the test seat.

16       Q.    Did you have any discussion

17   with any of the kids about the rules for

18   the ride?

19       A.    No, I don't recall that.

20       Q.    What, if any, conversation

21   were you having with them while you were

22   waiting in the line for the 10 or 15

23   minutes?

24       A.    The -- I don't recall the

SA119

1    content of my conversation.  It was a

2    rather chaotic area where the -- where

3    the queue lines -- or where the queue

4    line broke into -- broke into an area

5    where there were different points of

6    entry for different cars of the train,

7    but it wasn't terribly organized.

8            Q.    The queue line wasn't

9    organized?

10           A.    Yeah, by that I mean, we had

11   been to Hollywood Studios in Florida and

12   everything's very well organized.  At --

13   and we had been to -- had we went to

14   Disney also -- yeah, Disney when they

15   were very young -- and everything's very

16   orderly.

17               At the entrance to Kingda

18   Ka, there's a -- there's a push by the

19   crowd to reach the boarding location

20   sooner than might occur if everything was

21   orderly.

22               So, in other words, there's

23   a -- there seems like the crowd is

24   interested to push forward to not lose

Christopher James Fabricant

1  place in line such that people are

2  crowding together in what seems a rather

3  chaotic push toward the entry area

4  relative to other -- other amusement

5  parks where we've -- where we visited.

6          Q.    So your answer to my

7  question is, you don't recall there being

8  any discussion with the kids while you

9  were in the queue line; correct?

10         A.    Right.  I recall that -- I

11 recall a -- a bustling mass of people

12 pushing forward toward the entry area.

13         Q.    Understood.  Did you read

14 any signage while you were in line for

15 Kingda Ka?

16         A.    There's a -- there's a large

17 sign suspended from the ceiling that

18 gives a few instructions.  I think I

19 mentioned that I -- I recall seeing that

20 sign.

21         Q.    Did you read any other signs

22 while you were in line for Kingda Ka?

23         A.    I don't have specific

24 recollection of doing so, though I

SA121

Christopher James Fabricant

¹ wouldn't be surprised if I had.

²      Q.   Whether you would be

³ surprised or not, you don't have any

⁴ recollection of reading any signs,

⁵ correct, other than --

⁶      A.   Correct.

⁷      Q.   -- the one overhead that

⁸ you've told me.

⁹      A.   Correct -- at that -- yeah,

¹⁰ correct.

¹¹      Q.   Had you read any of the

¹² description of Kingda Ka on the park map

¹³ and guide?

¹⁴      A.   I would -- I would think

¹⁵ that I read the map and guide rather

¹⁶ extensively during my travels in the

¹⁷ park, as I mentioned before.

¹⁸      As far as a description of

¹⁹ Kingda Ka, there's not much of a

²⁰ description of any one given ride on the

²¹ map.  It was a map that has very limited

²² information about any particular ride.

²³      Q.   Had you done any research,

²⁴ for lack of a better term, on the

SA122

Christopher James Fabricant

1   Internet regarding any of the attractions

2   at Great Adventure before you went that

3   day?

4          A.    Very doubtful.  I would have

5   had no interest to do so.

6          Q.    Did you read any signage

7   regarding Kingda Ka before you rode it

8   that described the ride in any way?

9          A.    I think there's little doubt

10  that I would have read the signage that

11  would have been available to someone

12  wandering the park looking for something

13  to do.

14         Q.    Sir, you've already told me

15  that you don't recall what signs you read

16  as you were wandering the park.  I asked

17  you very specifically and you could not

18  name a single one, so let's not

19  speculate, again, about what you may have

20  or could have or would have or probably

21  might have done --

22         A.    No, I think I said almost --

23         Q.    -- my question is --

24         A.    I think I said almost

SA123

Christopher James Fabricant

1   certainly would have, I think that was my

2   word, almost certainly would have, read

3   the signage outside of Kingda Ka in my

4   travels, which is not a certainty,

5   counselor, and I -- and I wish that there

6   were exact recall of specific events

7   years ago, but -- but my mind doesn't

8   work that way and if your mind does, I

9   would -- I would congratulate you.

10      Q.    Do you recall anything that

11  was on the Kingda Ka signage with regard

12  to the description of the ride?

13      A.    The -- the signage in front

14  of Kingda Ka talks about requirements for

15  taking the ride, so it talks about -- so

16  it gives descriptions of who may ride the

17  ride and -- and gives a description for

18  prospective riders about who may

19  reasonably take the ride.

20      Q.    Okay.  And I understand that

21  you can say that because you've certainly

22  paid attention to that sign since that

23  day, since leaving that day when you

24  returned to the park.

SA124

1          Do you have a specific

2   recollection of reading the description

3   of the ride on the signage before you

4   rode it that day?

5          A.    I have -- I have pretty much

6   the same recollection as I do having gone

7   back to the park later:  I was in the

8   park.  I was reading signs.  I viewed

9   Kingda Ka, the ride.  I was in front of

10  Kingda Ka.  There were signs in front,

11  passing the time, watching people,

12  watching signs.  Yes, I would have almost

13  certainly read the signs on the day,

14  April the 23rd, 2017.

15         Q.    The rules sign for Kingda Ka

16  is immediately at the entrance to the

17  queue line; correct?

18         A.    "Immediately" is -- is --

19  it's certainly within 20 feet, if that's

20  immediate to your mind.

21         Q.    It's actually much closer

22  than 20 feet, isn't it?  Isn't it right

23  at the entrance to the queue, right where

24  the test seat is?

SA125

Christopher James Fabricant

1      A.    Right at the test seat, what

2  sign, the rules, no, that's not right at

3  the test seat.

4      Q.    The test seat isn't on one

5  side and the rules on the other right as

6  you're entering or preparing to enter the

7  queue line --

8      A.    Well, that's before --

9  that's before people are channeled in

10  that funnel to get through to the line.

11          So just beside the test seat

12  is a choke point that people channel

13  through to get into the line and -- and

14  people can get to that choke point from

15  one side or the other.

16          So as you're facing the

17  choke point, on the right side, there are

18  a series of signs relating to Kingda Ka,

19  the ride, about -- about checking

20  possessions, about rules of the ride,

21  about height factors, so these are

22  located rightward as you -- as you're

23  approaching the -- as you're approaching

24  the choke point.

SA126

Christopher James Fabricant

```
 1          Q.    And that is before you enter
 2   the single-file or supposed to be
 3   single-file queue line; correct?
 4          A.    Well, there's -- there's a
 5   single-file entry point, but once you get
 6   through the single-file entry point into
 7   the protected line, it's no longer narrow
 8   and single file.  It breaks open and you
 9   have a wandering course.
10                You mentioned the stairway
11   up, so there are -- there's sort of a
12   meandering course once you get past the
13   choke point.
14          Q.    The entrance to the queue
15   line is where the lockers are.  Do you
16   recall there being signage there --
17          A.    It's -- it's nearby to the
18   lockers, but the choke point or the
19   entrance to the queue line is just beside
20   the test seat.
21          Q.    That's also where the rules
22   sign is; correct?
23          A.    No, that's a little bit
24   before.  That's -- that's -- that's
```

SA127

1   outside the funneled area, so the

2   funneled area channels people into a

3   narrower and narrower corridor until you

4   slip past the location of the test seat

5   to -- to get into the protected line.

6          Q.    And I'm asking you about,

7   before you enter that line, the rules are

8   there, as is the test seat; correct?

9          A.    Yes.

10         Q.    That is the spot where

11  guests enter to get in line for Kingda

12  Ka; correct?

13         A.    Correct.

14         Q.    So every person riding

15  Kingda Ka walks past the test seat and

16  the rules sign; correct?

17         A.    The rules sign -- "past" --

18  I mean, relatively speaking past,

19  relatively so.

20         Q.    And that is the sign that

21  you have no recollection of reading when

22  you went to board the ride with the kids;

23  correct?

24         A.    Right, when I went to board

Christopher James Fabricant

1    with the kids, but -- but I almost

2    certainly -- or very likely -- read the

3    sign when I was wandering through the

4    park because it's not at the choke point.

5    It's -- it's outside the choke point

6    where the pedestrian traffic is walking

7    past the entrance to the ride.

8               So when you say that all of

9    these signs are located at the entrance,

10   I would say that it's equally -- it's

11   equally true that all of those signs are

12   located on the pathway that walks in

13   front of the entrance.

14              So for guests who are

15   traveling past Kingda Ka with no interest

16   to enter the line, they would have all of

17   those signs available to them is my

18   recollection.

19       Q.    The photographs will speak

20   for themselves.

21       A.    Yeah, they sure will.

22              (Pause.)

23              MS. EICHENBAUM:  Jamie,

24         could you put up document 10,

SA129

1      please?

2              (Pause.)

3              MS. EICHENBAUM:  We've just

4      put up a photograph that has been

5      premarked C. Fabricant-1.

6                  -   -   -

7              (Deposition Exhibit No. C.

8      Fabricant-1, Photograph, was

9      marked for identification.)

10                 -   -   -

11   BY MS. EICHENBAUM:

12         Q.    That is you?

13         A.    Correct.

14         Q.    And that is you sitting in

15   the test seat at Kingda Ka; correct?

16         A.    Yes.

17         Q.    What date was that

18   photograph taken?

19         A.    The date stamp says April

20   the 5th, 2021.

21         Q.    That's not a date stamp.

22   That's today's date and it's the exhibit

23   sticker.

24         A.    Oh, so thank you.  So when

SA130

Christopher James Fabricant

1    was it taken?  I see that the HERO camera

2    is in the foreground, so it would have

3    been taken in April of 2019.

4         Q.    Who took it?

5         A.    One of my sons.

6         Q.    Which one?

7         A.    I don't -- I don't recall.

8         Q.    Whose arm is in the front of

9    holding the HERO camera?

10        A.    It's either Nico or Thibaut.

11        Q.    You can't tell which one

12   from that photograph?

13        A.    I could guess.  I would

14   guess Thibaut, but I don't know for sure.

15        Q.    And that's the seat that you

16   did not sit in before you rode Kingda Ka

17   on April 23rd; correct?

18        A.    I didn't say that.  I said I

19   didn't recall sitting in it.

20        Q.    That is the seat that you

21   don't recall sitting in before you rode

22   Kingda Ka on April 23rd, 2017; correct?

23        A.    Yes, counselor, that's

24   correct.

SA131

Christopher James Fabricant

1     Q.    In fact, it's the seat that
2  you've just testified you don't even
3  recall seeing that day; correct?
4     A.    That's correct, also, yes.
5         MS. EICHENBAUM:  You can
6         take that down, Jamie.  Could you
7         put up document 11, please?
8              -  -  -
9         (Deposition Exhibit No. C.
10        Fabricant-2, Rules Sign at Kingda
11        Ka, was marked for
12        identification.)
13             -  -  -
14  BY MS. EICHENBAUM:
15     Q.    While the next document's
16  being put up, do you have a recollection
17  of sitting in any test seats for any
18  rides at Great Adventure on April 23rd,
19  2017?
20     A.    No, I don't.
21     Q.    We've put up what we've
22  premarked C. Fabricant-2.  This is the
23  rules sign at Kingda Ka that we were just
24  discussing; correct?

SA132

1          A.      Yes.

2          Q.      And you would agree with me

3    that the employee shown just beside or

4    behind that sign is at the entrance to

5    the queue line; correct?

6          A.      Yes.

7          Q.      And it's your testimony,

8    although you don't actually recall doing

9    it, that you think you may have stood in

10   that area close enough to read that rules

11   sign and read it while you were wandering

12   around the park before you rode the ride?

13         A.      Very likely, yes.  What you

14   don't see in the photograph, counselor,

15   is that -- at least I believe -- the --

16   where you see the attendant.

17   Perpendicular to that entry area is a

18   walkway and the walkway is where this

19   photograph is taken from.

20              So I would say this

21   photograph is not taken from the

22   immediate entry area to Kingda Ka, but,

23   rather, is taken from the walkway beside

24   the immediate entry area and the walkway

Christopher James Fabricant

1  is available to pedestrians who are

2  strolling through the park.

3        Q.    So how far -- well, strike

4  that.  You don't even remember reading

5  it, so it's really irrelevant.

6             So your testimony is, if you

7  read this sign or any part of it, it was

8  from back on the walkway?

9        A.    My testimony is that it

10 would be available to people on the

11 walkway without -- without those people

12 serving as an impediment to people who

13 are entering the ride.

14             When I think about entryway

15 to a ride, I think about an area that is

16 reserved for people who will join the

17 line and when I think about the area just

18 outside the entryway, I think about an

19 area that you could stand and linger

20 without serving as a hindrance or an

21 impediment to people who actually do want

22 to jump into the line.

23        Q.    And that's the distance from

24 which, if you read any part of that sign,

Christopher James Fabricant

1   you would have done it from --

2        A.    I don't think I mentioned --

3   I don't think I mentioned a distance, so

4   I'm -- I'm not understanding the

5   question.

6        Q.    I wasn't done my question.

7        A.    Sorry.   Excuse me.

8             (Pause.)

9             MS. EICHENBAUM:  You can

10        take that down, Jamie.   Thank you.

11        Could you please put up document

12        14?

13                  -   -   -

14             (Deposition Exhibit No. C.

15        Fabricant-3, Overhead Sign in

16        Station of Kingda Ka, was marked

17        for identification.)

18                  -   -   -

19   BY MS. EICHENBAUM:

20        Q.    You did testify that you

21   recall, actually, reading the signs in

22   the station that were overhead.   We've

23   put up Exhibit C. Fabricant-3.   Is that

24   the signage that you were referring to

Christopher James Fabricant

1    that you do actually recall reading on --

2         A.    Yes, it is.

3         Q.    -- April 23rd, 2017 before

4    riding Kingda Ka?

5         A.    Yes, it is.

6              MS. EICHENBAUM:  Could you

7         take that down, Jamie, and please

8         put up document 15?

9                   -  -  -

10             (Deposition Exhibit No. C.

11        Fabricant-4, Notice on Seatbacks

12        of Kingda Ka, was marked for

13        identification.)

14                  -  -  -

15   BY MS. EICHENBAUM:

16        Q.    Once you were on Kingda Ka

17   on April 23rd, 2017, did you also read

18   this notice that is on the seatbacks?

19        A.    If it was right before me, I

20   no doubt would have.

21        Q.    Do you recall reading that

22   notice once you got on Kingda Ka on April

23   23rd, 2017?

24        A.    I don't have a specific

SA136

Christopher James Fabricant

1  recollection of doing so.

2         MS. EICHENBAUM:  You can

3     take that down, Jamie, thank you.

4  BY MS. EICHENBAUM:

5         Q.    Did you read anything about

6  the speed or G forces involved in riding

7  Kingda Ka before you rode it that day?

8         A.    I don't have specific

9  recollection of reading about the speed,

10  though if that type of information was

11  available, it would have been of

12  interest.

13         The map, I believe --

14         Q.    My -- I gotta stop you

15  because we have a limited amount of time.

16         A.    Right.

17         Q.    I'm asking you very simple

18  questions that you can answer yes, no, or

19  you don't remember --

20         A.    Okay.  I don't remember.

21         Q.    -- do you -- thank you.

22         A.    You're welcome.

23         Q.    Did you, once you got onto

24  the ride, secure your own restraint?

SA137

1    A.    Back to the last question,

2    it's -- it's hard to not know that Kingda

3    Ka is -- it's touted as the tallest and

4    the fastest.  This is pretty general

5    knowledge, so do I know about G forces

6    and things like this?  Well, who knows

7    and what would they mean to me?

8         As far as -- as far as

9    adjusting the -- the restraint, yes,

10   passengers sit on the train and -- and

11   pull the restraint into position

12   themselves.

13        Q.    And an attendant then comes

14   along and checks the restraint to assure

15   it is secured; correct?

16        A.    Attendants are present at

17   the loading platform and when you say

18   comes along and checks the restraint, I'm

19   not sure what the "comes along" means in

20   your -- in your question.

21        Q.    Walks from the front or the

22   back of the train, down the side of the

23   train checking the restraints on each

24   passenger seated on the train; correct?

SA138

Christopher James Fabricant

1    A.    I'm not -- I'm not going to

2  say correct to that because I -- I don't

3  know that.

4    Q.    Okay.  An attendant did

5  check your restraint; correct?

6    A.    At least from a distance.

7    Q.    How did an employee check

8  your restraint from a distance?

9    A.    Visualization, just as the

10  attendant would if the attendant was

11  beside the car, but from a distance.

12    Q.    So your testimony is that no

13  attendant touched your restraint once you

14  had closed it?

15    A.    Yes, I think that -- I think

16  that's my recollection.

17    Q.    You think it is or it is?

18    A.    Yes, I -- I do not have a

19  recollection of an attendant touching my

20  restraint after I pulled it into

21  position.

22    Q.    Did an attendant physically

23  check your son's restraint once his was

24  closed?

SA139

Christopher James Fabricant

1    A.    Yeah, physically, I -- I --
2  I don't -- I don't have a recollection of
3  physical inspection of restraints.

4    Q.    How many attendants were at
5  the ride?

6    A.    Probably -- no, I won't say
7  "probably" because you don't like
8  "probably."  There were --

9    Q.    No, you either recall or you
10  don't.

11    A.    Oh, I do recall that there
12  were at least two, probably three or
13  more.

14    Q.    At some point in time after
15  you secured your restraint and you said
16  that an attendant visually checked it,
17  did you get the attention of an attendant
18  to ask or comment about your restraint?

19    A.    Yes.

20    Q.    Describe that employee.

21    A.    The employee was a young
22  male employee with dark hair, brown hair,
23  but fair skin, and the employee was of
24  thin build and medium stature.

SA140

Christopher James Fabricant

1      Q.     Did you initiate contact

2  with him or vice versa?

3      A.     I initiated contact with

4  him.

5      Q.     How did you do that?

6      A.     I raised my hand and I said,

7  it's too tight, but I don't know if -- if

8  my utterance was audible to him at his

9  location that was not directly beside me.

10     Q.     So you gestured by raising

11  your hand.  Did he come over and approach

12  you?

13     A.     No, I wish he had.

14     Q.     Did you ask him to?

15     A.     I raised my hand.  I asked

16  for help essentially.

17     Q.     And that's because you felt

18  that your restraint was too tight.

19     A.     Yeah, that's right.

20     Q.     And what response did you

21  get?

22     A.     I didn't get a response to

23  me.  There was a response where the

24  attendant seemed to turn to a colleague

SA141

Christopher James Fabricant

1  to report that a passenger had raised a

2  concern.

3      Q.    Did you hear anything that

4  the employees said?

5      A.    I wasn't close enough.

6      Q.    At any point in time, did

7  you gesture for any employee to come over

8  to you?

9      A.    Yeah, I raised my hand and I

10 asked for help essentially, like I said.

11     Q.    Aside from raising your

12 hand, did you ever gesture to an employee

13 to come over to you?

14     A.    No.  I raised my hand,

15 asking for help.

16     Q.    And you've indicated that

17 you told the employee your restraint was

18 too tight, but you don't know if he heard

19 you; is that correct?

20     A.    Yeah, that's right.  I don't

21 know if he heard me, that's right.

22     Q.    But after you said whatever

23 you said to him, it appeared to you that

24 he gestured and said something to another

SA142

Christopher James Fabricant

1    employee.

2         A.    Yes.

3         Q.    And what, if anything,

4    happened after he did that?

5         A.    The restraint loosened.

6         Q.    Just yours?

7         A.    Everyone's.

8         Q.    Did they all raise?

9         A.    Partially.

10        Q.    And what happened next?

11        A.    The restraint -- the

12   restraint -- what happened next was,

13   everyone on the ride pulled their

14   restraint back into position, including

15   myself, but I didn't pull it down so

16   tightly.

17        Q.    And did attendants then

18   physically check the restraints?

19        A.    No, no.  Not -- not --

20        Q.    Not physically --

21        A.    -- physically, visually

22   perhaps from a distance.

23        Q.    Did you have any further

24   communication with any employee before

SA143

Christopher James Fabricant

1  the launch -- before the train left the

2  station?

3        A.    I looked at the same

4  employee and said that it seemed okay --

5  or -- or not -- I didn't say that.  I

6  nodded that it seemed okay in its new

7  position.

8        Q.    Did he respond in any way?

9        A.    He seemed agreeable.

10       Q.    Did he respond in any way?

11 I don't know what that means, "he seemed

12 agreeable."

13       A.    I didn't -- I didn't --

14 well, I didn't have a word of -- I didn't

15 -- I didn't hear a word from the

16 employee.  I didn't have any

17 back-and-forth conversation with the

18 employee.  I -- I had eye contact with

19 the employee.

20       Q.    How many employees were on

21 your side of the train when you were

22 sitting in the station?

23       A.    I only recall the -- I

24 communicated with one employee,

SA144

1    counselor.

2         Q.    My question is, how many

3    employees were on your side of the train?

4    As opposed to Nico's side.

5         A.    At least one.

6         Q.    How many do you recall being

7    on Nico's side of the train?

8         A.    I don't recall.

9         Q.    Once you got into the ride,

10   did you put your head back against the

11   seat?

12        A.    I did.

13        Q.    And your head was against

14   the back of the seat?

15        A.    At least the lower part of

16   my occiput, yes.

17        Q.    Did you have any concerns at

18   that point about whether you would be

19   able to safely ride the ride?

20        A.    No.

21        Q.    Did you keep your head back

22   against the seat throughout the duration

23   of the ride?

24        A.    Yes, I did.

SA145

1    Q.    And was there any point in
2  particular on the ride where you felt
3  something unusual that suggested to you
4  you were injured?
5    A.    Counselor, I want to go back
6  to the last question.  Could you ask me
7  again the last question?
8    Q.    I don't recall what my last
9  question was --
10   A.    Did you keep your head back
11  against the headrest for the duration of
12  the ride, is that what you have?
13   Q.    Sure.  You'd like to change
14  your answer?
15   A.    Right, that's what I said.
16  I wanted to go back to the last question
17  and revisit it with perhaps some more
18  explanation that could shed light onto
19  the matter.
20         The headrest was too low.  I
21  didn't know that at the time.  During the
22  ride, when subjected to the forces
23  associated with the ride, my head would
24  have moved relative to what was a

Christopher James Fabricant

1    headrest too low so that my head not

2    encountering a headrest of appropriate

3    height may have been forced violently

4    back and then rebounded forward.  I think

5    it's likely that it did that.

6              So when you say --

7         Q.    Do you recall that?

8         A.    So when you say did I keep

9    my head back against the headrest for the

10   duration of the ride, well, knowing what

11   I know now about the height of the

12   headrest or the seatback, I don't see how

13   I could have.

14             So -- so I don't have a

15   specific recollection of what my head was

16   doing when the ride was launched with

17   such speed and such force and such -- and

18   such -- and such, let's say, vigor when

19   I'm in a seat that doesn't support my

20   head properly.

21             I just remember pain.

22        Q.    And you don't have any

23   recollection specifically other than

24   keeping your head back; correct?

SA147

Christopher James Fabricant

1    A.    I followed the directions at
2  the outset, face forward, head back and
3  against -- against what was there --
4    Q.    All right.
5    A.    -- so that's -- so that's my
6  recollection.
7    Q.    And was there a particular
8  point during the ride where you felt
9  something unusual that suggested to you
10 that you were injured?
11   A.    I felt pain in my shoulders,
12 especially my right shoulder.
13   Q.    At what point on the ride?
14   A.    After launch.
15   Q.    Everything is after launch,
16 sir, so at what point during the course
17 of the ride did you first feel pain in
18 your shoulders, especially the right one?
19   A.    My best recollection is that
20 after launch, the entire ride duration
21 was painful.
22   Q.    So was it at launch or
23 during launch that you first felt that
24 pain in your shoulders?

SA148

Christopher James Fabricant

1    A.    I answered your question,

2 counselor.

3    Q.    I've asked a different

4 question, sir.  Answer it, please.  Was

5 it at --

6    A.    Please ask -- please ask it

7 again.

8         MS. EICHENBAUM:  Kim, would

9     you mind reading it back, please?

10        THE WITNESS:  Thank you.

11             -  -  -

12        (The court reporter read the

13     pertinent part of the record.)

14             -  -  -

15        THE WITNESS:  Yes.

16 BY MS. EICHENBAUM:

17    Q.    Did the pain that you

18 experienced change at all during the

19 course of the ride or did it remain the

20 same throughout?

21    A.    I had a very severe pain for

22 the duration of the ride, pain like never

23 before.

24    Q.    When you got back to --

SA149

Christopher James Fabricant

1    strike that.

2              This may sound like an odd

3    question, but from your understanding,

4    did the ride operate normally for that

5    ride cycle?

6         A.    I have no reason to believe

7    that it didn't operate just as designed.

8         Q.    And when you got back to the

9    station, did you verbalize to any

10   employee that you felt that you were

11   injured?

12        A.    No.  I didn't know that I

13   was injured.  I knew I had pain.

14        Q.    Well, did you verbalize to

15   any employee that you had a very severe

16   pain for the duration of the ride?

17        A.    No, I did not.

18        Q.    Did you ask Nico if he was

19   okay?

20        A.    No.  He had no -- he had no

21   concern or worry on his face.

22        Q.    What about your son's

23   friends, the two young girls that were on

24   the ride with you and Nico; did you ask

SA150

Christopher James Fabricant

1   them if they were okay?

2        A.    No, all were -- all were

3   happy except for me.

4        Q.    Did you tell any of the kids

5   that you were feeling pain after the

6   ride?

7        A.    No.

8        Q.    Did you tell your wife when

9   you got off the ride that you were in

10  pain?

11       A.    Very doubtful.

12       Q.    At any point in time while

13  you were still at the park, did you

14  express anything to any employee of Six

15  Flags with regard to your ride on Kingda

16  Ka or feeling injured?

17       A.    I wasn't feeling injured.  I

18  had pain.

19       Q.    Did you express to any

20  employee of Six Flags while you were

21  still at the park on April 23rd, 2017

22  that you were feeling severe pain after

23  having ridden Kingda Ka?

24       A.    No.

SA151

Christopher James Fabricant

```
1            I might recall one other
2  circumstance in my life where I had an
3  absolutely terrible pain.  When I was a
4  kid --
5       Q.    Sir, that's okay.
6       A.    -- I fell on the ice --
7       Q.    It's really okay.  You've
8  answered my question.
9       A.    So -- I'm trying to provide
10 context, but that's okay, counselor.
11      Q.    That's okay.
12      A.    Thank you.
13      Q.    I understand completely.
14      A.    Thank you.
15      Q.    At any point in time within
16 2017, did you reach out to anyone at Six
17 Flags to advise that you had had a
18 problem on Kingda Ka?
19      A.    No.
20      Q.    Did you reach out to anyone
21 from Six Flags at any point in 2018 --
22      A.    No.
23      Q.    -- to tell them you'd had a
24 problem on Kingda Ka?
```

SA152

1      A.    I did not.

2      Q.    And at what point did you

3  first consult legal counsel?

4      A.    As I mentioned earlier

5  today, in June of 2017, not long after my

6  surgery on the neck for the injuries that

7  I suffered on the ride, I had a

8  deposition and my attorney for the

9  deposition was Richard Amdur.  I arrived

10  to the deposition with a neck brace that

11  I was wearing during my recovery from

12  surgery.

13        At some point during a break

14  from the deposition, my neck brace became

15  a topic of conversation for the attorneys

16  who were present and I related to them

17  that I had been injured on a roller

18  coaster and required emergency surgery

19  for the damage to my neck.

20        During the conversation, I

21  asked my attorney, Dick Amdur, if he

22  could please recommend someone, an

23  attorney, who deals with personal injury

24  such as mine so that I could pursue

SA153

Christopher James Fabricant

1   appropriate legal action.

2             He said that he would let me

3   know and not long afterward communicated

4   with me about -- about an attorney who he

5   recommended that I see by the name of

6   Bruce Nagel.

7        Q.    I'm sorry.  What was the

8   name?

9        A.    Bruce Nagel, N-A-G-E-L.

10       Q.    Did you consult Mr. Nagel?

11       A.    I did.

12       Q.    When was that?

13       A.    July or August, I had a

14   phone conversation with Bruce Nagel.

15       Q.    At some point in time, did

16   you consult a different attorney?

17       A.    I did.

18       Q.    Who was the next attorney?

19       A.    I -- I -- there's kind of a

20   story --

21       Q.    Can you just give me the

22   name?

23       A.    I'm trying.  I'm trying to

24   figure out a way to do it concisely given

SA154

Christopher James Fabricant

1   your -- your time concerns.

2                  Only after Bruce Nagel

3   declined the case did I seek counsel

4   elsewhere and he declined the case in

5   2019.

6          Q.    So after Mr. Nagel, you

7   consulted another attorney in 2019;

8   correct?

9          A.    I consulted other attorneys.

10  It was only at the last minute before

11  what I believe to be a two-year statute

12  of limitation was about to expire, so it

13  was only at the last moment, that Bruce

14  Nagel declined the case.

15                 And when that happened, I

16  had difficulty finding an attorney to

17  take the case on such short notice.  So I

18  reached out to several attorneys seeking

19  representation.

20         Q.    Was one of them Mr. Meyers?

21         A.    Yes, you're correct.

22         Q.    At any point between April

23  23rd, 2017 and when you consulted with

24  Mr. Nagel, did you return to Six Flags?

SA155

Christopher James Fabricant

```
 1        A.    No, I did not.

 2              May I have a restroom break,

 3   counselor?

 4              MS. EICHENBAUM:  Yes, with

 5        the reminder that you are not

 6        allowed to speak with anyone

 7        during the break.

 8              THE WITNESS:  Right.  And I

 9        -- just two minutes.  Thank you.

10              MS. EICHENBAUM:  Well, let's

11        take -- let's take to 20 after

12        just so that everyone who may need

13        can take the opportunity at once.

14              THE VIDEO TECHNICIAN:  The

15        time is 2:11 p.m.  We're going off

16        the record.

17              (A recess was taken from

18        2:11 p.m. to 2:20 p.m.)

19                   -  -  -

20              (The court reporter read the

21        pertinent part of the record.)

22                   -  -  -

23              THE VIDEO TECHNICIAN:  It is

24        2:20 p.m.  We are back on the
```

SA156

Christopher James Fabricant

1        record.
2    BY MS. EICHENBAUM:
3        Q.    Sir, did you have a signed
4    --
5        A.    Counselor, please, before we
6    -- before we move forward, Kim just read
7    a question.  Could she read that again
8    for me, please?
9        Q.    The question was whether you
10   returned to Six Flags between April 23rd,
11   2017 and when you first consulted with
12   Mr. Nagel.
13       A.    Right.  So -- so, yeah, I
14   did not, correct.
15       Q.    Did you have a signed fee
16   agreement or retainer agreement with Mr.
17   Nagel?
18       A.    No, I did not.
19       Q.    Without going into any
20   substance, did Mr. Nagel provide you with
21   any advice with regard to this alleged
22   incident or case?
23       A.    He certainly did.
24       Q.    I'm sorry.  He certainly

SA157

1 did?

2      A.    Yes.

3      Q.    Was it your understanding

4 that he was serving as your counsel up

5 until he advised you otherwise in 2019?

6      A.    Yes.

7      Q.    At what point in time did

8 you have a written agreement with him?

9      A.    I did not.

10      Q.    Sorry.  I misunderstood

11 then.  From the time you first consulted

12 with Mr. Nagel up until he advised you

13 that he was declining to accept your case

14 in 2019, had you consulted with any other

15 attorneys?

16      A.    No.

17      Q.    When in 2019 did he tell you

18 he was not going to take your case?

19      A.    Early in 2019, February or

20 March.

21      Q.    At any point in time between

22 when you first consulted with Mr. Nagel

23 and when he declined your case, did you

24 report to Six Flags that you felt you had

SA158

Christopher James Fabricant

1   been injured on Kingda Ka?

2        A.    No.

3        Q.    At any point from when you

4   consulted with Mr. Nagel in July or

5   August of 2017 to when he declined your

6   case in February or March of 2019, did

7   you return to Six Flags?

8        A.    I did.

9        Q.    How many times?

10       A.    At least once and probably

11  just once.

12       Q.    What month and year was

13  that?

14       A.    I believe it was -- that was

15  the question that I answered earlier when

16  my son wanted to go with some of his

17  friends and -- and it was either fall

18  2017 or fall 2018.

19       Q.    And was it Thibaut or Nico

20  that wanted to go?

21       A.    Thibaut.

22       Q.    Did Nico also go?

23       A.    Very likely.  They both

24  enjoy going to the arcade.

SA159

Christopher James Fabricant

1  Q.  When you returned to Six
2  Flags in the fall of 2017 or fall of
3  2018, did you report to anyone at the
4  park that you felt you had been injured
5  on Kingda Ka?
6  A.  No.
7  Q.  Did you take any photographs
8  or video footage on that visit to Six
9  Flags in the fall of 2017 or fall of
10  2018?
11  A.  I'm sure I took some
12  photographs.  I was instructed to do so
13  by Bruce Nagel.
14  Q.  What are you sure --
15  A.  Or -- or at least was
16  instructed by him to get information
17  about -- about signage and whatnot.
18  Q.  And so did you take
19  photographs and/or video footage on that
20  return trip to Six Flags?
21  A.  No video, several photos, I
22  believe.
23  Q.  Have those photographs been
24  produced to your counsel in this case?

SA160

Christopher James Fabricant

1    A.    I produced what I found on

2  the phone, so -- so you've got -- you've

3  got what I -- what I have.

4    Q.    The photographs that you

5  took on that first return visit with

6  Thibaut and maybe Nico were taken with

7  your cellphone?

8    A.    Yes.

9    Q.    Are those photographs date

10 and time stamped?

11    A.    I don't know.  For me, any

12 photos from back then were a handful, a

13 few photos were taken; and at my visit to

14 the park in 2019, I did what I thought

15 was an exhaustive survey, photographic

16 and video, and the other photos very well

17 may have been discarded, but -- but they

18 -- they weren't -- they were very few and

19 -- and not providing information that I

20 found -- well, I don't even recall seeing

21 them.

22        So -- so I -- I have trouble

23 answering questions about the specifics

24 of the photographs because I didn't do a

SA161

1    -- a serious job of taking relevant

2    photos.  I took a few photographs on that

3    day expecting to get back to Bruce Nagel

4    for further instruction.

5         Q.    What were those few

6    photographs of?

7         A.    I -- I -- I wish I recalled,

8    counselor.  I don't.  I'm sorry.

9         Q.    You have no recollection at

10   all?

11        A.    I believe the photographs

12   included a photograph of the signage that

13   we were looking at together in the newer

14   photo, which is in the pathway running

15   outside the front entrance to Kingda Ka

16   with rules relating to the ride.

17        Q.    Did you take any photographs

18   of the signs advising of the state

19   reporting requirement on that visit?

20        A.    Certainly not.  I had no

21   idea that the signs were present and I

22   had no idea that there was a reporting

23   requirement.

24             And by the way, neither did

1  Bruce Nagel, nor Richard Amdur, nor Ray

2  Gill, nor a host of other attorneys that

3  I spoke with.  They all told me that I

4  had two years to file a claim.

5          MS. EICHENBAUM:  Well, I'm

6      not going to give you legal

7      advice, but perhaps you should

8      talk to Mr. Meyers about a legal

9      malpractice claim then.  Attorneys

10     are charged with knowing the law

11     if they're advising clients.

12  BY MS. EICHENBAUM:

13     Q.    In any event --

14     A.    Thank you, counselor.

15     Q.    -- so the photographs that

16  you took on that first return visit to

17  the park, you recall being of signage,

18  but only of the signage at Kingda Ka

19  itself; is that --

20     A.    That's what I recall, that's

21  right, uh-hum.

22     Q.    Were those photographs

23  provided to Mr. Nagel?

24     A.    No.

SA163

1    Q.    Were they provided to

2  anyone?

3    A.    I don't believe so, no.

4    Q.    I thought you indicated that

5  you took them at his instruction or

6  request.

7    A.    I did, but -- but he -- he

8  canceled several appointments with me

9  before I was offered an appointment with

10  one of his partners because he was,

11  quote, too busy.

12    And then before any

13  appointment with his partner, I was told

14  that no one at the firm had time to take

15  the case, but I was told that only after

16  -- only after -- I was asked about

17  whether I had reported to the amusement

18  park about my injuries and I was --

19    Q.    What did that --

20    A.    And that -- and these

21  conversations took place in 2019.  And

22  they weren't conversations.  It's e-mail,

23  so it's -- so there's -- there's an

24  e-mail -- there's an e-mail chain that

SA164

¹ details all of these events.

²     Q.   So simply trying to piece

³ things together here on the chance that

⁴ it refreshes your recollection --

⁵     A.   Thank you.

⁶     Q.   -- you've indicated that Mr.

⁷ Nagel declined your case in February or

⁸ March of 2019.

⁹     A.   Correct.

¹⁰     Q.   Does that refresh your

¹¹ memory about whether that return visit to

¹² Six Flags when you took the photographs

¹³ was the fall of 2017 or '18?

¹⁴     A.   It does -- it does not, but

¹⁵ we could probably track down the

¹⁶ information by looking at, like, a credit

¹⁷ card receipt of when I -- when I visited

¹⁸ the park with my son.

¹⁹         MS. EICHENBAUM:  I'll make a

²⁰       request for that.  I don't recall

²¹       photographs being time stamped

²²       from that time period.  I

²³       absolutely could be wrong.  There

²⁴       are a lot of photographs in the

Christopher James Fabricant

1    case, but I don't recall that, so

2    if you believe you have some

3    documentation that would establish

4    when that return visit was, I

5    would appreciate you getting it to

6    your counsel.

7    BY MS. EICHENBAUM:

8        Q.    When you returned to Six

9    Flags with your son, did you go on any

10   attractions?

11       A.    No.

12       Q.    And regardless of whether it

13   was the fall of 2017 or fall of 2018, by

14   that point in time, you certainly knew

15   that you believed you had been injured in

16   your ride on Kingda Ka; correct?

17       A.    Yes, that's -- that's

18   correct.

19       Q.    But when you returned to the

20   park, you did not let anyone know that;

21   correct?

22       A.    No, I knew of no reporting

23   requirement until -- until -- until Ray

24   Gill told me about it, which was March

SA166

Christopher James Fabricant

1    2019.

2         Q.    But regardless of whether

3    you knew about a legal reporting

4    requirement, my question is, you didn't

5    let anyone at Six Flags know that you

6    felt you had been injured on Kingda Ka;

7    correct?

8         A.    Yeah, that's right.

9               It is -- maybe less is more.

10   I'll stop there.

11        Q.    Did Thibaut or Nico go on

12   any rides on that return visit in the

13   fall of 2017 or 2018?

14        A.    They may have.  I've told

15   the boys to avoid the large coasters, so

16   they know from me that -- that we don't

17   want to ride large coasters, but they can

18   take other -- other rides at the park.

19        Q.    Have you ever asked them if

20   either of -- well, strike that.

21              Have they been back to the

22   park without you being present since

23   April 23rd, 2017?

24        A.    Maybe.  I don't know.  I --

SA167

Christopher James Fabricant

```
 1   I tend to doubt it.
 2        Q.    Have they been to any other
 3   parks, fairs, carnivals, piers --
 4        A.    Yeah, they like -- at Point
 5   Pleasant Beach, there is -- is it
 6   Winkleman's?  There is a -- there's an
 7   arcade in an amusement area at Point
 8   Pleasant Beach there.
 9             Their grandparents live in
10   Point Pleasant, so they like to go to the
11   arcade and sometimes take a ride over
12   there.
13        Q.    Do they go on the rides at
14   that pier?
15        A.    I haven't accompanied them
16   at that pier since they were small
17   children taking small children's rides,
18   so I can't answer that.
19        Q.    Have you prohibited them
20   from going on roller coasters completely
21   or only at Great Adventure?
22        A.    Oh, it's just a -- it's just
23   like -- it's a general -- it's a general
24   recommendation and it's not a
```

SA168

¹ prohibition.

²             I have told the boys that I

³ was injured and that -- and that the

⁴ large coasters can be dangerous and asked

⁵ them not to ride the coasters.

⁶             So we don't have a family

⁷ where the father makes prohibitions.

⁸      Q.   Do you know if they've

⁹ ridden coasters since April 23rd, 2017

¹⁰ one way or the other?

¹¹      A.   I suspect they have not, but

¹² you -- you would have to ask the boys and

¹³ see what they say.  The boys are -- are

¹⁴ honest young men and they will answer

¹⁵ your question just the way -- just the

¹⁶ way you've asked it.

¹⁷      Q.   You indicated, I believe,

¹⁸ that you've returned to Great Adventure

¹⁹ one additional time since April 23rd,

²⁰ 2017; correct?

²¹      A.   That's right.

²²      Q.   When was that?

²³      A.   Either in the fall of 2017

²⁴ or 2018, and then again in April of 2019.

SA169

1     Q.    What was the purpose of

2   returning in April of 2019?

3     A.    To gather information for

4   the lawyer, Gary Meyers.

5     Q.    And you indicated that Mr.

6   Gill advised you of the reporting

7   requirement at some point in 2019?

8     A.    Yeah, that's right, after --

9   I met with Mr. Gill in his office, who

10  Mr. Gill is friends with Bruce Nagel.

11  They both have -- have residences in

12  Delray, Florida, as he -- as he told me

13  or as I recall he told me.

14          And when I told him that I

15  was injured on a coaster and that Bruce

16  Nagel agreed to take it, but then just

17  became too busy, he -- he was somewhat

18  entertained and said that he would take

19  the case.  So he gave me a contract and I

20  signed the contract the next day.

21          But before I drove back to

22  his office, he wrote me a text or called

23  me on the phone saying that he wasn't

24  going to take the case because he just

SA170

1  found out about a reporting requirement

2  at Great Adventure, this 90-day reporting

3  requirement.

4          Q.    What month --

5          A.    So when I -- when I met with

6  him in his office, he said, yeah, you got

7  two years, you've got enough time to get

8  this in, but not a whole lot of time, so

9  let's get moving on it.

10                And then very soon afterward

11  he said, oops, sorry, you can't -- you

12  can't make a case against the park, but

13  you can still make a case against the

14  manufacturer and I said, okay, that's

15  very disappointing to me, but let's do

16  it.  He said, nope, I'm not going to take

17  the case because we need -- we need -- we

18  need liability against the park and the

19  manufacturer in order to proceed, so he

20  dropped me.

21                And when was that?  That was

22  2019.

23          Q.    When in 2019?

24          A.    Just before I made contact

Christopher James Fabricant

1  with -- with Mr. Meyers, February/March,

2  probably March.

3            And -- and, counselor, I

4  should say, I had a family member, a

5  young family member, who required much of

6  my attention for reasons that I won't

7  state that -- that consumed much of my

8  time in the early part of 2019.

9            So what had been a plan to

10 proceed with this matter very early in

11 2019 was dashed back by -- by family

12 matters.

13      Q.    In April of 2019 when you

14 returned to Great Adventure, was the

15 purpose of that visit to gather

16 information for Mr. Meyers, as you put

17 it?

18      A.    Yes, that's right.

19      Q.    Did anyone go with you?

20      A.    Yeah, my boys went with me.

21      Q.    Anyone else?

22      A.    No one else, just my boys.

23      Q.    Did they go on rides that

24 day?

1        A.    I don't believe so, but I

2    believe they went to the arcade.  They

3    stayed with me when I sat in the test

4    seat because I needed -- I needed

5    somebody to hold the camera.

6              But after that, they ran off

7    and enjoyed the attractions while I

8    gathered information, including

9    information about the signage or notices

10   regarding the 90-day reporting

11   requirement.

12       Q.    Were they with you when you

13   went to first aid and interrogated the

14   EMT there?

15       A.    "Interrogated the EMT."  I

16   think that -- that you're referring to

17   Elaine, I think she said her name was

18   Elaine, is that -- is that the

19   interrogation?

20       Q.    Yes, were your boys with you

21   when you went to first aid?

22       A.    I don't believe -- I don't

23   believe so.  They were with me perhaps

24   earlier.  I made two trips to first aid,

1    I believe, so -- so on one of the trips,

2    they were with me.  On another trip, they

3    would not have been with me, and that was

4    when I did have the conversation with

5    Elaine about filing an incident report

6    relating to my injury.

7          Q.    Right.  Were your boys with

8    you when you had your discussions with

9    multiple security personnel at the

10   entrance area of the park?

11         A.    No, they were not.

12         Q.    When you went to the park

13   that day, what did you bring with you --

14   and by "you," I'm referring to you and

15   your boys collectively -- for equipment

16   to be used for taking photographs and

17   video footage?

18         A.    A HERO camera, GoPro HERO

19   camera.  I bought the camera expressly

20   for the purpose of the task at hand and

21   haven't used it for anything else.

22         Q.    Did you also have a

23   cellphone with you?

24         A.    I'm sure I did.

SA174

Christopher James Fabricant

```
 1          Q.    Did your boys also have
 2   cellphones with them?
 3          A.    I'm sure they did.
 4          Q.    Did you have them take
 5   photographs for you?
 6          A.    I don't -- I don't recall.
 7   After -- you know, we've -- we've all
 8   gone through our cellphones to provide
 9   available information, so if they had
10   photographs, they were rendered in
11   discovery.
12          Q.    My question is, did you ask
13   them to take photographs for you that
14   day?
15          A.    Well -- well, certainly when
16   I was sitting in the test seat, one of
17   the boys had to take the photo or the
18   video if there was a video.  I don't
19   recall whether it's a still photo or a
20   video.
21          Q.    Other than at the test seat,
22   did you have either of the boys take any
23   photographs or video for you that day?
24          A.    I don't think so.  I think
```

SA175

Christopher James Fabricant

1   that that was the only occasion where --

2   where I was not in the position to take a

3   relevant photograph.

4         Q.    Did either of your boys --

5   strike that.

6               Was either of your boys

7   given the GoPro during that visit to take

8   photographs or video footage?

9         A.    I don't -- I don't have a

10  specific recollection, but I'm not sure

11  they -- I tend to doubt it.

12        Q.    So if Thibaut testified when

13  we started, but have not yet completed,

14  his deposition that he took a ton of

15  photographs and video for you that day,

16  that does not fit your recollection?

17        A.    Right.  I think there was --

18  there -- I don't think there would have

19  been an abundance of photographic or

20  video content that was acquired with

21  Thibaut's hand.

22              Thibaut was a participant in

23  the activity for a fraction of the time

24  and then he and Nico went off and enjoyed

SA176

Christopher James Fabricant

1   the amusements at the park while I

2   continued those activities relating to

3   gathering photographic or video

4   information relating to signage at the

5   park.

6           Q.    When you arrived at the park

7   that day, did you advise any employee of

8   the park the purpose of you being there?

9           A.    Well, the purpose that I was

10  there was to take my boys for

11  entertainment and to take photographs or

12  video of the signage in the park, so --

13  so, no, I don't think there's a

14  requirement to enter the park to give a

15  purpose for being at the park.

16          Q.    And I'm not asking whether

17  you believe there's a requirement or not.

18  My question was did you, and your

19  answer's no?

20          A.    Correct.

21          Q.    At some point in time, you

22  were approached by security, however,

23  because there were complaints about you

24  photographing and videoing other guests;

SA177

1    correct?

2         A.    I don't think I'm going to

3    agree with you that there were

4    complaints.  I don't -- I don't know that

5    there were complaints and I -- I tend to

6    doubt it.

7              There was concern expressed

8    by security at the -- at the baggage

9    check area that I was -- I was

10   inadvertently taking photographs of that

11   area and the concern expressed to me by

12   security was that because it was a

13   security checkpoint, that they didn't

14   want me to take photographs, even

15   inadvertent photographs, of that

16   location.

17             And I agreed with them that

18   photographs of the security area

19   shouldn't be included in any of my

20   photographs, so I moved on at that point.

21        Q.    Were you approached by an

22   employee or employees of the park a

23   second time --

24        A.    Yes.

SA178

Christopher James Fabricant

1    Q.    -- and asked to stop?

2    A.    Yes, I was.

3    Q.    What reason were you given

4  that second time?

5    A.    Among the reasons that were

6  given was the one that you stated, that

7  -- that there were complaints from guests

8  about me taking photographs.

9    Q.    And you were explicitly told

10  that if you wanted to take photographs of

11  the signs, that was fine; correct?

12   A.    I don't -- I don't -- I

13  don't know about that, counselor.  I

14  would have to review the video footage to

15  see if -- to see if such a statement was

16  made, but they wanted me out of the park

17  and they wanted me to stop taking

18  pictures of the signs.

19   Q.    That's your recollection?

20   A.    Well, yeah, I was escorted

21  out of the park by a -- by a police

22  officer, not a security guard from the

23  park, but by a security officer from, I

24  believe, Jackson Township who they called

SA179

Christopher James Fabricant

1  to have me -- to have me taken away from

2  the park.

3       Q.    And that was after you were

4  asked to stop taking photographs and

5  video footage, but you continued;

6  correct?

7       A.    No, I don't believe so.  I

8  think it was coincident.  So they -- they

9  said -- okay.  Let's back up.  I believe

10 that they said don't take pictures of the

11 security -- security checkpoint and I

12 said of course I'll stop -- I'll stop

13 inadvertently capturing the security

14 checkpoint.

15            And I told them I'm just

16 taking pictures of the signs.  And then

17 continued to do that and then they came

18 up to me and said people are complaining

19 and you're going to have to leave the

20 park.

21            So I don't believe -- and I

22 feel pretty strongly about this -- I

23 don't believe that they told me to stop

24 taking photos and video until they made

1   the decision that not only would I have

2   to stop, but I would be removed from the

3   park.

4           Q.    Did an employee of Six Flags

5   tell you that they had called Jackson

6   Township police to remove you?

7           A.    That's probably too strong,

8   also.  They had -- they had the police

9   there on hand to -- probably to ensure

10  that I would leave the park on their

11  direction.

12          So probably -- well, I won't

13  speculate, but when they ultimately asked

14  me to leave the park, there was a Jackson

15  police officer on hand who was present,

16  but who was not an active participant in

17  the matter.  He was seeming to just

18  oversee the activities, because I was not

19  looking to defy the park personnel.  I

20  was very happy to comply with their

21  directives and if their directive was to

22  -- that I would have to leave the park,

23  then I would leave the park.

24          Q.    You did continue taking

SA181

Christopher James Fabricant

1   photographs and video footage after they

2   asked you to stop; correct?

3          A.    I don't believe so.  No,

4   they asked me to stop taking photographs

5   of -- that captured the security area.

6          Q.    When is the last time you

7   actually watched and listened to the

8   video footage that you took?

9          A.    Several weeks ago.

10          Q.    Okay.  All right.  When you

11   went to -- strike that.

12                When you were taking all of

13   the photographs and video footage with

14   the GoPro of the signage, people, the

15   entrance/exit area, guest services, all

16   of those areas, ride information center,

17   were you holding the GoPro in your hand?

18          A.    Yes, always.

19          Q.    When you went to first aid,

20   were you using the GoPro to video?

21          A.    Yes.

22          Q.    Did you advise the employee

23   in first aid that you were videoing?

24          A.    I had the GoPro in my hand

SA182

Christopher James Fabricant

¹ facing the individual who I was talking

² to.

³      Q.    That's not my question.  Did

⁴ you advise her that you were recording

⁵ her?

⁶      A.    No, I don't have a

⁷ recollection of that.

⁸      Q.    Did you ask her permission

⁹ to record her?

¹⁰      A.    No.  My understanding is

¹¹ that there aren't restrictions on

¹² photographs or video at the park.

¹³      Q.    When you were on Kingda Ka,

¹⁴ which row of seats -- strike that.  I

¹⁵ assume Nico was next to you.

¹⁶      A.    Correct.

¹⁷      Q.    Which row of seats were you

¹⁸ in on the train?

¹⁹      A.    My recollection is that we

²⁰ were near the back, but not in the back.

²¹      Q.    But you believe there was at

²² least one row of seats behind you?

²³      A.    That's right.

²⁴      Q.    Do you believe there were at

1   least two or you can only say one with

2   certainty?

3          A.    Yeah, one or more.  I can't

4   say with -- with more specificity.

5          Q.    What color was the train?

6          A.    I don't recall.

7          Q.    Do you recall the color of

8   the restraint?

9          A.    I don't.

10         Q.    Do you recall the color of

11  the straps that went from above your

12  shoulders down to the restraint?

13         A.    It's -- it's all the

14  restraint.  There's a restraint system

15  that has over-the-shoulder harnesses and

16  a lap -- and a lap bar.  Is that -- is

17  that your understanding?

18         Q.    Let's stick with my

19  question, which is, with regard to the

20  straps that went from behind you, over

21  your shoulders, and down to the

22  restraint, do you recall what color those

23  straps were?

24         A.    I'm not sure I agree with

Christopher James Fabricant

1   your characterization of them as straps.

2   They have some rigidity.  I think about

3   straps as a flexible piece of cloth.  A

4   rigid harness isn't a strap.

5           There's a strap I think

6   between -- between the legs on this -- on

7   this restraint system.

8       Q.    Sir, whether you like my

9   terminology or not, I assure you it's

10  accurate within the amusement industry in

11  which I've been working for 20-plus

12  years.

13      A.    Thank you.

14      Q.    You know the part that I'm

15  talking about.  Do you recall what color

16  it was?

17      A.    I don't, no.  Probably

18  green.

19          MR. MEYERS:  I'm going to

20      caution the witness not to guess.

21          THE WITNESS:  Thanks.

22      Thanks.

23  BY MS. EICHENBAUM:

24      Q.    When you boarded the train,

SA185

Christopher James Fabricant

¹ did Nico get in first or did you?

²      A.    Nico.

³      Q.    So once you were seated, he

⁴ was to your right?

⁵      A.    To my left, facing forward.

⁶      Q.    Did you step over him to

⁷ board?

⁸      A.    No.  He was --

⁹      Q.    Or past him?

¹⁰      A.    No.  He -- he entered first

¹¹ and he moved from right-sided boarding

¹² area to left seat and then I became

¹³ seated after him in the right seat facing

¹⁴ forward.

¹⁵      Q.    Have you gone back up into

¹⁶ the Kingda Ka station at any point in

¹⁷ time since April 23rd, 2017?

¹⁸      A.    No, I have not.

¹⁹      Q.    When you were waiting to

²⁰ board the train at Kingda Ka, did you

²¹ notice an elevated booth with an employee

²² or employees in it?

²³      A.    Yes.

²⁴      Q.    Was that on the same side of

SA186

Christopher James Fabricant

1  the train that you were waiting on or was

2  it on the opposite side?

3        A.   I don't recall.  I recall

4  the attendant communicating about --

5  about my trouble with the harness, and my

6  recollection was that he was

7  communicating with someone who was in

8  some form of enclosure or booth.

9              So -- so I don't have a

10 specific recollection about where that --

11 that booth or that control area may have

12 been located.

13       Q.   During the course of the

14 ride on Kingda Ka, did the pain that

15 you've described get any worse at any

16 point or was it constant from launch?

17       A.   Yes, constant from launch.

18 And it may have gotten worse during the

19 ride.

20       Q.   That was my question.  Did

21 it get worse during the course of the

22 ride or was it constant?  So if you don't

23 remember --

24             MR. MEYERS:  I'm going to

SA187

Christopher James Fabricant

```
 1        object --
 2   BY MS. EICHENBAUM:
 3        Q.    -- that is fine --
 4            MR. MEYERS:  I'm going to
 5        object to the form of the
 6        question.
 7            But you can answer it if you
 8        can answer.
 9            THE WITNESS:  The -- yes,
10        the pain seemed to get worse
11        during the course of the ride.
12   BY MS. EICHENBAUM:
13        Q.    Was it progressive or did it
14   -- was there any other particular point
15   during the course of the ride where you
16   noticed an increase?
17        A.    There was -- the whole ride
18   was painful.  It became more painful as
19   -- as the ride progressed and as the ride
20   made aggressive movements.
21        Q.    And my question is, was that
22   a progressive pain or was there another
23   particular point during the course of the
24   ride where you felt an apparent acute
```

SA188

Christopher James Fabricant

1  change in the level of your pain?

2       A.    With aggressive change of

3  direction of the ride, I experienced

4  coincident worsening of pain.

5       Q.    You've indicated that during

6  the ride, you felt that the restraint got

7  tighter; is that correct?

8       A.    Yes, it certainly did.

9  That's the whole point.

10      Q.    What do you mean, that's the

11  whole point?

12      A.    Let's strike that.  So --

13  so, yes, it certainly did get tighter

14  during the ride.

15      Q.    And my follow-up question

16  is, what did you mean when you said

17  that's the whole point?

18      A.    I spoke inadvertently.  I

19  didn't have any meaning.

20      Q.    I didn't give the

21  instruction at the beginning and I guess

22  I should have, but you've taken an oath

23  here today to tell the truth in response

24  to every question, and that oath is as

SA189

Christopher James Fabricant

1   significant as if you were before a judge

2   and a jury in a court of law.

3          A.     Thank you.

4          Q.     So you just made a statement

5   "that is the whole point."  My question

6   to you is, what did you mean by that?

7   You meant something.  You said it for

8   some reason.  What was the reason?

9          A.     I said that I wanted to

10   strike that part of my answer because I

11   didn't have a reason for saying it that

12   -- that I could -- that I could

13   articulate or comprehend.  So I -- I

14   really, counselor, don't know why I said

15   it and that's the point.

16              That's the -- can you read

17   me back the question?  Maybe that will

18   help me to understand why I said that.

19          Q.     Let me ask you this:  Do you

20   believe that you were injured because the

21   restraints tightened during the course of

22   the Kingda Ka ride?

23          A.     I think that contributed to

24   the injury, but may not have been the

SA190

1   primary factor.

2          Q.    What do you believe the

3   primary factor was?

4          A.    I'm not an expert in

5   whiplash-type injuries.  Should I give my

6   opinion, not being an expert?

7          Q.    You can give a lay person's

8   opinion.  I'm asking you what you

9   believe.

10         A.    I think that on coasters,

11  designers of coasters want to provide a

12  smooth development of forces against the

13  body and want to provide support for body

14  parts during a smooth progression of

15  forces.

16              If you have a smooth

17  acceleration and supported body parts,

18  then the ride affords protection against

19  injury.  If during smooth acceleration

20  you introduce jerking or snapping or

21  crackling or popping types of forces,

22  which are forces not in line with the

23  smooth acceleration, then injury would be

24  more likely to occur.

SA191

1           If you have unsupported body

2     parts and new forces introduced beyond

3     those contemplated by the designers

4     because the harness is crushing a rider's

5     shoulders, then the body is subjected to

6     those forces.

7           And if the response of the

8     rider to a crushing force against the

9     shoulders is to contract muscles, like

10    buttock muscles that would only serve to

11    amplify forces against the shoulders, all

12    of these are contributing, I think, to

13    the pain that I experienced during the

14    ride and the injury to my body parts that

15    I experienced during the ride.

16         Q.    Did you sustain any injury

17    to either of your shoulders in your ride

18    on Kingda Ka?

19         A.    I'm not aware of any

20    internal injury to my shoulders.

21         Q.    Did you have any bruising on

22    either of your shoulders?

23         A.    I did on the right side over

24    the acromioclavicular joint, which is on

SA192

Christopher James Fabricant

1  the point of the shoulder (Indicating),

2  so...

3      Q.    And you took a photograph of

4  that of course?

5      A.    No, I didn't, counselor.

6      Q.    No.  So there's no evidence

7  of that bruising that we're hearing about

8  for the first time now?

9          MR. MEYERS:  Object to the

10         form of the question.

11         But you can answer it.

12         THE WITNESS:  That's right,

13     there's no photographic evidence

14     of the bruising on my right

15     shoulder.

16 BY MS. EICHENBAUM:

17     Q.    Is it reported in the

18 medical record from your first

19 appointment following your ride on Kingda

20 Ka?

21     A.    You'd have to look at the

22 medical record, but -- but -- the medical

23 record would indicate that I had severe

24 shoulder pain after riding the ride, but

SA193

Christopher James Fabricant

1  whether it indicates bruising or not,

2  that's to the examiner.

3      Q.    Did you show the physician

4  that you first saw after riding Kingda Ka

5  bruising on your shoulder?

6      A.    I don't -- I don't -- I

7  don't have recollection of that.

8      Q.    Did you have any imaging

9  studies done of either of your shoulders

10  as opposed to your cervical spine?

11      A.    No, I did not.

12      Q.    Then you've not received any

13  medical attention for either of your

14  shoulders; correct?

15      A.    Yeah, that's correct,

16  counselor.

17      Q.    Did you show anyone the

18  bruising on your shoulder?

19      A.    I don't -- I don't have any

20  recollection of that.

21      Q.    When you first sat on the

22  seat in Kingda Ka and lowered your own

23  restraint, were the straps coming down

24  over your shoulders actually in contact

SA194

Christopher James Fabricant

1   with your shoulders?

2          A.    Yes.

3          Q.    And at that point, did you

4   secure the crotch strap on the restraint?

5          A.    I don't -- I don't recall

6   the -- I don't recall engaging the crotch

7   strap.

8          Q.    Do you recall connecting the

9   crotch --

10         A.    No, I'm sure -- I would have

11  had to engage the crotch strap.  So just

12  when in the sequence the crotch strap was

13  engaged is unclear to me.

14                Was -- was it -- so -- so

15  the harness was pulled down.  The crotch

16  strap was secured.  And then was the --

17  was the harness pulled down more so after

18  the crotch strap -- I believe that's --

19  that's the sequence.

20         Q.    Did you tighten the crotch

21  strap once it was attached?

22         A.    I -- I don't -- I don't know

23  that the crotch strap is adjustable.  The

24  shoulder harness is adjustable.

SA195

1    Q.    I assure you it is.  So my
2  question is, did you adjust the crotch
3  strap once you had lowered your restraint
4  and connected the two ends of that crotch
5  strap restraint?
6    A.    Did I do what?  Adjust the
7  tension of the crotch strap?
8    Q.    Correct.
9    A.    I don't have a recollection
10  of how I handled the crotch strap.
11    Q.    So you don't recall either
12  way, whether you did or not --
13    A.    That's right.
14    Q.    -- fair?
15    A.    That's right -- well --
16  that's right, yes.
17    Q.    After you claim that the
18  employees released the restraint and then
19  you closed it again, were the shoulder
20  straps contacting your shoulders at that
21  point?
22    A.    There -- I think that --
23  that -- when I pulled it down the second
24  time, it was just at the location of my

Christopher James Fabricant

1  shoulders.  So it would have been the

2  case where there was no free space

3  between shoulders and strap except for

4  perhaps to slide a piece of paper, so

5  there wasn't a gap there.  It was a flush

6  circumstance.

7       Q.    Were the shoulder straps

8  contacting any other spot or spots on

9  your body when you closed the restraint

10  the first time, other than your

11  shoulders?

12       A.    Well, both times, the -- the

13  shoulder straps -- well, there's a

14  harness system.  It's got a lap bar and

15  it's got over-the-shoulder harnesses and

16  then it's got the seatbelt or the crotch

17  strap.

18            So the first time I pulled

19  it down, it was too tight against the top

20  of my shoulders.  The second time I

21  pulled it down, it was flush, which means

22  it wasn't making contact or pulling

23  against my shoulders, but it was directly

24  atop my shoulders.

SA197

Christopher James Fabricant

1    Q.    I understood all of that

2   testimony and my question was, was any

3   other portion of either of those straps

4   that were contacting both of your

5   shoulders the first time you lowered the

6   restraint contacting any other part of

7   your body?  For instance your chest --

8    A.    Oh.

9    Q.    -- as an example.

10    A.    No, the lap bar came down

11   against my pelvis or front of my thigh

12   area, but -- but, no, the -- the shoulder

13   harness was not firmly pressed against my

14   abdomen.

15    Q.    My question is, was it

16   contacting any part of your body other

17   than your shoulders?

18    A.    The shoulder harnesses were

19   directly atop my shoulders.  The lap bar

20   was making contact with other parts of

21   the body.

22    Q.    Let me do it this way:

23   There is a horizontal portion that is at

24   your pelvis or thighs; correct?

Christopher James Fabricant

```
 1         A.    Right.   Now are you calling
 2    that part of the shoulder straps?
 3         Q.    I'm not.
 4         A.    Okay.
 5         Q.    So the shoulder straps are
 6    the straps on either side of your head
 7    that go vertically, albeit curved --
 8         A.    Yes.
 9         Q.    -- from behind you --
10         A.    Yes.
11         Q.    -- down to connect to that
12    lap bar that is on your lap or --
13         A.    Yes.
14         Q.    -- pelvis or thighs.
15         A.    Uh-hum.   Uh-hum.
16         Q.    Was any portion of those
17    vertical shoulder straps contacting any
18    part of your body other than your
19    shoulders?
20         A.    Well, where the -- where the
21    over-the-shoulder portion of the harness
22    comes down to meet the lap bar, the
23    lowest portion of the over-the-shoulder
24    harness where it meets the lap bar would
```

SA199

1  be in contact with the body where the lap

2  bar is in contact with the body.

3          But the -- but the -- but

4  the shoulder straps weren't touching my

5  head.  They weren't touching my chest, if

6  that's what you're asking.

7          MS. EICHENBAUM:  Jamie,

8      could you put back up C.

9      Fabricant-1, please?

10          (Pause.)

11          MS. EICHENBAUM:  Could you

12      enlarge it just -- I know.  This

13      may or may not work -- just a bit

14      so that we've got the orange

15      portion of the straps and lap

16      restraint, please?  If that's

17      possible.  Perfect.

18  BY MS. EICHENBAUM:

19      Q.    Looking at this photograph

20  that we know was taken at least months

21  later, if not years after --

22      A.    Yes.

23      Q.    -- your ride on Kingda Ka --

24      A.    Yes.

1    Q.    -- does this photograph meet
2  your recollection of what the Kingda Ka
3  seat that you were seated in during your
4  ride on April 23rd, 2017 looked like?
5    A.    As a general term, as a
6  general expression, yes.
7    Q.    Is that what you recall the
8  shoulder straps and lap restraint looking
9  like?
10    A.    Yes.
11    Q.    And aside from perhaps
12  color, but I'm talking about the
13  substance of them.
14        And what about the crotch
15  strap; does that appear to be the same to
16  your recollection of where it connected
17  back during your ride in 2017?
18    A.    I can't see in this
19  photograph where the connection between
20  the crotch strap is and the -- and the
21  place where you secure the crotch strap.
22        So this is a still photo,
23  which may represent the harness in a
24  position that's not -- that wouldn't have

1  been the final position.

2      Q.    You believe that the harness

3  is not in the same position in this

4  photograph as it was when you rode the

5  ride back on April 23rd, 2017?

6      A.    Well, it -- it -- in this, I

7  don't know if the -- I don't know if the

8  crotch strap has been secured in this one

9  here.

10     Q.    Okay.  That aside, do you

11 believe the harness -- the lap restraint

12 -- the orange --

13     A.    Yeah.

14     Q.    -- so that we're not mincing

15 terms and arguing over what we're going

16 to call things --

17     A.    Thank you.

18     Q.    -- do you believe that the

19 orange portion of the seat shown in this

20 photograph accurately shows the position

21 of your restraint system when you rode

22 Kingda Ka on April 23rd, 2017?

23     A.    I really can't say because

24 the test seat does not have a locking

1   mechanism.

2          Q.    Well, what was your point in

3   having this photograph taken?

4          A.    Well, to show the position

5   of the -- to show the position of my

6   body, the harness on a roller coaster

7   that had injured me, and to see if I

8   could get some insight about -- about the

9   injury that occurred.

10         Q.    Right.  So --

11         A.    And after looking -- and

12  after looking at it, seeing the position

13  of the headrest too low in the back, I

14  said, well, gee whiz, that's probably a

15  big contributor to my injury, that the

16  headrest didn't support my head during

17  the ride.

18         Q.    When you went to take this

19  photograph, was it with the intent that

20  you'd be sharing it with an attorney who

21  you were hoping would accept your case?

22         A.    No, I think the attorney did

23  accept the case already.  I think it was

24  a -- it was part of gathering information

Christopher James Fabricant

1  for the case.

2           Q.    So you made every effort in

3  taking this photograph or having it taken

4  to re-create the position you were in on

5  the ride on the day of the incident,

6  didn't you?

7           A.    Counselor, I have to say,

8  the test seat does not have a locking

9  mechanism, so you can't re-create the

10 experience or the circumstance just prior

11 to launch in the test seat.

12               The -- the -- so there's no

13 -- it doesn't lock into position, so you

14 pull the strap through.  The yellow mark

15 comes through to the desired position.

16 The attendant tells you that it fits you

17 fine, you'll do great.

18               So -- so that's without a

19 locking mechanism demonstrated and

20 without knowledge that the locking

21 mechanism will allow the thing to become

22 tighter during the ride.

23          Q.    When you were preparing to

24 have this photograph taken, did you pull

SA204

Christopher James Fabricant

1    the restraint down as far as you could?

2         A.    Pull the restraint down as

3    far as I could.  I pulled it down until

4    the mark on the crotch strap -- I mean,

5    it's got instructions, the test seat

6    does, so I secured the harness in the

7    manner that is described in order to

8    provide you with an expectation that you

9    could proceed and take the ride.

10              So there -- there -- does

11   that answer your question?

12        Q.    No.  My question was, did

13   you pull the restraint or push the

14   restraint down as low as you could get it

15   when this photograph was taken?

16        A.    Well, in this particular

17   photograph, no, it's not down to its

18   lower position.  It's raised from the low

19   position.  So it's a still photograph and

20   I don't know if I have a video or not

21   that shows the thing coming down.

22              And -- and -- so -- so twice

23   after the event, I pulled it down,

24   secured the crotch strap, the yellow mark

SA205

Christopher James Fabricant

1     came through, the attendant said, sure,

2     you're good to go, in so many words.

3            So in this photograph, the

4     harness does not appear to be in its low

5     position that would have been present at

6     the time of launch.

7         Q.    Did you push the restraint

8     down in this photograph?

9         A.    I -- I don't have a

10    recollection of securing the crotch strap

11    in this photograph.

12        Q.    I didn't ask you about the

13    crotch strap, sir.  You keep going back

14    to a crotch strap.

15            Did you push or pull the

16    restraint down as low as you could get it

17    when you were sitting in the test seat

18    for this photograph?

19        A.    It doesn't appear that it's

20    in the low position, so -- so for this

21    photograph, it doesn't appear that the --

22    that the shoulder harness is down in its

23    lowest position.

24        Q.    So you went to take a

SA206

Christopher James Fabricant

```
 1   photograph and you're claiming at least
 2   in part that you were injured because the
 3   shoulder straps tightened, but you didn't
 4   make the effort to tighten the restraint
 5   to show what you believed it looked like
 6   on the day of the accident.  Did I get
 7   that?
 8                MR. MEYERS:  I'm going to
 9        object to the form of the
10        question.
11                But you can answer.
12                THE WITNESS:  I took a
13        picture of myself in the test seat
14        to show the seat relative to my
15        body and the harness as it -- as
16        it is present in the test seat.
17                This photograph might have
18        been captured at the moment of
19        movement of the harness to a low
20        position or at the movement of
21        harness upward.
22                So I don't know when the
23        photograph was taken with respect
24        to what you described as the final
```

SA207

Christopher James Fabricant

```
 1          position or the low position of
 2          the harness on this particular
 3          occasion when I was sitting in a
 4          test seat that doesn't have the
 5          locking mechanism that's present
 6          in the actual ride.
 7  BY MS. EICHENBAUM:
 8          Q.    Before taking this
 9  photograph, did you push down on the lap
10  bar as hard as you could to get it as low
11  as you could?
12          A.    No, it doesn't -- it doesn't
13  appear like I'm pushing it down as hard
14  as I could, so no.
15          Q.    What would it appear like if
16  you were pushing it down as hard as you
17  could?
18          A.    I think it would be in a
19  lower position.
20          Q.    Were you wearing a
21  sweatshirt under your jacket in this
22  visit to the park?
23          A.    I don't recall.
24          Q.    Can you tell from this
```

SA208

Christopher James Fabricant

1  photograph?

2        A.    I can see a -- I can see

3  what appears -- a T-shirt.  I can't see

4  anything besides the T-shirt, so I don't

5  -- I don't know if there's anything

6  additional.

7        Q.    And you've indicated you

8  don't recall what you were wearing when

9  you went to the park on April 23rd, 2017;

10 correct?

11       A.    That's right.

12       Q.    Were you leaning your head

13 back in this photograph?

14       A.    Counselor, this is after my

15 neck injury and my surgery, so I have

16 limited range of motion of my neck.

17       Q.    That's not my question.  My

18 question is, were you leaning your head

19 back in this photograph?

20       A.    Probably as far as I could.

21 I have limited range of motion in my

22 neck, so I have problems when I move my

23 neck to even what would be considered

24 relatively modest positions.

SA209

 1          Maybe this will help --
 2  maybe this will help answering that
 3  question:  If I stand against a flat wall
 4  and I try to put my head back against the
 5  wall, the lower portion of my back comes
 6  off of the wall because of the fused area
 7  of my neck.
 8          So -- so I don't have the
 9  ability to move my head in a typical way
10  after my injury and after my fusion of
11  the spine.
12      Q.    All right.  So this
13  photograph really does not depict how you
14  would have been seated or restrained on
15  the day of April 23rd, 2017; is that
16  fair?
17      A.    No, it's -- it gives -- no,
18  I don't think that's fair.  I think it
19  gives a pretty good sense for my body's
20  dimensions relative to the seat on Kingda
21  Ka and it gives great insight into the --
22  into the mechanism by which I suffered a
23  catastrophic injury to my neck on the
24  ride that day.

SA210

Christopher James Fabricant

```
 1          Q.     You're not an engineer;
 2   correct?
 3          A.     Before, you seemed
 4   interested in my opinions as a layman.
 5   So I just -- just expanded upon them for
 6   you, counselor.
 7          Q.     You're not an engineer;
 8   correct?
 9          A.     That's right, I'm not an
10   engineer.
11          Q.     You have no experience in
12   designing rides or what goes into them;
13   correct?
14          A.     That's correct, counselor.
15          Q.     All right.  And you've just
16   indicated that your range of motion in
17   your neck is significantly different now
18   than it was on April 23rd, 2017; correct?
19          A.     Yes.
20          Q.     So the position that your
21   neck and/or head are in in this
22   photograph does not accurately depict
23   what your head and neck position would
24   have been back on April 23rd, 2017;
```

SA211

Christopher James Fabricant

1  correct?

2      A.    It depends with what

3  respect.  So -- so --

4      Q.    With all respects, in all

5  respects, sir.

6      A.    No, I -- no, I -- I'm not

7  going to go along with that.  My spine is

8  fused, but the rest of my body is the

9  rest of my body, counselor.

10     Q.    I understand that and my

11 question was specifically about your head

12 and neck.

13     A.    No, I don't think it was.

14           Could we read back the

15 question, please, Kim?

16           MS. EICHENBAUM:  We need

17      your video back, sir.

18           THE WITNESS:  I beg your

19      pardon?

20           MS. EICHENBAUM:  We need

21      your video back.

22           THE WITNESS:  Video.  What

23      video?  Oh, oh, sorry, sorry.

24           That was another incoming

Christopher James Fabricant

1    call.

2                    -  -  -

3              (The court reporter read the

4        pertinent part of the record.)

5                    -  -  -

6              THE WITNESS:  Thank you,

7        Kim.

8              So counselor, yes, so you

9        were right and I was wrong, so --

10       so -- so, yes, we would expect

11       that --

12             MS. EICHENBAUM:  That's

13       fine.  That's -- the "yes" was

14       great.

15             THE WITNESS:  Okay.

16             MS. EICHENBAUM:  That's just

17       --

18             THE WITNESS:  Thank you.

19             MR. MEYERS:  I'm sorry.

20       Could you let him finish his

21       response, please?

22             Finish your response.

23             THE WITNESS:  Thanks.

24       Thanks, Gary.  So insofar as my

SA213

1           neck has limitations relating to

2           the surgery, the photograph --

3           insofar as my neck has limitations

4           in movement relating to the

5           surgery, I may not have been able

6           to adopt the same position in the

7           chair exactly so as I had on 2017.

8    BY MS. EICHENBAUM:

9           Q.    And you've already also said

10   that you don't believe that the restraint

11   shown in this photograph is in the same

12   position as it was when you rode on April

13   23rd, 2017; correct?

14          A.    Yes.

15          MS. EICHENBAUM:  We can take

16          that down, Jamie.  Thanks.

17   BY MS. EICHENBAUM:

18          Q.    Were the straps that went

19   over your shoulders padded?

20          A.    They're -- they're -- I

21   don't think there's padding, per se.

22   There is just -- just from that

23   photograph -- you want to put the

24   photograph back up, I'll describe what I

SA214

Christopher James Fabricant

```
 1   see.

 2        Q.    I'm interested in your

 3   recollection, sir.  Do you recall --

 4        A.    I don't -- I don't -- I

 5   don't recall any thick padding on the --

 6   on the shoulder harness.

 7        Q.    I didn't limit it to thick

 8   or thin or any qualifications.  Do you

 9   recall there being any padding on the

10   shoulder straps?

11        A.    I -- I'm having trouble with

12   the straps.  I mean, the strap -- maybe

13   there's a cloth portion beneath the rigid

14   portion and -- and to someone's mind the

15   cloth portion could be termed a cushion

16   of some sort.

17             So I -- I would -- would --

18   I don't think there's a traditional

19   cushion -- what would be traditionally

20   considered a cushion beneath those --

21   those shoulder harnesses.

22        Q.    When the train left the

23   station, describe for me the movement of

24   the train.
```

SA215

Christopher James Fabricant

1         A.    Rapid acceleration.

2         Q.    Right from the station?

3         A.    Yes -- oh, no, you -- you

4   roll out to a -- you roll out to the

5   launch area.  So -- so you roll up to the

6   launch area.  There's some form of a --

7   of an indication about how soon you're

8   getting to launch and then the launch

9   occurs.

10        Q.    Were you having any

11  conversation with Nico as the train was

12  pulling forward to the launch location?

13        A.    No, none.

14        Q.    Was he saying anything to

15  you?

16        A.    No, he was not.

17        Q.    Had he ever been on Kingda

18  Ka before?

19        A.    I think it's fair to say

20  that, no, he was never on Kingda Ka

21  before or since.

22        Q.    Was he excited to be going

23  on it?

24        A.    He had an interest to go on

SA216

Christopher James Fabricant

1   the ride.  He asked me to accompany him

2   on the ride because he didn't want to go

3   by himself, so -- so he and the girls had

4   an interest to take the ride.

5         Q.    But they weren't excited

6   about it.

7         A.    Excitement, interest, it's

8   -- it's -- it's -- could be one and the

9   same.

10        Q.    Could they not be one and

11  the same?

12        A.    Yeah, certainly they could

13  not be one and the same.  How -- if they

14  were excited a little bit, they were very

15  interested perhaps.

16            So I -- I'm not sure -- so

17  let me answer it this way:  So the kids

18  were not jumping up and down saying to me

19  how excited they were that they would be

20  riding Kingda Ka.  They came up to me and

21  said, hey, we're interested to take

22  Kingda Ka, the big coaster, would you

23  join us and I said, sure.  So we went to

24  the ride and took the ride.

Christopher James Fabricant

```
 1              I don't think there was -- I
 2   don't think there was a whole lot of
 3   overt excitement that I perceived on the
 4   part of the children.  They were
 5   interested to have an experience of
 6   taking this big coaster that was touted
 7   with all the -- all the biggest and
 8   fastest descriptions and -- and we went
 9   and took the ride.
10              So, no, "excitement" I think
11   is -- is too strong.
12        Q.    Once you were seated on the
13   ride and you put your head back against
14   the headrest in accordance with the
15   signage that you said you had read and
16   followed --
17        A.    Yes.
18        Q.    -- did you have any concern
19   about where your head was contacting the
20   headrest?
21        A.    No, I didn't.
22        Q.    You indicated that the
23   restraint tightened during the ride.  Did
24   it tighten only at launch or do you
```

1  believe it also continued to tighten

2  after launch during the course of the

3  ride or do you not know?

4      A.   I think that it continued to

5  tighten during the ride, so I think it

6  tightened at the launch and I think it

7  tightened more during the ride.

8            MR. COLLER:  Folks, can we

9       take a couple minutes?

10           MR. MEYERS:  Sure.

11           THE WITNESS:  Yes.

12           MS. EICHENBAUM:  What time

13      do you have?

14           MR. COLLER:  Quarter of and

15      then I want to just discuss some

16      scheduling issues before we go

17      back on the record at a quarter

18      of.

19           THE WITNESS:  So five

20      minutes did you say?

21           MR. COLLER:  Yeah.

22           THE WITNESS:  Okay.  Thanks.

23           THE VIDEO TECHNICIAN:  The

24      time is 3:39 p.m.  We're going off

Christopher James Fabricant

1    the record.

2         (A recess was taken from

3    3:39 p.m. to 3:52 p.m.)

4         THE VIDEO TECHNICIAN:  The

5    time is 3:52 p.m.  We are back on

6    the record.

7         MS. EICHENBAUM:  So we took

8    a quick break and counsel had some

9    discussion, including the witness,

10   and we're going to adjourn for

11   today due to various issues.  We

12   won't be able to complete today --

13   the deposition today, so we'll be

14   back Thursday.

15        That time will be solidified

16   once Brenden, Counsel Coller,

17   finds out about an order to show

18   cause hearing, but we'll plan on

19   Thursday morning at some point to

20   reconvene.

21        Sir, just let me remind you

22   that while we're on the break,

23   which will now be a couple of days

24   as opposed to only a few minutes,

SA220

Christopher James Fabricant

```
 1          but you cannot have any

 2          substantive conversation with

 3          anyone, including counsel, about

 4          the substance of your deposition.

 5               Do you understand?

 6               THE WITNESS:  Yes, I do.

 7               MR. MEYERS:  Well, I'm not

 8          sure I agree with that including

 9          counsel --

10               MS. EICHENBAUM:  That's

11          absolutely the case, Gary.  He is

12          still under oath and he remains so

13          until we reconvene.  You cannot go

14          back and have discussion with the

15          witness about anything to do with

16          the testimony, the facts, the

17          allegations, or anything else in

18          the midst of a deposition.

19               And if you're going to

20          disagree with that, we're going to

21          have to involve the judge

22          immediately.

23               MR. MEYERS:  Why don't you

24          -- why don't you send me some
```

SA221

Christopher James Fabricant

1    authority for --

2        MS. EICHENBAUM:  I am not

3    sending you authority.  Are you

4    telling me that you're not going

5    to follow that very, very

6    well-known rule?

7        MR. MEYERS:  I didn't say

8    I'm not going to follow it.  I'm

9    saying I don't agree with it and,

10   frankly, I don't have any reason

11   to make a big issue out of it, but

12   I don't -- I don't agree that it's

13   proper.

14       And if I find an authority

15   that disagrees with it and I

16   decide to send it to you, we'll

17   talk about it, because we may wind

18   up going to the Court with that.

19       MS. EICHENBAUM:  If you want

20   to spend your time researching

21   that issue and sending me an

22   authority, we can talk about it.

23   I'm not going to waste my time

24   because I'm confident in my

SA222

1    position.  It is no different than

2    if we took an hour for lunch.  An

3    attorney cannot talk to the

4    witness in the midst of a

5    deposition, other than an issue of

6    privilege.

7         MR. MEYERS:  I think you're

8    wrong about that, but anyway,

9    we'll discuss it at another point

10   in time.

11        MS. EICHENBAUM:  Do I have

12   your agreement that there will not

13   be any substantive discussion with

14   the witness --

15        MR. MEYERS:  Yes.

16        MS. EICHENBAUM:  -- unless

17   and until you provide me with that

18   authority --

19        MR. MEYERS:  Yes.

20        MS. EICHENBAUM:  -- and we

21   have had the opportunity to

22   discuss it --

23        MR. MEYERS:  Yes.

24        MS. EICHENBAUM:  -- and

SA223

Christopher James Fabricant

1    raise it with the judge, if

2    necessary?

3              MR. MEYERS:  Yes.

4              MS. EICHENBAUM:  Thank you.

5              MR. MEYERS:  Okay.  I guess

6    we're all done.

7              THE WITNESS:  Thank you.

8              MR. MEYERS:  Thank you,

9    everybody.

10             THE VIDEO TECHNICIAN:  It is

11   3:54 p.m.  We are going off the

12   record.

13             (Witness excused.)

14             (Deposition adjourned at

15   approximately 3:54 p.m.)

16

17

18

19

20

21

22

23

24

SA224

```
 1
 2                         CERTIFICATE
 3
 4
 5              I, Kimberly A. Cahill, a
     Federally Approved Registered Merit
 6   Reporter, Certified Court Reporter and
     Notary Public, do hereby certify that
 7   prior to the commencement of the
     examination, the witness was duly
 8   remotely sworn by me to testify to the
     truth, the whole truth and nothing but
 9   the truth.
10              I DO FURTHER CERTIFY that
     the foregoing is a verbatim transcript of
11   the testimony as taken stenographically
     by me at the time, place and on the date
12   hereinbefore set forth, to the best of my
     ability.
13
                I DO FURTHER CERTIFY that I
14   am neither a relative nor employee nor
     attorney nor counsel of any of the
15   parties to this action, and that I am
     neither a relative nor employee of such
16   attorney or counsel, and that I am not
     financially interested in the action.
17
18                   _Kimberly A. Cahill_
     _____
19   KIMBERLY A. CAHILL, a
     Federally Approved Registered
20   Merit Reporter
     Certified Court Reporter
21   Notary Public
     Dated:  April 14, 2021
22
23
24
```

SA225

Christopher James Fabricant

```
 1              INSTRUCTIONS TO WITNESS

 2

 3              Please read your deposition

 4    over carefully and make any necessary

 5    corrections.  You should state the reason

 6    in the appropriate space on the errata

 7    sheet for any corrections that are made.

 8              After doing so, please sign

 9    the errata sheet and date it.

10              You are signing same subject

11    to the changes you have noted on the

12    errata sheet, which will be attached to

13    your deposition.

14              It is imperative that you

15    return the original errata sheet to the

16    deposing attorney within thirty (30) days

17    of receipt of the deposition transcript

18    by you.  If you fail to do so, the

19    deposition transcript may be deemed to be

20    accurate and may be used in court.

21

22

23

24
```

SA226

```
 1                 _   _   _   _   _

                    E R R A T A
 2                 _   _   _   _   _

 3      PAGE    LINE      CHANGE   |   REASON

 4      _____   _____    _____

 5      _____   _____    _____

 6      _____   _____    _____

 7      _____   _____    _____

 8      _____   _____    _____

 9      _____   _____    _____

10      _____   _____    _____

11      _____   _____    _____

12      _____   _____    _____

13      _____   _____    _____

14      _____   _____    _____

15      _____   _____    _____

16      _____   _____    _____

17      _____   _____    _____

18      _____   _____    _____

19      _____   _____    _____

20      _____   _____    _____

21      _____   _____    _____

22      _____   _____    _____

23      _____   _____    _____

24      _____   _____    _____
```

SA227

Christopher James Fabricant

1

2          ACKNOWLEDGMENT OF DEPONENT

3

4          I,_____, do

5    hereby certify that I have read the

6    foregoing pages, 1 - 228, and that the

7    same is a correct transcription of the

8    answers given by me to the questions

9    therein propounded, except for the

10   corrections or changes in form or

11   substance, if any, noted in the attached

12   Errata Sheet.

13

14

15   _____

16    CHRISTOPHER JAMES FABRICANT         DATE

17

18

19   Subscribed and sworn

     to before me this

20   _____ day of _____, 20_____.

21   My commission expires:_____

22

     _____

23   Notary Public

24

SA228

```
 1                        LAWYER'S NOTES

 2     PAGE    LINE

 3     _____   _____    _____

 4     _____   _____    _____

 5     _____   _____    _____

 6     _____   _____    _____

 7     _____   _____    _____

 8     _____   _____    _____

 9     _____   _____    _____

10     _____   _____    _____

11     _____   _____    _____

12     _____   _____    _____

13     _____   _____    _____

14     _____   _____    _____

15     _____   _____    _____

16     _____   _____    _____

17     _____   _____    _____

18     _____   _____    _____

19     _____   _____    _____

20     _____   _____    _____

21     _____   _____    _____

22     _____   _____    _____

23     _____   _____    _____

24     _____   _____    _____
```

SA229

EXHIBIT "K"

# Cited Portions of Deposition of Plaintiff,

Christopher Fabricant, of 6/3/2021

Christopher James Fabricant

1          UNITED STATES DISTRICT COURT
             DISTRICT OF NEW JERSEY
2          NO. 3:19-cv-12900-AET-LHG
                    -  -  -
3

   CHRISTOPHER FABRICANT, M.D.:
4  and MALIKA FABRICANT, h/w  :
                              :
5          v.                 :
                              :
6  SIX FLAGS GREAT ADVENTURE, :
   LLC, et al.                :
7

                    -  -  -
8

                 JUNE 3, 2021
9

                    -  -  -
10

11          CONTINUATION ZOOM VIDEOTAPE
12  deposition of CHRISTOPHER JAMES FABRICANT,
13  taken pursuant to notice, commencing
14  at 10:00 a.m., on the above date
15  before LISA MARIE CAPALDO, RPR, a
16  Registered Professional Reporter and
17  Notary Public in and for the Commonwealth
18  of Pennsylvania.
19

20

21          GOLKOW LITIGATION SERVICES
        877.370.3377 ph | 917.591.5672 fax
22             deps@golkow.com
23

24

SA231

1    APPEARANCES:
2

     THE LAW OFFICES OF G. MARTIN MEYERS, P.C.
3    BY:  G. MARTIN MEYERS, ESQUIRE
     35 West Main Street, Suite 106
4    Denville, New Jersey  07834
     (973) 625-0838
5    Gmm@gmeyerslaw.com
     -- For the Plaintiffs
6

7    SPECTOR GADON ROSEN VINCI, P.C.
     BY:  HEATHER M. EICHENBAUM, ESQUIRE
8    Seven Penn Center
     1635 Market Street, 7th Floor
9    Philadelphia, PA  19103
     (215) 241-8888
10   Heichenbaum@sgrvlaw.com
     -- For the Defendant,
11   Six Flags Great Adventure, LLC
12

     COZEN O'CONNOR
13   BY:  F. BRENDEN COLLER, ESQUIRE
     One Liberty Place
14   1650 Market Street, Suite 2800
     Philadelphia, PA  19103
15   (215) 665-5518
     Bcoller@cozen.com
16   -- For the Defendants,
     Intamin, Ltd. and Intaride, LLC
17
18
19
20
21
22   Also Present:
             Bob Behrens, Videographer
23       Jamie Holness, Paralegal
24

SA232

```
 1                    -   -   -
 2                  I N D E X
 3                    -   -   -
 4   Testimony of:
 5
             CHRISTOPHER JAMES FABRICANT
 6
        By Mr. Coller          381
 7      By Ms. Eichenbaum       400
        By Mr. Meyers           501
 8
 9                    -   -   -
10                E X H I B I T S
11                    -   -   -
12
     NO.     DESCRIPTION                  PAGE
13
     C-5     Photograph                   434
14
     C-6     Photograph                   437
15
     C-7     Photograph                   438
16
     C-8     Photograph                   439
17
     C-9     Answer to Interrogatories   443
18
     C-10    Complaint                    446
19
     C-11    Video clip                   450
20
     C-12    Video clip                   455
21
     C-13    Video clip                   476
22
     C-14    Video clip                   483
23
     C-15    Video clip                   486
24
```

SA233

```
 1                    -   -   -

 2        E X H I B I T S (CONTINUED)

 3                    -   -   -

 4                                        PAGE

 5   C-16   Video clip                    490

 6   C-17   Video clip                    494

 7   C-18   Video clip                    496

 8   C-19   Video clip                    498

 9        (Exhibits were marked and retained

     by counsel.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

SA234

Christopher James Fabricant

```
1                        -   -   -

2            DEPOSITION SUPPORT INDEX

3                        -   -   -

4

5    Direction to Witness Not to Answer

6    Page Line      Page Line       Page Line

7    403  11

8

9

10   Request for Production of Documents

11   Page Line      Page Line       Page Line

12   396  5         454  22 (video)

13   459  23        478  16 (metadata)

14

15

16   Stipulations

17   Page Line      Page Line       Page Line

18   None

19

20

21   Question Marked

22   Page Line      Page Line       Page Line

23   None

24
```

SA235

Christopher James Fabricant

```
 1                 -  -  -

 2            All parties to this

 3      deposition are appearing remotely

 4      and have agreed to the witness

 5      being sworn in remotely.

 6                 -  -  -

 7            PROCEEDING

 8                 -  -  -

 9            THE VIDEOGRAPHER:  Good

10      morning.  We are now on the

11      record.  Today's date is Thursday,

12      June 3rd, 2021, and the time is

13      now approximately 10:08 a.m.

14            This continues the

15      videotaped deposition of

16      Dr. Christopher Fabricant in the

17      matter of Fabricant versus

18      Six Flags Great Adventure, LLC,

19      et al.

20            Will counsel please identify

21      yourselves for the record?

22            MR. MEYERS:  Yes.  Good

23      morning.

24            Gary Meyers, appearing for
```

SA236

Christopher James Fabricant

```
 1        the plaintiff,

 2        Dr. Christopher Fabricant.

 3             MR. COLLER:  Brenden Coller

 4        from Cozen O'Connor on behalf of

 5        Intamin, Limited and

 6        Intaride, LLC.

 7             MS. EICHENBAUM:

 8        Heather Eichenbaum, with Spector

 9        Gadon Rosen Vinci, on behalf of

10        the defendant, Six Flags Great

11        Adventure, LLC.

12             THE VIDEOGRAPHER:  Will the

13        court reporter please swear in the

14        witness.

15                  -  -  -

16             CHRISTOPHER JAMES FABRICANT,

17        after having been duly sworn, was

18        examined and testified as follows:

19                  -  -  -

20                  EXAMINATION

21                  -  -  -

22  BY MR. COLLER:

23        Q.   Good morning, Dr. Fabricant.

24  Again, my name is Brenden Coller.  I was
```

SA237

Christopher James Fabricant

1  asking you some questions -- I think it

2  was back in April -- and then we decided

3  to call it a break.

4           So I just have a few minutes

5  of more questioning, and then I will pass

6  you back to Ms. Eichenbaum, okay?

7       A.    Yes.

8       Q.    Between your last deposition

9  in April and now, have you received any

10  medical treatment?

11      A.    Treatment?

12           I've seen physicians, but I

13  have not received treatment per se.

14      Q.    What physicians have you

15  seen?

16      A.    Since April?

17      Q.    Correct.

18      A.    I have seen Dan Osei, who is

19  a hand surgeon, orthopedic specialist at

20  Hospital for Special Surgery.

21           I have seen Erin Manning

22  either just before or after the April

23  meeting.  I don't remember the timeframe

24  exactly.  But she is a recent visit.

SA238

1    She's a neurologist at Hospital for

2    Special Surgery.

3              And I have seen Todd Albert,

4    who is an orthopedic spine surgeon at

5    Hospital for Special Surgery, who, on

6    two previous occasions, has performed

7    surgery on my cervical spine.

8              Additionally, I have had an

9    ultrasound study of the peripheral nerves

10   of my right upper extremity.

11        Q.    Who performed the

12   ultrasound?

13        A.    I don't want to misstate the

14   name.  It's a name that is difficult for

15   me to remember.  I believe the first name

16   is Nwawka.  The last name, I believe,

17   starts with an O.  I'd be happy to

18   furnish you with the name.

19        Q.    Where was the ultrasound

20   performed?

21        A.    At the Hospital for Special

22   Surgery department of radiology area

23   concerned with performing ultrasounds.

24        Q.    Have you spoken with any

Christopher James Fabricant

1  doctor about the results of that

2  ultrasound?

3       A.   I think I was wrong.  I

4  think her last name is Nwawka.  It's

5  N-W-A, and it ends with a K-I, I believe.

6  I believe that's her last name.  And

7  that's the radiologist who was

8  responsible for the ultrasound study.

9       Q.   And back to my previous

10  question, have you discussed the results

11  of the ultrasound with any doctor?

12       A.   Yes.  I've discussed the

13  results with the doctor who performed the

14  study.

15          I discussed the results of

16  the ultrasound with Dan Osei, the hand

17  surgeon.

18          And I discussed the results

19  of the ultrasound study in brief with

20  Todd Albert, the cervical spine surgeon.

21       Q.   And what were the results of

22  that study?

23       A.   The study showed that I have

24  enlargement or thickening of both the

SA240

1    median nerve and the ulnar nerve.

2         Q.    Where are those nerves?

3         A.    They did a comparison of

4    right side to left side.  So when I said

5    they performed an ultrasound of the right

6    upper extremity, typically when they do

7    so, for comparison purposes, they also do

8    imaging of the left upper extremity.  So

9    both sides were surveyed.

10            And your question was where

11   is the nerve located, Brenden -- or

12   Counselor?  Forgive me.

13        Q.    Yes.

14        A.    The median nerve traverses

15   the right forearm to the wrist on the

16   palm side.

17            And the ulnar nerve passes

18   beside or behind the elbow, traverses the

19   forearm on the medial side toward the

20   hand, into the hand.

21        Q.    Have any of the doctors with

22   whom you discussed this ultrasound told

23   you that the enlargement or thickening of

24   these nerves was a result of you riding

Christopher James Fabricant

1    the Kingda Ka roller coaster?

2         A.    No one told me that

3    specifically.

4         Q.    Has any doctor told you

5    whether any of your symptoms are a result

6    of the enlargement or thickening of the

7    nerves?

8         A.    The conversations that we

9    have had, the physicians and I, have

10   included conversations about how the

11   symptoms may be the result of what's

12   called a double crush syndrome, where a

13   nerve is insulted at one location, and

14   then it is more easily insulted at a

15   second location, with the context in my

16   case being the nerve or the -- yeah, the

17   nerve being insulted at the cervical

18   spine and being more susceptible to

19   injury at the periphery, where these

20   nerves were shown to be thickened.

21        Q.    What doctor did you have

22   that discussion with?

23        A.    I had that discussion with

24   Dan Osei and also touched on these topics

SA242

Christopher James Pedrícant

1   with Todd Albert.

2          Q.    So going back to my original

3   question, what symptoms, if any, that

4   you're currently experiencing are a

5   result of the enlargement or thickening

6   of these nerves?

7          A.    Well, that's the question,

8   isn't it?

9                Here's the story as I

10  understand it:

11               In the fall of 2020, I saw

12  Brian Halpern and reported to him, among

13  other symptoms or problems, weakness of

14  the right hand.

15               And he made referral to

16  Dr. Feinberg for an electrophysiology

17  study and also to Todd Albert, who, in

18  turn, made referral to Dan Osei.

19               I went back to

20  Brian Halpern.  He made referral to

21  Erin Manning.

22               And all these referrals, I

23  think, have been trying to zero in on why

24  the presentation of weakness -- or let me

SA243

Christopher James Fabricant

1    say -- have boiled down to what is the

2    cause for the weakness.

3                    As I understand it, when a

4    person has a neuropathy associated with a

5    peripheral nerve, such as the ulnar nerve

6    or the median nerve, symptoms typically

7    begin with numbness, progress through

8    pain, and only later, typically, would

9    develop into weakness.

10                   My symptoms seemed to be

11   predominantly weakness.  What's more, my

12   symptoms of the hand and forearm were not

13   localized just to the ulnar nerve -- my

14   weakness, that is -- but my weakness also

15   was distributed to muscles supplied by a

16   completely different nerve, the radial

17   nerve.

18                   So this has added some lack

19   of clarity to the notion that a

20   compression of a peripheral nerve is

21   behind the symptoms.  If it's a

22   compression of the ulnar or the median

23   nerve causing the thickening that was

24   revealed on the ultrasound -- and, by the

SA244

Christopher James Fabricant

1   way, it was revealed not just on the

2   right-sided ultrasound but also on the

3   left-sided ultrasound, but it was more

4   pronounced on the right side.

5              If weakness is distributed

6   beyond those nerves, including muscles of

7   the radial nerve, then what's the source

8   of the weakness?

9              There is a condition called

10  amyotrophy, or wasting and weakness

11  associated, with cervical spondylosis.

12  And it tends to present in the way my

13  weakness has presented.

14             So these are the issues that

15  presently are in the air as I move

16  forward with evaluation and management of

17  what may be troubles relating both to the

18  cervical spine and the peripheral nerves.

19       Q.   Has a doctor diagnosed you

20  with -- was it andriopathy?  Was that --

21       A.   Amyotrophic cervical

22  spondylosis.

23       Q.   Has a doctor diagnosed --

24       A.   I haven't seen that in any

¹ of the records.

²       Q.     Has any doctor advised you

³ of the next steps to treat the enlarged

⁴ or thickened nerve?

⁵       A.     Yes.   Next week, I'm having

⁶ surgery to release the right ulnar nerve

⁷ and the right median nerve.

⁸       Q.     Who is performing that

⁹ surgery?

¹⁰       A.     Dr. Osei.

¹¹       Q.     And is that surgery taking

¹² place at HSS?

¹³       A.     Correct.

¹⁴       Q.     And will you be -- do you

¹⁵ know if you'll be spending the night at

¹⁶ the hospital after your surgery?

¹⁷       A.     It's an outpatient surgery,

¹⁸ and it does not require general

¹⁹ anesthesia.   It has an operating time, as

²⁰ I understand, about 90 minutes.

²¹       Q.     And I'm sorry if you said

²² this.

²³       Is that only on the right

²⁴ side, or is it the right and left side?

Christopher James Fabricant

1    A.    That's right.  It's only on
2  the right side, the side where I have the
3  weakness.
4    Q.    When was the surgery
5  scheduled?
6    A.    Within the last month, let's
7  say.
8    Q.    And was that at the time
9  that you saw Dr. Osei?
10    A.    Yes.  It was Dan Osei who,
11  at my initial encounter with him, told me
12  that based upon my symptoms, he did not
13  believe that a peripheral neuropathy was
14  in play.  But he said that we should
15  perform an ultrasound so that we can have
16  confidence in the idea that this is not a
17  peripheral neuropathy.
18          When I had the ultrasound,
19  as mentioned, it did show quite striking
20  enlargement, striking to me, anyway.
21  Others can -- of course, I'm not a
22  specialist in extremities.  But it showed
23  quite an enlargement of these peripheral
24  nerves.

SA247

Christopher James Fabricant

1          When I returned to Dan Osei,

2    the ordering physician of the ultrasound,

3    he told me that based upon the thickening

4    or the enlargement of these peripheral

5    nerves, he would be worried if I were not

6    to have surgery to release these nerves

7    because of the extent of the enlargement

8    or thickening.  He presented the

9    circumstance as one where if the weakness

10   being experienced was not solely due, or

11   primarily due, to a nerve compression,

12   then the nerve -- I'm not sure I'm

13   stating this right.

14          So the idea is:

15          What's causing the weakness?

16   Is it the neck, or is it the peripheral

17   nerves?  When you have such a situation

18   and you don't have a clear way to

19   demonstrate which circumstance may be

20   most important and when you have

21   information that suggests it may be the

22   neck, well, why not do the easy surgery,

23   in relative terms, to release the

24   peripheral nerves so that you can address

SA248

Christopher James Fabricant

1   the situation that is causing the

2   thickening, if not address the situation

3   that is associated with the weakness?

4         Q.   Has any doctor definitively

5   told you the reason why your nerves

6   became enlarged or thickened?

7         A.   Specific reason?  No.  I

8   don't think any doctor has told me the

9   specific reason.

10              I do have, on the right

11  side, an ulnar nerve that experiences

12  subluxation.  That means it's --

13        Q.   Dr. Fabricant, I appreciate

14  it, but I had only asked you the question

15  of whether a doctor told you the specific

16  cause of it.

17              Sounds like you said, no.

18              No doctor has, correct?

19        A.   The specific cause?  No.  I

20  don't think so.  I think that's right.

21        Q.   When did you last see

22  Dr. Albert?

23        A.   Within the last several

24  weeks or month.

SA249

Christopher James Fabricant

```
 1              Q.    Why did you see Dr. Albert?
 2              A.    Dr. Osei suggested that I
 3    see Dr. Albert because of these issues
 4    that we've discussed.  Dr. Osei wanted
 5    Dr. Albert to be involved in the process
 6    if there was a concern or suspicion or
 7    possibility that the cervical spine may
 8    be an important contributor to these
 9    symptoms; i.e., weakness.
10              Q.    And did Dr. Albert -- what
11    did Dr. Albert say during that
12    appointment?
13              A.    It was a brief encounter.
14    Dr. Albert said that I may reasonably
15    proceed with release of the peripheral
16    nerves and then circle back to him
17    afterward as circumstances require, with
18    the plan that we may consider additional
19    imaging of the cervical spine at a later
20    date, such as dynamic imaging, where the
21    study is done with head not in a neutral
22    position but either a flexed or an
23    extended position to show dynamic
24    compression issues relating to spinal
```

SA250

Christopher James Fabricant

```
 1   cord or nerves.
 2          Q.    Do you have any follow-up
 3   appointment with Dr. Albert scheduled as
 4   of today?
 5          A.    No, I don't.
 6          Q.    Do you have any follow-up
 7   appointment scheduled with Dr. Manning as
 8   of today?
 9          A.    No, I don't.
10          Q.    Other than your surgery
11   scheduled with Dr. Osei, do you have any
12   follow-ups scheduled with Dr. Osei?
13          A.    Well, I have a
14   post-operative visit scheduled between
15   one and two weeks after the surgery,
16   probably for suture removal.
17          Q.    After your most recent
18   appointments with Dr. Osei and
19   Dr. Albert, did you obtain a copy of any
20   records that the doctors produced in
21   connection with that visit?
22          A.    I did.  They are posted on
23   the HSS website, which is very efficient.
24          Q.    Have you provided those to
```

SA251

Christopher James Fabricant

1    your counsel?

2            A.    I have not, no.

3                  Just last night, I looked at

4    the most recent note from Dan Osei.

5                  MR. COLLER:  Gary, I'd ask

6            that you work with Dr. Fabricant

7            to obtain the Dr. Osei and

8            Dr. Albert records from these

9            visits in the last month or so.

10                 MR. MEYERS:  Okay.

11   BY MR. COLLER:

12           Q.    Dr. Fabricant, since your

13   last -- I should have asked you this

14   earlier:

15                 Since your last deposition

16   in April, have you reviewed any new or

17   additional documents to prepare for your

18   deposition today?

19           A.    No, I have not.

20           Q.    Other than any discussions

21   you may have had with your counsel, did

22   you discuss your deposition testimony

23   with anyone?

24           A.    No.

SA252

Christopher James Fabricant

1     Q.    And you appreciate that
2  you're still under oath today as you were
3  in your last deposition, which is the
4  same as if you were in a courtroom with a
5  judge and a jury?
6     A.    Yes, of course.
7     Q.    Since your deposition in
8  April, have you performed any
9  calculations to assess any lost wages
10 that you incurred?
11    A.    No.
12    Q.    Since your last deposition,
13 have you performed any calculations to
14 assess any out-of-pocket losses or any
15 out-of-pocket payments you have made?
16    A.    Not that I recall.
17    Q.    Has any doctor ever told you
18 what caused your cervical injury?
19    A.    This is years ago.  This is
20 2017.  So Todd Albert told me that the
21 roller-coaster ride was the cause for the
22 injury.
23    Q.    Did he say what about the
24 roller-coaster ride?

SA253

Christopher James Fabricant

```
1         A.    I don't recall that he did.

2         Q.    Other than a discussion in

3   2017 with Dr. Albert, have you had a

4   discussion with anybody else regarding

5   what caused your cervical injury?

6         A.    I think Brian Halpern.  I

7   saw Brian Halpern after the event

8   happened as well.

9               I saw Richard Sultan.

10              I saw another neurologist

11  right out of the gate.

12              So these physicians were all

13  seen within the context of my injury from

14  riding the roller coaster.

15        Q.    Did you have a discussion

16  with any of those doctors regarding what

17  it was about the roller coaster that

18  caused your cervical injury?

19        A.    I don't recall a detailed

20  conversation about what caused the

21  injury.  No.

22        Q.    The shoulder strap on the

23  roller coaster, you testified that it got

24  tighter as the ride progressed?
```

SA254

Christopher James Fabricant

1       A.    Are you referring to the

2   shoulder harness that's rigid that

3   travels from behind the head, over the

4   shoulders, and meets the lap bar?

5       Q.    Yes.

6             Well, you're claiming that

7   part of the roller coaster became tighter

8   as the ride progressed, correct?

9       A.    Yes.

10      Q.    So do you know why that part

11  of the roller coaster became tighter as

12  the ride progressed?

13      A.    I'm not an engineer.  But

14  after riding the ride, I have learned

15  that the harness is designed to tighten.

16      Q.    Do you know why it's

17  designed to tighten?

18      A.    I think I'll hesitate to

19  comment on that because, again, I didn't

20  design the ride.  I'm not an engineer.

21      Q.    Were these straps that you

22  claim were tightening -- did they touch

23  your neck at any point?

24      A.    No, not to my recollection.

Christopher James Fabricant

1              MR. COLLER:  Dr. Fabricant,

2         those are all the questions I

3         have.  I will pass it on to

4         Ms. Eichenbaum.  Thank you.

5              THE WITNESS:  Thank you.

6                   -  -  -

7              EXAMINATION

8                   -  -  -

9    BY MS. EICHENBAUM:

10        Q.    Sir, did you have any

11   conversation with Mr. Meyers regarding

12   the substance of this case since your

13   last deposition date?

14             MR. MEYERS:  I'm going to

15        object to the question.

16             And I just want to instruct

17        the witness.  If you want to

18        answer as to whether or not you

19        had a conversation with me, that's

20        fine.  But anything that was said

21        during any conversation that you

22        and I had is privileged, and I

23        would warn you not to divulge the

24        content of any conversation that

SA256

Christopher James Fabricant

```
 1          we had.
 2                  With that qualification, you
 3          can respond to that question.
 4                  MS. EICHENBAUM:  I disagree
 5          with the qualification, Counsel.
 6          We had the discussion before we
 7          went off the record previously.  I
 8          believe you are wrong, I believe
 9          privilege is waived, but we won't
10          argue about it today because I'm
11          certain we won't reach an
12          agreement.
13  BY MS. EICHENBAUM:
14          Q.    So for right now, my only
15  question is:
16                  Did you have communications
17  with counsel about the substance of this
18  case and/or your testimony from the last
19  date of your deposition to today?
20          A.    I had no conversation about
21  my testimony with counsel.
22          Q.    Did you have substantive
23  conversations about this case or your
24  claims in this case with your counsel
```

SA257

Christopher James Fabricant

1    since your last deposition?

2           A.    I think that's

3    attorney-client privileged, as counselor

4    said.

5           Q.    Sir, you can answer yes or

6    no, please.  I'm not asking you the

7    substance.

8                 I'm asking you to confirm,

9    as it sounds from your counsel's own

10   comments, that you had communications

11   with your counsel since your last

12   deposition regarding the substance of

13   your claims in this case.

14                That's a yes or no.

15                MR. MEYERS:  By the way, I

16         want to object to that comment

17         about it sounds from your -- I

18         didn't say anything that sounds

19         any way.

20                All I told him was that he

21         could say if he's had

22         conversations with me.  I didn't

23         say anything about what -- and

24         basically, I instructed him to --

SA258

Christopher James Fabricant

1    that anything that we discussed is

2    privileged.

3            So, frankly, I'm going to

4    object to him characterizing, in

5    any way, what kind of

6    conversations that we had.  I

7    think he's already responded by

8    saying that we've had

9    conversations or at least implying

10   that.

11           But beyond that, I'm

12   instructing him not to answer.

13   BY MS. EICHENBAUM:

14       Q.   Sir, did you have

15   communications, yes or no, with your

16   counsel regarding the substance of your

17   claims in this case since your last

18   deposition?

19           MR. MEYERS:  Counsel, again,

20   I'm instructing him not to answer.

21           MS. EICHENBAUM:  Counsel,

22   you can't instruct him not to

23   answer yes or no whether he had

24   communications.

SA259

Christopher James Fabricant

```
 1              You want me to go to

 2        Judge --

 3              MR. MEYERS:  I --

 4              MS. EICHENBAUM:  Let me

 5        finish.

 6              You want me to go

 7        Judge Goodman and say, the witness

 8        won't state whether or not he had

 9        communications, but we're here to

10        fight over it.  Really?

11              It's a yes-or-no question

12        whether there were communications.

13        If there were, I will address it

14        with the judge.  If there were

15        not, she's going to be very angry

16        that we go to her because you

17        wouldn't acknowledge either way if

18        there were not any.

19              It is a simple yes or no,

20        and I am not asking for the

21        substance of any of the

22        communication.  I'm asking if

23        there were any.

24              MR. MEYERS:  All right.
```

SA260

```
1              You can answer and tell her
2       whether there were any
3       communications between us since
4       the time --
5              THE WITNESS:  Substantive?
6       I mean, this is a --
7              MS. EICHENBAUM:  Oh --
8              MR. MEYERS:  Doctor, answer
9       whether or not there were
10      communications.  That's all you're
11      being asked to answer, whether or
12      not we had communications since
13      the time of the last deposition.
14             THE WITNESS:  Yeah.  We
15      spoke about changing the date of
16      scheduling, for example, from
17      last --
18  BY MS. EICHENBAUM:
19      Q.   I'm not interested in what
20  you talked about.
21      A.   Well, Counselor --
22      Q.   I'm asking if you had
23  substantive conversations about the
24  claims you're making in this case.
```

SA261

```
 1          A.    What do you mean by

 2  substantive?

 3          Q.    Sir, you're an M.D.

 4                You don't know what the word

 5  substantive means?

 6          A.    I'd like your take on

 7  substantive, Counselor, because there

 8  haven't been any conversations that would

 9  perhaps qualify as substantive.

10                This term, what does this

11  term mean to you?

12          Q.    I'll address it with the

13  judge.

14          A.    Very good.

15          Q.    And we'll reserve the right

16  to come back for day four.

17          A.    So, Counselor, since --

18          Q.    No.  There's no question

19  pending, sir.

20          A.    Since my last deposition --

21          Q.    There is no question

22  pending, sir.

23                MR. MEYERS:  Are you

24          responding to her last question?
```

SA262

Christopher James Fabricant

```
 1          Do you wish to add something to
 2          her last question -- your response
 3          to her last question?
 4               THE WITNESS:  I think not.
 5          Thanks, Gary.
 6               MR. MEYERS:  Okay.
 7  BY MS. EICHENBAUM:
 8          Q.   In response to counsel's
 9  questions, you were indicating that you
10  have a surgery next week with regard to
11  your ulnar and median nerves in your
12  right upper extremity.
13               Has any medical provider
14  given you any theory other than the
15  injury that you're claiming to your neck
16  as a cause for your hand symptoms?
17          A.   Well, yes.  We're releasing
18  the peripheral nerves because the nerves
19  are enlarged or thickened, and the
20  process that caused them to be enlarged
21  or thickened may be contributing to the
22  symptoms.
23          Q.   My question is:
24               Have they given you any
```

SA263

Christopher James Fabricant

1   possibilities of what would have caused

2   this condition that is unrelated to your

3   neck?

4           A.    As I tried to answer before,

5   the right ulnar nerve moves into and out

6   of its groove.  It's called subluxation.

7   It snaps on occasion.

8                 If you have a nerve that, on

9   occasion, moves out of its groove and has

10  friction and snapping action, that can

11  cause the nerve to become thickened or

12  enlarged.  So that's an example of a

13  conversation about how the nerve may have

14  become thickened.

15          Q.    And is that subluxation that

16  you've referred to something that you

17  have always had, or is it a degenerative

18  condition or is it caused, for instance,

19  by repetitive motion in that extremity?

20          A.    It happens very

21  infrequently.  When I had the ultrasound

22  study, the ultrasonographer moved my arm

23  into a position where she was able to

24  cause the nerve to sublux, or move out of

SA264

Christopher James Fabricant

1  the groove.  That's something that they

2  look for when they do the study.  And she

3  did it time and time and time again,

4  causing the nerve to move in and out of

5  the groove.

6             After having the study, the

7  nerve was uncomfortable because it had

8  been moved into and out of the groove

9  with the transducer of the ultrasound

10 machine compressing it.

11            As I later learned, one of

12 the objectives -- one of the objectives

13 of the ultrasonographer is to see if you

14 have pain associated with that nerve

15 because that's another finding that could

16 support the diagnosis of a peripheral

17 neuropathy.

18            Well, I didn't go to anyone

19 because I had pain with the nerve.  It

20 was only when I had the ultrasound

21 snapping the nerve in and out of its

22 groove, with the transducer compressing

23 the nerve time and again, that I had some

24 pain after that study was done.

SA265

Christopher James Fabricant

```
 1              And I told Dan Osei about
 2   that.  I said, look, I don't notice this
 3   subluxation except for only very
 4   uncommonly.  And I don't have pain with
 5   the nerve.  That's not why I came in to
 6   see you.
 7              But I have to say I don't
 8   often take Advil, but I took a couple of
 9   Advil the day after that ultrasound study
10   because after the maneuvers by the
11   ultrasonographer, snapping the nerve,
12   compressing the nerve, it was
13   uncomfortable.  And then I stopped the
14   Advil, and the pain resolved.
15              So when people try to
16   determine whether a peripheral neuropathy
17   is present, you have electrophysiology
18   studies like I had.  And if the
19   electrophysiology studies show findings
20   of a peripheral neuropathy, that supports
21   the diagnosis.
22              Well, I had that, and it did
23   not support the diagnosis of a peripheral
24   ulnar neuropathy.  It showed a mild,
```

SA266

Christopher James Fabricant

1  right-sided median neuropathy.  So there

2  is not a typical presentation here of a

3  peripheral neuropathy.  I didn't go in

4  with numbness on my fourth and fifth

5  fingers for the ulnar nerves.  I didn't

6  go in with typical symptoms of the median

7  neuropathy, where the rest of the hand is

8  showing numbness.  I didn't have pain

9  associated with these nerves.

10            I had, from time to time,

11  very minimal numbness of the fourth and

12  fifth digit on my right hand, but not a

13  dominant symptom.  What became dominant

14  for me was this weakness of my right

15  hand.  And it was evaluated, and everyone

16  is trying to understand this.

17            Could it be that there was

18  an insult at the cervical spine that

19  affected the motor nerves and not the

20  sensory nerves?  Then you would get

21  weakness without the numbness and the

22  tingling.  So that would be one way to

23  explain why I'm having weakness because

24  of an issue at the cervical spine.

SA267

Christopher James Fabricant

1           But there is not any perfect

2    clarity.  As often occurs, Counselor, in

3    medicine, you take the information that

4    you have, and you try to make your best

5    judgment.  And the best judgment of

6    Dan Osei and Todd Albert -- and I'm in

7    agreement -- the best judgment is that if

8    you've got thick nerves, really thick,

9    let's release them so that you can avoid

10   future troubles, if not help with present

11   troubles.

12         Q.    Has any medical provider

13   told you that the condition you were

14   experiencing with your ulnar and median

15   nerves in your right upper extremity may

16   be a degenerative condition?

17         A.    No one has used that

18   terminology.

19           However, spondylosis is a

20   degenerative condition, as you know.  And

21   if spondylosis is one of the -- is one of

22   the possible contributors, then I think,

23   yes.  I think, yes, that -- this is a

24   conversation that Dan Osei and

SA268

Christopher James Fabricant

1   Todd Albert and I have all been having.

2       Q.   Has any medical provider

3   told you it's possible that the symptoms

4   that you are experiencing in your right

5   upper extremity are caused by repetitive

6   hand movements?

7       A.   No one has told me that.

8   No.

9       Q.   What is the specific surgery

10  that you're having?  It's a release --

11  ulnar nerve release and median nerve

12  release?

13      A.   That's correct.  Plus a

14  transposition of the right ulnar nerve so

15  that it won't sublux.

16      Q.   Since your last deposition,

17  have you been prescribed any new

18  medications?

19      A.   No.

20      Q.   Have you prescribed yourself

21  any medications?

22      A.   No.

23      Q.   Other than the surgery with

24  Dr. Osei scheduled for next week, do you

SA269

Christopher James Fabricant

1   have any other medical appointments with

2   any medical providers scheduled at this

3   time?

4        A.    No.  Oh, I also --

5   Counselor, I'm sorry.  I also saw my

6   primary care physician because I was in

7   need of clearance to undergo surgery with

8   Dr. Osei.  I also was due for routine

9   primary care services.

10           So I didn't mention

11  before -- when I rolled off the

12  physicians' appointments over the last

13  month, I didn't mention before that I

14  also have had an appointment with

15  Bela Bhuskute, who is my primary care

16  physician, for the purpose of routine

17  primary services and clearance for

18  undergoing a surgery.

19       Q.    Other than the surgery with

20  Dr. Osei, has any medical provider

21  recommended any future medical attention

22  for which you just haven't made the

23  appointments yet?

24       A.    The term recommended is not

SA270

Christopher James Fabricant

1   one that I would use for any offers or

2   opportunities.  So sometimes people --

3   sometimes a physician will offer a care

4   but not recommend a care.

5            So last time I saw -- or one

6   of the recent visits with Brian Halpern,

7   there was an offer of referral for

8   physical therapy.

9       Q.    And you did or did not

10  accept that offer?

11      A.    Oh, did not.

12            Again, we've been trying to

13  understand a problem and have seen a

14  number of different physicians toward

15  that goal.  And now we are having an

16  intervention after reaching the end of

17  that process or moving far enough along

18  in that process to make a reasonable

19  judgment about the next best appropriate

20  treatment.

21      Q.    When did Dr. Halpern, using

22  your term, offer physical therapy?

23      A.    Earlier in 2021.

24      Q.    What month?

Christopher James Fabricant

```
 1          A.    I wonder.

 2          Q.    I'm sorry?

 3          A.    I don't recall, Counselor.

 4          Q.    How many times have you seen

 5   Dr. Halpern this year?

 6          A.    At least once.

 7          Q.    At least once?

 8          A.    That's right.

 9          Q.    And you don't recall when

10   that was?

11          A.    That's right.  It was -- I'm

12   better at the sequence for seeing these

13   various physicians than I am of the

14   calendar time.

15               So I saw Dr. Halpern in late

16   2020, who ordered the electrophysiology

17   studies with Dr. Feinberg.  Saw

18   Dr. Feinberg.  Had the electrophysiology

19   studies.

20               After that, went back to

21   Brian Halpern, I think, twice.  So -- I

22   think I went to him once.

23               Then I saw Todd Albert.

24   Todd Albert said, see Dan Osei.
```

SA272

Christopher James Fabricant

1          Brian Halpern said, see

2    Erin Manning.

3          So that was a recommendation

4    that I followed through on -- or an offer

5    that I followed through on to further

6    evaluate my symptoms and then circled

7    back to see Brian Halpern, I think one

8    more time within this process of being

9    evaluated.

10          And understand what

11   Brian Halpern is and does.  He's a

12   primary --

13      Q.   Sir, that's okay.  We're far

14   beyond the question.

15          I simply asked whether you

16   remembered what month it was that you saw

17   him.

18          If you don't, you can simply

19   say you don't remember.

20      A.   I tried to say that,

21   Counsel.

22      Q.   Yeah.

23          How many times have you gone

24   back to Six Flags Great Adventure since

Christopher James Fabricant

1    April of 2017 and sat in the test seat at

2    Kingda Ka?

3            A.    I believe twice.

4            Q.    When were those two times?

5            A.    (No audible response.)

6            Q.    Was that the fall of 2017

7    and then the 2019 visit that you've

8    already told us about?

9            A.    It was for sure the 2019

10   visit.  As far as the fall of 20 -- that

11   was probably it, but I don't have an

12   exact recollection of when.  I do

13   remember doing so on the day that I took

14   video footage with my boys, and that was

15   in April of 2019.

16           Q.    Did you take any photographs

17   or video footage when you sat in the test

18   seat on your other return to the park?

19           A.    I don't recall.  I don't

20   recall doing so.

21           Q.    Was anyone with you on that

22   other visit in 2017 when you sat in the

23   test seat?

24           A.    I don't recall sitting in a

Christopher James Fabricant

```
1   test seat, Counselor.  I thought I said
2   that I don't recall sitting in a test
3   seat in the fall of 2017.
4        Q.    My initial question was:
5             How many times have you
6   returned to Six Flags Great Adventure and
7   sat in the test seat?
8             You said, two times.
9        A.    No.  No.  I said I recall
10  one time in April of 2019.  And I believe
11  there was another occasion, but I can't
12  tell you when.
13       Q.    Well, how many times have
14  you been back to Great Adventure since
15  April 23rd of 2017?
16       A.    At least once, perhaps
17  twice.  Or, actually, this is too
18  specific.  I really don't recall,
19  Counsel.
20       Q.    You don't recall how many
21  times you've gone back to Great Adventure
22  since the day you claim you were injured
23  at the ride?
24       A.    At least twice.
```

SA275

Christopher James Fabricant

```
 1        Q.    On both of those occasions,

 2   did you sit in the test seat at

 3   Kingda Ka?

 4        A.    On at least on the second

 5   occasion -- or on at least the occasion

 6   of April of 2019.

 7        Q.    When you were on the

 8   Kingda Ka ride, you indicated that you

 9   gestured to an employee to get their

10   attention because you felt your restraint

11   was too tight, correct?

12        A.    Correct.

13        Q.    Show me how you gestured.

14        A.    (Witness complies with

15   request.)

16        Q.    When you sat in the test

17   seat at least in April of 2019 and you

18   developed your theory about how you were

19   injured on the ride, did you try moving

20   your head or neck at all to see if you

21   could re-enact any movement you might

22   have experienced on the ride?

23        A.    I don't recall doing so.

24        Q.    And am I correct that at no
```

SA276

1  point before April of 2019 did you ever

2  contact the park or speak to anyone at

3  the park and advise them that you

4  believed you had been injured on

5  Kingda Ka?

6      A.    That's correct.

7      Q.    Have you ever fallen while

8  skiing?

9      A.    Sure.

10     Q.    Have you ever been injured

11 in a fall while skiing?

12     A.    No.  No serious injuries.

13     Q.    Have you been injured at all

14 while skiing?

15     A.    I remember once skiing at --

16 what's the site in Vermont that we go --

17 or used to go?  Turned my knee.  My knee

18 was sore, but I still skied the next day.

19     Q.    Have you sustained any other

20 injuries while skiing?

21     A.    No.

22     Q.    Have you ever fallen while

23 ice skating?

24     A.    Fallen while ice skating?

Christopher James Fabricant

1  Yes.  I have fallen while ice skating.

2       Q.    Have you ever been injured

3  in a fall while ice skating?

4       A.    No.

5       Q.    Am I correct that you didn't

6  express to anyone between April 23rd of

7  2017, when you got off Kingda Ka, to

8  May 13 of 2017, the day before

9  Mother's Day, that you felt any pain or

10 discomfort?

11      A.    Could you state that

12 question again, Counsel?

13      Q.    Am I correct that you didn't

14 express to anyone, between the time you

15 got off Kingda Ka on April 23, 2017 until

16 May 13 of 2017, that you were feeling any

17 pain or discomfort?

18      A.    Where does this question

19 come from?

20            I was seeing physicians for

21 the problems that I was having since

22 riding the coaster.  So April 23 -- was

23 it about May 3rd that I saw

24 Brian Halpern?  And then I saw a

Christopher James Fabricant

1   neurologist, and then I saw Todd Albert.

2   Then I saw Richard Sultan.

3            So I saw all of these

4   physicians because I was experiencing

5   pain and both upper and lower extremity

6   symptoms.

7        Q.    That was May 13, correct?

8            Your surgery was May 14,

9   Mother's Day?

10       A.    So between April 23rd and my

11  surgery, did I express to anyone that I

12  had pain?

13           Yes, of course I did.

14       Q.    When was the first date that

15  you sought any medical attention after

16  April 23, 2017?

17       A.    I think it was about halfway

18  through that three-week interval.  So it

19  was about ten days after taking the

20  roller-coaster ride and about ten days

21  before the surgery.  So it was about

22  halfway through.

23       Q.    And that was Dr. Sultan?

24       A.    No.  That was Dr. Halpern,

SA279

Christopher James Fabricant

1  of course.

2       Q.    Why are you opposed to

3  allowing us to obtain your health

4  insurance records?

5       A.    I don't agree with your

6  characterization, Counselor.

7       Q.    Well, we've asked that you

8  sign a HIPAA authorization, and that

9  request has been refused.

10           Why?

11      A.    Counselor, I don't agree

12  with your question -- the premise of your

13  question.

14      Q.    So if we send you a HIPAA

15  authorization to obtain your health

16  insurance records, you will sign that?

17      A.    Of course.

18      Q.    Has your health insurance

19  changed at all since your last

20  deposition?

21      A.    No.

22      Q.    We talked previously about

23  the motor vehicle accident that you had

24  on the Parkway when you struck the deer.

SA280

Christopher James Fabricant

```
1              Are you certain that you

2   didn't see any medical provider following

3   that motor vehicle accident?

4         A.    Yes, I am certain.

5         Q.    Are you certain that you

6   took no prescription medications after

7   that motor vehicle accident?

8         A.    Yes.

9         Q.    Are you certain --

10         A.    Well, certain, I mean, after

11   that accident -- well, after that

12   accident -- comes to today.  And of

13   course, I've taken prescription

14   medications since -- was that accident

15   in -- I don't remember the year, but it's

16   been years.

17              So, yes.  I have taken

18   prescription medications since many years

19   ago when I had the accident.

20         Q.    Are you certain that you

21   didn't take any prescription medications

22   in the month following that motor vehicle

23   accident?

24         A.    I can't be certain,
```

SA281

Christopher James Fabricant

1  Counselor, but I don't recall having any

2  problems requiring any physician

3  appointments or any prescription

4  medications following the accident.

5            I had the accident.  I

6  called the police.  I went home.  Resumed

7  my activities the next day.  Didn't have

8  any problems afterwards.

9       Q.   Are you certain that you

10 didn't prescribe yourself any medications

11 in the month following that motor vehicle

12 accident?

13      A.   I don't recall doing so.

14      Q.   What was your reason for

15 returning to Six Flags Great Adventure in

16 the fall of 2017?

17      A.   My son Tebow wanted to go

18 with his friends.  And I had spoken with

19 Bruce Nagel, who had asked me to gather

20 some information for him.

21      Q.   Bruce Nagel, the attorney?

22      A.   That's right.

23      Q.   Did you walk around, reading

24 signs when you were at the park that day?

SA282

Christopher James Fabricant

```
 1          A.    I believe that I did.

 2          Q.    Was part of your reason for

 3    going to the park to read the signage?

 4          A.    It was difficult for me to

 5    return to the park, having been injured

 6    as I was.  My son's request to go to

 7    Great Adventure gave me an excuse to go

 8    to the park.  It was not easy for me to

 9    do so.  It was a site that I had been

10    injured in a -- that required surgery,

11    and it was tough to do.

12          Q.    My question was:

13                Was part of your reason in

14    going back to the park to read the

15    signage?

16          A.    I had, on my list of things

17    to do, a return visit to the park to

18    carry out the directive of Bruce Nagel.

19    My son's request to go to the park gave

20    me an opportunity to do that.  So that's

21    my answer, Counselor.

22          Q.    What was the directive of

23    Bruce Nagel that you were carrying out?

24          A.    To --
```

SA283

Christopher James Fabricant

```
1              MR. MEYERS:  I'm going to
2        caution, Counsel, that that is
3        also subject to attorney-client
4        privilege.
5              MS. EICHENBAUM:  Well,
6        Counsel, your client has
7        volunteered a great deal of
8        information about his
9        communications with his prior
10       counsel, and you've never once
11       objected.  So I think that's
12       clearly waived.
13             MR. MEYERS:  All right.
14             You can answer that
15       question.
16             THE WITNESS:  He wanted to
17       know things such as what posted
18       warnings were present at the
19       roller coaster.
20   BY MS. EICHENBAUM:
21       Q.   But you don't recall if, on
22   that visit, you sat in the test seat?
23       A.   Yeah.  I don't recall that,
24   Counselor.
```

SA284

Christopher James Fabricant

1  Q. And you don't recall whether

2  you took any photographs or video

3  footage?

4  A. I'm quite sure I wouldn't

5  have taken any video footage. I didn't

6  have a video camera. I had an old cell

7  phone. I may have taken some photos.

8  But, again, specific

9  recollection from so many years ago, I

10  don't have that.

11  Q. When you were at the park in

12  the fall of 2017, at least in part at the

13  direction of your legal counsel, did you

14  see signage relating to the reporting

15  requirement for injuries?

16  A. Certainly not.

17  Q. Did you enter the park

18  through the usual main entrance for

19  guests?

20  A. I'm not sure I understand

21  the question, Counselor. There's one

22  entrance. I didn't jump the fence.

23  Q. So you entered through the

24  main entrance for the park, correct?

SA285

Christopher James Fabricant

```
 1          A.    Correct.

 2          Q.    And you are aware, at least

 3   as of 2019, that there are signs at the

 4   entrance relating to the reporting

 5   requirement for claims of injury,

 6   correct?

 7          A.    Yes.

 8          Q.    And you claim that you did

 9   not see those signs in 2017?

10          A.    Most definitely.  That's my

11   claim.

12          Q.    And when you left the

13   park -- strike that.

14                Did you go to first aid in

15   2017?

16          A.    No.

17          Q.    When you left the park in

18   2017, did you exit through the exit

19   adjacent to the main entrance?

20          A.    They are one and the same,

21   Counselor.

22                MR. MEYERS:  I don't want to

23          interrupt.  But by my timing,

24          we're now past the one-hour mark
```

SA286

1        for --

2              MS. EICHENBAUM:  I'm

3        wrapping up.  I'm wrapping up.

4              And I apologize because

5        counsel's interruption threw me

6        off a bit there.

7              Lisa, would you mind reading

8        back the last question and answer,

9        please?

10                     -  -  -

11              (Whereupon, the court

12        reporter read the pertinent part

13        of the record.)

14                     -  -  -

15              THE WITNESS:  Let me answer

16        that again, please, Counselor.

17              So the answer to your

18        question is yes.  I did exit

19        through the exit which is adjacent

20        to or directly beside the

21        entrance.

22    BY MS. EICHENBAUM:

23        Q.    And at least as of 2019,

24    you're aware that the reporting

SA287

Christopher James Fabricant

1   requirement signage is also posted at

2   that exit, correct?

3          A.    Yes.

4          Q.    And you claim that you

5   didn't see that signage when you were

6   there in 2017?

7          A.    That's right because it's

8   not conspicuous.

9          Q.    Yeah.

10         A.    Or I should say it's not

11  conspicuously posted.

12         Q.    I understand your position.

13         A.    And, look, I should --

14  here's what I should say:

15         I didn't --

16         MR. MEYERS:  Let me caution

17      the witness.  There's no question

18      pending.

19         THE WITNESS:  All right.

20      Thanks, Counselor.

21         MR. MEYERS:  I think we are

22      past the one-hour mark.  So I

23      think that it's time to move on to

24      the -- you have two hours of

SA288

Christopher James Fabricant

1    questioning left about videos and

2    photographs as per our

3    arrangement.

4         MS. EICHENBAUM:  I'm going

5    to take five minutes to get things

6    set up for that.

7              -  -  -

8         (Whereupon, a discussion off

9    the record occurred.)

10             -  -  -

11        THE VIDEOGRAPHER:  This ends

12   media unit number one in the

13   deposition of

14   Dr. Christopher Fabricant.  The

15   time is 11:11 a.m.  We're going

16   off the record.

17             -  -  -

18        (Whereupon, a brief recess

19   was taken.)

20             -  -  -

21        THE VIDEOGRAPHER:  This

22   begins media unit number two in

23   the deposition of

24   Dr. Christopher Fabricant.  The

SA289

Christopher James Fabricant

```
 1          time is 11:23 a.m.  We're back on

 2          the record.

 3                  MS. EICHENBAUM:  Jamie,

 4          could you please put up

 5          document 18?

 6                      -  -  -

 7                  (Whereupon, a discussion off

 8          the record occurred.)

 9                      -  -  -

10   BY MS. EICHENBAUM:

11          Q.    Dr. Fabricant, we've put up

12   what has been marked C-Fabricant-5, which

13   was the next exhibit number from where we

14   left off.

15                  Do you recognize this as the

16   entrance to the Kingda Ka ride?

17                      -  -  -

18                  (Whereupon, Exhibit-5 was

19          marked for identification.)

20                      -  -  -

21                  THE WITNESS:  Counselor,

22          when you say, where we left off, I

23          don't recall seeing any images.

24                  Did we see images before
```

SA290

Christopher James Fabricant

1    during my deposition?

2  BY MS. EICHENBAUM:

3      Q.    Sir, that's just for the

4  record.

5           The question is:

6           Do you recognize what's

7  shown in this photograph as the entrance

8  to the Kingda Ka attraction?

9      A.    Yes, I do.

10          MS. EICHENBAUM:  And, Jamie,

11     could you enlarge just slightly

12     over to the two individuals?

13     There you go.  That's good.

14  BY MS. EICHENBAUM:

15     Q.    Do you see the test seat in

16  this photograph?

17     A.    I do.

18     Q.    And there are two men shown

19  in this photograph.  One is your counsel.

20          The other is the backside of

21  someone taking a photograph of a sign,

22  correct?

23     A.    I see that.  Yes.

24     Q.    And is it your testimony

SA291

Christopher James Fabricant

1  that on the day that you rode Kingda Ka

2  in April of 2017, you read the sign that

3  the man is taking a photograph of in this

4  picture?

5       A.    It's very likely that I read

6  that sign.  Yes.

7       Q.    Do you have a specific

8  recollection of reading that sign?

9       A.    I don't think I testified to

10  that effect.  I think it's very likely

11  that I read that sign.

12       Q.    I'm not asking what you

13  think you've testified to.

14            I'm asking:

15            As you sit here today, is it

16  your testimony that you have a specific

17  recollection of reading that sign, or you

18  do not?

19       A.    This is back in 2017.  So I

20  don't have a specific recollection of any

21  particular sign -- reading any particular

22  sign.

23            MS. EICHENBAUM:  Jamie,

24       could you zoom in to the sign in

SA292

Christopher James Fabricant

1     the center of this photograph?

2     All right.  It's actually not

3     going to come out clear with

4     enlarging.

5          So let's put up document 12,

6     which we'll mark as C-Fabricant-6.

7               -  -  -

8          (Whereupon, Exhibit-6 was

9     marked for identification.)

10              -  -  -

11         MS. EICHENBAUM:  Can we

12    enlarge that just slightly?

13 BY MS. EICHENBAUM:

14    Q.    Sir, did you read this sign

15 on April 23rd of 2017 before riding

16 Kingda Ka?

17    A.    I may have.  It is a sign,

18 though, that has sign factors that make

19 it pretty difficult to read, as you would

20 agree.

21    Q.    My question is:

22         Did you read this sign?

23         If you don't recall one way

24 or the other, you can simply say you

SA293

¹ don't recall.

²        A.    It's likely that I did read

³ this sign, as the others near the

⁴ entrance, but I don't have a specific

⁵ recollection of doing so.

⁶        Q.    Whether or not you read this

⁷ sign, you did not sit in the test seat

⁸ before riding Kingda Ka on April 23rd of

⁹ 2017, correct?

¹⁰        A.    Say that again, Counselor?

¹¹        Q.    Regardless of whether or not

¹² you read this sign on April 23, 2017, you

¹³ did not sit in the test seat before

¹⁴ riding Kingda Ka, correct?

¹⁵        A.    I don't recall sitting in

¹⁶ the test seat, Counselor.

¹⁷            MS. EICHENBAUM:  You can

¹⁸        take that down, Jamie.  Thank you.

¹⁹            Could you put up P-74,

²⁰        please?

²¹                -  -  -

²²            (Whereupon, Exhibit-7 was

²³        marked for identification.)

²⁴                -  -  -

SA294

1    BY MS. EICHENBAUM:

2         Q.    Do you recognize what's

3    shown in this photograph?

4         A.    I do.

5         Q.    This is the entrance at

6    Six Flags, the main entrance?

7         A.    That's right.  It's the

8    entrance concourse.

9         Q.    And while I understand that

10   you claim you didn't see the sign that is

11   essentially behind the female in a yellow

12   top on April 23 of 2017, you now

13   understand that that is a sign posting

14   the reporting requirement for injuries.

15             Is that correct?

16        A.    That's correct.

17             MS. EICHENBAUM:  You can

18        take that down, Jamie.

19             And please put up P-76 and

20        P-77, which will be C-Fabricant-8.

21                  -  -  -

22             (Whereupon, Exhibit-8 was

23        marked for identification.)

24                  -  -  -

SA295

1    BY MS. EICHENBAUM:

2        Q.    Do you recognize that this

3    photograph shows the exit from Six Flags

4    Great Adventure?

5        A.    Counselor, before we move

6    on, that question about the sign near the

7    entrance that we had to zoom in and zoom

8    in and zoom in on, I think I said I don't

9    recall seeing that sign.

10            So what's your question

11   about this sign, Counselor?

12       Q.    Well, for the record, we

13   didn't zoom in on that photograph that we

14   last showed, C-Fabricant-7, at all.

15       A.    The one with all the kind of

16   striped elements overlaying atop the

17   text.  I think my testimony today was --

18   can we go back to the audio/visual --

19       Q.    No.  No, sir.  Actually, we

20   can't.  If your counsel has follow-up

21   questions, he'll be free to ask you, but

22   we're moving on.

23            With regard to the

24   photograph that is on the screen now,

SA296

Christopher James Fabricant

1  C-Fabricant-8, do you recognize this as

2  the exit from Six Flags Great Adventure?

3          A.    I do.

4          Q.    And in this photograph, you

5  see the sign posted on the brick column?

6          A.    I see that.

7          Q.    And although I understand

8  you claim that you did not see that sign

9  at any time before 2019, you now

10  understand that that is a sign advising

11  of the reporting of injuries requirement?

12          A.    Yes.

13          Q.    And that is the only sign

14  posted at the exit, correct?

15          A.    That's my understanding.

16  That's the only sign giving notice of the

17  reporting requirement that's at the exit.

18          Q.    It's the only sign at the

19  exit other than park exit, correct?

20          A.    Well, now you're changing

21  your question, Counselor.  So there are

22  signs all over the place.

23                So in this narrow view, we

24  see two signs.  If we expanded the view,

1   I suspect we would see additional signs.

2            So when you say, that's the

3   only sign, at the exit, no.  By your own

4   admission, there's two signs in this

5   image, and there are likely more signs --

6   or perhaps more signs if we were to look

7   at the entire exit.  The exit has not

8   just one exit turnstile.  It has a series

9   of them that aren't shown in this photo.

10       Q.    I excluded park exit.  So I

11  didn't mislead with the question.

12            I said, other than park

13  exit, there is one sign posted at the

14  exit.

15            Do you have a specific

16  recollection of there being more than

17  this one sign other than park exit at the

18  exit?

19       A.    It depends what you mean by

20  exit, Counselor.  There are signs

21  distributed in that vicinity certainly.

22       Q.    At the exit turnstile, do

23  you recall there being more than the one

24  sign other than park exit?

Christopher James Fabricant

```
 1        A.    I don't recall another sign.

 2             MS. EICHENBAUM:  Jamie,

 3        could you put up document 16?

 4             And let me just preface,

 5        Gary.  I'm just going to ask

 6        authentication of signatures.

 7        That's all it is.  I'm not asking

 8        substance.  But we left all

 9        exhibits, essentially.

10                  -   -   -

11             (Whereupon, Exhibit-9 was

12        marked for identification.)

13                  -   -   -

14   BY MS. EICHENBAUM:

15        Q.    We've put up what's been

16   marked C-Fabricant-9.  I'll represent to

17   you that these were answers to

18   interrogatories provided to us by your

19   counsel in this case, the answers to

20   written questions relating to the lawsuit

21   back in -- on July 6th of 2020.  At least

22   that is when they were dated, and I'm

23   sure they were received around that

24   timeframe, at least.
```

SA299

Christopher James Fabricant

```
 1              I'm going to have only one
 2   question.
 3              MS. EICHENBAUM:  Jamie can
 4        you scroll down to the
 5        verification page, please?
 6   BY MS. EICHENBAUM:
 7        Q.    While she's doing that, do
 8   you recall providing answers to written
 9   questions in relation to this case?
10        A.    I do.
11        Q.    And we are now on page 30 of
12   this 30-page document.  It's titled
13   certification.
14              Is that your signature?
15        A.    Yes.
16        Q.    And did you review the
17   answers to the written questions before
18   signing this certification?
19        A.    I did.
20        Q.    And you understood that in
21   signing it, you were averring, or
22   swearing or certifying, that the answers
23   to the written questions were all true
24   and correct?
```

SA300

Christopher James Fabricant

 1          A.    Yes.

 2                MS. EICHENBAUM:  You can

 3          take that down, Jamie, please.

 4                And could you put up what

 5          was marked Malika-3?  Scroll down

 6          to the next page, hopefully.

 7          Nope.  Next.  Okay.

 8  BY MS. EICHENBAUM:

 9          Q.    I'll represent to you that

10  this is a copy of the original complaint

11  that was filed by your counsel on your

12  behalf -- on behalf of you and your wife.

13                My only question about this

14  document is whether you saw it before it

15  was filed?  It was the complaint

16  initiating this lawsuit.

17          A.    I did.

18          Q.    And in reviewing it,

19  certainly you would have brought to your

20  counsel's attention if anything in it was

21  inaccurate?

22          A.    Yes, I believe I would have.

23          Q.    There were two later

24  complaints filed, a first amended and a

SA301

Christopher James Fabricant

```
1   second amended complaint, later in the

2   case.

3           Did you also review those to

4   ensure they were accurate before they

5   were filed?

6        A.   Do you have those for me to

7   review?  I'll review these, if you want

8   me to, Counselor, to refresh my memory.

9        Q.   If you don't recall, I don't

10  want to waste the time.

11          You indicated you recalled

12  reviewing the original one.

13          Do you have a recollection

14  of reviewing the other two complaints

15  that were filed later?

16       A.   I do have a recollection of

17  reviewing additional items, but to recall

18  the specifics from several years ago

19  would be difficult.

20          MS. EICHENBAUM:  Could you

21       put up P-78 through -80, please,

22       which will be C-Fabricant-10?

23              -  -  -

24          (Whereupon, Exhibit-10 was
```

SA302

Christopher James Fabricant

```
1            marked for identification.)

2                   -  -  -

3    BY MS. EICHENBAUM:

4         Q.    Showing you what's been

5    marked C-Fabricant-10, do you recognize

6    this as being the entrance to first aid

7    at Six Flags Great Adventure?

8         A.    Yes.

9         Q.    And my understanding, from

10   your prior testimony, is that you were

11   never in the area of first aid before

12   2019.  Is that correct?

13        A.    That's correct.

14        Q.    You would agree with me,

15   though, that when you went in April of

16   2019, there is a sign on the door that

17   also contains the injury reporting

18   requirement of the state of New Jersey,

19   correct?

20        A.    Yes.

21        Q.    And that's the sign shown in

22   this photograph, C-Fabricant-10?

23        A.    Yes.

24        Q.    When you returned to
```

SA303

1    Six Flags in 2019, did you read that

2    sign?

3          A.    Yes.  Well, I read -- all

4    the signs are the same.  So you read one,

5    you've read them all.  All the signs

6    related to reporting requirement.

7          Q.    Did you read this particular

8    sign when you were at first aid in 2019?

9          A.    I'm not sure I would have.

10   It's on the exterior of an

11   outward-swinging door.

12         Q.    That's not my question.

13         Did you read it in 2019 when

14   you went to first aid?

15         A.    I would have read enough of

16   it to know that it was the sign relating

17   to reporting requirement.

18         Q.    What was the first location

19   at which you read the reporting

20   requirement signage at the park?

21         A.    I don't recall, Counselor.

22         Q.    By the time you went to the

23   park in 2019, you were aware of the state

24   of New Jersey reporting requirement,

SA304

Christopher James Fabricant

1    correct?

2         A.    Yes.

3         Q.    And you were specifically

4    looking for the signs posting that

5    reporting requirement, correct?

6         A.    Right.  I was looking for

7    the signs that I hadn't noticed before.

8         Q.    But you don't remember where

9    you first saw that sign?

10        A.    I could say it was probably

11   the sign on the eastern side of the

12   entrance concourse.  It was probably that

13   sign that's in the location before you

14   pass through the entrance to the park.

15        Q.    That was the photograph

16   marked C-Fabricant-7, P-74, the sign at

17   the entrance.

18             MS. EICHENBAUM:  Jamie, you

19        can take that down, please.

20   BY MS. EICHENBAUM:

21        Q.    By the way, how many exit

22   turnstiles are there when you're leaving

23   the park?

24        A.    Several.

SA305

Christopher James Fabricant

```
 1          Q.     Can you recall how many?

 2          A.     Perhaps three.

 3                 MS. EICHENBAUM:  Jamie,

 4          could you put up video one,

 5          please?  Don't start it, but just

 6          get it up on the screen.

 7                 We will mark this video

 8          C-Fabricant-11.

 9                          -  -  -

10                 (Whereupon, Exhibit-11 was

11          marked for identification.)

12                          -  -  -

13   BY MS. EICHENBAUM:

14          Q.     I'll represent to you that

15   all of the videos that you'll be shown

16   were provided to us by your counsel in

17   this case, and it's our understanding

18   that they were all taken either by you or

19   one of your sons.  There's nothing in

20   here that didn't come from your counsel

21   in this case, just so you have that

22   assurance on the record.

23                 This is you, correct?

24          A.     Correct.
```

SA306

Christopher James Fabricant

```
 1          Q.    Do you know who shot this
 2   video based on just this still shot of
 3   the first frame?
 4          A.    It was probably Tebow, my
 5   son, my oldest son.
 6          Q.    Do you believe this was shot
 7   with the GoPro?
 8          A.    Probably.
 9          Q.    Were videos shot with
10   anything other than the GoPro?
11          A.    Not to my recollection.
12          Q.    My understanding is that you
13   shot some video footage with the GoPro,
14   as did Tebow.  Is that correct?
15          A.    That sounds correct.
16              MR. COLLER:  Jamie, you can
17          play this video, please.
18                  -  -  -
19              (Whereupon, the video was
20          played.)
21                  -  -  -
22              (Whereupon, a discussion off
23          the record occurred.)
24                  -  -  -
```

SA307

Christopher James Fabricant

1    MS. EICHENBAUM:  Let's go

2    off the video at least for a

3    moment.

4        THE VIDEOGRAPHER:  This ends

5    media unit number two in the

6    deposition of

7    Dr. Christopher Fabricant.  The

8    time is 11:47 a.m.  We're going

9    off the record.

10            -   -   -

11        (Whereupon, a brief recess

12    was taken.)

13            -   -   -

14        THE VIDEOGRAPHER:  This

15    begins media unit number three in

16    the deposition of

17    Dr. Christopher Fabricant.  The

18    time is 11:50 a.m.  We're back on

19    the record.

20        MS. EICHENBAUM:  After a

21    brief break, we figured out the

22    sound issue.

23        Jamie, could you run the

24    video again now with sound?

SA308

Christopher James Fabricant

```
 1              -  -  -
 2          (Whereupon, the video was
 3      played.)
 4              -  -  -
 5  BY MS. EICHENBAUM:
 6          Q.    Sir, you don't recall when
 7  that video was taken?
 8          A.    I suspect it was in April of
 9  2019.
10          Q.    Are you certain of that?
11          A.    Yes.
12          Q.    And would you agree with me
13  that in that video, you didn't lower the
14  restraint all the way in what's shown on
15  the video?
16          A.    Yeah.  I don't see the
17  seatbelt being secured in that video.
18                It's not the seatbelt.  It's
19  the strap that goes between the legs.
20  That's part of the process of drawing the
21  harness down to its position.  So that
22  was not performed in that video segment.
23          Q.    Are you aware of any other
24  video of you in the test seat at
```

SA309

Christopher James Fabricant

1   Kingda Ka?

2       A.   Well, yeah.  There's another

3   video that was produced.

4       Q.   Of you in the test seat?

5       A.   (No audible response.)

6       Q.   You believe there's another

7   video of you in the test seat?

8       A.   Well, I see the video that

9   you have there, and there's no -- it's a

10   brief segment of the video.

11       Q.   Well, that's what we

12   received.

13         Do you believe there's

14   additional video footage of you in the

15   test seat?

16       A.   There may be, yes.

17       Q.   Is there?

18       A.   I would have to see what was

19   produced.

20       Q.   I'll represent to you that's

21   what we received of you in the test seat.

22         So if there is additional

23   footage, we'll ask that that be produced,

24   and we'll reserve the right to come back

SA310

1    to ask questions about it depending what

2    it shows since we haven't seen it.

3                MS. EICHENBAUM:  Jamie,

4         could you run video three, please,

5         which will be C-Fabricant-12?

6                     -  -  -

7                (Whereupon, Exhibit-12 was

8         marked for identification.)

9                     -  -  -

10   BY MS. EICHENBAUM:

11        Q.    Let me stop it.

12              Sir, the first few -- looks

13   like one minute and 46 seconds of that

14   video, is -- was that shot by you?

15        A.    Yes.

16        Q.    And were you holding your

17   GoPro in your hand?

18        A.    Yes.

19        Q.    Were they aware that you

20   were recording the discussion?

21        A.    I believe so, yes.

22        Q.    What do you base that belief

23   on?

24        A.    Because they are telling me

SA311

Christopher James Fabricant

```
 1    not to take video pictures.  So if they
 2    weren't aware, why would they tell me not
 3    to take video pictures?
 4              So, yes.  They knew -- I'm
 5    holding it in my hand and pointing it in
 6    different directions, and it's a GoPro
 7    camera.
 8         Q.    And they are telling you not
 9    to record, but you continued to anyway,
10    correct?
11         A.    No.  My understanding was --
12    after having a conversation, my
13    understanding was that it was okay for me
14    to take video images of the park grounds,
15    including the signage, but to avoid
16    taking video images of the security
17    checkpoint for security purposes.
18         Q.    The first minute and few
19    seconds of this video, you were at the --
20    just outside the park entrance.
21              Is that correct?
22         A.    Yes.
23         Q.    And now we are at 1:46 in
24    the video, and you've turned and started
```

SA312

Christopher James Fabricant

1   walking.

2            And are you now on the side

3   of that area that would be closest to the

4   park exit?

5        A.   It's all one and the same,

6   Counselor.  There's not -- this is a

7   concourse.  So it's a wide concourse.

8   And the gentleman in the image is walking

9   outward toward the parking lot, so he

10  appears to be leaving the park.  This is

11  the western side of what we can call the

12  entrance/exit concourse.

13       Q.   As you are approaching the

14  entrance area, the main gate area for the

15  park, the entrance turnstiles are

16  directly in front of you.

17           Standing from the far left

18  over toward the right, all of the exit

19  turnstiles are to the far right, correct?

20       A.   Yes.

21           MS. EICHENBAUM:  You can

22       keep playing the video, Jamie,

23       please.

24                -  -  -

SA313

Christopher James Fabricant

```
1                    (Playing video.)

2                      -  -  -

3              MS. EICHENBAUM:  I'm sorry.

4       Pause for just one second again.

5  BY MS. EICHENBAUM:

6       Q.   Just to go back momentarily

7  before we keep going -- because I think

8  this video is fairly long, about 12,

9  13 minutes -- you asked the security

10  personnel to show you the reporting

11  requirement sign at the entrance when you

12  were speaking with them, correct?

13       A.   Well, she pointed out a sign

14  that I had not noticed.  It's in a

15  location where it is not especially

16  noticeable, let's say.

17              So when she pointed it out

18  to me, I was surprised because I went to

19  the park that day for the express purpose

20  of viewing signage and hadn't noticed

21  this sign.

22              MS. EICHENBAUM:  Could you

23        back up and start the video over,

24        please?
```

SA314

```
 1                  -   -   -

 2              (Playing video.)

 3                  -   -   -

 4   BY MS. EICHENBAUM:

 5        Q.    You've just indicated to the

 6   security personal that you found out

 7   about the reporting requirement sign last

 8   week, correct?

 9        A.    That's what I said.  Yes.

10        Q.    So you were aware of the

11   signage not because they told you about

12   it, but you were already aware of it,

13   correct?

14        A.    Well, they told me about it

15   on that occasion.  As mentioned, Elaine

16   was telling me it had been present for

17   years.  But it was -- look, I got a

18   letter from an attorney telling me that

19   the sign park had these signs.  So that's

20   the first I found out about it.  It was

21   April of 2017 that I found out about

22   these signs.

23        Q.    I'm going to make a request

24   for a copy of that correspondence.
```

SA315

Christopher James Fabricant

```
 1              MS. EICHENBAUM:  Would you

 2         mark that on the transcript,

 3         please, Lisa?

 4    BY MS. EICHENBAUM:

 5         Q.    In any event, you indicated

 6    to the security personnel that you're

 7    speaking to in this video that you were

 8    aware of the signage since last week,

 9    correct?

10         A.    Right.

11              MS. EICHENBAUM:  And you can

12         keep playing, Jamie, please.

13                   -  -  -

14              (Playing video.)

15                   -  -  -

16              MS. EICHENBAUM:  Pause.

17    Thank you.

18    BY MS. EICHENBAUM:

19         Q.    That sign that she's

20    pointing out -- and you indicate that you

21    see it -- that's at the entrance side or

22    the exit side?

23         A.    I'm sorry.  Could you ask

24    that again, Counselor?  My mind was
```

SA316

Christopher James Fabricant

1  wandering.

2       Q.    The sign that the security

3  personnel just pointed out to you in this

4  video, is that on the entrance side or

5  the exit side?

6       A.    It's on the exit side.

7       Q.    Was this video shot before

8  you entered the park that day, or did you

9  enter and come back out and shoot this

10 video?

11      A.    I don't recall.

12      Q.    Were your children with

13 you -- your sons with you when you were

14 having this communication and shooting

15 this video?

16      A.    They were not.

17      Q.    Where were they?

18      A.    I believe they were in the

19 park, which would mean that I probably

20 exited to shoot these video segments.

21      Q.    And in this video, you did

22 not ask the personnel where the signage

23 was at the entrance, correct, the

24 reporting signage?

SA317

Christopher James Fabricant

1          A.    Signage was at the entrance?

2               I don't think I asked such

3    specific questions about, like, where's

4    the signage?  At the exit or entrance or

5    where have you?

6               I think I would have said,

7    well, gee-whiz, I am looking for these

8    signs.  Never noticed them on all of the

9    prior occasions, nor had anyone else who

10   I had spoken to.

11              And I was there looking for

12   these signs, and I wasn't so specific in

13   my questions about the sign at the

14   entrance or exit per se.  I just wanted

15   to know where these signs were.  And I

16   noticed that there is this orphaned post

17   here, this white post identical to the

18   post across the concourse, and there's no

19   sign there.

20              So Elaine pointed out to me

21   that that sign had been moved.  I guess

22   her suggestion was that it had been moved

23   from that post right on the concourse to

24   its present location on the fence located

SA318

Christopher James Fabricant

1   back from the concourse and not facing

2   the concourse and facing the tree.

3        Q.    None of that is reflected in

4   the video, correct?

5        A.    Some of it is.  Sure.

6   Elaine's remark to me, I think she said

7   something about it was moved, I think,

8   doesn't she?

9        Q.    So the video will speak for

10  itself.

11            Did you ask when the sign

12  was moved?

13       A.    No, I didn't.  I wondered

14  when it was moved.

15       Q.    Right.

16            So for all you know, the

17  sign was on that lone white post in April

18  of 2017, correct?

19       A.    I have no idea whether -- I

20  have no idea about any signs in 2017.

21            MS. EICHENBAUM:  Jamie, you

22       can keep playing, please.

23                 -  -  -

24            (Playing video.)

SA319

1                    -   -   -

2    BY MS. EICHENBAUM:

3          Q.    As the video is progressing,

4    we're at three minutes and ten seconds,

5    approximately.

6                You're walking back toward

7    the entrance to the park, correct?

8          A.    Yes.

9          Q.    Is there any reason you

10   didn't take any video footage of the

11   posted signage regarding the reporting

12   requirement that's posted at the

13   entrance?

14         A.    I don't know what you mean.

15         Q.    Simple question:

16               Is there any reason you

17   didn't shoot video footage of the signage

18   indicating the reporting requirement that

19   is posted at the entrance?

20               MS. EICHENBAUM:  Pause this,

21         Jamie, please.

22               THE WITNESS:  Sorry.  I

23         think we did have, in the image

24         that was captured, video of the

SA320

Christopher James Fabricant

```
1           sign on the eastern side of that
2           entry/exit concourse.
3    BY MS. EICHENBAUM:
4           Q.    And it's right at the edge
5    of the walkway, correct?
6           A.    That's right.  It is.  And
7    it's facing the walkway, too.
8           Q.    But you didn't walk up to
9    that one to show how close it is to the
10   walkway?
11          A.    Well, look, the video speaks
12   for itself.  So we've watched about half
13   the video.  So I don't recall going up to
14   one sign or another.  So if we run the
15   video, we can see what I actually did on
16   that day, Counselor.
17          Q.    Well, you very clearly went
18   up to the one posted on the fencing at
19   the exit, correct?
20          A.    Yes, I did.  And that sign
21   was unknown to me until Elaine pointed it
22   out.
23          Q.    Like the one posted on the
24   brick column right at the exit
```

SA321

1  turnstiles, correct?

2       A.    Yeah.  They were all unknown

3  to me.

4             MS. EICHENBAUM:  Jamie, you

5       can keep playing, please.

6                  -  -  -

7             (Playing video.)

8                  -  -  -

9  BY MS. EICHENBAUM:

10      Q.    Did you go to guest

11 relations on April 23, 2017?

12      A.    No, I did not.

13      Q.    What was your purpose of

14 going to guest relations on the day you

15 shot this video?

16      A.    Well, my understanding is

17 that Six Flags is required to post notice

18 of the 90-day reporting requirement at

19 guest relations at the main entrance,

20 which is guest relations as we're

21 observing it.

22             MS. EICHENBAUM:  Pause it,

23      Jamie.  Thank you.

24 BY MS. EICHENBAUM:

SA322

Christopher James Fabricant

1       Q.    Just so we're clear, though,
2   you didn't go to guest relations on
3   April 23, 2017.
4            So you wouldn't have seen a
5   sign whether it was posted there or not,
6   correct?
7       A.    Correct.
8            MS. EICHENBAUM:  You can
9       keep playing.  Thank you.
10               -  -  -
11           (Playing video.)
12               -  -  -
13  BY MS. EICHENBAUM:
14      Q.    By the way, when you were at
15  the area of guest relations, did you go
16  up to a window and ask what to do if you
17  were injured?
18      A.    No, I did not, Counselor.
19           MS. EICHENBAUM:  Stop,
20      please.  You've got to back up
21      just a little, Jamie.  Sorry.
22      It's skipping forward after you
23      hit pause.  Play.  Stop.
24  BY MS. EICHENBAUM:

SA323

1          Q.    This is the park exit that

2     we looked at the still photograph of

3     earlier, correct?

4          A.    Yes.

5          Q.    And for the record, that was

6     marked C-Fabricant-7.

7                You see the reporting

8     requirement sign -- and this is obviously

9     not the best angle.  I think we get

10    better in a different video.

11               But do you see the reporting

12    requirement sign on the posted on the

13    brick there?

14         A.    Yes.

15         Q.    And this is that wider shot

16    that you were asking about.

17               It is the only sign shown

18    posted on the exit -- other than, again,

19    park exit -- in this wider shot as well,

20    correct?

21         A.    Yes.  So it's the only sign

22    that I see at the exit.

23               MS. EICHENBAUM:  Jamie, you

24         can continue, please.  Pause it,

Christopher James Fabricant

1          please, Jamie.

2                    -  -  -

3               (Playing video.)

4                    -  -  -

5               MS. EICHENBAUM:  Pause it,

6          please, Jamie.

7     BY MS. EICHENBAUM:

8          Q.    When you exited the park on

9     April 23rd of 2017, which of the three

10    turnstiles did you go through?

11         A.    I don't recall.

12         Q.    Were you speaking to anyone

13    at the time you exited the park?

14         A.    I don't recall.

15         Q.    Was anyone speaking to you

16    as you exited the park?

17         A.    I don't recall.

18         Q.    Were you looking for any

19    signs as you left the park?

20         A.    I don't recall.  I suspect I

21    wasn't looking for any signs.

22         Q.    As you left the park, did

23    you believe you had been injured?

24         A.    Yeah.  My shoulder hurt like

SA325

Christopher James Fabricant

1  hell.

2            MS. EICHENBAUM:  You can

3       continue playing, Jamie.  Thank

4       you.

5                  -  -  -

6            (Playing video.)

7                  -  -  -

8            MS. EICHENBAUM:  Pause it,

9       please, Jamie.

10            THE WITNESS:  And,

11       Counselor, I'm going to take

12       advantage of the pause.  You

13       didn't give me a chance to

14       complete my last answer before you

15       restarted the video, so I waited

16       until we had a pause.

17  BY MS. EICHENBAUM:

18       Q.   I don't believe that is the

19  case, but I'm going to move forward

20  because we only have so much time.

21            Again, if your counsel

22  has --

23       A.   Hey, Counselor --

24       Q.   No.  Sir, this isn't how a

Christopher James Fabricant

1  deposition works.

2              -  -  -

3         (Overlapping speakers.)

4              -  -  -

5  BY MS. EICHENBAUM:

6       Q.    If your counsel has

7  follow-up --

8       A.    If I give an answer --

9       Q.    Sir, this is not --

10      A.    -- and you restart the video

11  before my answer is concluded and then

12  you tell me that --

13           MS. EICHENBAUM:  Counsel,

14      this time is not going to count

15      toward my time.  I'm not doing

16      this.

17           THE WITNESS:  Counselor, you

18      asked a question.  I gave an

19      answer.  Didn't complete my

20      answer.  You restarted the video.

21      I politely waited until the video

22      stopped, and then I asked to

23      complete my answer.

24           And you said, no way.

SA327

1          That's not how this works?

2              Is that really what you're

3          going to say?

4    BY MS. EICHENBAUM:

5          Q.    Your answer was complete,

6    sir.  I'm moving forward.

7          A.    No.  It wasn't complete,

8    Counselor.

9          Q.    Then your counsel can ask

10   you a follow-up.

11         A.    How about we have the

12   stenographer read back the question and

13   the answer so that I can conclude my

14   answer?

15         Q.    I'm not going to do that

16   because we're under a time limit, and

17   we're not going to waste more time.

18         A.    Waste more time, Counselor?

19   Giving a complete answer is not, in my

20   opinion, a waste of our time.

21         Q.    Then your counsel can go

22   back and ask you if you want to complete

23   an answer.  He has the opportunity to do

24   that, and I'm sure he won't restrict

1    himself on his time.

2              The individual that spoke to

3    you in this video asked you to stop

4    recording, correct?

5        A.    Elaine Lynch asked me to

6    stop recording.  She did.

7        Q.    Asked you to put down the

8    camera, correct?

9        A.    If you play me back the

10   words, I can tell you exactly what she

11   said.  But, yes.  She wanted me to stop

12   the video recording.

13       Q.    You continued to record,

14   correct, through that entire

15   communication?

16       A.    As soon as she said, stop

17   taking video of people, I turned the

18   camera toward the ground.  The camera

19   remained on, but I turned the camera

20   toward the ground.  So I wasn't taking a

21   video of the people, as she had requested

22   of me.  So I was responsive to her

23   request, Counselor.

24       Q.    But we're several seconds

SA329

Christopher James Fabricant

1    afterward, and you're videotaping people

2    in this, correct?

3              That's what's on the screen

4    right now at 12:30?

5         A.   Well, if we could back up

6    and then play from the point where she

7    asks me to stop recording, I could answer

8    your question best.

9         Q.   The video will speak for

10   itself.

11             MS. EICHENBAUM:  You can hit

12        play, Jamie.  Just 15 seconds

13        left.

14                  -  -  -

15             (Playing video.)

16                  -  -  -

17   BY MS. EICHENBAUM:

18        Q.   We've now watched the

19   entirety of that 12-minute and 45-second

20   video.

21             And at no point in that

22   video did you go up and video the sign at

23   the entrance containing the reporting

24   requirement that is directly adjacent to

SA330

Christopher James Fabricant

 1    the walkway, correct?

 2         A.    That's right.  We didn't see

 3    any -- well, we saw the sign in the

 4    background as I was talking to the

 5    security guard.

 6         Q.    And you did not make a point

 7    to go up and video that sign that is

 8    immediately adjacent to the walkway,

 9    correct, at the entrance?

10         A.    Well, at that point, I'm

11    learning about signs, and I'm doing my

12    best to see the signs and to video the

13    signs.

14         Q.    Sir, it's a simple yes or

15    no.

16              Would you agree with me that

17    even though you made a point of going up

18    and closely videoing the sign at the

19    exit, you didn't do so with the identical

20    sign at the entrance?

21         A.    That's right.  We didn't see

22    that.

23              MS. EICHENBAUM:  I need to

24         take two minutes.

SA331

Christopher James Fabricant

```
1              Jamie, could you put up --
2         or get ready to put up video four,
3         please?  It will be
4         C-Fabricant-13.
5                   -  -  -
6              (Whereupon, Exhibit-13 was
7         marked for identification.)
8                   -  -  -
9              (Whereupon, a discussion off
10        the record occurred.)
11                  -  -  -
12   BY MS. EICHENBAUM:
13        Q.    Sir, would you please just
14   repeat your question (sic) as you gave it
15   before to that question?
16        A.    Repeat the question?
17        Q.    (No audible response.)
18        A.    So, Counselor, you want me
19   to provide a complete answer to this
20   question but not the last question?
21        Q.    I'm asking a yes-or-no
22   question.  I want a yes or no, which is
23   what you gave when you answered it
24   two minutes ago.  But for whatever
```

SA332

Christopher James Fabricant

1  reason, the stenographer didn't get the

2  yes.  That is correct.

3              So I'm just asking you to

4  repeat it.

5       A.    What's the question?

6              MS. EICHENBAUM:  Lisa, would

7       you read back the question again,

8       please?

9                  -   -   -

10             (Whereupon, the court

11      reporter read the pertinent part

12      of the record.)

13                 -   -   -

14             THE WITNESS:  Yes.  That

15      video does not show me doing so.

16             MS. EICHENBAUM:  If you

17      would get ready to put up

18      video four, which will be

19      C-Fabricant-13, please.  And I'm

20      going to go off for just literally

21      30 seconds.

22                 -   -   -

23             (Whereupon, a brief recess

24      was taken.)

SA333

Christopher James Fabricant

```
 1                -  -  -
 2            MS. EICHENBAUM:  We've
 3       marked this C-Fabricant-13,
 4       eight minutes and 20 seconds long.
 5            You can go ahead and hit
 6       play, Jamie, please.
 7                -  -  -
 8            (Playing video.)
 9                -  -  -
10   BY MS. EICHENBAUM:
11       Q.   Sir, was this video taken
12   before or after the last one that we just
13   viewed that was 12 minutes and
14   45 seconds?
15       A.   I don't recall.
16            MS. EICHENBAUM:  Counsel,
17       I'm making a request for the
18       digital metadata relating to the
19       videos.  It would be stored on the
20       originals in the GoPro or on the
21       card, the memory card.
22   BY MS. EICHENBAUM:
23       Q.   You're again at the exit to
24   the park, correct?
```

SA334

Christopher James Fabricant

```
1          A.    Correct.

2          Q.    And approaching the exit?

3          A.    Correct.

4          Q.    As you're walking?

5          A.    Yes.

6          Q.    And that showed an even

7   wider view of the entire exit area.

8                And the only sign posted on

9   the exit, itself, other than park exit,

10  is that reporting requirement sign,

11  correct?

12         A.    Yes.

13         Q.    It appears that the video

14  starts and stops in different places to

15  some extent.

16               Did you stop recording at

17  times during shooting this video?

18         A.    Yes.  I must have.

19         Q.    Have any communications with

20  any employees of Six Flags that were not

21  videotaped that day?

22         A.    Not to my recollection.

23         Q.    With regard to signage.

24  Sorry.  Let me qualify.
```

SA335

Christopher James Fabricant

```
 1                    With regard to signage.
 2          A.    I don't believe so, no.
 3                MS. EICHENBAUM:  Back up and
 4          just stop for one second, Jamie.
 5          Sorry.  I know there's a delay.
 6          There you go.
 7   BY MS. EICHENBAUM:
 8          Q.    On the upper right not
 9   corner but close to it, that is the
10   entrance area to the park, correct?
11          A.    Yeah.  That's the same
12   concourse where I was talking with the
13   security personnel before in the other
14   video.
15          Q.    Right.
16                And that's the reporting
17   requirement sign that we see that you
18   didn't go up to and shoot close up?
19          A.    Well, we see several
20   different signs there.
21          Q.    And one of them is the
22   reporting requirement sign that you did
23   not approach and video close up even
24   though it is right next to the walkway,
```

SA336

1  correct?

2       A.    Well, so far, I haven't.  I

3  don't know what the rest of the video

4  might show, Counselor.

5            I'm not hearing you,

6  Counselor, your audio.

7       Q.    I indicated Jamie could hit

8  play.

9       A.    Thanks.

10            -  -  -

11       (Playing video.)

12            -  -  -

13  BY MS. EICHENBAUM:

14       Q.    That was you speaking to one

15  of your sons?

16       A.    Yes.

17       Q.    You're now, when you end the

18  video, at the reporting requirement sign

19  at the entrance, correct?

20       A.    Yes.  And I seem to be doing

21  what you said I didn't do.

22       Q.    Right when you stopped

23  videoing, as you walked up to it?

24       A.    It may have been the case,

SA337

Christopher James Fabricant

1   Counselor, that that was the moment that

2   I was approached by the security

3   personnel.  So this video may have

4   preceded the other video that you showed

5   before because in this video, toward the

6   end, I was walking rather nearby to the

7   security checkpoint.  And it may have

8   captured the attention of the security

9   personnel, and they may have approached

10  me.  And that may -- I don't know.  I

11  don't have a recollection.  But that may

12  have been why I stopped the video at that

13  point.  I don't know.

14       Q.    That's all conjecture,

15  correct?

16       A.    Yes, it is.  I'm trying to

17  make sense of what you have shown me so

18  far and do my best job for you.

19       Q.    In any event, the video

20  stops.

21            No one is speaking to you

22  when the video stops, correct?

23       A.    That's right.  I didn't hear

24  any voice.

SA338

Christopher James Fabricant

```
 1          Q.    And you stopped videoing

 2    just as you approached the reporting sign

 3    that is posted at the entrance right next

 4    to the walkway, correct?

 5          A.    Well, just as I

 6    approached -- no.  I had approached the

 7    sign, and I showed the sign within the

 8    context of the other signs present.

 9                MS. EICHENBAUM:  Jamie, you

10          could put up, please, video five,

11          which will be C-Fabricant-14.

12                   -   -   -

13          (Whereupon, Exhibit-14 was

14          marked for identification.)

15                   -   -   -

16                THE WITNESS:  Is this a long

17          video?  May I take a five-minute

18          bathroom break, Counselor?

19                MS. EICHENBAUM:  I'm fine

20          with that.

21                THE VIDEOGRAPHER:  This ends

22          media unit number three in the

23          deposition of

24          Dr. Christopher Fabricant.  The
```

SA339

Christopher James Fabricant

```
 1          time is 12:40 p.m.  We're going

 2          off the record.

 3                    -   -   -

 4               (Whereupon, a brief recess

 5          was taken.)

 6                    -   -   -

 7               THE VIDEOGRAPHER:  This

 8          begins media unit number four in

 9          the deposition of

10          Dr. Christopher Fabricant.  The

11          time is 12:47 p.m.  We're back on

12          the record.

13               MS. EICHENBAUM:  Can you

14          play C-Fabricant-14, please?

15                    -   -   -

16               (Playing video.)

17                    -   -   -

18     BY MS. EICHENBAUM:

19          Q.    This is, again, video of

20     guest relations, correct?

21          A.    No.  This is a different

22     guest relations location.

23          Q.    It is guest relations,

24     correct?
```

SA340

Christopher James Fabricant

```
1            A.    That's right.  It's the
2     guest relations located inside the park.
3            Q.    Correct.
4                  And you would agree with me
5     that posted at guest relations is the
6     reporting requirement sign, correct?
7            A.    Yes.
8            Q.    And you're actually within
9     the queue line for guest relations in
10    this video.
11                 You're walking it?
12           A.    That's right.
13           Q.    And the reporting
14    requirement sign was just shown at
15    approximately 57 seconds, correct?
16           A.    I wasn't looking at the
17    marker, but there it is.  You can see
18    half of the sign -- or a third of the
19    sign beside the woman's body.
20           Q.    Right.
21                 Earlier in the video, you
22    could see all of it, correct, as you
23    walked in?
24           A.    Yes.  You can see the sign,
```

SA341

Christopher James Fabricant

1   but, of course, you couldn't read the

2   words on the sign.

3         Q.    Well, you could if you

4   approached it as closely as you did the

5   other signs or zoomed in, even, correct?

6         A.    Zoomed in?  That's a

7   stretch.

8               But if you're directly

9   beside the sign, yes, you can read it.

10              MS. EICHENBAUM:  Could you

11         put up video six, Jamie, which

12         will be C-Fabricant-15?

13                   -  -  -

14              (Whereupon, Exhibit-15 was

15         marked for identification.)

16                   -  -  -

17              MS. EICHENBAUM:  Play.

18                   -  -  -

19              (Playing video.)

20                   -  -  -

21   BY MS. EICHENBAUM:

22         Q.    Have you used your GoPro on

23   occasions other than this?

24         A.    For practical purposes, no.

SA342

Christopher James Fabricant

1   When I first acquired the camera, I

2   practiced within my house.  But this was

3   the only video taking that I conducted

4   with the camera of any significance.

5        Q.    Did the GoPro allow you the

6   option of having a date or time stamped

7   on your videos?

8        A.    I'm not so familiar with the

9   GoPro, Counselor.  On the day that I used

10  it, I wasn't sure how much video time I

11  might have.  That might explain why I

12  turned it off several times.  So I really

13  don't know the details of the workings of

14  the camera.  I bought the camera for this

15  purpose, I used it for this purpose, and

16  then I set it aside.

17       Q.    So you didn't look to see if

18  you could have a date and time stamp on

19  your video footage?

20       A.    Whatever the default

21  settings are in the camera, I suspect, is

22  what we have.  So you may very well have

23  time stamps on everything.

24       Q.    But your videos do not,

SA343

Christopher James Fabricant

```
 1   correct?
 2         A.    You mean, like, shown on the
 3   image as it appears -- or shown on the
 4   video as it appears?
 5         Q.    Right.
 6         A.    I don't see any time stamp
 7   on this video.
 8         Q.    That is a reporting
 9   requirement sign again, shown at 2:08 in
10   this photograph, correct?
11         A.    Yep.  That's the sign as it
12   appears at another location.  That's
13   correct.
14         Q.    Immediately adjacent to a
15   walkway, correct?
16         A.    It's behind a fence --
17   behind a corner of the fence.
18               MS. EICHENBAUM:  Jamie,
19         could you replay just the last
20         portion of that video where he's
21         at the sign?  Go back to that and
22         just pause it right there.  There
23         you go.  Stop.
24                     -   -   -
```

SA344

Christopher James Fabricant

```
 1                    (Playing video.)

 2                       -   -   -

 3  BY MS. EICHENBAUM:

 4        Q.    The fence you're referring

 5  to is the black wrought-iron fence that

 6  is below the sign, correct?

 7        A.    It is below and in front of

 8  the sign.

 9        Q.    It doesn't obstruct your

10  view of the sign, correct?

11        A.    It does not in this image,

12  but it does prevent -- not prevent, but

13  it does hinder close-up viewing of the

14  sign.

15        Q.    So the sign is within

16  approximately a foot of the walkway, is

17  it not?

18        A.    I am not sure, Counselor.

19              Because of sign factors

20  relating to how the text is presented,

21  the colors, and the size, you really do

22  have to be right up to that sign, very

23  nearby in order to read the content of

24  the sign.  And even if you can read the
```

SA345

Christopher James Fabricant

1    content, it's confusing.

2         Q.    Are you aware that that

3    language is what is required by the

4    state?

5         A.    I think that language falls

6    short of what is required, Counselor.

7    Counselor, the language is confusing,

8    ambiguous and inaccurate.

9         Q.    I appreciate you giving your

10   opinion on that.

11            MS. EICHENBAUM:  You can

12        take this one down, Jamie.  It

13        speaks for itself.

14            Could we please put up

15        video seven, please, which will be

16        C-Fabricant-16?

17                -  -  -

18            (Whereupon, Exhibit-16 was

19        marked for identification.)

20                -  -  -

21            (Playing video.)

22                -  -  -

23   BY MS. EICHENBAUM:

24        Q.    Did you shoot this video?

SA346

Christopher James Fabricant

1          A.    I did.  At least I believe I
2    did.
3          Q.    This is approaching first
4    aid, correct?
5          A.    That's correct.
6                MR. COLLER:  Could you
7          pause, please, Jamie?  Back up,
8          please.
9    BY MS. EICHENBAUM:
10         Q.    The entrance to first aid
11   has the red first-aid awning over it,
12   correct?
13         A.    It does.
14         Q.    And other than the
15   no-smoking symbol on the door, the only
16   sign is the reporting requirement,
17   correct?
18         A.    On the door?  That's
19   correct.
20         Q.    Were either of your sons
21   with you when you were shooting this
22   video?
23         A.    Yes.
24         Q.    Which one, or both?

SA347

Christopher James Fabricant

1      A.    They both would have been

2    with me, I believe.

3      Q.    And the testimony has been

4    that you had one of your sons go into

5    first aid ahead of you while you were

6    outside.  Is that correct?

7      A.    Yes.  We saw Tebow, my

8    oldest son, exiting as I was approaching.

9      Q.    And why did you have Tebow

10   go into first aid by himself?

11     A.    I don't recall.

12     Q.    Was he injured?

13     A.    No.

14     Q.    Why would he go into first

15   aid, then?

16     A.    I really don't recall.  It

17   may have related to what happens with

18   respect to viewing of the sign when the

19   door is open.

20     Q.    Did you discuss that with

21   Tebow, why you were sending him into

22   first aid?

23     A.    I doubt that I would have

24   any such conversation with Tebow.

SA348

Christopher James Fabricant

1    I probably asked him to go

2  ahead -- to enter the building and then

3  to exit in a moment so that I could take

4  a photograph of the outward-swinging door

5  with -- the outward-swinging door within

6  a confined space, bounded by metal and

7  concrete where the door is above the

8  landing.  So you have to step upward to

9  enter the building, and then this door is

10  swinging outward towards you if another

11  guest is exiting as you approach the

12  door.

13          Q.    Did you tell him to speak to

14  anyone in first aid?

15          A.    Counselor, I believe I would

16  have asked Tebow to go into first aid and

17  then exit -- to turn around and exit as I

18  was approaching.

19          Q.    So the answer is no, you did

20  not ask him to speak with anyone in first

21  aid.  Is that correct?

22          A.    That's correct.  Yes.

23          Q.    And you didn't go to first

24  aid on April 23rd of 2017.

SA349

Christopher James Fabricant

```
 1            So you wouldn't have seen

 2   this sign regardless of how the door

 3   opens or closes, correct?

 4        A.    That's correct.  Yes.

 5            MS. EICHENBAUM:  You can

 6        continue, playing, Jamie.  Thank

 7        you.

 8                -  -  -

 9            (Playing video.)

10                -  -  -

11            MS. EICHENBAUM:  And

12        video eight, please, which will be

13        C-Fabricant-17.

14                -  -  -

15            (Whereupon, Exhibit-17 was

16        marked for identification.)

17                -  -  -

18            (Playing video.)

19                -  -  -

20   BY MS. EICHENBAUM:

21        Q.    Did you shoot this video?

22        A.    Yes, I believe I did.

23        Q.    Was this before or after you

24   were asked to stop recording people by
```

SA350

Christopher James Fabricant

1   park security?

2        A.    Before.

3        Q.    This was your walk to first

4   aid, correct?

5        A.    Correct.

6        Q.    And how had you determined

7   where first aid was?

8        A.    I don't recall specifically.

9   I may have looked at the map.

10        Q.    The same map that you had a

11   copy of on April 23rd, 2017, correct, the

12   park map and guide?

13        A.    Well, I don't know if the

14   map and guide changed from one year to

15   the next, but it was the park map.

16   There's a standard park map that's

17   published by the amusement park.

18        Q.    And it does tell you where

19   first aid is located, correct?

20        A.    Yes.

21             MS. EICHENBAUM:  Video nine,

22        please, Jamie, which will be

23        C-Fabricant-18.

24                  -  -  -

SA351

Christopher James Fabricant

 1              (Whereupon, Exhibit-18 was

 2         marked for identification.)

 3              -   -   -

 4              MR. MEYERS:  Before we get

 5         started, how much longer do you

 6         have?  Because we're at 1:00.  We

 7         were supposed to be stopping at

 8         1:00 so that we could take a

 9         half-hour break for lunch.

10              MS. EICHENBAUM:  Well, the

11         time wasn't including breaks, to

12         my understanding, but there are

13         two more videos.  That's it.

14              -   -   -

15              (Playing video.)

16              -   -   -

17    BY MS. EICHENBAUM:

18         Q.    Did you shoot this video?

19         A.    I did.

20         Q.    And this is only

21    nine seconds, but this is the inside of

22    the first-aid reception area?

23         A.    Yep.  Shows all the bare

24    walls inside first aid.

SA352

1    Q.    And, again, you didn't go to

2  first aid on April 23rd, 2017.

3            So it didn't matter what was

4  on the walls, correct?

5    A.    Asked and answered,

6  Counselor.

7    Q.    You can answer the question.

8    A.    What is the question,

9  Counselor?

10    Q.    And you didn't go to first

11  aid on April 23rd, 2017.  So it doesn't

12  matter whether the walls were bare or

13  not.

14            You wouldn't have seen them,

15  correct?

16    A.    Well, it does matter,

17  Counselor, that the walls were bare, I

18  believe, because it does matter that the

19  park did not fulfill its obligation to

20  provide conspicuous notice of the

21  reporting requirement.

22    Q.    That's your opinion.

23            But you didn't go to first

24  aid, so you wouldn't have seen a sign if

SA353

1   it was on the wall, correct?

2           A.    That's correct.

3                 MS. EICHENBAUM:  Video two,

4           Jamie, please, which will be

5           C-Fabricant-19.

6                      -  -  -

7                 (Whereupon, Exhibit-19 was

8           marked for identification.)

9                      -  -  -

10                (Playing video.)

11                     -  -  -

12  BY MS. EICHENBAUM:

13          Q.    Did you, again, shoot this

14  video?

15          A.    I did, yes.

16          Q.    So that video cuts out.

17                But in any event, that was

18  shot by you in 2019, correct?

19          A.    Correct.

20          Q.    So you went into first aid

21  approximately two years after you claim

22  to have been injured and wanted to file a

23  report?

24          A.    It was less than two years

Christopher James Fabricant

1    from the incident.

2         Q.    And at that point, you were

3    already aware of the reporting

4    requirement, correct?

5         A.    Yes.  It was a --

6         Q.    Within 90 days?

7         A.    The reporting requirement

8    only holds, Counselor, if notice has been

9    conspicuously posted.

10        Q.    That's not my question, sir.

11        A.    Sure, it is.

12        Q.    Not, it's not?

13        A.    Sure, it is.

14        Q.    At the time you went into

15   first aid approximately two years after

16   you claimed to have been injured and

17   wanted to file a report, you were aware

18   of the 90-day reporting requirement of

19   the state of New Jersey, correct?

20        A.    No.  I didn't believe that

21   the 90-day reporting requirement applies

22   because notice was not conspicuously

23   posted and because notice was not posted

24   at the designated locations.

SA355

Christopher James Fabricant

1    Q.    You were aware that --

2    A.    That's the whole point.

3  That's the whole point, Counselor.  It

4  was under two years, and I had just found

5  out about the reporting requirement

6  and -- I had just found out about it and

7  wanted to go and fill out the report.

8    Q.    And she advised you to put

9  it in writing and send it in and gave you

10 the address, correct?

11   A.    Right.  She told me that if

12 it didn't happen on that day, that she

13 wasn't going to take the report or give

14 me an incident report to fill out and

15 that she wasn't going to participate in

16 the process beyond asking me to mail

17 information to a post office box.

18   Q.    Right.

19         Did you ever mail that --

20   A.    So she seems like she was

21 following a standard process by the

22 amusement park to not take a report if it

23 happens in the past and not on that day.

24   Q.    Did you send in the written

SA356

Christopher James Fabricant

1   information as she suggested you do?

2        A.    I did not, no.

3        Q.    And by the way, you already

4   had legal counsel by this point in 2019?

5        A.    I did, yes.

6        Q.    That was Mr. Meyers?

7        A.    Yes.  And my activities were

8   after I had retained counsel.

9             MS. EICHENBAUM:  With the

10            caveat relating to the items we

11            have requested, I don't have any

12            further questions at this time.

13            MR. MEYERS:  Brenden, do you

14            have anything further?

15            MR. COLLER:  Nope.  Nothing

16            for me.

17                 -   -   -

18                 EXAMINATION

19                 -   -   -

20   BY MR. MEYERS:

21        Q.    I just have one on redirect.

22            Dr. Fabricant, you had an

23   incomplete answer that you were trying to

24   finish earlier?

SA357

Christopher James Fabricant

1      A.    I did, yes.

2      Q.    Do you recall what it was?

3      A.    I think the question was:

4            Did you know you were

5    injured as you exited the park that day?

6      Q.    What was the part of your

7    answer that you were not --

8      A.    I responded that, yes, my

9    shoulder hurt like hell.  And I didn't

10   expand on that.

11           When I took the ride and the

12   harness came down against my shoulder

13   forcefully, it hurt like hell.  When the

14   harness was released and I exited the

15   ride, to some degree, the pain was

16   relieved.  And as I exited the park, I

17   still had pain in my shoulder and did not

18   believe that I had been injured

19   seriously.

20           I later found out that,

21   indeed, I was injured very seriously as

22   my symptoms progressed from just the

23   shoulder pain -- as the record shows

24   elsewhere, progressed over the next

SA358

Christopher James Fabricant

1  several weeks to a situation of an

2  emergency requiring surgery.

3              Thank you, Counselor.

4        Q.    I think you were also asked

5  a question about a sign -- or you started

6  to say something about a sign that is

7  located at the entrance to the Kingda Ka,

8  where it says something about -- it was

9  shown today to say something about, may

10  not accommodate patrons of larger size.

11             Do you recall seeing that

12  sign?

13       A.    Yeah.  I don't recall -- I

14  do not recall seeing that sign.  And

15  viewing the sign today makes me believe

16  that the sign may have not been presented

17  in a manner that would allow a patron or

18  a park-goer -- a park-goer to see and

19  read the sign in an easy way.  It seemed

20  like it had sign factors that made

21  reading the sign less than facile.

22             MR. MEYERS:  I have no

23        further questions.

24             THE VIDEOGRAPHER:  This ends

SA359

Christopher James Fabricant

```
 1        media unit number four in the

 2        deposition of

 3        Dr. Christopher Fabricant.  The

 4        time is 1:14 p.m.  We're going off

 5        the record.

 6               -  -  -

 7        (Whereupon, the deposition

 8        concluded.)

 9               -  -  -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

SA360

```
 1                    CERTIFICATE

 2         I, LISA CAPALDO, Registered Court

 3    Reporter, do hereby certify that prior to

 4    the commencement of the examination,

 5    CHRISTOPHER FABRICANT, M.D., was duly

 6    remotely sworn by me to testify to the

 7    truth, the whole truth, and nothing but

 8    the truth.

 9         I DO FURTHER CERTIFY that the

10    foregoing is a verbatim transcript of the

11    testimony as taken stenographically by me

12    at the time, place, and on the date

13    hereinbefore set forth, to the best of my

14    ability.

15         I DO FURTHER CERTIFY that I am

16    neither a relative nor employee nor

17    attorney nor counsel of any of the

18    parties to this action, and that I am

19    neither a relative nor employee of such

20    attorney or counsel, and that I am not

21    financially interested in the action.

22

23    _____

      LISA CAPALDO, RPR

24    Notary Public
```

SA361

Christopher James Fabricant

```
 1        INSTRUCTIONS TO WITNESS

 2

 3            Please read your deposition

 4   over carefully and make any necessary

 5   corrections.  You should state the reason

 6   in the appropriate space on the errata

 7   sheet for any corrections that are made.

 8            After doing so, please sign

 9   the errata sheet and date it.

10            You are signing same subject

11   to the changes you have noted on the

12   errata sheet, which will be attached to

13   your deposition.

14            It is imperative that you

15   return the original errata sheet to the

16   deposing attorney within thirty (30) days

17   of receipt of the deposition transcript

18   by you.  If you fail to do so, the

19   deposition transcript may be deemed to be

20   accurate and may be used in court.

21

22

23

24
```

SA362

```
1                    - - - - - -

                  E R R A T A
2                    - - - - - -

3     PAGE   LINE       CHANGE  |  REASON

4     _____  _____  _____

5     _____  _____  _____

6     _____  _____  _____

7     _____  _____  _____

8     _____  _____  _____

9     _____  _____  _____

10    _____  _____  _____

11    _____  _____  _____

12    _____  _____  _____

13    _____  _____  _____

14    _____  _____  _____

15    _____  _____  _____

16    _____  _____  _____

17    _____  _____  _____

18    _____  _____  _____

19    _____  _____  _____

20    _____  _____  _____

21    _____  _____  _____

22    _____  _____  _____

23    _____  _____  _____

24
```

SA363

EXHIBIT "L"

Treatment Records of Dr. Brian Halpern

**HSS**

HSS HIM VERISMA
535 East 70th Street
NEW YORK NY 10021-4823
Amb Encounter Report

Fabricant, Christopher J
MRN: 2114445, DOB: ██████ Sex: M
Visit date: 5/3/2017

---

**Telephone Encounter**

**Call Information**

| | Provider | Department | Center |
|---|---|---|---|
| 5/3/2017 10:30 AM | Halpern, Brian C, MD | BEL 1 DR. B. HALPERN | Belaire |

**Reason for Call**

**Neck - Pain**

**Call Documentation**

**Halpern, Brian C, MD at 5/3/2017 10:30 AM**

Status: Addendum

**Date**: 5/3/2017
**Name**: Christopher J Fabricant MD
**DOB:** ██████

<u>**Cervical Spine**</u>

<u>**CHIEF COMPLAINT**</u>**::**
Chief Complaint
Patient presents with
- Neck - Pain

<u>**HPI**</u>:
WHAT: Neck pain.
HOW: Was on a roller coaster.
WHEN: Ten days ago.

Chris is a surgical gynecologist, has had no issues with his neck in the past, was on a roller coaster, was too tight on him, had acute neck pain following that, and then over the last few days dysesthesias in the C8 nerve root distribution bilaterally, which are getting better. No weakness appreciable. Neck pain is better. Comes in to have this checked out.

Now Chris also notes his back bothering him a little bit, a little numbness intermittently sitting, under the left foot.

<u>**MEDICAL HISTORY**</u>: Christopher J Fabricant MD has no past medical history on file.

<u>**SURGICAL HISTORY**</u>: He has no past surgical history on file.

<u>**MEDICATIONS**</u>:
No current outpatient prescriptions on file.

---

Generated on 3/21/22  2:36 PM

42 CFR part 2 prohibits unauthorized disclosure of these records.

**HSS**

HSS HIM VERISMA
535 East 70th Street
NEW YORK NY 10021-4823
Amb Encounter Report

Fabricant, Christopher J
MRN: 2114445, DOB: 3/17/1965, Sex: M
Visit date: 5/7/2020

## Medications

### Medications the Patient Reported Taking

| | Disp | Refills | Start | End |
|---|---|---|---|---|
| **cholecalciferol, vitamin D3, 50 mcg (2,000 unit) capsule (Taking)** | | | | |

Sig: Take 1 capsule by mouth daily Indications: low vitamin D levels.
Class: Historical Med
Route: oral

### Medications at Start of Encounter

| | Disp | Refills | Start | End |
|---|---|---|---|---|
| **cholecalciferol, vitamin D3, 50 mcg (2,000 unit) capsule (Taking)** | | | | |

Sig - Route: Take 1 capsule by mouth daily Indications: low vitamin D levels.   - oral
Class: Historical Med

## Telephone Encounter

### Call Information

| | Provider | Department | Center |
|---|---|---|---|
| 5/7/2020 8:45 AM | Halpern, Brian C, MD | URGENT ORTHO CARE PRMS | Temp |

### Reason for Call

**Follow-up**

## Call Documentation

**Halpern, Brian C, MD at 5/7/2020  8:45 AM**

Status: Addendum

**Date**: 5/7/2020
**Name**: Christopher J Fabricant
**DOB**: ▮▮▮▮▮▮

### **Cervical Spine**

### **CHIEF COMPLAINT**::

**Chief Complaint**
Patient presents with
 • Follow-up

**HPI**:  Chris comes in today.  He is a 55-year-old surgical gynecologist who I saw back on 05/03/2017.  At initial evaluation, he had been on a roller coaster ten days prior.  Prior to this, he had no issues with his neck.  He felt the shoulder constraints were too tight on him and the lower cervical support was too low in the back.

42 CFR part 2 prohibits unauthorized disclosure of these records.

SA366

**HSS**

HSS HIM VERISMA                    Fabricant, Christopher J
535 East 70th Street               MRN: 2114445, DOB: ██████ Sex: M
NEW YORK NY 10021-4823    Visit date: 5/7/2020
Amb Encounter Report

---

**Call Documentation (continued)**

**Halpern, Brian C, MD at 5/7/2020  8:45 AM (continued)**

---

Immediately following his roller coaster ride, he had acute pain with progressive dysesthesias in both upper and lower extremities.

At initial evaluation, he had good motion of the neck and shoulders.  He had weakness of the adductor digiti minimi bilaterally.  He had no sensory deficits that were appreciated.  Also, physical exam of the back was negative.  He had an MRI of the lumbar spine which revealed some facet disease at L4-L5 with a little bit of pinching of the L5 nerve root on the left.  More importantly, his cervical spine MRI done on 05/02/2017 revealed disk protrusion at C3-C4 effacing the ventral cerebral spinal fluid with impingement of the cord resulting in severe central stenosis.  At C4-C5 there was also a small disk protrusion resulting in moderate-to-severe central canal stenosis.  Some moderate central stenosis at C5-C6 and mild degeneration at C6-C7 and C7-T1.  There was definite impingement of the cord and mild deformation at C3-C4 with abutment of the cord at C4-C5.  He was placed on prednisone and referred to Dr. Todd Albert on 05/12/2017.

He was evaluated by Dr. Albert, who noted progressive burning pain in the back and neck, worse with any activities.  He had trouble sleeping at night.  Neuropathic-type pain in both arms and legs.  The patient did not feel like the prednisone had helped at all.  Dr. Albert's impression was congenital cervical stenosis with likely cervical contusion on top of that as a direct result of the roller coaster ride.  At that time, he recommended laminoplasty with laminectomy.  Following Dr. Albert's evaluation, the patient's symptoms immediately and progressively became much worse.  He had upper back pain, neck pain, bilateral arm and leg symptoms with burning across the abdomen and umbilicus bilaterally.  He had difficulty lifting the head.  He was subsequently evaluated at Jersey Shore University Medical Center emergency room, where it was thought he had an acute cord event that was progressing.  He was also having difficulty swallowing, which has persisted to this date.  On 05/14/2017, he had anterior cervical decompression and fusion from C3-C5 with allograft bone or local autologous bone and anterior plate fixation by Dr. Albert.  Subsequent to the operation, he improved but had persistent residual symptoms with numbness in the bilateral arms and both legs intermittently.  No bowel or bladder issues.  He ultimately went back to work at about 6 weeks.  It is important to note that he continued to be symptomatic, but was improved from the surgery.

Then in October of 2018, he went rowing on the river.  He subsequently had progressively increasing symptoms in all extremities, especially the right arm.  Over the ensuing months he began EMR at the office, which forced him to be in a lot of extension at the neck.  His symptoms progressively became a lot worse.  Then on June 6, 2019, he had a second surgery with Dr. Albert for fusion / exploration at C3-C5 posteriorly, partial laminectomy inferiorly at C4 and superiorly at C7, and laminoplasty with fixation at C5-C6.

Since that time frame, the patient is still symptomatic in the right arm greater than the left arm and legs.  He does have difficulty at times at the office, as he has to move his neck in multiple positions, especially when trying to do his electronic medical records or while examining patients.  In the OR if he is straight-on, he is okay.  If he has to rotate or has to look at the monitors, this will progressively increase the symptoms in the bilateral arms and both legs.  Presently, he is still symptomatic and has never completely recovered.  The symptoms have progressively worsened over time.  He does not want to take any medications for this.  He has trouble sleeping.  No bowel or bladder issues, no gait issues, or unsteadiness of gait.  However, he is limited in his ability to work efficiently without symptoms.

**MEDICAL HISTORY**: Christopher J Fabricant has a past medical history of Cervical myelopathy and Low vitamin D level.

---

Generated on 3/21/22  2:36 PM

42 CFR part 2 prohibits unauthorized disclosure of these records.



HSS HIM VERISMA
535 East 70th Street
NEW YORK NY 10021-4823
Amb Encounter Report

Fabricant, Christopher J
MRN: 2114445, DOB: ████  Sex: M
Visit date: 5/7/2020

---

**Call Documentation (continued)**

Halpern, Brian C, MD at 5/7/2020  8:45 AM (continued)

---

**SURGICAL HISTORY**: He has a past surgical history that includes Fusion Cervical Anterior 2 Level With Instrumentation (Anterior, 5/14/2017); pr lam w/o facetec foramot/dskc 1/2 vrt seg, cervical (Posterior, 6/5/2019); and pr c-laminoplasty w/graft/plate, 2 or more (Posterior, 6/5/2019).

**MEDICATIONS**:

Current Outpatient Medications:
• cholecalciferol, vitamin D3, (VITAMIN D3) 1,000 unit capsule, Take 1,000 Units by mouth daily Indications: vitamin D deficiency.  , Disp: , Rfl:

**ALLERGIES**: He is allergic to latex, natural rubber.

**FAMILY HISTORY**: Christopher J Fabricant family history includes Arthritis in his mother; Parkinsonism in his father.

**SOCIAL HISTORY**: He  reports that he has never smoked. He has never used smokeless tobacco. He reports that he does not drink alcohol or use drugs..

**ROS**:
Review of Systems

**PHYSICAL EXAM**:

Vitals:

|  | 05/07/20 0842 |
|---|---|
| Weight: | 180 lb (81.6 kg) |
| Height: | 188 cm (6' 2") |

**General:** No acute distress, well-developed
**Respiratory:** Normal effort, no respiratory distress
**Psychologic:** Alert, oriented x3, normal affect, age-appropriate judgment, does not appear anxious.
**Cervical Spine:**  Extremely limited cervical spine motion in all fields with flexion / extension, right and left lateral bending and rotation.  Extension elicits symptoms in both arms and legs.  Right lateral bending elicits symptoms in the right arm.  He has full motion of the shoulders without any pain.  Negative supra and infraspinatus, negative labral grind.  He has no weakness of the biceps.  He has 4+/5 weakness of the triceps and abductor digiti minimi on the right.  No sensory deficits.  Reflexes are 2+ bilaterally and equal.  Negative Hoffmann sign bilaterally.
**Lumbar Spine:**  Full motion without any pain.  Negative straight leg raising.  Distal motor and sensory exam is normal.  Reflexes are 2+ bilaterally and equal.  Negative Babinski.
**Bilateral Shoulders:**
　　　Range of motion if full bilaterally with flexion and abduction.
　　　There is no recreation of pain in the elbow with these motions.
　　　No strength deficit appreciated with active range of motion.
　　　Negative painful arc on the left, negative on the right

---

42 CFR part 2 prohibits unauthorized disclosure of these records.

SA368

**HSS**

HSS HIM VERISMA
535 East 70th Street
NEW YORK NY 10021-4823
Amb Encounter Report

Fabricant, Christopher J
MRN: 2114445, DOB: ███████ Sex: M
Visit date: 5/7/2020

**Call Documentation (continued)**

**Halpern, Brian C, MD at 5/7/2020  8:45 AM (continued)**

**Skin:** Skin intact without concerning skin discoloration of the symptomatic joint or extremity
**Lymphatic**: No palpable cubital lymph nodes bilaterally
**CVS**: 2+radial pulses, no evidence of edema in bilateral upper extremities
**Neurologic:**
Coordination and Balance: normal coordination and balance


**DIAGNOSTIC STUDIES:**
No new imaging today.

No results found.

**REVIEW OF RECORDS:**
I personally reviewed the records the patient brought in and used the information in my decision making
process during today's visit.

**ASSESSMENT AND PLAN:**
The patient is consistently symptomatic from his initial injury, whereas he had no issues before that.  He has
symptoms down the right arm.  He is able to perform his work, but it is painful and limiting at times.
Functioning as a surgical urologic gynecologist puts him in a lot of different positions that exacerbate his
symptoms.  I would anticipate this is the result of his injury in April of 2017 on a roller coaster involving all his
symptomatology.

He has had 2 surgeries since that time and may need more surgeries in the future.  I would anticipate more
progressive symptoms, limited motion of the neck, weakness in the arms, numbness, and that his ability to
perform as a surgical urologic gynecologist will be more limited in the future.  We will follow up with him as
needed.  He is not doing any physical therapy at the moment.  He is taking no medications except for vitamin
D.

- The suspected diagnosis and differential diagnosis were discussed with the patient.
- Risks of medication use were discussed with the patient today and the patient was advised to
  discontinue use immediately if experiencing any GI side effects or any other side effects concerning to
  the patient.  They expressed understanding.

With the written prescriptions, medication side effects instructions were given to the patient with directions
to read them immediately. These include but are not limited to cardiac and gastrointestinal risks related to
anti-inflammatory medication; depression, suicide, and swelling risks related to anti-seizure medications;
and sedation and addiction risks of narcotics.

The patient understands the nature of the injury and complications related to the treatment including, but
not limited to, drug-related risks and poor outcomes.

Electronically signed by Schweigert, Cathy on 5/11/2020 10:39 AM

Generated on 3/21/22  2:36 PM

42 CFR part 2 prohibits unauthorized
disclosure of these records.

EXHIBIT "M"

# Treatment Records of Jersey Shore University
Medical Center

*Nurse's Notes*

*Jersey Shore University Medical Center*

**Name: Fabricant, Christopher**
**Age:** 52 yrs **Sex:** Male **DOB:** ▉▉▉▉▉▉
**Arrival Date:** 05/13/2017 **Time:** 08:37
**Bed** CCHall1

**MRN:** 0636874
**Account#:** 1301386698
**Private MD:** BHUSKUTE, BELA

**Presentation:**

| | | |
|---|---|---|
| 05/13 08:40 | Presenting complaint: Patient states that he was on a roller coaster ride on April 28 th. Patient stating that he was injured by the shoulder harness. Patient stating that he has had pain since then. Patient has been evaluated by physician and diagnosed with cervical disease. Patient has seen Neuro. Patient stating that he had examination yesterday that included increased movement of neck and is having worsening symptoms. Pain level 7/10. Care prior to arrival: None. Onset of Symptoms Date May 13, 2017. | mr20 |
| 08:40 | Method Of Arrival: Walk-in. | mr20 |
| 08:40 | Acuity: 3. | mr20 |
| 08:43 | Method of Arrival: Walk-in. | mr20 |

**Triage Assessment:**

| | | |
|---|---|---|
| 08:45 | **General:** Appears in no apparent distress, comfortable, well nourished, well groomed, Behavior is cooperative, pleasant. **Pain:** scale 7/10. **Neurological:** No deficits noted. Level of Consciousness is awake, alert, Oriented to person, place, time. **Cardiovascular:** No deficits noted. Capillary refill < 3 seconds. **Respiratory:** No deficits noted. Airway is patent Respiratory effort is even, unlabored, Respiratory pattern is regular, symmetrical. **Derm:** No deficits noted. Skin is intact, is healthy with good turgor, Skin is. | mr20 |

**Historical:**
- **Allergies:** Positive latex allergy; No known drug Allergies;
- **Home Meds:**
  1. None
  2. Prednisone PO
- **PMHx:** None
- **PSHx:** None
- **POLST:** No Document.
- **Family history::** Not pertinent..
- **Exposure risk/Travel Screening::** None identified..
- **Social history::** No barriers to communication noted..
- **Flu Like Symptoms?:** No.

**Screening:**

| | | |
|---|---|---|
| 08:46 | **Fall risk assessment completed:** Interventions N/A. | mr20 |
| 08:53 | **Advance Directive:** Patient does not have an advanced directive. | rd |
| | Patient does not have any cultural, religious or dietary request. **Domestic Violence:** Patient denies any domestic violence. **Are you currently having thoughts of hurting yourself?** Patient denies suicidal thoughts/ideations. **Are you currently having thoughts of harming others or property?** Patient states, No. | |

**Assessment:**

| | | |
|---|---|---|
| 08:51 | **General:** Appears in no apparent distress, well nourished. **Language spoken:** English. **Pain:** Quality of pain is described as piercing. **Present on admission:** Other has neck pain with movement. | rd |
| 09:24 | **General:** pt to have MRI. | rd |
| 10:46 | **General:** returned from MRI ambulatory. | rd |
| 11:51 | **General:** Received pt pending results.. | gb |
| 13:13 | **General:** Dr. Sultan to see pt before he leaves ED. | gb |
| 15:19 | **General:** Pt is discharged. Waiting for MRI disc.. | gb |

**Vital Signs:**

| Time | B/P | Pulse | Resp | Temp | Pulse Ox | Weight | Pain | Staff |
|---|---|---|---|---|---|---|---|---|
| 08:46 | 176 / 85 | 88 | 18 | 97.8(O) | 100% on R/A | | | mr20 |
| 13:00 | 120 / 78 | 73 | 20 | 98 | | | | gb |

**\*\*\* CHART COMPLETE \*\*\***
Emergency Department

SA371

*Nurse's Notes Con't*

Jersey Shore University Medical Center

**Glasgow Coma Score:**

| Time | Eye Response | Verbal Response | Motor Response | Modifying Factors | Total | Staff |
|------|-------------|----------------|----------------|-------------------|-------|-------|
| 11:32 | spontaneous(4) | oriented(5) | obeys commands(6) | | 15 | rkp |

**ED Course:**

| | | |
|---|---|---|
| 08:37 | Patient arrived in ED. | lk5 |
| 08:37 | Patient visited by Ketchledge, Laura. | lk5 |
| 08:37 | Patient moved to Waiting. | lk5 |
| 08:39 | Patient visited by Dallas, Erica, PA-C. | erd |
| 08:43 | Triage completed. | mr20 |
| 08:44 | Patient visited by Hutchison, Heather, Reg. | hh2 |
| 08:47 | Patient moved to CC Waiting. | mr20 |
| 08:47 | Patient moved to CC16. | rd |
| 08:47 | Patient visited by Seward, Alecia, Reg. | as |
| 08:47 | Arm band placed on Patient placed in waiting room Patient notified of wait time. | mr20 |
| 08:49 | Cavuto, Christine, RN is Primary Nurse. | cc8 |
| 08:53 | Resting quietly. | rd |
| 08:53 | Patient has correct armband on for positive identification. Bed in low position. Call light in reach. Verbal reassurance given. | rd |
| 08:53 | No procedures done that require assistance. | rd |
| 08:54 | BHUSKUTE, BELA, MD is Private Physician. | as |
| 08:59 | Patel, Rajendra, MD is Attending Physician. | rkp |
| 09:43 | Mri Spine Cervical W/O Contr Sent. | rd |
| 09:43 | Mri Spine Thoracic W/O Contr Sent. | rd |
| 12:00 | KLEIN, ALAN, MD is Admitting Physician. | rkp |
| 15:10 | Patient moved to CCHall1. | rd |

**Outcome:**

| | | |
|---|---|---|
| 08:53 | **Attachments** None. **IVs: Discontinued** N/A. **Total length of IV infusions:** Not Applicable. **Patient education:** Learning Barriers assessed none. **Resident Disp Form Attached?** No. **Nursing Plan of Care:** Anxiety. Goal: Able to focus and follow simple instructions, Met goal. | rd |
| 12:00 | Admit ordered by MD. | rkp |
| 13:13 | **Chart Completed by Nurse.** Admitted to Brennan 5 with transporter via wheelchair Report called to receiving unit. report given to Carla. **Medication re-evaluation** N/A -no medications given. | gb |
| 14:30 | Admit undone. | rkp |
| 14:31 | Discharge ordered by MD. | rkp |
| 15:20 | Patient left the ED. | gb |

**Signatures:**

| | | | | | |
|---|---|---|---|---|---|
| Patel, Rajendra, MD | MD | rkp | DeChiara, Renie, RN | RN | rd |
| Burns, Gail, RN | RN | gb | Seward, Alecia, Reg | Reg | as |
| Hutchison, Heather, Reg | Reg | hh2 | Cavuto, Christine, RN | RN | cc8 |
| Dallas, Erica, PA-C | PA-C | erd | Rogers, Melissa, RN | RN | mr20 |
| Bialko, Christopher | Scribe | cb20 | Ketchledge, Laura | | lk5 |

**Name: Christopher Fabricant**          **Emergency Department**          MRN: 0636874
Account#: 1301386698
Print Time: 5/14/2017 17:21:06          Page 2 of 2

SA372

*Physician Documentation*                    *Jersey Shore University Medical Center*

**Name: Fabricant, Christopher**
**Age:** 52 yrs **Sex:** Male **DOB:** ▮▮▮▮▮▮              **MRN:** 0636874
**Arrival Date:** 05/13/2017 **Time:** 08:37         **Account#:** 1301386698
**Bed** CCHall1                              **Private MD:** BHUSKUTE, BELA

**Chief Complaint:** - Neck pain
**HPI:**

| | | |
|---|---|---|
| 05/13 08:39 | This 52 yrs old White Male presents to ED via Unassigned with complaints of **Neck pain**. | erd |
| 08:42 | pt reports that in late April he was on a rollercoaster and injured his neck/back reports that he herniated C3/C4. reports that he went and had an examination yest with hospital of special services and that since then his sx increased of numbness, tingling and muscle twistches. denies urinary/bowel incontinence. | erd |
| 09:00 | The patient or guardian complains of pain, that is acute. The symptoms are located C-spine. Context: Pt was on a rollercoaster, 4/28/17. Was in a shoulder harness and developed shoulder pain and paraesthesia in both hands. Had imaging done with sports medicine doctor that showed ruptured discs in c-spine. Associated signs and symptoms: Associated signs and symptoms: Pertinent negatives: weakness, bowel/bladder incontinence. The pain radiates to the abdomen, low back and mid back. Modifying factors: the symptoms are aggravated by lying supine. Severity of symptoms: in the emergency department the symptoms are actually worse. Language spoken: English. History is obtained from Patient. Onset: several weeks ago. The patient has been recently seen by a physician: yesterday pt had examination at a hospital with special services, ROM was tested which exacerbated the sx's later on in the day. Pt has congenital narrowing of cervical spine. Describes pain as 'burning'. | cb20 |

**Historical:**
- **Allergies:** Positive latex allergy; No known drug Allergies;
- **Home Meds:**
  1. None
  2. Prednisone PO
- **PMHx:** None
- **PSHx:** None
- **POLST:** No Document.
- **Family history::** Not pertinent.
- **Exposure risk/Travel Screening::** None identified..
- **Social history::** No barriers to communication noted..
- **Flu Like Symptoms?:** No.
- **The history from nurses notes was reviewed:** .,.

**ROS:**

| | | |
|---|---|---|
| 09:05 | **Neck:** Positive for pain with movement, pain at rest. **Abdomen/GI:** Negative for bowel incontinence. **Back:** Positive for radiated pain. **GU:** Negative for bladder incontinence. All other systems are negative, | cb20 |
| 09:05 | **Neuro:** Positive for paraesthesia in hands, Negative for weakness. | cb20 |

**Exam:**

| | | |
|---|---|---|
| 09:07 | **Constitutional:** The patient appears alert, awake.<br>**Respiratory:** the patient does not display signs of respiratory distress, Respirations: normal.<br>**Neuro:** Orientation: is normal, Mentation: lucid, able to follow commands, Motor: moves all fours.<br>**Skin:** Exam negative for diaphoresis, pallor.<br>**Psych:** Behavior/mood is pleasant, cooperative, Affect is calm. | cb20 |
| 11:32 | **Head/face:** Exam is negative for.<br>**Neck:** External neck: is nomal, C-spine: vertebral tenderness, diffusely, ROM/movement: pain, that is moderate, with any movement. | rkp |
| 11:32 | **Neuro:** Sensation: is normal, Gait: is steady, Deep tendon reflexes are normal. | rkp |
| 12:00 | | rkp |

**\*\*\* CHART COMPLETE \*\*\***
Emergency Department

SA373

| **MERIDIAN HEALTH** | **NAME:** | FABRICANT, CHRISTOPHER |
|---|---|---|
| | **MR #:** | 000000636874 |
| | **SEX:** M | **DOB:** ▮▮▮▮▮ |
| | **ACCT#:** | 001301386698 |

JERSEY SHORE UNIVERSITY MEDICAL CENTER

NEUROLOGY CONSULT

Patient Location: ERI EJ045

Name: Fabricant, Christopher
MR #:    000000636874
DOB: ▮▮▮▮▮
Age: 52
Sex: M

DATE OF CONSULTATION:

DICTATED BY:            Richard Sultan, DO

CONSULTING PHYSICIAN:

ATTENDING PHYSICIAN:    Alan Klein, MD

REQUESTING PHYSICIAN:   Alan Klein, MD

HISTORY OF PRESENT ILLNESS: The patient is a 52-year-old surgeon who I am seeing in the emergency room with the following history. The patient has no significant past medical problems. On 04/28/2017 he was with his children going on a roller coaster. The shoulder harness was put in place above his shoulders and appeared to be extremely tight stopping him from having any mobility while on the ride once it became locked into position. During the ride he felt as if he was being pushed in a downward position with no ability to move in either direction. At the conclusion of the ride he developed severe pain localized to his shoulders radiating somewhat to his medial area of his shoulders and his upper back and neck. Subsequently, he developed paresthesias in the 4th and 5th fingers bilaterally of his hands. He continued over the next few days to be symptomatic more so after he would manipulate his neck in either direction. He eventually then had an MRI of the cervical spine at Jersey Shore Medical Center which showed herniated disks at C3-C4 and C4-C5 with cord impingement. MRIs of the thoracic and lumbar spine are unremarkable. Over the course of the next few days he continue to attempt to work but it was fairly clear that with type of motion of his neck either laterally or in a flexion, extension motion he would subsequently developed more pain in his shoulders. Pain in his neck, and eventually he was developing paresthesias in his thighs as well. He saw my partner, Dr. Fitzpatrick, and eventually was also seen by a spinal surgeon at the Hospital for Special Surgery. Over the past few days his pain has woken him from sleep and is burning in nature. It is associated with some contraction type

Page 1 of 3

SA374

| **MERIDIAN HEALTH** | **NAME:** | FABRICANT, CHRISTOPHER |
|---|---|---|
| | **MR #:** | 000000636874 |
| | **SEX:** | M          **DOB:** ▮▮▮▮▮▮ |
| | **ACCT#:** | 001301386698 |

feeling of the muscles in his legs and over his umbilicus. He developed a patchy unusual feeling of sensitivity over his right medial thigh.

Over the past 24 hours, he has developed severe pain feeling as if he having difficulty holding his head up and his neck is feeling increasingly tight. He also feels that his gait has become somewhat unstable. He has not had any loss of bowel or bladder.

PAST MEDICAL HISTORY: The remainder of his past medical history is unremarkable. He is a well-known and extremely busy surgeon here at Jersey Shore.

PHYSICAL EXAMINATION: His vital signs are stable. His heart is regular rate and rhythm. He has no cranial or carotid bruit. He is clearly in some degree of discomfort and appears to be a chore for him to simply hold his neck up. His cranial nerves were intact. Motorically, he is 5/5 in all groups. He is walking in a somewhat apprehensive fashion. He has clonus bilaterally at the knees. He does not have clonus at the ankles, but his left plantar response is upgoing. He has a patchy area of hyperesthesia in an L3-L4 distribution in the left lower extremity.

IMAGING DATA: I subsequently reviewed his MRI of the cervical spine repeated today. This shows, as noted previously, herniated disks at C3-C4 and C4-C5 with cord impingement. It appears there may be some congenital narrowing at the C3-C4 level. I do not appreciate any degree of myelomalacia.

IMPRESSION: This is a 52-year-old gentleman with acute cervical cord impingement and evolving cervical myelopathy. It appears his symptoms relate to a traumatic event on 04/28/2017.

PLAN: I have discussed his status with this spinal surgeon at Hospital for Special Surgery. The patient is already on prednisone and his dose has been tapered, but I do not feel that simply increasing his prednisone dose will ameliorate the situation. I am concerned over the somewhat rapid resolution of his symptomology and the need for emergent surgery. His surgeon will be arranging most likely a transfer to Special Surgery and we will proceed from there.

Electronically Signed by SULTAN, RICHARD DO on 15-May-2017 09:54:15 -04:00

NTS
Job #423856/CS #5168819
D: 05/13/2017 14:08
T: 05/13/2017 15:22

Page 2 of 3

SA375

| **MERIDIAN HEALTH** | **NAME:** | FABRICANT, CHRISTOPHER |
|---|---|---|
| | **MR #:** | 000000636874 |
| | **SEX:** | M          **DOB:** ████ |
| | **ACCT#:** | 001301386698 |

cc:   Sultan, Richard  13465
      Klein, Alan  12729

Page 3 of 3

**Assessment Report**

Generated from 04/13/2017 00:00 to 05/13/2017 23:59

| | | | |
|---|---|---|---|
| **Pt Name:** | FABRICANT, CHRISTOPHER | | |
| **Acct No:** | 1301386698 | **MRN:** | 0636874 |
| **DOB:** | ■■■■■■ | **Age/Sex:** | 52Y/M |
| **Adm Date:** | 05/13/2017 | **Dsch Date:** | 05/13/2017 |
| **Atn Dr:** | KLEIN, ALAN MD | | |
| **Entity:** | JSUMC | | |
| **Dx:** | UNSPECIFIED CORD COMPRESSION | | |

### Signout Comment

| | | | |
|---|---|---|---|
| Assessment Sts | Complete | Collected DTime | 05/13/2017 13:07 |
| Collected By | KEVIN XIA | | |

**Signout comment**

| | |
|---|---|
| Signout comment | 52 y/o M h/o congenital cervical narrowing, had roller coaster injury resulting in c3-c4 disk herniation 4/28, and recently acute exacerbation from MRI manipulation. |
| | Had surgery scheduled for june laminplasty |
| | here for observation over concerns of cord compression |
| | |
| | MRI cervical - similar to prior thoracic MRI - T12 atypical hemangioma |
| | |
| | prednisone - pt does not want to be on high dose of decadron unless symptoms worsens, paresthesias but no incontinence |
| | neuro on board |
| | neurology on board |
| | |
| | FULL |

Clinical Note:

## Erroneous Assessments

### Assessment Admission

| | | | |
|---|---|---|---|
| Assessment Sts | Erroneous | Collected DTime | 05/13/2017 13:38 |
| Collected By | KarlA Moshett, RN | | |

**Admission History**

| | | | |
|---|---|---|---|
| Admit From | Emergency Dept | Chief Complaint | Back, neck pain |
| Preferred Language | English | Ability to speak English language | Yes |
| Ability to understand English language | Yes | | |

**Patient History**

| | | | |
|---|---|---|---|
| Will the PT need Help At Home after Discharge | No | Interested in health instructions | Yes |

SA377

**Assessment Report**

Generated from 04/13/2017 00:00 to 05/13/2017 23:59

| | | | |
|---|---|---|---|
| **Pt Name:** | FABRICANT, CHRISTOPHER | | |
| **Acct No:** | 1301386698 | **MRN:** | 0636874 |
| **DOB:** | ▮▮▮▮ | **Age/Sex:** | 52Y/M |
| **Adm Date:** | 05/13/2017 | **Dsch Date:** | 05/13/2017 |
| **Atn Dr:** | KLEIN, ALAN MD | | |
| **Entity:** | JSUMC | | |
| **Dx:** | UNSPECIFIED CORD COMPRESSION | | |

**Assessment Admission**

| | | | |
|---|---|---|---|
| **Assessment Sts** | Erroneous | **Collected DTime** | 05/13/2017 13:38 |
| **Collected By** | KarlA Moshett, RN | | |

### Patient History

| | | | |
|---|---|---|---|
| **Motivation Level** | Seems interested | **Does patient understand disease management** | Yes |
| **Does patient understand reasons for treatments** | Yes | **Learning Preferences** | Verbal instruction |
| **Learning Barrier** | None | **Patient concern to be addressed** | None |
| **Occupation** | Physician | **Do you have any concerns about fulfilling your sexual needs** | No |
| **Does the pt have flu-like symptoms incl fever,severe headache** | No | | |

### Past Med/Surg Hx

| | | | |
|---|---|---|---|
| **Does the Pt Have a History of Pain?** | Yes | **Type of Pain** | Chronic |
| **Past Hx Back Pain** | Yes | **Renal Failure** | No |
| **Past Hx Diabetes** | No | | |

### Pain

### Braden Scale

| | | | |
|---|---|---|---|
| **Mobility** | 4. No Limitations | **Moisture** | 4. Rarely Moist |
| **Activity** | 3. Walks Occasionally | **Nutrition** | 3. Adequate |
| **Friction/Shear** | 2. Potential Problem | **Sensory/Perception** | 4. No Impairment |
| **Braden Score Total** | 20 | | |

### Fall Risk

| | | | |
|---|---|---|---|
| **Scale-Pt has Fallen During the Pres Hosp Adm** | No (+0) | **Fall Int-Standard Falls Protocol Implemented** | Yes |
| **Fall Meds Pt Ed Hand Out Given to Pt and/or Fam and/or S.O.** | Yes | **Fall Prev Pt Ed Hand Out Given to Pt and/or Fam and/or S.O.** | Yes |

**Clinical Note:**

**Pt Name:** FABRICANT, CHRISTOPHER  
**Entity:** JSUMC  
**Adm Date:** 05/13/2017  
**MRN:** 0636874  
Page 2 of 3  
**Assessment Report**  
ORE_0010_DSCH.rpt version v1.00  
**Generated By:** Workflow  
**Generated On:** 14-May-17 16:16

Copyright © Cerner Health Services, Inc. All rights reserved.  
Crystal Reports © 2017 Business Objects SA. All rights reserved.

SA378

**Assessment Report**

**Generated from 04/13/2017 00:00 to 05/13/2017 23:59**

| | | | |
|---|---|---|---|
| **Pt Name:** | FABRICANT, CHRISTOPHER | | |
| **Acct No:** | 1301386698 | **MRN:** | 0636874 |
| **DOB:** | ███████ | **Age/Sex:** | 52Y/M |
| **Adm Date:** | 05/13/2017 | **Dsch Date:** | 05/13/2017 |
| **Atn Dr:** | KLEIN, ALAN MD | | |
| **Entity:** | JSUMC | | |
| **Dx:** | UNSPECIFIED CORD COMPRESSION | | |

### Assessment History

**Assessment Name: Assessment Admission**                                      **Collected DateTime:** 05/13/2017 13:38

| Version | Entered Date | Revised Status | Reason Revised |
|---|---|---|---|
| Revision: 1.00 | 05/13/2017 16:10 | Erroneous | No admit |
| | | Previous Status | |
| | | In progress | |

SA379

EXHIBIT "N"

Treatment Records of Dr. Todd Albert

SA380

# Fabricant, Christopher J

MRN: 2114445

**Albert, Todd J, MD**          Op Note          Date of Service: 5/14/2017 12:00 AM
Physician                        Signed
Spine

THE HOSPITAL FOR SPECIAL SURGERY
OPERATIVE RECORD

Patient Name: Fabricant, Christopher MR# 2114445 Date: 5/14/2017

ATTENDING SURGEON:          Todd J Albert, M.D.

OPERATING SURGEON: TODD ALBERT, M.D.

ASSISTANT: BLAKE STAUB, M.D.

PREOPERATIVE DIAGNOSIS: CONGENITAL CERVICAL STENOSIS. HERNIATED DISK AND MYELOPATHY, PROGRESSIVE.

POSTOPERATIVE DIAGNOSIS: CONGENITAL CERVICAL STENOSIS. HERNIATED DISK AND MYELOPATHY, PROGRESSIVE, WITH HERNIATED DISK AT C3-4 AND 4-5.

NAME OF OPERATION: ANTERIOR CERVICAL DECOMPRESSION AND FUSION C3 TO 5. ALLOGRAFT BONE, LOCAL AUTOGENOUS BONE, ANTERIOR PLATE FIXATION.

ANESTHESIA: GENERAL ENDOTRACHEAL.

ESTIMATED BLOOD LOSS: 100 ML.
SPECIMENS: NONE.
COMPLICATIONS: NONE.

INDICATIONS FOR SURGERY:
This is a 52 year-old male who was on a ride at Great Adventure and after the ride developed symptoms of myelopathy and neuropathic pain. He was worked up, found to have congenital stenosis and herniated disk at C3-4 and less so at 4-5. He became progressive on Friday into Saturday. He was admitted urgently to Hospital for Special Surgery and I brought him to the Operating Room this morning for decompression and fusion. I was present for, oversaw and performed the entirety of the operation including exposure, decompression, diskectomy, arthrodesis and instrumentation.

PROCEDURE:
Prior to surgery I explained in detail to the patient and family the possible risks of surgery which included the risk of nerve injury, persistent and or worsening pain, spinal fluid leak, infection or meningitis, excessive bleeding, paralysis, death, blindness, sexual dysfunction, retrograde ejaculation, blood vessel injury, injury to neighboring organs, need for further surgery, bowel and bladder dysfunction, instability, and autonomic nervous system dysfunction as well as unforeseen medical and surgical complications. An understanding that in general spinal surgery

SA381

Fabricant, Christopher J (MR # 2114445)        Admission Date: 05/13/2017, Discharge Date: 05/15/2017

# Fabricant, Christopher J                                                       MRN 2114445

**Albert, Todd J, MD**          H&P          Date of Service: 5/14/2017 7:24 AM
Physician                       Signed
Spine

I have seen patient. Worsening myelopathy. He has difficulty standing and with any movement. Congenital stenosis and herniated discs at C3-5. Plan ACDF C3-5. Risks and benefits explained to patient and he is anxious to move forward with surgery this AM.

Electronically signed by Albert, Todd J, MD at 5/14/2017 7:27 AM

Admission
(Discharged) on
5/13/2017

SA382

EXHIBIT "P"

Notice of Service of Process of
Complaint of 4/29/2019



**null / ALL**
**Transmittal Number: 19728475**
**Date Processed: 04/30/2019**

# Notice of Service of Process

| | |
|---|---|
| Primary Contact: | Mary A. Roma<br>Six Flags Entertainment Corporation<br>230 Park Avenue<br>16TH Fl<br>New York, NY 10169 |
| Electronic copy provided to: | Danielle Bernthal |

| | |
|---|---|
| **Entity:** | Six Flags Theme Parks Inc.<br>Entity ID Number  1962175 |
| **Entity Served:** | Six Flags Theme Parks Inc. |
| **Title of Action:** | Christopher Fabricant, M.D. vs. Intamin Amusement Rides Int. Corp. Est. |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Product Liability |
| **Court/Agency:** | Ocean County Superior Court, NJ |
| **Case/Reference No:** | OCN-L-974-19 |
| **Jurisdiction Served:** | New Jersey |
| **Date Served on CSC:** | 04/29/2019 |
| **Answer or Appearance Due:** | 35 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| Sender Information: | G. Marin Meyers<br>973-625-0838 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

251 Little Falls Drive, Wilmington, Delaware 19808-1674   (888) 690-2882   |   sop@cscglobal.com

SA384

EXHIBIT "T"

Report of Defendant's Expert,
Joseph Sala, of 3/9/2022

SA385



Exponent
3440 Market Street
Suite 600
Philadelphia, PA 19104

telephone 215-594-8800
facsimile 215-594-8899
www.exponent.com

March 9, 2022

Heather Eichenbaum, Esq.
Spector, Gadon, Rosen, Vinci P.C.
1635 Market Street, 7th Floor
Philadelphia, PA 19103

Subject:    Fabricant v. Six Flags Great Adventure, LLC
            Project No. 2010934.000

Dear Ms. Eichenbaum:

I am writing to summarize the work undertaken by Exponent® in connection with human factors issues in the above-referenced case and the conclusions reached on the basis of work to date.

I received a Bachelor's Degree in psychology from and performed Honors research in psychology at Rutgers University. I hold a Ph.D. in experimental psychology from Johns Hopkins University and conducted post-doctoral research at Stanford University, with a focus in cognitive neuroscience. I am a Principal Scientist at Exponent and a Director of the Human Factors Practice, where I routinely address how the capabilities and limitations of people interact with the products, equipment, and systems in their environment, and how this interaction affects safety. I frequently use large-scale databases (e.g., National Electronic Injury Surveillance System, Fatality Analysis Reporting System, National Automobile Sampling System Crashworthiness Data System, National Fire Incident Reporting System) to analyze the frequency and patterns of accidents, identify patterns of unsafe behaviors, and to measure risk.

I have published papers and presented at conferences related to human factors issues, including attention, risk communication through warnings, and brain functioning. I have assessed the adequacy of warnings and safety information across a wide range of products, environments, and activities. I have contributed to the design of warnings, instructions, and labeling accompanying a variety of consumer products. I have presented results from my human factors investigations to governmental agencies, such as the Consumer Product Safety Commission and the Food and Drug Administration. I am a member of the Human Factors and Ergonomics Society, the Association for Psychological Science, the Society for Neuroscience, and the Society for Risk Analysis.

A copy of my resume and a list of previous testimony is attached. Exponent currently bills my time at $630 an hour. A list of the materials I have reviewed to date is also included.



Heather Eichenbaum, Esq.
March 9, 2022
Page 2

On November 6, 2020, I participated in an inspection of the Six Flags Great Adventure property in Jackson Township, New Jersey. During this inspection I directly observed the areas in which the injury reporting requirements were posted and the signage itself. Furthermore, I have received and reviewed documents produced, including State of New Jersey inspection logs, answers to interrogatories provided by the plaintiff, photographs and videos produced by the plaintiffs, and deposition testimony and exhibits. Based upon this work, I conclude that the signage posted at Six Flags Great Adventure setting forth the reporting requirements for accidents and injuries was consistent with the requirements set forth in New Jersey Statutes Annotated (N.J.S.A.) 5:3-57.[1]

The signage at issue states:

**Accident or Injury**
**Reporting Requirement**

In order to bring suit against Six Flags Great Adventure LLC in connection with an injury you must report it in writing, giving all details, within ninety (90) days of the incident giving rise to the suit.

A report shall be made at any of the following locations:
Guest Relations (located at the front entrance) or
First Aid (located behind Garden State Grill
in the Boardwalk)

This same message is then repeated in Spanish. As provided in the Carnival and Amusement Ride Safety Act (CARSA) regulation, the message identifies the need to report any injury in writing, the timeframe in which such reporting is required, and two locations where such reports can be made.

Upon review of the evidence available and observation of the same, this "Accident or Injury Reporting Requirement" signage was posted in at least eleven locations, including the areas designated to receive the reporting and first-aid (which was one of the locations to receive such reports). Case materials highlight the existence and location of the eleven signs: five signs are located within the water attraction area of the park and six signs are located in the hard ride area of the park, namely: 1) on the west side of the guest entry/exit concourse, 2) on the east side of the same concourse, 3) immediately beside the four (4) exit turnstiles at the main exit, 4) just inside the park entrance, 5) at the row of service windows at Guest Relations, and 6) on the

---

[1] New Jersey Revised Statutes Title 5, Section 5:3-57

Heather Eichenbaum, Esq.
March 9, 2022
Page 3

exterior of the entrance door to First Aid (see Appendix A).[2] Posting requirements contained within N.J.S.A. 5:3-57 state that signs need to be posted in at least five different locations, including at each entrance and exit, each place designated for receiving reports, and at each designated first aid station.[3] The above postings at the Six Flags Great Adventure property satisfy and exceed these requirements. Case materials document that all of CARSA reporting signs have been present since at least 2013 and that there have never been any changes to their size, content, or location.[4] There is no evidence to suggest that the signage was any different even before 2013 than at any time since then. Furthermore, there is no evidence in the records produced to suggest that Six Flags Great Adventure was found to have been in violation of the CARSA accident reporting signage requirements, despite such signage being specifically included as an item of designated inspection.[5]

From a human factors' perspective, these signs and their posting were conspicuous. Several elements common to the signs and their position render them readily identifiable and noticeable, clearly visible, and salient. In fact, the signage and their positioning made the most of elements understood within the scientific research of human perception, attention, and information processing that enhance the ability of such signs to come to the awareness of those attending to their surroundings. For example, each sign was presented singly, as a stand-alone sign, apart from and distinct from other signage; reporting requirement signage was not presented against a cluttered background or amongst other competing visual elements. Thus, the signage stood out from its background, appearing against a dedicated post or column, contrasting with its surroundings and highlighting its own presence. The signage was also placed at, or near, eye-level and would fall within the gaze of patrons navigating the park, particularly during entry, exit, or while seeking information from designated informational and aid areas, such as Guest Relations and First Aid. The sign itself uses black text, providing high contrast against a light background. Moreover, bolding of the sign's title (**Accident or Injury Reporting Requirement**), indentation of the informational content, and the use of "white space" establish a visual hierarchy to aid observers' identification and processing of the sign. Furthermore, the format and display of the signage is recognizably distinct from the more flamboyant and whimsical nature of the themed attractions and entertainment signage throughout the park, making the CARSA signage distinct and stand-out from other signage while underscoring their serious informational purpose and significance.

---

[2] Answers of Plaintiff Christopher Fabricant, M.D. to Interrogatories of Defendant Six Flags Great Adventure, LLC; Edward Zakar Affidavit
[3] New Jersey Revised Statutes Title 5, Section 5:3-57
[4] Edward Zakar Affidavit
[5] P000455, P000457, P000459, P000460- P000463, P000465-P000470, P000474, P000478-P000486, P000489-P000493, P000495-P000497, P000499-P000501, P000505-P000508, P000511, P000514, P000515, P000517-P000530, P000532-P000536, P000539-P000552

$Ex^{™}$

SA388

Heather Eichenbaum, Esq.
March 9, 2022
Page 4

Of note, I have reviewed multiple documents demonstrating that Six Flags Great Adventure underwent multiple State inspections, however, there is no evidence indicating that the signage or posting of reporting requirements was insufficient or deficient in any way. While plaintiff contends that the signage was inconspicuous, the arguments to support the claim are rhetorical in nature. While the plaintiff claims he didn't notice the signage at the time of his visit when he claims he was injured, he readily identifies and acknowledges the signage on a subsequent visit attending to and observing the surroundings. Moreover, plaintiff also admits that he can't specifically recall what specific signs he read on the day he claims he was injured, despite noting that he was walking around the park reading signs to pass the time while his other family members went on rides.[6] No signage can compel someone to notice, read, and/or comply with it and any visual feature, signage included, may be unattended, unnoticed, and/or dismissed. However, the reporting requirement signs are posted such that they are prominent and salient amongst their surroundings. The signage would be conspicuous and accessible to patrons attending to their environment and engaging with, looking for, or otherwise reading signage, which, again, plaintiff testified he was doing as he walked around the park alone for an extended time just before he rode Kingda Ka on the same day he claims he was injured.

I may use any of the following exhibits as a summary or in support of all of my opinions: (1) any of the materials, or excerpts there from, identified in this report and appendix, including the materials considered list; (2) excerpts from relevant statutes; (3) any exhibit used in or identified at any deposition taken in this litigation. Any exhibits created will be made available prior to the start of trial.

Sincerely,

Joseph B. Sala, Ph.D.
Principal Scientist
Director, Human Factors

---

[6] Deposition of Christopher Fabricant (4/5/2021), pp. 74-75, 81-83, 87-88, 95

2010934. 9748

$E^x$™

SA389

Heather Eichenbaum, Esq.
March 9, 2022
Page 5

List of Materials
- Depositions and Exhibits
  - Christopher Fabricant
  - Sandor Kernacs
  - Malika Sahni-Fabricant
  - Nicholas Fabricant
  - Thibaut Fabricant
- Edward Zakar Affidavit
- Bates Stamped Documents
  - Intamin Ltd. (Fabricant) 1-597
  - Intaride LLC (Fabricant) 1-4
  - P000001-202
  - P000266-552
- New Jersey Revised Statutes Title 5, Section 5:3-57
- Videos
  - IMG_1892
  - _Elaine Lynch
  - Part 1
  - Part 2
  - _Entrance-Exit-Guest Relations
  - _Exit turnstiles (and beyond)
  - _Guest Relations (inside park) 1
  - _Near Guest Relations (inside park) 2
- Legal Documents
  - Second Amended Complaint and Jury Demand
  - Answer of Defendant, Six Flags Great Adventure, LLC, to Plaintiffs' Second Amended Complaint
  - Plaintiffs' Disclosures Pursuant to FRCP 26
  - Rule 26 Initial Disclosures of Defendant, Six Flags Great Adventure, LLC
  - Answers to Plaintiff Christopher Fabricant, M.D. to Interrogatories of Defendant Six Flags Great Adventure, LLC
  - Answers to Plaintiff Christopher Fabricant, M.D. to Medicare/SSI Interrogatories of Defendant Six Flags Great Adventure, LLC
  - Plaintiffs' Responses to FRCP 34 Demand for Production by Defendant Six Flags Great Adventure, LLC
  - Plaintiffs' First Request for Materials Under Fed. R. Civ. P. 34 to Defendant Six Flags Great Adventure, LLC
  - Plaintiffs' Request for Documents and Things to Defendant Six Flags Great Adventure, LLC
  - Response to Plaintiffs' First Request for Materials Directed to Defendant Six Flags Great Adventure, LLC
  - Plaintiffs' Initial Interrogatories Under Fed. R. Civ. P. 33 to Defendant Six Flags Great Adventure, LLC
  - Answers to Plaintiffs' Interrogatories Directed to Defendant, Six Flags Great Adventure, LLC

$E^x$ ™

SA390

Heather Eichenbaum, Esq.
March 9, 2022
Page 6

- o Plaintiffs' First Request for Admission Under Fed. R. Civ. P. 36 to Defendant Six Flags Great Adventure, LLC
- o Response to Plaintiffs' First Request for Admissions Directed to Defendant Six Flags Great Adventure, LLC
- o Answers of Plaintiff Christopher Fabricant, M.D. to Defendant SFGA's Medicare/SSI Interrogatories
- o Plaintiffs' Revised Responses to Defendant SFGA's FRCP 34 Demands for Production



SA391

Heather Eichenbaum, Esq.
March 9, 2022
Page 7

**Appendix A**



Signage on the exterior of the entrance door to First Aid.

2010934. 9748



Heather Eichenbaum, Esq.
March 9, 2022
Page 8



Signage beside a row of service windows at Guest Relations which every guest going to Guest Relations must stand in front of or at least walk directly past.

2010934. 9748

Heather Eichenbaum, Esq.
March 9, 2022
Page 9




Signage beside the four (4) exit turnstiles



SA394

Heather Eichenbaum, Esq.
March 9, 2022
Page 10



Signage just inside entrance to the park

2010934. 9748

E𝑥™

Heather Eichenbaum, Esq.
March 9, 2022
Page 11



Signage on west side of the guest entry/exit concourse

Heather Eichenbaum, Esq.
March 9, 2022
Page 12



Signage on east side of the guest entry/exit concourse

SA397

EXHIBIT 'BB'

SELECT RIDE RULE SIGNS
FOR KINGDA KA



SA399



# ATTENTION ALL GUESTS
## READ IMPORTANT SAFETY INFORMATION
## AND FOLLOW INSTRUCTIONS OF ATTENDANTS

**54"** Minimum to ride alone

Riders must be at least 54" tall to ride.

# Kingda Ka
### RIDE DESCRIPTION: High Thrill
An intense roller coaster with quick acceleration, high speeds, steep drop with fast turns.

**Do not ride if you have any of the following conditions:**

**For your safety, you should be in good health to ride.** Only you know your physical conditions or limitations. If you suspect your health could be at risk for any reason, or you could aggravate a pre-existing condition of any kind, DO NOT RIDE!

## No alcoholic beverages can be consumed in queue lines.

## RIDE RULES

- All passenger restraints including lap bars, shoulder harnesses and seat belts must be positioned and fastened properly to allow guest to ride. Due to the restraints, some Guests with unique body dimensions may not be able to ride.
- Loose articles (glasses, cell phones, hats, wallets, keys etc.) are not permitted on this ride, leave them in a locker or with a non rider.
- Camera and video equipment are not permitted on the ride.
- Smoking is not permitted in the queue line or on the ride.
- Chewing gum, candy, food and drinks are permitted in the queue line but not on the ride.
- Line jumping for any reason is cause for ejection from the park.
- The park is not responsible for any personal items that are lost, damaged or stolen.
- If you are hearing impaired, ask the ride attendant for written instructions before boarding the ride.
- Stay seated, face forward, keep head, arms and legs inside ride at all times.
- Remove jewelry including earrings prior to riding.
- Hold on to the grab bar at all times.
- Keep your head against the backrest and hold onto the grab bar at all times.
- Strobe lights are in use at this attraction.
- Riders must have upper body control and able to sit up straight with head against the set back.
- Riders must possess at least one (1) naturally fully formed and functioning arm absent of prosthetic devices and two(2) naturally fully formed and functioning legs absent of prosthetic devices.
- A functioning arm is a full arm with the ability to be flexed at the elbow and a minimum of three full fingers with the ability to hold on with a firm grip.
- A functioning leg is a fully formed natural leg with a foot with the ability to bend at the knee.
- Prosthetics are not permitted.
- Casts may not restrict the rider from bending the elbow or knee and may not restrict the restraints in any way.
- Riders using a wheel chair must transfer from the wheel chair to the ride.
- Guest must be able to navigate down a ladder in the event of the ride evacuation.
- Riders who do not meet the extremity requirements may be able to ride Kingda Ka by utilizing a Supplemental Restraint Harness, if all other requirements are met.

**N.J.S.A. 5:14A-9.33  Rider Responsibility**
State law requires that each rider must obey all written warnings and directions regarding this ride and refrain from behaving in a reckless manner which may cause or contribute to injury to the rider or others. Failure to comply is a violation of law and subject to penalty under the New Jersey Code of Criminal Justice pursuant to N.J.S.A. 5:3-36.1. Violators may be subject to a fine of up to $200 and imprisonment of up to six months.

**Entrance located at THE FLASH Pass entrance.**
Refer to Safety and Accessibility Guide for details.

SA400



This Ride May Not
Accommodate Guests
Of A Larger Size.

Please Utilize Test Seat
Prior To Waiting In Line.

If Your Physical Characteristics
Prevent The Shoulder Restraint or
Seatbelt From Funtioning Properly,
Or If Your Head Cannot Be
Supported By The Seat Back,
You Will Not Be Permitted To Ride.

SA401

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| CHRISTOPHER FABRICANT, M.D. and MALIKA FABRICANT, Husband and Wife, | : | CIVIL ACTION |
| | : | NO. 3:19-cv-12900 |
| Plaintiffs | : | |
| | : | |
| vs. | : | Hon. Georgette Castner |
| | : | |
| INTAMIN AMUSEMENT RIDES INT. CORP., ET AL. | : | |
| | : | |
| Defendants. | : | |
| | : | |

---

**STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANTS INTAMIN LTD. AND INTARIDE, LLC'S MOTION FOR SUMMARY JUDGMENT TO DISMISS PLAINTIFFS' COMPLAINT PURSUANT TO FED.R.C.P.56.**

Defendants Intamin Ltd. and Intaride, LLC submit this Statement of Undisputed Material Facts in support of their Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56. All exhibits cited below are true and correct copies from the record in this matter.

**Plaintiff Dr. Fabricant Rides the Kingda Ka Rollercoaster at Six Flags and Alleges He Sustained Injuries During the Ride.**

1. Plaintiff Christopher Fabricant (hereinafter "Dr. Fabricant") initiated this action based on the allegation that Dr. Fabricant sustained injuries riding the Kingda Ka rollercoaster at Six Flags Great Adventure ("Six Flags") in

Jackson, New Jersey on or about April 23, 2017. *See* Second Amended Complaint attached hereto as **Exhibit D** at ¶¶ 17, 21–22, 25–27.

2. Six Flags commissioned Intamin, Ltd., a company specializing in the design and construction of amusement park rides, to design the Kingda Ka rollercoaster for the Six Flag Great Adventure theme park in Jackson, New Jersey. *See* June 3, 2021, Deposition of Sandor Kernacs attached hereto as **Exhibit B** at 19:20–25, 20:1–25.

3. Kingda Ka was built and opened in 2005. *See* **Exhibit B** at 39:6–13; s*ee also* Expert Report of Edward Pribonic attached hereto as **Exhibit A** at 4; *see also* Kingda Ka Wikipedia Page produced by Plaintiff attached hereto as **Exhibit M**.

4. Intamin President Sandor Kernacs visited the park and inspected the location where the ride would be built. **Exhibit B** at 20:1–9.

5. Mr. Kernacs oversaw the creation of a "custom design" for the rollercoaster. **Exhibit B** at 20:22–25.

6. Intamin custom designs each rollercoaster, "according to the customer's wishes." **Exhibit B** at 71:6–7.

7. The rollercoaster utilizes a complex restraint system comprising many parts, manufactured by different companies. **Exhibit B** at 52:15–25.

LEGAL\71913698\1

SA403

8. The restraint system for Kingda Ka was explicitly designed for Kingda Ka and includes variations that make it different from other restraint systems. **Exhibit B** at 58:1–4.

9. The Kingda Ka restraint system is not identical to the restraint system on other rollercoasters designed by Intamin. **Exhibit B** at 60:11–23, 61:3–4.

10. Additionally, the Kingda Ka seats were custom-designed for the rollercoaster. **Exhibit B** at 104:19–25, 105:1–2. Intamin does not "have a seat that [it] can put in on any roller coaster. All of them are custom." **Exhibit B** at 64:12–13.

11. Kingda Ka warns its riders to keep their head against the headrest through signs posted around the ride and on the backs of the seats facing riders. **Exhibit B** at 76:15–19, 78:1–4.

12. One of these warnings reads, "This Ride May Not Accommodate Guests of a Larger Size. Please Utilize the Test Seat Prior To Waiting In Line." *See* Expert Report of John Yannacone attached hereto as **Exhibit I** at 4, Figure 8.

13. Prior to opening the ride, Intamin provided Six Flags with operation manuals, which were reviewed several times and approved by the state of New Jersey. **Exhibit B** at 30:7–15.

SA404

14. Mr. Kernacs visited the park after Kingda Ka was operational and witnessed Six Flags employees enforcing Intamin's requirements for safe ride operation. **Exhibit B** at 35:8–20.

15. On the date of the incident, Dr. Fabricant allegedly rode the rollercoaster with his son, Nicolas Arnaud Fabricant, and Nicolas's two friends after waiting in line for approximately 10–15 minutes. **Exhibit D** at ¶ 18*; see also* April 5, 2021, Deposition of Dr. Fabricant, attached hereto as **Exhibit H** at 92:15–24, 93:1–4.

16. Before riding the rollercoaster, riders have the opportunity to sit in a test seat, which is a replica of the seat used in the rollercoaster, to test their fit and comfort level in the seat before boarding the rollercoaster.

17. Dr. Fabricant testified that he did not recall seeing or sitting in the test seat. **Exhibit H** at 130:15–24; *see also* **Exhibit B** at 49:21–23.

18. While he was waiting to board the ride, Dr. Fabricant claimed that he had read one overhead sign at the station, which gave instructions on how to safely ride the rollercoaster, but had not read any other signs surrounding the ride. **Exhibit H** at 96:16–24, 97:1–12, 121:2–10.

19. Dr. Fabricant also received verbal instructions on how to safely ride the rollercoaster from a recorded message that plays before every ride. **Exhibit H** at 97:13–24, 98:1–8.

20. Dr. Fabricant testified that he was aware of the height requirements for Kingda Ka before he rode the rollercoaster. **Exhibit H** at 101:14–24, 102:1–11.

21. The ride can accommodate guests as tall as 77 inches. *See* Report of Edward M. Pribonic attached hereto as **Exhibit A** at 10. Dr. Fabricant is 74 inches tall. *See* Report of Albert J. Todd attached hereto as **Exhibit P** at 1.

22. When Dr. Fabricant got on the rollercoaster, he sat in a car near the back of the train, with his son Nicolas. **Exhibit H** at 182:13–23, 185:2–14.

23. Dr. Fabricant claims that when he sat in the seat on the Kingda Ka car and pulled the harness down over his body, the harness was too tight, so he summoned a ride attendant from Six Flags to help him. **Exhibit D** at ¶ 19. **Exhibit H** at 140:3–24, 141:9–24.

24. The attendant caused the harnesses to loosen and Dr. Fabricant was able to readjust the harness to a position that felt comfortable. **Exhibit H** at 142:3–16.

25. Dr. Fabricant testified that his head—"[a]t least the lower part of [his] occiput"—was against the back of the seat when he sat down and that he kept his head back for the duration of the ride. **Exhibit H** at 144:21–24.

SA406

He did not have any concern about where his head was contacting the headrest at the time of the ride. **Exhibit H** at 217:12–21.

26. Dr. Fabricant alleges that when the ride began, he felt the harness force against the top of his shoulders and lock tighter as the ride progressed. **Exhibit D** at ¶ 20; **Exhibit H** at 188:5–8.

27. He claims that he felt pain on his shoulders for the duration of the ride, but that the pain subsided once the ride ended. **Exhibit D** at ¶ 20. **Exhibit H** at 187:17–20; *see also* April 8, 2021, Deposition of Dr. Fabricant, attached hereto as **Exhibit N** at 242:6–8.

28. When the ride was over, Dr. Fabricant did not report that he had felt pain during the ride to the Six Flags ride attendants, his son, or his wife. **Exhibit H** at 149:9–17, 150:4–24.

29. Dr. Fabricant allegedly began to experience pain in his neck about a week and half after riding Kingda Ka. **Exhibit N** at 247:10–15.

30. Ultimately, Dr. Fabricant claims that as a result of the single ride on Kingda Ka, he ruptured two intervertebral discs in his cervical spine, which resulted in three surgeries. **Exhibit D** at ¶ 26.

31. Dr. Fabricant's surgeries were on May 14, 2017, June 2019, and June 2021. **Exhibit D** at ¶ 26; **Exhibit N** at 250:5–13.

**<u>Plaintiff Dr. Fabricant Returns to Six Flags to Document Kingda Ka's Signs and Notices.</u>**

6

SA407

32. After speaking with an attorney about a possible personal injury claim, Dr. Fabricant returned to the park in the fall of 2017 to conduct a personal investigation of "what posted warnings were present at the roller coaster." *See* June 3, 2021, Deposition of Dr. Christopher J. Fabricant, attached hereto as **Exhibit O** at 426:14–24, 427:1–24, 428:16–19.

33. Dr. Fabricant returned again to the park with his two sons in April of 2019, to gather information for his lawyer. **Exhibit H** at 171:13–22.

34. Dr. Fabricant and his sons brought aGoPro HERO camera and cell phones for the purpose of taking photographs and videos of the Kingda Ka rollercoaster's signage and notices. Dr. Fabricant also was photographed by one of his teenage sons sitting in the Kingda Ka test seat during this visit.[1] **Exhibit H** at 173:12–24, 174:12–20.

35. Dr. Fabricant testified that the photograph his son took reflected his recollection of "what the Kingda Ka seat that [he was] seated in during [his] ride on April 23rd, 2017 looked like." *See* Expert Report of Edward Pribonic attached hereto as **Exhibit A** at 10. **Exhibit H** at 200:1–13.

**<u>Plaintiffs File A Complaint Against Six Flags Great Adventure and Defendant Intamin and Intaride.</u>**

---

[1] Notably, this single photograph is used as the sole basis for both of Plaintiff's liability experts and their reports.

SA408

36. On April 30, 2019, Plaintiffs filed a Complaint in New Jersey Superior Court. *See* Dkt. 1, Exhibit A (Original Complaint).

37. On May 15, 2019, Plaintiffs filed an Amended Complaint in New Jersey Superior Court. *See* Dkt. 1, Exhibit B (Amended Complaint).

38. On May 24, 2019, Defendant Six Flags filed a Notice of Removal to remove the case to the U.S. District Court of New Jersey. Dkt. 1.

39. On June 14, 2019, Defendants Intamin and Intaride filed a Motion to Dismiss Plaintiffs' Amended Complaint. Dkt. 8.

40. On June 20, 2019, Plaintiffs filed a Motion to Remand. Dkt. 10-5. All Defendants opposed this Motion. Dkt. 13, 14. The Court denied Plaintiffs' Motion to Remand on July 24, 2019. Dkt. 23, 24.

41. On July 11, 2019, Plaintiffs filed a Motion for Leave to File a Second Amended Complaint. Dkt. 19. The Court granted this Motion on August 12, 2019. Dkt. 30.

42. Plaintiffs filed the Second Amended Complaint on August 13, 2019. Dkt. 32. The Second Amended Complaint (SAC) is the basis for the current litigation.

43. In the SAC, against Defendants Intamin and Intaride, Plaintiffs alleged that Kingda Ka had a defect in design or manufacture because it uses "harness devices with an unrestricted capacity to 'lock down'" and because

SA409

its seats are "insufficient in their size and design to protect individuals . . . whose upper bodies extend *above* the rear of the seat backs." **Exhibit D** at ¶¶ 31–33.

44. Further, Plaintiffs alleged that Defendants Intamin and Intaride failed to warn riders "with larger and taller body frames" that they could not safely ride Kingda Ka. **Exhibit D** at ¶¶ 35–36.

45. Plaintiffs also alleged against Defendants Intamin and Intaride breaches of express and implied warranties. **Exhibit D** at ¶¶ 41–42.

46. Additionally, Mrs. Fabricant asserted a loss of consortium claim. **Exhibit D** at ¶ 44.

47. On August 27, 2019, Defendants Intamin and Intaride filed a Motion to Dismiss the SAC. Dkt. 34.

48. On January 23, 2020, Intamin's Motion to Dismiss was granted in part, dismissing Plaintiffs' warranty claims, and Mrs. Fabricant's loss of consortium claim. Dr. Fabricant is the only remaining Plaintiff. Dkt. 43.

49. On April 23, 2023, the parties engaged in Arbitration before Gerard H. Hanson over Plaintiff's two remaining claims—design defect and failure to warn. Dkt. 102.

50. On October 27, 2023, Plaintiff wrote a letter to the Court demanding a Trial De Novo. Dkt. 103.

LEGAL\71913698\1

SA410

51. On January 24, 2024, the Court entered an order stipulating the dismissal with prejudice of Plaintiff's alleged economic damages arising from loss of wages, income, future earnings, future earning capacity, and household services. Dkt. 111.

## Parties Engage in Discovery as to the Design Defect and Failure to Warn Claims.

52. The Parties have engaged in discovery, including depositions of expert witnesses.

53. Plaintiff relies on Edward Pribonic to support his argument that Kingda Ka's seats and restraints are defectively designed. *See* Expert Report of Edward Pribonic attached hereto as **Exhibit A.**

54. Plaintiff also relies on Colonel John Smith to support his design defect argument. *See* Expert Report of John Smith attached hereto as **Exhibit E**.

55. Mr. Pribonic admits he has no knowledge, exposure, or experience with the development and production of Intamin's seats and restraint systems. *See* July 9, 2024, Deposition of Edward M. Pribonic attached hereto as **Exhibit C** at 166:17–24.

56. Mr. Pribonic admits to knowing "[n]othing in particular" about the production of Kingda Ka's seats. **Exhibit C** at 165:25.

57. More broadly, Mr. Pribonic has no experience in the production of rollercoaster seats. **Exhibit C** at 165:2–7. Mr. Pribonic has similarly

10

SA411

limited knowledge of the production of restraint systems. **Exhibit C** at 166:4–6.

58. Despite this being his second case regarding Kingda Ka, Mr. Pribonic never inspected the rollercoaster, nor did he perform any testing or analysis to determine its dynamics. **Exhibit C** at 57:7–16.

59. Perhaps due to his limited knowledge and investigation, Mr. Pribonic's report offers only vague and scientifically unsupported conclusions that "[e]xtending the seat height is an obvious and simple solution. Taller seats exist on many other roller coasters around the world." **Exhibit A** at 13.

60. Col. Smith offers similarly vague conclusions that Dr. Fabricant would not have sustained his alleged injuries "[h]ad the seat supported [his] entire head." **Exhibit E** at 9. He offers no feasible alternatives. *See* **Exhibit E** at 6.

61. Mr. Pribonic did *not* produce a design that would support these seat height extensions, claiming that "[t]here is no design necessary to support [his assertion]." **Exhibit C** at 170:15–18, 172:17–20. He further testified:

> Q: Is there any schematic or drawing that [you] Ed Pribonic drafted or put together?
> A: No.
> Q: Is there anything that you designed that would show or demonstrate the extension of a seat height?
> A: No.

LEGAL\71913698\1

SA412

**Exhibit C** at 172:10–20.

62. Mr. Pribonic also failed to consider whether the design risks of Kingda

Ka's seats outweigh their utility or the effects of an extended seat on the

utility of the ride. He testified:

> Q: Did you do any kind of utility analysis as to the risk that
> would happen if the seat was extended?
> A: No.
> Q: Did you conduct a rider track analysis of extended seat
> backs?
> A: No. All of that is not my job; that's the job of Intamin.

> **Exhibit C** at 173:2–9.

63. Mr. Pribonic's expert analysis consisted only of a comparison of a

schematic of another rollercoaster and the single photo of Plaintiff in the

test seat, over which he imposed a few red lines. **Exhibit A** at 14.

64. Mr. Pribonic only offered the reductive conclusion that, because one other

rollercoaster has higher seat backs, so, therefore, could and should the

Kingda Ka:

> Q. Is your report limited, when it comes to this alternative
> design, to putting the schematic for an El Loco seat next
> to a picture of Christopher Fabricant in a Kingda Ka seat?
> A. That's all I put in the report.

> **Exhibit C** at 172:21–25, 173:1.

65. Equally unsupported is Mr. Pribonic's conclusion that "the Intamin

restraint contains un-necessary shoulder straps which provide no safety

LEGAL\71913698\1

SA413

purpose and can prevent proper positioning of the lap bar due to its defective design." **Exhibit A** at 16.

66. Mr. Pribonic claims that his diagrams "illustrate the obvious shortcoming of the Kingda Ka…restraints." **Exhibit A** at 11. The figures and their accompanying discussion, however, focus on the seat height and never discuss the harness restraints. *See* **Exhibit A** at 11–14.

67. In any case, Mr. Pribonic agreed that the tightness of the restraints would have no effect on Dr. Fabricant's neck:

> Q. Isn't it true that the tightness of the shoulder restraint is completely unrelated to the forces experienced on the neck?
> A. Yes.
> Q. And, again, is there anything that you read in your appendix, any of the medical records, any of the deposition testimony that indicate any injuries whatsoever to plaintiff's shoulders?
> A. No.
>
> **Exhibit C** at 150:13–22.

68. Mr. Pribonic further testified:

> Q: So is it your opinion that the restraint had no impact on his head and neck?
> A. Yes.
>
> **Exhibit C** at 152:12–14.

69. When asked about the design defects of restraints in his deposition, Mr. Pribonic initially addressed only the seatback:

SA414

Q. Now, you state in your report – we just talked about this -- on page 15 and 16, the language you use is: It's my opinion that Intamin failed to perform the required testing for the seats and restraints as required by the NJAC and ASTM standards. Do you agree -- actually, let me pull it up just for ease of reference. I am on page 16 of exhibit 1. Do you see that, Mr. Pribonic?

A. Yes.

Q. So, again: It is my opinion that Intamin failed to perform required testing for the seats and restraints. These defects render the seats and restraints unreasonably dangerous and defective. What defects are you talking about?

A. The seat back is too low for the 77-inch individual.

**Exhibit C** at 137:5–24.

70. Further, Mr. Pribonic offered no design alternative for the restraints:

Q: What's a class 5 restraint?

A. Class 5 restraint is an individual restraint device that has confirmation locking required and can only be locked and unlocked by the attendants and some other criteria in involved.

Q. Are class 5 restraints at issue here?

A. No.

Q. Not at all?

A. The restraint that's on Kingda Ka would classify as a class 5 restraint. Whether a class 4 restraint would be acceptable would be something that has to be determined by the ride analysis, which wasn't done and not presented.

Q. And not something you did either?

A. No. I am not designing this coaster for Intamin.

Q. And you're also not designing a feasible alternative either. We can agree on that, right?

MR. MEYERS: Objection.

THE WITNESS: I did not design an alternative.

**Exhibit C** at 176:3–25, 177:1–2.

LEGAL\71913698\1

71. Intamin experts mechanical engineer John Yannacone and biomechanical engineer Steven Rundell repeatedly debunk Mr. Pribonic's specious conclusions. *See* Expert Report of John Yannacone attached hereto as 6–7, 8–10. *See also* Expert Report of Steven Rundell attached hereto as **Exhibit G** at 39–44.

72. Mr. Yannacone and Mr. Rundell both personally visited the Kingda Ka rollercoaster to perform an inspection to prepare their expert reports. **Exhibit I** at 2; **Exhibit G** at 9.

73. On December 2, 2021, Mr. Rundell performed a comprehensive inspection and analysis on the Kingda Ka rollercoaster to determine the forces implicated and potential hazards. **Exhibit G** at 9.

74. During the inspection, his team took photographs, measurements, and a 3D laser scan of the rollercoaster's cars and the track in which the cars run. **Exhibit G** at 9.

75. They also conducted ride testing with human volunteers on that same date. The purpose of the testing was to collect "ride vehicle accelerations and head accelerations of differently-sized, properly-restrained occupants." The testing included one "large" subject who measured 73 inches tall. **Exhibit G** at 12–13.

LEGAL\71913698\1

SA416

76. Mr. Rundell used the data from this testing, along with a simulated full 3D motion model, to investigate the occupant dynamics experienced by Plaintiff during his ride on Kingda Ka. **Exhibit G** at 23.

77. Mr. Rundell concluded that the compression and hyper-flexion of the spine required to cause or contribute to the type of disc bulge or herniation Plaintiff experienced "would not be forcibly induced by the subject ride." **Exhibit G** at 37.

78. Mr. Rundell also concluded that the forces and motions experienced by Plaintiff during the ride are consistent with noninjurious physical activity such as "plopping in a chair." **Exhibit G** at 38.

79. On the other hand, Mr. Pribonic's conclusions, albeit few in number, as to the height of a rider and alleged defect are erroneously based on a study from 2000, on 40-year-old men in the general population, despite the injury happening nearly 20 years after the study and the Plaintiff being well over 50 years of age:

> Q. If I am reading this on page 12: The body size of a 40-year-old American male for year 2000 in one gravity conditions. That's what you just cited to as the basis for your deduction that he had a sitting height of 39.2 inches, right?
> A. Yes.
> Q. Okay. So this is a chart from the year 2000, relying on gravity conditions in the year 2000, for the body of a 40-year-old American male, right?
> A. Yes.

LEGAL\71913698\1

**Exhibit C** at 105:20–25, 106:1–6.

80. Mr. Pribonic's calculations also are derived from an "erect" individual as opposed to an individual's normal seated height for his data, which results in an increase in the seated height reported in the data. **Exhibit G** at 43.

81. Both of Plaintiff's experts admit that they are unqualified to speak to the causal connection between Kingda Ka's seat design and restraint system and Dr. Fabricant's alleged injuries.

82. Mr. Pribonic conceded: "I don't evaluate injuries. I am not a biomechanical engineer. I don't offer biomechanical opinions." **Exhibit C** at 24:18–20. Biomechanical engineers, he explained, "evaluate specific injury. For instance, in this case, cervical areas injured and how that can occur and what sort of forces are necessary to induce that injury…I don't do that type of work." **Exhibit C** at 25:15–20.

83. Mr. Smith made a similar concession: "I'm not going to opine on his injuries, but I can tell you what the laws of physics require…" *See* March 18, 2024, Deposition of John Smith attached hereto as **Exhibit F** at Smith at 159:5-7.

## The New Jersey Department of Community Affairs Has Found the Kingda Ka Signage to be Sufficient.

LEGAL\71913698\1

84. The Department of Community Affairs ("DCA") never found any deficiencies or violations regarding the warnings and instructions for potential Kingda Ka riders. *See* production from the New Jersey Department of Community Affairs, attached hereto as **Exhibit J.**

85. One month before the incident, an inspection found the signage to be acceptable. *See* March 23, 2017, New Jersey Department of Community Affairs Amusement Ride Report, attached hereto as **Exhibit K**.

86. After the incident, signage alone was explicitly assessed and inspected and found to be compliant. *See* July 16, 2018, New Jersey Department of Community Affairs Amusement Ride Report, attached hereto as **Exhibit L**.

Respectfully submitted,

COZEN O'CONNOR

*/s/ Benjamin I. Wilkoff*
Paul K. Leary, Jr., Esqire
Benjamin I. Wilkoff, Esquire
Heather H. Hill, Esquire
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, PA 19103
(215) 665-2000
PLeary@cozen.com
BWilkoff@cozen.com
HHill@cozen.com
*Attorneys for Defendants,*
*Intaride, LLC and Intamin Ltd.*

Dated:  July 31, 2024

18

SA419

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

_____

CHRISTOPHER FABRICANT, M.D. and   :
MALIKA FABRICANT, Husband and      Civil Action no. 3:19-cv-12900-GC-JBD
Wife,                           :

        Plaintiffs,      :

        v.            :

INTAMIN AMUSEMENT RIDES INT.   :
CORP. EST., INTARIDE LLC a/k/a INTA-
MIN LTD, INTERNATIONAL AMUSE-   :
MENTS INC., INGENIEUR-BÜRO
STENGEL GmbH, MARTIN & VLEM-   :
INCKX LTD., MARTIN & VLEMINCKX
USA, LLC, SIX FLAGS GREAT ADVEN-  :
TURE, LLC, SIX FLAGS THEME PARKS
INC., JOHN DOES 1-20 and ABC CORP-  :
ORATIONS 1-10,
                           :

        Defendants.
_____:

_____

**PLAINTIFF'S BRIEF IN OPPOSITION
TO INTAMIN DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
_____

G. Martin Meyers, Esq. (#5833)
LAW OFFICES OF G. MARTIN MEYERS, P.C.
35 West Main Street, Suite 106
Denville, New Jersey 07834
Telephone: (973) 625-0838
Telefax:   (973) 625-5350
*Attorneys for Plaintiffs*

Dated: September 16, 2024

SA420

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    iii

I.  PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1

II. LEGAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    2

A. DEFENDANTS' STATUTE-OF-REPOSE ARGUMENT RESTS ON AN
   INAPPOSITE CASE, IGNORES CONTROLLING LAW, AND IGNORES
   THE FACT RECORD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    2

   1.  The Complaint Here Is Poles Apart From That In *Tafaro v. Six Flags Great
       Adventure*, 3:17-Cv-5607 ("Tafaro II"), While This Court Previously Held That
       These Plaintiffs State A Valid Cause Of Action For Products Liability . . . . . . . . . .    3

   2.  The Fact Record Presents A Strong Likelihood That The Seats, Seat Backs
       And Rider Restraints On Kingda Ka Are Mass-Produced Products, Or At Least
       Presents A Genuine Fact Issue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    5

   3.  Defendants Ignore Applicable Case Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    6

   4.  New Jersey Courts' "Two Hats" Analysis Squarely Supports The Intamin
       Defendants' Liability For Plaintiff's Injuries . . . . . . . . . . . . . . . . . . . . . . . . . . . .    7

B. DEFENDANTS' SALLY THAT PLAINTIFFS CANNOT SHOW A DESIGN
   DEFECT BECAUSE THEIR EXPERTS "FAIL TO *OFFER*[SIC] A
   PROPOSED ALTERNATIVE DESIGN" IS FACTUALLY AND LEGALLY
   BASELESS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    10

   1. The Seat Backs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    11

   2. The Rider Restraints . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    12

C. DEFENDANTS' ATTEMPT TO DENY OBVIOUS FACT ISSUES REGARDING
   CAUSATION IS BASED UPON MISLEADING DEPOSITION EXCERPTS,
   DESIGNED TO MISREPRESENT THE RECORD OF THIS CASE . . . . . . . . . . .    14

   1.  Col. John J. Smith, PE's Qualifications And Opinions Regarding
       Causation  Underscore The Presence Of Genuine Issues Of Material Fact
       On Causation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    14

i

SA421

2. The Medical Expert Narrative Report Of Todd J. Albert, M.D., Plaintiff's Treating Spine Surgeon  Supports The Conclusion That Plaintiff Christopher Fabricant's Injuries Were Caused By His Ride On The Defectively Designed Kingda Ka Roller Coaster . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

3. The Threadbare "Debunking" By Defendants' Engineering Expert . . . . . . . . . 18

D. DEFENDANTS' COUNTER TO PLAINTIFFS'FAILURE-TO-WARN CLAIMS RELIES BY TURNS ON MISSTATING AND IGNORING NEW JERSEY PRODUCTS LIABILITY LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

1. The Reasonableness Of Defendants' Warnings Under N.J.S.A. 2A:58C-4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

2. Defendants' Reliance On New Jersey Signage Regulations For Amusement Park Operators Is An Insufficient Basis For Summary Judgment Dismissing Plaintiffs' Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

III. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

SA422

## TABLE OF AUTHORITIES

<u>Cases</u>

*Aly v. Federal Express Inc.*,
2008 WL 4378233 (D.N.J. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6, 7

*Black v. Pub. Serv. Electric & Gas Co.*,
56 N.J. 63 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

*Brown v. Jersey Cent. Power & Light*,
163 N.J. Super. 179 (App. Div. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2 n.2

*Davis v. Brickman Landscaping, Ltd.*,
219 N.J. 395 (2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

*Dziewiecki v. Bakula*,
180 N.J. 528 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7-9

*Fabian v. Minster Mach. Co., Inc.*,
258 N.J. Super. 261 (App. Div. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

*Garten v. Six Flags*,
2020 U.S. Dist. LEXIS 147655 (D.N.J. 2020) . . . . . . . . . . . . . . . . . . . . . . . . .  5 n.5

*Garten v. Six Flags*,
3:19-cv-20040 (D.N.J.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6, 12 n.11

*Kingett v. Miller*,
347 N.J. Super. 566 (App. Div. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21 n.16

*Lindsey v. Caterpillar, Inc.*,
2007 U.S. Dist. LEXIS 45452 (D.N.J. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . .10, 16

*Milanowicz v. The Raymond Corp.*,
148 F. Supp. 2d 525 (D.N.J. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

*McCalla v. Harnischfeger Corp.*,
215 N.J. Super. 160 (App. Div. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

*Nafar v. Hollywood Tanning Sys.*,
2010 U.S. Dist. LEXIS 65183 (D.N.J. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . .  21

*Oz Condo. Ass'n, Inc. v. Oz*,
2019 N.J. Super. Unpub. LEXIS 1636 (App. Div. 2019) . . . . . . . . . . . . . . . . . . .  2 n.2

SA423

*Picariello v. Safway Servs., LLC,*
2012 U.S. Dist. LEXIS 122061 (E.D. Pa. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Poliseno v. GM,*
328 N.J. Super. 41 (App. Div. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17 n.14

*Tafaro v. Six Flags Great Adventure,*
No. 3:17-cv-5607 (D.N.J. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-5

*Thomas v. CMI Terex Corp.,*
2009 U.S. Dist. LEXIS 86623 (D.N.J. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

*Viets v. Dorel Juvenile Group,*
2008 U.S. Dist. LEXIS 58367 (D.N.J. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17 n.14

*Worrell v. Elliott & Frantz,*
2013 U.S. Dist. LEXIS 54862 (D.N.J. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11


Statutes and Regulations

New Jersey Statute of Repose, N.J.S.A. 2A:14-1.1 . . . . . . . . . . . . . . . . . . . . . . . . . 2-9

N.J.S.A. 2A:58C-3(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

N.J.S.A. 2A:58C-4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19-22

N.J.A.C. 5:14A-9.34 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

N.J.A.C. 5:14A-9.34(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22


Industry Standards

ASTM F1193-6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

SA424

## I.   PRELIMINARY STATEMENT.

The Intamin Defendants' 7/31/24 Motion for Summary Judgment is meritless, and should be rejected.  First, Defendants' Motion relies on a single inapposite case, *Tafaro v. Six Flags Great Adventure*, No. 3:17-cv-5607 (D.N.J. 2019), to argue that Plaintiffs' products-liability claims are barred by the ten-year New Jersey statute of repose for buildings and land improvements, because (Defendants say) the products Plaintiff complains of – seats and harnesses – are "essential to the function" of the Kingda Ka roller coaster, which is itself "a land improvement", and therefore the seats and harness are *themselves* "land improvements" as well. However, as explained below, this case is easily distinguishable from *Tafaro*, and for this and other reasons Defendants' statute of repose argument should be rejected.

Defendants also argue that Plaintiffs cannot demonstrate design defect in the Kingda Ka roller coaster's seats and restraints because Plaintiffs' experts did not *themselves* "draft[ ] or design[ ]" a feasible alternative design to compare them with – completely overlooking analysis and comparison by Plaintiff's expert, Edward M. Pribonic, PE to alternative designs already on the market for years, which have a public record of causing *no* neck or shoulder injuries, while those on Kingda Ka have a public record of causing *22* neck injuries in six (6) years; and directly applicable New Jersey caselaw regarding the significance of alternative, safer designs already in use

Defendants then venture that Plaintiff "fails to demonstrate" proximate causation, by misrepresenting the qualifications of Plaintiff's biomechanical causation expert, Col. John J. Smith, PE, and *ignoring* the expert report of Plaintiff's treating spine surgeon, Todd J. Albert M.D., which squarely places the blame for Plaintiff's injuries on his Kingda Ka ride experience on 4/23/17.  Lastly, Defendants attempt to negate Plaintiff's failure-to-warn claims by relying

1

SA425

on New Jersey amusement signage regulations and inspections while ignoring (and misstating) New Jersey products-liability statutory and case law.

Once these and other factual and legal errors in the Intamin Defendants' Supporting Brief are corrected, it is unmistakably clear that their Motion for Summary Judgment should be denied in its entirety.

## II.     LEGAL ARGUMENT.

### A.  DEFENDANTS' STATUTE-OF-REPOSE ARGUMENT RESTS ON AN INAPPOSITE CASE, IGNORES CONTROLLING LAW, AND IGNORES THE FACTUAL RECORD OF THIS CASE.

Defendants argue that Plaintiff's products-liability claims are barred by the ten-year New Jersey statute of repose, N.J.S.A. 2A:14-1.1 (hereinafter "NJSOR") for buildings and land improvements, because (they argue) the seats and harnesses of which Plaintiffs complain are "essential to the function" of the Kingda Ka roller coaster (Db8)[1] -- which Plaintiffs do not dispute is a land improvement -- and therefore *are themselves* land improvements.  (Db6-11). In urging the Court to adopt this position, Defendants rely entirely[2] (a) on the District Court's March 26, 2019 dismissal on the pleadings in the readily distinguishable case *Tafaro v. Six Flags Great Adventure*, No. 3:17-cv-5607 (D.N.J. 2019), and (b) on the naked say-so of Sandor Kernacs, *Defendant Intamin's own President*, that Defendant custom-designs seats and rider restraints for every roller coaster they make (*insinuating,* without ever saying, that the seats and

---

[1] "Db___" herein refers to pages of Defendants' 7/31/24 moving Brief.
[2] Defendants also (Db7-8) cite (and quote) NJSOR cases which have *nothing* to do with proffers of products liability: *Oz Condo. Ass'n, Inc. v. Oz*, 2019 N.J. Super. Unpub. LEXIS 1636, *2, 7 (App. Div. 2019) (possession and control of a building where water leaks occurred); *Brown v. Jersey Cent. Power & Light*, 163 N.J. Super. 179, 191-198 (App. Div. 1978) (action against electrical system designer and builder for unsafe location of electrical cabinet in building).

SA426

restraints are different for each roller coaster).  At best for Defendants, a genuine issue of material fact is presented with respect to both of these arguments.

     **1.**    **The Complaint Here Is Poles Apart From That In *Tafaro V. Six Flags Great Adventure*, 3:17-cv-5607 ("Tafaro II"), While This Court Previously Held That These Plaintiffs State A Valid Cause Of Action For Products Liability.**

The dismissed complaint in *Tafaro* is miles apart from that here.[3]  In *Tafaro*, even after two amendments, the products-liability complaint alleged that the "El Loco" *roller coaster, not* its seats, rider restraints or any other component, was the defective "product":

    10.    . . . [T]he nature and extent of [plaintiff's] injury was a direct and proximate result of various *defects in the roller coaster* El Toro . . .

COUNT ONE
. . .
    4.    Defendant lntamin . . . manufactured, designed, distributed and sold *the El Toro product* which was not reasonably fit and suitable for its intended use and which product was defectively designed and which design defects rendered it unreasonably dangerous to the members of the public . . .

    5.    The El Toro *roller coaster was defectively designed* in that the design of its interior compartment and seating did not protect the patron from being thrown about inside the car while on the ride. More specifically, *the El Toro was defective* in that the seating being utilized for patrons for said ride, was improperly designed.  . . . In addition*, the El Toro roller coaster was designed* with an improper containment system, seat belt and lap bar . . .

    6.    . . . At the time of the subject incident, *there were other comparable roller coasters* being manufactured with better and softer materials for the seats. There were seats that were higher with better padding and more sufficient neck and head support . . .
. . .
    8.    *The El Toro roller coaster,* more particularly, the interior design of the roller coaster car including the seat and restraints as outlined above, *were defective in design and formulation* and unreasonably dangerous when it left the hands of the defendant[ ] lntamin . . . and it reached the plaintiff, the ultimate consumer without substantial alterations in said condition.

---

[3] Unlike *Tafaro*, this Court *did not dismiss* the Complaint in this matter on the pleadings. (Exhibit "A" to Decl. of G. Martin Meyers, Esq. filed herewith).

3

9.      The risks that were inherent in *the El Toro as designed* with the improper seating, the improper car containment envelope and restraint system, far outweigh its benefits for use by patrons as a roller coaster.
. . .

11.      *El Toro was a defective product* . . .

COUNT TWO
. . .

15.      The *El Toro* as manufactured, designed and distributed by lntamin . . . therefore *lacked proper warnings and had insufficient warnings* to warn users such as the plaintiff herein of the dangers of the product and the potentiality of harm that could be caused to the minor plaintiff as a result of the violent movement both side to side and front and backwards, in connection with the type and manner of restraint system that was employed in the ride.

16.      Therefore, *the El Toro was a defective product* when it left the hands of the defendant[ ] lntamin . . .

(Exhibit "B", at 3-8, emphasis supplied).[4]  Arguably, under the NJSOR Judge Wolfson *had* to

dismiss the complaint in *Tafaro* because it complained *only* of a "defective roller coaster" which

the pleading repeatedly called a "product".  (Id.).

*Here*, by contrast, Plaintiffs from the start complained solely of *the seats and rider*

*restraints* in Kingda Ka, *not the roller coaster as a whole*:

1.      This is a products liability action, and a negligence action, arising from injuries sustained by Plaintiff Christopher Fabricant, M.D. . . . on or about April 23, 2017, while riding on the Kingda Ka Roller Coaster . . . Defendants . . . Intaride LLC [and] Intamin Ltd.. . . . manufactured, designed, sold, and placed into the stream of commerce *the seats and harness devices* contained within the cars of the Kingda Ka Roller Coaster at Great Adventure.
. . .
8.      At all times hereinafter mentioned, Defendants Intamin Ltd. ("Intamin Ltd") and/or Intaride LLC ("Intaride") . . . were responsible for the construction and installation of *the seats and harness devices* contained in the cars at the Kingda Ka Roller Coaster, at the Great Adventure Amusement Park in Jackson, New Jersey.  Upon information and belief, Defendants Intamin Ltd and/or Intaride LLC participated in the design, manufacture, sale, packaging, and/or installation of *the harness devices and seats* contained within the Kingda Ka Roller Coaster at Six Flags Great Adventure in Jackson, New Jersey, on or about April 23, 2017.
. . .

---

[4] "Exhibit ___" refers to Exhibits to the Declaration of G. Martin Meyers, Esq., filed herewith.

SA428

31.    Plaintiffs' damages are the direct and proximate result of the defective design, and/or defective manufacture, by defendants . . . Intamin Ltd., Intaride LLC . . ., said design defects . . . being that the said Kingda Ka Roller Coaster _seats and harnesses,_ incorporated a harness device with the unrestricted capacity to "lock down" against the shoulders, chest, and/or cervical spine of individual riders, and seats insufficient in their size and design to protect individuals who, like Plaintiff Christopher Fabricant, M.D., are six feet and two inches tall (6'2") in height or greater, and/or whose upper bodies extend _above_ the rear of the seat backs on the seats contained within the cars of the Kingda Ka Roller Coaster, from the unreasonable risk of whiplash injury to the vertebrae of their necks and spines.

. . .

35.    Defendants . . . Intamin Ltd., Intaride LLC . . . failed to adequately warn users of the above-described Kingda Ka car _seats, seat backs, and harness devices,_ of the dangers of uncontrollable, and irreversible tightening of the harness devices, while the ride is progressing, and the dangers to patrons with larger and taller body frames, like Plaintiff Christopher Fabricant, M.D., of the dangers they faced if a substantial portion of their head and/or neck was above the rear of the seat, from whiplash forces generated by the extreme speed, and extreme torqueing forces generated by the Kingda Ka Roller Coaster, while it is in motion.

(Exhibit "C", emphasis supplied).  This Court, unlike in _Tafaro,_ on 8/12/19 _denied_ Defendants'

Motion for Dismissal of Plaintiffs' very different Complaint in this matter, and _granted_

Plaintiffs' cross-motion to amend the Complaint, holding that it was non-futile (i.e., validly

pled) under the NJSOR.  (Exhibit "A", at 3-4).

## 2.    The Fact Record Presents A Strong Likelihood That The Seats, Seat Backs And Rider Restraints On Kingda Ka Are Mass-Produced Products.

Judge Thompson, in her 8/12/19 Opinion holding that Plaintiffs' Complaint stated a

valid claim under the NJSOR, observed that at some later point (which has now come),[5] "the

Court must determine whether the seat and harness device that allegedly caused injuries are

---

[5] As Defendants acknowledge (Db9-10), the present posture is like _Garten v. Intamin Amusement Rides Int. Corp. Est._, 2020 U.S. Dist. LEXIS 147655, *16-18 (D.N.J. 2020), where -- _also_ denying dismissal on the pleadings -- this Court similarly deferred deciding whether Kingda Ka seats and harnesses were products or land improvements pending completion of discovery.  (Id.).

SA429

standardized or mass-produced on the one hand, or specially designed on the other." (Exhibit "A", at 4).

Accordingly, Plaintiffs respectfully submit that the naked ipse dixit of Defendant's President, Sandor Kernacs, that "Kingda Ka's seats and the restraint system are unique[sic] and were custom-designed for Kingda Ka" (Db9, citing *only* Kernacs' 6/3/21 Deposition testimony in *Garten v. Six Flags,* 3:19-cv-20040), is directly *refuted* by the following contrary documentary evidence, *already* of record in this matter, clearly indicating the mass-produced design, cross-application, and worldwide distribution of the headrest and restraint harness at issue in this action:

- Defendant's written admission that "the same passenger restraint units, as developed and refined for [Intamin] Roller Coasters, are used on Drop Rides, Tyro Swings and the faster Water Rides", and are *not at all* unique to Kingda Ka or even to roller coasters (Exhibit "D", Docket # 28-1, at 5);[6]

- The 7/15/19 Declaration of Edward M. Pribonic, P.E., attaching and identifying photographs which unmistakably demonstrate that the Kingda Ka seat backs and rider restraints which are the focus of Plaintiffs' product liability claims are incorporated in Intamin roller coasters *worldwide*, and are *not at all* unique to "Kingda Ka" (Exhibit "E", Docket ## 22-3, 22-4, 28-1);

- Intamin's website, specifically noting that "[Intamin subsidiary] Intamin Deutschland . . . specialize[s] in . . . design and production of . . . passenger seat and restraint systems" (Exhibit "E", Dkt. #28-1, at 7).

**3.  Defendants Ignore Applicable Case Law.**

As they have done previously, the Intamin Defendants overlook numerous cases in which the NJSOR was held not to protect commercial equipment or machinery. See, e.g., *Aly v.*

---

[6] Defendants have previously argued that "a rollercoaster and its seats are not similar in any way to a mass-produced product which was selected from a brochure". (Dfdts. 8/27/19 Brief in support of Dismissal of Second Amended Complaint, Dkt #34-1, at 13, internal quote omitted). To the contrary, it appears "selection from a brochure" is a plausible likelihood in light of this publicly available internet brochure by the Intamin Defendants themselves. (Id.).

SA430

*Federal Express Inc.*, 2008 WL 4378233, **2, 9 (D.N.J. 2008) (large, made-to-order conveyor machine, anchored to concrete floor of building constructed for sorting function, was <u>not</u> covered by statute of repose); *McCalla v. Harnischfeger Corp.*, 215 N.J. Super. 160, 169 (App. Div. 1987) (overhead crane <u>not</u> covered, despite fact that building was specially built to contain it).

     *Aly v. Federal Express*, 2008 WL 4378233 at *9 (D.N.J. 2008), and *McCalla v. Harnischfeger,* 215 N.J. Super. at 169 (N.J. App. Div. 1987), are particularly instructive.  In each case, the court declined to apply the New Jersey statute of repose to a commercial machine which was concededly <u>"integral" to the commercial function of the surrounding real estate</u> -- in the case of *McCalla,* a building specially constructed to house it.  (<u>Id</u>.).  Judge Chesler reasoned in *Aly*, and the Appellate Division in *McCalla,* that in order to fall under the New Jersey statute of repose, a product must be such that, "if removed [it] would do <u>irreparable or serious physical injury</u> **to the freehold**."  (*Aly*, 2008 WL 4378233 at *9, emphasis supplied).  Judge Chesler continued:

> As in *McCalla,* the item here that purportedly constitutes an improvement <u>was essential to the business conducted</u> within the building in which the injury occurred.  <u>That does not bring the conveyor system within the ambit of the statute of repose.</u> Where the item at issue, whether an overhead crane or a conveyor system, <u>has no impact on the structural integrity of the building or does not somehow permanently alter the real property, it does not improve real property within the meaning of the statute of repose.</u>

*Aly*, 2008 WL 4378233 at *9, emphasis supplied; <u>accord</u> *McCalla v. Harnischfeger,* 215 N.J. Super. at 165-166 (relying on New Jersey tax law of fixtures).

**4.  New Jersey Courts' "Two Hats" Analysis Squarely Supports The Intamin Defendants' Liability For Plaintiff's Injuries In This Case.**

     In *Dziewiecki v. Bakula*, 180 N.J. 528 (2004), the New Jersey Supreme Court expressly *rejected* the argument the Intamin Defendants are now inviting this Court to adopt -- that,

7

SA431

because they participated in erecting a roller coaster which *overall* is unique, fixed to the ground and therefore may constitute an "improvement to real property" under the NJSOR, each and every component that roller coaster contains, no matter how standardized and mass-produced, is *also* an improvement to real property.  The Court in *Dziewiecki* rejected precisely that argument in favor of a "two-hats" analysis:

> …the Appellate Division previously has opined that a person who "participated *to any extent*" in activities covered by the SOR is entitled to its protection.  [citations omitted]. <u>We reject that approach and hold that when a person in effect wears "two hats" (undertakes activities covered by the SOR *and* comes under the product liability statute), and the cause of the injury is attributable to both, the responsibility should be allocated between the two.</u>  That portion of the liability that relates to activities that fall within the SOR would not after ten years be actionable, and <u> that portion of the liability that derives from a product liability cause of action would be covered by the limitations period set forth in *N.J.S.A.* 2A:14–2.</u>  Other courts have held, as we have today, that statutes of repose like New Jersey's SOR focus on the "activities" of persons seeking their protection. *See, e.g., Dighton, supra,* 506 *N.E.*2d at 515 (fixing scope of protection of SOR to acts "performed with respect to 'improvement to real estate' ") (citation omitted); *McConnaughey v. Bldg. Components, Inc.,* 536 *Pa.* 95, 637 *A.*2d 1331, 1333 (1994)(requiring defendant to show actions "within the class which is protected by the [SOR]"); *Condit v. Lewis Refrigeration Co.,* 101 *Wash.*2d 106, 676 *P.*2d 466, 468 (1984) (limiting its SOR to "activities relate [d] to the process of building a structure").  Not only does allocation accord with the statutory language, but also, it provides a more equitable distribution of the burden than an all-or-nothing approach.

(*Dziewiecki v. Bakula*, 180 N.J. 528, 533–534, emphasis supplied).

The defendants in *Dziewiecki*, as here, were involved *both* in construction of a ground improvement (swimming pool) -- such that claims arising from negligent construction were subject to the Statute of Repose (<u>id</u>., 180 N.J. at 532) -- *and* in manufacturing a standardized "pool kit" product *incorporated in* the pool, which the Court held was *not* an "improvement to real property" (<u>id</u>. at 532-533).  Accordingly, the New Jersey Supreme Court held the defendant was protected by the NJSOR insofar as it erected and installed a swimming pool in the ground (<u>id</u>., 180 N.J. at 532), but <u>*the same*</u> defendant, insofar as it *also* designed and manufactured the

pool-construction kit (the disassembled pool), was exposed to products liability arising from defects in _the kit's_ manufacture, design, and safety warnings.  The Court held the kit itself was _not_ an "improvement to real property," despite its being incorporated into a swimming pool that _was_ such an improvement (id., 180 N.J. at 532-534).

  The Kingda Ka roller coaster at Six Flags Great Adventure stands on the same footing as the swimming pool in  _Dziewiecki_, -- an "improvement to real property" -- while _at the same time_ the standardized components it contains, such as the rider harnesses, locks, and seat backs at issue here, stand on the same footing as the "pool kit" in _Dziewiecki_, because they are clearly _not_ unique, but are obviously used widely, in thousands of identical assemblies on Intamin rides around the world, and therefore represent "products" subject to the NJPLA.  (See Exhibit "E", at 9, 11, 13, 15, 17, 19, 21, 23).  Thus, under the Supreme Court's analysis in _Dziewiecki_, the Intamin Defendants, involved as they are in manufacture and sale of the evidently-standardized harnesses, locks and seat backs on the "Kingda Ka" roller coaster, are exposed to liability under the NJPLA _notwithstanding_ the NJSOR, to the extent Defendants' activities involved manufacture, design, or inadequate warnings provided with those standardized mass products. That is true even if the "activities" of those Defendants in erecting the Kingda Ka roller coaster itself are shielded by the NJSOR.  _Dziewiecki_, 180 N.J. 528, at 533–534.

  Thus, a reasoned review of applicable case law clearly indicates the Intamin Defendants are not entitled to summary judgment on statute-of-repose grounds.  (Id.).

9

SA433

**B.    DEFENDANTS' CONTENTION THAT PLAINTIFFS CANNOT SHOW A DESIGN DEFECT BECAUSE THEIR EXPERTS "FAIL TO _OFFER_[SIC] A PROPOSED ALTERNATIVE DESIGN" IS ERRONEOUS, AND SHOULD BE REJECTED.**

Defendants, playing on the word "offer", repeatedly insinuate that Plaintiffs' biomechanical and amusement-design engineering experts, Col. John J. Smith, PE[7] and Edward M. Pribonic, PE, "fail to _offer_ a proposed alternative design" to the seat backs and rider restraints on Kingda Ka, because they did not themselves _design_ such seat backs and restraints. (Db13-21).[8]

That is not the law in New Jersey.  In _Thomas v. CMI Terex Corp_., 2009 U.S. Dist. LEXIS 86623, at *25 (D.N.J. 2009), this Court held that existing alternative designs _already in use,_ which demonstrate feasibility and effectiveness, "provid[e] sufficient reliable proof that this alternative design (extremely simple, to the point of needing very little explanation) was feasible and effective".  (Id., quoting _Lindsey v. Caterpillar, Inc_., 2007 U.S. Dist. LEXIS 45452 (D.N.J. 2007), and _Milanowicz v. The Raymond Corp._, 148 F. Supp. 2d 525, 533 (D.N.J. 2001)). Accord, _Worrell v. Elliott & Frantz_, 2013 U.S. Dist. LEXIS 54862, *15-16 (D.N.J. 2013).

_____

[7] Colonel Smith, a physicist and biomechanical engineer, was not asked to, and did not, propose alternative designs.  Instead, he opined on the effect of Defendants' existing defective design. See IV., below.

[8] Defendants dismiss Col. Smith as "a geophysicist" (Db13, 17), ignoring both his CV (Exhibit "G") and his 3/18/24 Deposition testimony (Exhibit "H"), laying out his qualifications to opine on the match between Dr. Fabricant's spinal injuries and the forces he experienced on 4/23/17 while riding Kingda Ka:

- In addition to his B.S. in geophysics from the Colorado School of Mines, Col. Smith has an M.S. degree in biomechanical trauma from Lynn University, Florida (id. Tr. 14:16-19);

10

SA434

**1. The Seat Backs**.

"[E]xtremely simple, to the point of needing very little explanation" (*Thomas v. CMI Terex Corp.*, 2009 U.S. Dist. LEXIS 86623, at *25), perfectly describes Engineer Pribonic's proffer of the *existing,* superior (because taller) seat-back design – incorporated in the "El Loco" coaster in Las Vegas – that clearly gives full support to the backs of adult riders' heads and prevents rearward cervical hyperextension. (Exhibit "F", at 13-14).[9] That design, *already in use worldwide,* is manifestly "a practical and technically feasible alternative design" under the New Jersey Products Liability Act. (Exhibit "F", at 13-14; N.J.S.A. 2A:58C-3(a)(1)).

Moreover, both Kingda Ka and El Loco *have been tested* in daily use for years in the real world, and the resulting difference in cervical injuries is startling. Compare Exhibit "I" (Kingda Ka data from Amusement Safety Organization online database sent to Mr. Pribonic on 3/9/21: *22* cervical injuries on Kingda Ka in six years, 2011-2016) against Exhibit "J", at 27 (El Loco data from Clark County amusement authority: as of 2019, *no (zero)* reported neck injuries in *five years*, and only *one* rider injury overall, a double amputee who fell out of the coaster). Accord, *Thomas v. CMI Terex Corp.*, 2009 U.S. Dist. LEXIS 86623, at *8 (D.N.J. 2009) (expert is not required to test alternative design that is already in use on similar

---

- Since 1992 Col. Smith has attended over a hundred courses, conferences or seminars on accident investigation, reconstruction and biomechanics (id. Tr. 15:4-7);
- Col. Smith has reconstructed over 4,000 injury events, most including biomechanical analysis (id. Tr. 15:7-9);
- Col. Smith has published over two dozen articles in accident reconstruction and biomechanics (id. Tr. 15:10-11).

11

SA435

machinery and has demonstrated its feasibility and effectiveness); *Worrell v. Elliott & Frantz*, 2013 U.S. Dist. LEXIS 54862, *15-16 (D.N.J. 2013) (same).[10]

Defendants next attack Engineer Pribonic's scaling method for comparing the seat back heights on Kingda Ka and comparator El Loco (Db16), *ignoring* the following facts:

a. Sander Kernacs, President of Intamin Ltd., ***admitted under oath*** **on 6/3/21[11] that "El Loco" seat backs are visibly taller than Kingda Ka's, and that Intamin could have easily, at little extra cost, designed and made similar seat backs for Kingda Ka, but chose not to.** (Exhibit "K", Tr. 70:1-71:12).

b. Scaling -- mathematically converting real life dimensions to a smaller or larger size to make a drawing – is universally applied and validated in engineering work, is a feature of all engineering, architectural, and design software in use today, and can be used to measure objects in photographs "to a reasonable degree of accuracy". (Exhibit "J", at 1-2, ¶ 2).

c. <u>Contra</u> Defendants' assertion (Db16) that Mr. Pribonic gave "no indication of calculation or scale" for defendants' Kingda Ka seat, the drawing that he comparison-scaled to "El Loco" was produced, *with dimensions and scale*, *by Defendants* (Exhibit "J", at 5), and was clearly identified in Pribonic's Appendix as "Intamin Ltd. (Fabricant) 134". (Exhibit "F", at 19).

d. The many photographs of El Loco and Kingda Ka seat backs filed herewith (Exhibit "F" at 6, 11, 14; Exhibit "P" at 11, 14) additionally demonstrate that El Loco headrests tower over riders' heads, whereas Kingda Ka's headrests wedge *underneath* (<u>id</u>.).

e. Publicly available reports make clear that El Loco produced *no* neck injuries in *five years* of use, 2014-2019, whereas Kingda Ka riders reported *22* neck injuries in *six* years of use, 2011-2016 (<u>supra</u> at 10-11, and Exhibits "I", "J" at 27).

**2. The Rider Restraints.**

Contrary to Defendants' insinuations and cherry-picked snippets of deposition testimony (Db20-21), Plaintiffs' engineering and amusement ride expert, Edward M. Pribonic, PE analyzed at length, in his 6/2/22 report, the shortcomings of Kingda Ka's shoulder harness

---

[10] Defendants *omit to mention* that Colonel John J. Smith, PE, Plaintiffs' biomechanical expert, was not called on to offer a comparator product, but they *admit* that Col. Smith concluded that a taller seat back would have prevented Plaintiff's injuries (Db17).
[11] In *Garten et al. v. Six Flags et al.*, 3:19-20040 (D.N.J.).

SA436

design, and of Defendants' failure to test it, for tall riders such as Plaintiff (Exhibit "F", at 6-7).

He opined, quite simply, that Defendants' shoulder straps, when pulled down onto a Kingda Ka

rider of Plaintiff's size, rested on Plaintiff's shoulders before the lap bar which was Kingda Ka's

chief restraint could contact Plaintiff's lap and hold Plaintiff down against the seat.  This, in

turn, permitted Plaintiff's head – already barely touching the top of, rather than resting against,

the already-short seat back -- to ramp entirely *over* the headrest, flailing about during the ride

and seriously injuring his neck (id., at 7, 14, 16).  In his 6/2/22 report, Engineer Pribonic

opined:

> His restraint was not properly positioned to his body. And there are two failures creating the improper position.
>
> A. The Six Flags ride attendant failed to place the restraint in contact with Dr. Fabricant's body, (legs). (SFGA Kingda Ka Standard Operating Procedure, page 36). Had the attendant noticed this improper position, it should have alerted him to the fact that Dr. Fabricant's height exceeded the maximum height allowed.
> B. *The defective design of the restraint prevented it from engaging the legs of a tall rider before the shoulder straps stopped the downward positioning of the restraint.* This also was an unacceptable condition as stated in the ride regulations.
> . . .
> It is my opinion that Dr. Fabricant's restraint was not placed on him properly in consideration of his upper torso length and the minimum position of the restraint. The Six Flags attendant either *did not understand the necessary position of the restraint*, or simply did not bother to look at Dr. Fabricant's height relative to the seat as is his responsibility.

(Id. at 7, 14, emphasis supplied).  Mr. Pribonic amplified this analysis in his 7/29/24 Deposition

(omitted by Defendants):

> A. The [design] defect would be two things at least: That the seat back was too low for [Intamin's instructions permitting up to a] 77-inch [tall] rider and that *the over the shoulder harnesses also were not properly designed for a 77-inch rider in that they would not allow the lap bar to contact the thighs of the rider.*
> . . .
> Q. So what is your opinion as to the [shoulder] restraint and the tightness?
> A. My opinion is that *because the restraint was touching his shoulders, it didn't allow the lap bar to touch his thighs, and his head was above the back of the seat rest.*

13

SA437

Q. . . . you're basing a large part of your opinion on a photograph that you didn't take, that you weren't present when it was taken, and on a test seat that you really have no information about, correct?

A. I don't. I only have *the visual information that shows that on Dr. Fabricant, the lap bar doesn't reach his thighs, the lap bar touches his shoulder, and his head is substantially above the back of the seat. . . . I said all of those things are required by the Six Flags standard operating procedure to be checked and verified that his head was below the back of the seat and the lap bar is on his thighs.*

(Exhibit "L", Tr. 139:5-11, 151:16-22, 255:4-256:3).

By contrast, the lap-bar rider restraints on the El Loco roller coaster, proffered as an alternative design by Engineer Pribonic (Exhibit "F", at 14), *dispense* with the "un-necessary [Kingda Ka] shoulder straps which . . . prevent proper positioning of the lap bar" (id. at 16). That mis-positioning resulted in Plaintiff's not being held in full contact with the Kingda Ka seat and contributed to his "ramping" backward over the already-short headrest, worsening the whiplash effect on his neck.  (Exhibit "H", Smith 3/18/24 Tr. 217:4-218:1, 224:6-10).

Plaintiffs filed with this Court *five years ago,* on 9/23/19, two *additional* examples of strapless roller-coaster lap restraints – one *by Defendants themselves*, in an online brochure for their "Taron" ride –at Dkt ## 36-3 and 36-4.  (Exhibit "M").

As shown, Defendants cannot demonstrate a lack of triable fact issues regarding design defects either in their seat backs or their rider restraints.  (Id.).

### C.  USING MISLEADING SNIPPETS OF DEPOSITION TESTIMONY, DEFENDANTS ATTEMPT TO DENY OBVIOUS FACT ISSUES REGARDING CAUSATION.

#### 1.  Col. John J. Smith, PE's Qualifications And Opinions Regarding Causation.

14

SA438

Baldly misrepresenting Colonel Smith's qualifications ("neither [of Plaintiff's experts] is a biomechanical engineer", Db21),[12] Defendants lamely venture that Plaintiffs "provide no basis to support any assertion that there is a correlation between Plaintiff's injuries and the purported aforementioned defects" (id.).  To the contrary, Colonel Smith specifically testified about the role of the too-short Kingda Ka headrest – and absent product warnings -- in Plaintiff Christopher Fabricant, M.D.'s neck and shoulder injury:

> I did the calculation, and the reason I did the calculation is to see *but for the design of the seat,* but for Dr. Fabricant being as tall as he was would I expect any issues. No. At 1.65 Gs, even at 2 Gs, if the head is fully supported, then no, I don't expect issues.
> . . .
> [I]s the 1.65 Gs, double it, cut it in half, a hundred percent variation, led it down to zero, is that the overriding factor by itself? And the answer is no, it's not. 1.65 should be okay, should be okay *if you fully support the head.*

(Exhibit "H", Smith 3/18/24 Tr. 171:25-172:5, 172:24-173:3, emphasis supplied).

Colonel Smith repeatedly testified that what he could *not* do is to *reproduce* Plaintiff's injuries, as if Plaintiff were a machine part, or *numerically* to parse the forces at play on Plaintiff on 4/23/17:[13]

> A. . . . And so the question is, can you calculate, can you measure the hundreds of forces? No, you cannot. But even if you could, what is his [Plaintiff's] threshold for injury, because your  threshold is not the same as mine and your threshold today is not your

---

[12] Defendants ignore both Colonel Smith's CV (Exhibit "G") and his 3/18/24 Deposition testimony (Exhibit "H") outlining his qualifications to opine on the causation of Dr. Fabricant's spinal injuries:

- Col. Smith has an M.S. degree in biomechanical trauma from Lynn University, Florida (id. Tr. 14:16-19);
- Since 1992 Col. Smith has attended over a hundred courses, conferences or seminars on accident investigation, reconstruction and biomechanics (id. Tr. 15:4-7);
- Col. Smith has reconstructed over 4,000 injury events, most including biomechanical analysis (id. Tr. 15:7-9);
- Col. Smith has published over two dozen articles in accident reconstruction and biomechanics (id. Tr. 15:10-11).

[13] Colonel Smith also denied being qualified to *diagnose* Dr. Fabricant's injuries.  (Exhibit "H", Tr. 158:1-10, in answer to counsel's vague query whether he would "opine on his injuries").

15

SA439

threshold tomorrow.  We go back to rear impacts. You may take a seven-mile-an-hour change in velocity one day and not be injured.  The next day because of variations, the permutations, you may take a 4 and B  injury.  So that's why, yes, if you could measure all of them and if you knew the threshold for injury, then you might have an argument. But since we know neither of those two things, the idea of comparing it to something that isn't was a method for litigation. It's not used anywhere outside of litigation.

Q. Do you know Dr. Fabricant's threshold for injury?

A. No. Nobody does.

Q. Did you take any steps to try and ascertain it?

A. It would be unethical to do that because you would have to test him to failure, and especially, if he already has an injury, he couldn't be tested anyway. That's why nobody uses that in the real world.

(Exhibit "H", Tr. 68:5-69:7).

Where (as here) a product victim has a contributing asymptomatic birth defect (spinal stenosis, Exhibit "N", at 2), and (consequently) the factors leading to his injury are too many and complex to readily permit of numerical analysis (see Exhibit "H", Smith 3/18/24 Tr. 159:1-20, 160:8-18), courts in this Circuit permit an expert to rely on his education and experience, and on the existence of competing designs that constitute better industry practice.  E.g., *Lindsay v. Caterpillar*, 2007 U.S. Dist. LEXIS 45452, *12 (D.N.J. 2007) (specialization of product and complexity of forces at play in crush injury "does not lend itself to extensive testing"); *Picariello v. Safway Servs., LLC,* 2012 U.S. Dist. LEXIS 122061 *9-10, 12-13 & n.3 (E.D. Pa. 2012) (distinguishing engineering from purely scientific analysis).

By way of answer to Defendants' misleading snippet of Colonel Smith's deposition testimony stating, "I don't evaluate injuries" (Db22), Colonel Smith testified quite clearly about his role vis-à-vis medical practitioners, whose task *is* to diagnose injuries, when he made that statement:

You need to know what the diagnosed injuries are.  Again, you [counsel] used the word "alleged" earlier. No, I don't deal with alleged injuries. I only deal with diagnosed injuries. So we have to know what those are, you have to know how the event occurred so that you can see if we have a match.

16

SA440

(Exhibit "H", Tr. 67:2-9).

Colonel Smith specifically testified about the role of the too-short Kingda Ka headrest – and absent product warnings -- in Plaintiff Christopher Fabricant, M.D.'s neck and shoulder injury:

> I did the calculation, and the reason I did the calculation is to see *but for the design of the seat,* but for Dr. Fabricant being as tall as he was would I expect any issues. No. At 1.65 Gs, even at 2 Gs, *if the head is fully supported, then no, I don't expect issues.*
> . . .
> [I]s the 1.65 Gs, double it, cut it in half, a hundred percent variation, led it down to zero, is that the overriding factor by itself? And the answer is no, it's not. 1.65 should be okay, should be okay *if you fully support the head.*

(Exhibit "H", Tr. 171:25-172:5, 172:24-173:3, emphasis supplied).

## 2. The Medical Expert Narrative Report Of Todd J. Albert, M.D., Plaintiff's Treating Spine Surgeon.

Plaintiff Christopher Fabricant's surgeon, Todd J. Albert, M.D., opined on 8/9/21 that Plaintiff had an asymptomatic congenital cervical stenosis which predisposed him to serious injury from his ride on Kingda Ka. (Exhibit "N", at 2).[14] Thus, Dr. Albert related (id. at 2), "My assessment was congenital stenosis and likely a cervical cord concussion from the violence of the [Kingda Ka] ride that he was on in April [2017]". (Id.).

Defendants themselves *relied* on this report by Dr. Albert in their 7/31/24 Motion to bar the report and testimony of Engineer Pribonic (Dkt #118, at 10 & Dkt #118-5), but now apparently find it inconvenient to do so ("Defense expert Steven Rundell . . . concluded that the Kingda Ka roller coaster did not expose Plaintiff's cervical spine to a risk of hyperextension, which is consistent[sic] with the medical findings", Db22).

---

[14] Plaintiffs claim that Kingda Ka was a *substantial* factor in producing Dr. Fabricant's injuries, not the *only* factor. See, e.g., *Viets v. Dorel Juvenile Group*, 2008 U.S. Dist. LEXIS 58367, *25 (D.N.J. 2008); *Poliseno v. GM*, 328 N.J. Super. 41, 54 (App. Div. 2000).

17

Defendants' pretense to find no fact issues of causation is contrary not just to the record but to Defendants' own arguments, and should be rejected.

18

### 3.  The Threadbare "Debunking" By Defendants' Engineering Expert.

Defendants next inject the assertions of their liability expert, Steven Rundell, PE, as "debunking" causation.  (Db22-23).  Defendants ballyhoo Mr. Rundell's "personal" inspection of the "roller coaster" (of which only the seat backs and lap restraints are at issue in this action), his "photographs[15] . . . and a 3D laser scan of the rollercoaster's *cars and the track*"[sic], and his "ride testing with human volunteers . . . includ[ing] one 'large' subject who measured 73 inches tall" (Dfdts. 7/31/24 "Statement of Undisputed Material Facts", ¶¶ 72-76).

Leaving aside what a laser scan of "cars and track" shows about the seat backs and rider restraints at issue in this action, the photographs of Mr. Rundell's specimen "large" (6'1") rider in figs. 5 and 6 of Rundell's report (Exhibit "P", at 13-14) – an inch *shorter than Plaintiff* (measured at 6'2" by Defendants' IME John Tydings, M.D., Exhibit "O", at 1) clearly show a man whose *head rests on top of* the Kingda Ka headrest, like Plaintiff Christopher Fabricant did (Exhibit "P", at 11, 14), thereby *buttressing* Plaintiffs' case.  (Id.).

Further, it is difficult to see how non-physician Rundell's conclusion "that the Kingda Ka roller coaster did *not* expose Plaintiff's cervical spine to a risk of hyperextension" is "consistent with the medical findings" (Db22), when those findings -- *adopted by Defendants in their Motion* (Dfdts. Exh. P) -- show *exactly the opposite* (id. at 2).  Defendants are neither consistent with the record nor with themselves.

Plaintiffs' biomechanical expert Col. John J. Smith, PE gave a blistering critique of Mr. Rundell's junk numbers and junk science in his 3/81/24 Deposition, over strenuous objection by Defendants' counsel (Plaintiffs' Exhibit "H", Tr. 9:9-23, 11:8-12:1, 44:18-45:14, 63:9-17, 65:7-

---

[15] Presumably photographs taken by Defendants are more "scientific" than those taken by Plaintiffs ("unscientific", Db16).

19

69:13, 121:24-123:5, 131:3-134:11).  The facts bear Colonel Smith out.  Accounts of _blackouts_ experienced by Kingda Ka riders due to its extreme G forces can be found at Plaintiffs' Exhibit "Q".  Defendants' expert, Steven Rundell PE, _admits_ the maximum vertical acceleration on Kingda Ka is 3*g* and the maximum back-to-front force is 5*g*.  (Dfdts. Exh. G, at 15, 16).  This is *greater* than forces experienced by fighter pilots launching from Navy carriers *wearing G-suits*. (Exhibit "R", https://aviation.stackexchange.com/questions/25084/what-is-the-force-exerted-by-the-catapult-on-aircraft-carriers).

Particularly in view of the night-and-day contrast between Kingda Ka's disastrous record of neck injuries on the one hand, and the complete absence of such with the comparator seats and lap bars on El Loco (see Point B.1., above), Defendants' argument for summary judgment on causation grounds should be resoundingly rejected as well.

### D. DEFENDANTS' COUNTER TO PLAINTIFFS' FAILURE-TO-WARN CLAIMS RELIES BY TURNS ON MISSTATING AND IGNORING NEW JERSEY PRODUCTS LIABILITY LAW.

Regarding Plaintiffs' failure-to-warn claims under N.J.S.A. 2A:58C-4, Defendants first venture into archaic notions of comparative liability and assumption of risk, as if the Products Liability Act did not exist ("These warnings . . . communicated adequate information on the dangers and safe use of the ride, such that a reasonably prudent person would have understood the risk associated with the high-speed rollercoaster", Db2, citing no law).  Later, they place their reliance _completely_ on their purported compliance with New Jersey amusement-ride statutes and regulations.  (Db24-27).

20

SA444

**1. The Reasonableness Of Defendants' Warnings Under N.J.S.A. 2A:58C-4.**

In the process, Defendants misquote Plaintiffs' Second Amended Complaint ("SAC") and the discovery record, *pretending* Plaintiffs claim that Defendants failed to warn "that there were purported risks for larger and taller patrons" (Db24) – a warning even vaguer than the Six Flags user guide and map, which Plaintiffs have said for years *would not have deterred* Dr. Fabricant (who is less than 77" tall) from riding Kingda Ka  (Exhibit "C", SAC ¶ 24), not to mention Defendants' *actual*, cloud-vague warning, posted off to one side of the Kingda Ka boarding area (Dfdt. Exh. I, at 4 fig.8), "May Not Accommodate Guests Of A Larger Size".

Plaintiffs, in their Second Amended Complaint, outline Defendants' failure to warn with much greater precision than Defendants indicate:

> 25.     . . . what the warnings and/or instructions failed to advise Plaintiff, or other patrons of was the danger, about which Defendants were aware, or should have been aware, *that someone whose height was sufficient to bring most or all his head above the rear of the seat on the Kingda Ka Roller Coaster, and whose height was sufficient to bring the superior, or top, portions of his shoulders flush against the secured harness, would be subject to extensive, severe and varying forces, including whiplash forces,* sufficient to cause severe damage to the vertebrae of the cervical spine; *or that*, by virtue of its locking system, which allowed the harness on the Kingda Ka Roller Coaster, during the ride, to move to ever-tighter positions, but did *not* allow the harness to return to a previous, looser position, *once tightened, the harness presented the risk of crushing downward forces against the shoulders as well, also sufficient, when combined with other forces experienced during the ride, to cause severe damage to the vertebrae of the spine, and to the shoulders of riders* who become subject to excessive tightening of the harness during the ride – exactly as Plaintiff Christopher Fabricant, M.D. later discovered he had experienced in this case.
> . . .
> 35. Defendants . . . Intamin Ltd., Intaride LLC . . . (the "Products Liability Defendants") *failed to adequately warn users of the above-described Kingda Ka car seats, seat backs, and harness devices, of the dangers of uncontrollable, and irreversible tightening of the harness devices, while the ride is progressing, and the dangers to patrons with larger and taller body frames, like Plaintiff Christopher Fabricant, M.D., of the dangers they faced if a substantial portion of their head and/or neck was above the rear of the seat,* from whiplash forces generated by the extreme speed, and extreme torqueing forces generated by the Kingda Ka Roller Coaster, while it is in motion.

(Exhibit "C", at 10, 14; Exhibit "S", at 4).

SA445

By contrast, the warnings boasted of by Defendants and their expert Steven Rundell, PE (Exhibit "P") *do not* alert Kingda Ka riders to the *dangers* they face, but instead set out *conduct Defendants demand of them* – "Remain Seated Upright, With Your Head Back, Facing Forward, With Your Arms And Legs Inside The Train"; "Hold Onto The Grab Bar At All Times During The Ride Until The Ride Comes To A Complete Stop" (Dfdts. Exh. G, at 48).

Defendants' warnings -- *silent* on the dangers Kingda Ka riders face -- are by turns so misleading and vague as nearly to constitute a trap.[16]  N.J.S.A. 2A:58C-4 speaks of "reasonableness" in a product designer's conduct (id.), and Defendants' size and height warnings for Kingda Ka were *not* reasonable.  See, e.g., *Nafar v. Hollywood Tanning Sys.*, 2010 U.S. Dist. LEXIS 65183, *19 (D.N.J. 2010) ("The statute imposes on a manufacturer a duty to take reasonable steps to ensure that appropriate warnings for safe use reach foreseeable users of the equipment", emphasis supplied); *Fabian v. Minster Mach. Co., Inc.*, 258 N.J. Super. 261, 275 (App. Div. 1992) ("when a jury determines a failure to warn claim under N.J.S.A. 2A:58C-4[, it] thus assesses *the overall reasonableness of the defendant's conduct*").

Given Intamin's prior notice of Kingda Ka's ever-lengthening (and public) list of neck-injury victims (see III.A., above), "the overall reasonableness of the defendant's conduct" (or *unreasonableness*, as here) plainly tilts in Plaintiff's favor here.  (Id.).

---

[16] See, e.g. (by way of analogy only), *Kingett v. Miller*, 347 N.J. Super. 566, 568 (App. Div. 2002) (warning to "be careful" insufficient to alert business invitee to dangerous stairway).  The analogy is valid because N.J.S.A. 2A:58C-4 speaks of "reasonableness" in a product designer's conduct.  (Id.).

SA446

**2. Defendants' Reliance On New Jersey Signage Regulations For Amusement Park Operators Is An Insufficient Basis For Summary Judgment Dismissing Plaintiffs' Claims.**

"[A] regulatory code or standard is evidence of due care but is not conclusive on the subject." *Black v. Pub. Serv. Electric & Gas Co.*, 56 N.J. 63, 77 (1970); accord, *Davis v. Brickman Landscaping, Ltd.*, 219 N.J. 395, 412 (2014) ("regulations represent *minimum standards* and do not establish the complete duty of the defendant under all circumstances", internal quotes omitted, emphasis supplied). But Defendants, discussing at length irrelevant amusement-operator regulations under the DCA and NJAC, barely mention New Jersey products-liability law, and completely ignore the actual warning deficiencies that Plaintiffs complain of. (Db25-27).

Hence, Defendants' claim that "analysis or evidence addressing Intamin's culpability for failing to warn Dr. Fabricant is noticeably missing from the record" rings hollow in the face of the following:

- Engineer Pribonic's extensive analysis of Defendants' violations of N.J.A.C. 5:14A-7.2, N.J.A.C. 5:14A-9.34 and ASTM F1193-6 (Exhibit "F", at 9-10, 16) – and violations of *their own* guidelines (id. at 7-9).

- Defendants' "rider height warnings" visible to Kingda Ka riders (Yannacone 11/11/22 report, Dfdt. Exh. I, at 4) *nowhere* state a *maximum* rider height for Kingda Ka, but only a *minimum* (id.). Contrast, N.J.A.C. 5:14A-9.34(e) ("a legible sign in plain view of the riding public indicating *the height restriction* for that ride. *Any other limitations* on who can use the ride shall be clearly stated on the sign.") (Pribonic 6/2/22 report, at 9).

In sum, Defendants' failure-to-warn analysis ignores the Second Amendment Complaint, the discovery record, the New Jersey Products Liability Act, N.J.S.A. 2A:58C-4, and the case law. Thus, regarding warnings, as with every other claim in this action, Defendants' Motion for Summary Judgment falls short of disproving the presence of fact issues, and should be rejected in its entirety.

23

SA447

**III.  CONCLUSION.**

For all the foregoing reasons, the Intamin Defendants' Motion for Summary Judgment

should be denied.

Respectfully submitted,

Dated:  September 16, 2024                    By:  _/s/ G. Martin Meyers_____
                                                    G. MARTIN MEYERS (5833)

24

SA448

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

_____

| | |
|---|---|
| CHRISTOPHER FABRICANT, M.D. and MALIKA FABRICANT, Husband and Wife, | :<br>:   Civil Action no. 3:19-cv-12900-GC-JBD<br>: |
| Plaintiffs, | : |
| v. | : |
| INTAMIN AMUSEMENT RIDES INT. CORP. EST., INTARIDE LLC, INTAMIN LTD, INTERNATIONAL AMUSEMENTS INC., INGENIEUR-BÜRO STENGEL GmbH, MARTIN & VLEMINCKX  LTD., LTD., MARTIN & VLEMINCKX USA, LLC, SIX FLAGS GREAT ADVENTURE, LLC, SIX FLAGS THEME PARKS  INC., JOHN DOES 1-20 and ABC CORPORA-TIONS 1-10, | :<br>:<br>:<br>:<br>:   **CERTIFICATE OF SERVICE**<br>:   _Electronically Filed_<br>: |
| Defendants. | : |

_____

_____

## PLAINTIFFS' RESPONSE TO INTAMIN DEFENDANTS'
## "STATEMENT OF UNDISPUTED MATERIAL FACTS"

_____

1.      Plaintiff Christopher Fabricant (hereinafter "Dr. Fabricant") initiated this action based on the allegation that Dr. Fabricant sustained injuries riding the Kingda Ka rollercoaster at Six Flags Great Adventure ("Six Flags") in Jackson, New Jersey on or about April 23, 2017.  _See_ Second Amended Complaint attached hereto as Exhibit D at ¶¶ 17, 21–22, 25–27.

     **Response**:      Admitted.

2.      Six Flags commissioned Intamin, Ltd., a company specializing in the design and construction of amusement park rides, to design the Kingda Ka rollercoaster for the Six Flag Great Adventure theme park in Jackson, New Jersey.  _See_ June 3, 2021, Deposition of Sandor Kernacs attached hereto as Exhibit B at 19:20–25, 20:1–25.

     **Response**:      Plaintiffs lack knowledge (other than this party testimony) from which to admit or deny this statement.

SA449

3.      Kingda Ka was built and opened in 2005.  *See* Exhibit B at 39:6–13; s*ee also* Expert Report of Edward Pribonic attached hereto as Exhibit A at 4; *see also* Kingda Ka Wikipedia Page produced by Plaintiff attached hereto as Exhibit M.

      **Response**:      Admitted as to year of opening.  Plaintiffs lack knowledge on which to affirm or deny construction dates for Kingda Ka, which (from the Wikipedia article) appears to predate 2005.

4.      Intamin President Sandor Kernacs visited the park and inspected the location where the ride would be built.  Exhibit B at 20:1–9.

      **Response**:      Plaintiffs lack information based on which to admit or deny this party statement, which appears to have no relevance to the seats, restraints and signage at issue in this action.

5.      Mr. Kernacs oversaw the creation of a "custom design" for the rollercoaster.  Exhibit B at 20:22–25.

      **Response**:      Plaintiffs lack information on which to admit or deny this statement, which lacks relevance to the seats, restraints and signage on Kingda Ka.

6.      Intamin custom designs each rollercoaster, "according to the customer's wishes." Exhibit B at 71:6–7.

      **Response**:      Plaintiffs lack information sufficient to admit or deny this statement, which, if true, demonstrates that Intamin designed  Kingda Ka without regard to rider safety and makes "the customer" a guarantor of safety.

7.      The rollercoaster utilizes a complex restraint system comprising many parts, manufactured by different companies.  Exhibit B at 52:15–25.

      **Response**:      Plaintiffs lack basis to admit or deny this statement.

8.      The restraint system for Kingda Ka was explicitly designed for Kingda Ka and includes variations that make it different from other restraint systems.  Exhibit B at 58:1–4.

      **Response**:      **Denied** as to Defendant's insinuation that its "explicit" design is/was a *custom* or *unique* design.  As shown in Exhibit "E" at 7, 9, 11, 13, 15, 17, 19, 23, 30, the "restraint system" on Kingda Ka is identical to those incorporated by Intamin into several other roller coasters, including

9.      The Kingda Ka restraint system is not identical to the restraint system on other rollercoasters designed by Intamin.  Exhibit B at 60:11–23, 61:3–4.

SA450

**Response**:    **Denied**. Contrary to this bald party assertion, as shown in Exhibit "E" at 7, 9, 11, 13, 15, 17, 19, 23, 30, the "restraint system" on Kingda Ka is identical to those incorporated by Intamin into

10.     Additionally, the Kingda Ka seats were custom-designed for the rollercoaster. Exhibit B at 104:19–25, 105:1–2. Intamin does not "have a seat that [it] can put in on any roller coaster. All of them are custom." Exhibit B at 64:12–13.

**Response**:    **Denied**. Contrary to this bald party assertion, as shown in Exhibit "E" at 7, 9, 11, 13, 15, 17, 19, 23, 30, the seats on Kingda Ka are identical to those incorporated by Intamin into several other roller coasters, including

11.     Kingda Ka warns its riders to keep their head against the headrest through signs posted around the ride and on the backs of the seats facing riders. Exhibit B at 76:15–19, 78:1–4.

**Response**: **Denied**. "There were no visible warnings on the seat, or on the harness device" (Dfdt. Exh. D, at 8, ¶ 20). Plaintiffs further **Deny** that Defendants believed at any time that such signage is needed, since (as stated by CEO Kernacs under oath, where quoted by Defendant) "if anybody has any common sense, would figure it out" (Dfdts. Exh. B, 6/3/21 Tr. 78:2-4). Plaintiffs further **Deny** that complying with Defendants' warnings at Exhibit "P", at 48 ("keep their head against the headrest") would have overcome the extraordinary forward and downward G-forces of Kingda Ka on Plaintiff's head on 4/23/17 or would have prevented the whiplash injuries he suffered then and following. See Exhibits "I", "Q", "R".

12.     One of these warnings reads, "This Ride May Not Accommodate Guests of a Larger Size. Please Utilize the Test Seat Prior To Waiting In Line." *See* Expert Report of John Yannacone attached hereto as Exhibit I at 4, Figure 8.

**Response**: Admitted. **Denied** that such a vague warning ("Guests of a Larger[sic] Size" – "Larger" than what?) would have prompted Plaintiff Christopher Fabricant, M.D. – or any rational customer of his size – to avoid Kingda Ka.

13.     Prior to opening the ride, Intamin provided Six Flags with operation manuals, which were reviewed several times and approved by the state of New Jersey. Exhibit B at 30:7–15.

**Response:** Admitted that Intamin furnished SFGA with operators' instructions. Plaintiffs lack information sufficient to admit or deny the balance of this statement.

14.     Mr. Kernacs visited the park after Kingda Ka was operational and witnessed Six Flags employees enforcing Intamin's requirements for safe ride operation. Exhibit B at 35:8–20.

**Response:**

Plaintiffs lack information on which to admit or deny this statement.

3

SA451

15.     On the date of the incident, Dr. Fabricant allegedly rode the rollercoaster with his son, Nicolas Arnaud Fabricant, and Nicolas's two friends after waiting in line for approximately 10–15 minutes. Exhibit D at ¶ 18; *see also* April 5, 2021, Deposition of Dr. Fabricant, attached hereto as Exhibit H at 92:15–24, 93:1–4.

**Response:**

**Admitted**, except for "allegedly".

16.     Before riding the rollercoaster, riders have the opportunity to sit in a test seat, which is a replica of the seat used in the rollercoaster, to test their fit and comfort level in the seat before boarding the rollercoaster.

**Response:**

**Denied** that hunting around for a such a seat and sitting on such a seat in non-moving conditions is a "test" of "fit".  **Admitted** that the test seat pictured in the photographs of plaintiff at pp. 11 and 14 of Engineer Pribonic's 6/2/22 report (Dfdt. Exhibit A) "is a replica of the seat used in the rollercoaster", as Defendants admit.

17.     Dr. Fabricant testified that he did not recall seeing or sitting in the test seat. Exhibit H at 130:15–24; *see also* Exhibit B at 49:21–23.

**Response:**

**Denied**.  Dr. Fabricant sat in the test seat when photographed by his son.  (Exhibit "T", 4/5/21 Tr. 129:8-130:14).

18.     While he was waiting to board the ride, Dr. Fabricant claimed that he had read one overhead sign at the station, which gave instructions on how to safely ride the rollercoaster, but had not read any other signs surrounding the ride. Exhibit H at 96:16–24, 97:1–12, 121:2–10.

**Response:**

**Admitted** as to the time in which Plaintiff waited to board Kingda Ka.  **Denied** that Plaintiff did not read any other signs in the vicinity of the ride.  (Exhiti "T", Tr. 95:21-96:18).

19.     Dr. Fabricant also received verbal instructions on how to safely ride the rollercoaster from a recorded message that plays before every ride. Exhibit H at 97:13–24, 98:1–8.

**Response:  Admitted**.

20.     Dr. Fabricant testified that he was aware of the height requirements for Kingda Ka before he rode the rollercoaster. Exhibit H at 101:14–24, 102:1–11.

SA452

**Response:**

**Denied**.  Plaintiff testified that he believed ("I suspect") that he "had an independent recollection of the height requirements for Kingda Ka" when his guests boarded, as to minimum required heights for children.  (Exhibit "T", Tr. 100:16-103:5).

21.    The ride can accommodate guests as tall as 77 inches. *See* Report of Edward M. Pribonic attached hereto as Exhibit A at 10. Dr. Fabricant is 74 inches tall.  *See* Report of Albert J. Todd attached hereto as Exhibit P at 1.

**Response:**

**Denied.** *Defendants* set the upper limit on rider height for riders of Kingda Ka at 77 inches.  However, as shown by Dr. Fabricant's experience on 4/23/17, the ride was not safe for a person 74 inches tall.

22.    When Dr. Fabricant got on the rollercoaster, he sat in a car near the back of the train, with his son Nicolas. Exhibit H at 182:13–23, 185:2–14.

**Response:  Admitted**.

23.    Dr. Fabricant claims that when he sat in the seat on the Kingda Ka car and pulled the harness down over his body, the harness was too tight, so he summoned a ride attendant from Six Flags to help him. Exhibit D at ¶ 19.  Exhibit H at 140:3–24, 141:9–24.

**Response:  Admitted.**

24.    The attendant caused the harnesses to loosen and Dr. Fabricant was able to readjust the harness to a position that felt comfortable. Exhibit H at 142:3–16.

**Response:  Admitted,** except that Plaintiff denies that he was able to adjust the harness at all.

25.    Dr. Fabricant testified that his head—"[a]t least the lower part of [his] occiput"—was against the back of the seat when he sat down and that he kept his head back for the duration of the ride. Exhibit H at 144:21–24.  He did not have any concern about where his head was contacting the headrest at the time of the ride. Exhibit H at 217:12–21.

**Response:  Admitted in part.  Denied** that Plaintiff "did not have any concern about *where his head was contacting the headrest*" (emphasis supplied).  That is a misquote. Plaintiff testified that he was not concerned "at that point about whether [he] would be able to safely ride the ride" (Exhibit "T", Tr. 144:17-19).

26.    Dr. Fabricant alleges that when the ride began, he felt the harness force[sic] against the top of his shoulders and lock tighter as the ride progressed.  Exhibit D at ¶ 20; Exhibit H at 188:5–8.

**Response:  Admitted.**

27.    He [Plaintiff] claims that he felt pain on his shoulders for the duration of the ride, but that the pain subsided once the ride ended. Exhibit D at ¶ 20. Exhibit H at 187:17–20; *see also* April 8, 2021, Deposition of Dr. Fabricant, attached hereto as Exhibit N at 242:6–8.

**Response:**

**Denied**.  Plaintiffs' 7/6/20 answers to Interrogatories of Defendant SFGA read in part:

When the harness was unlocked and sprang upward, Plaintiff felt the unbearable pain immediately lessen. However, after the ride, Plaintiff's shoulders, especially the right one, continued to cause him considerable pain, but the pain did not prevent him from driving Nico and Nico's friends home, or from returning to work the next day.
. . .
Two days after the roller coaster ride, [Plaintiff] noticed numbness of his hands. By three weeks, he was suffering numbness of hands and feet, burning pain of back and extremities, and weakness and spasticity of his lower extremities. During the progression, he was evaluated by physicians specializing in sports medicine, orthopedic surgery, and neurology.

When the progression became associated with spasticity and weakness of his lower extremities, Plaintiff sought care in the Emergency Department at Jersey Shore University Medical Center (Saturday, May 13, 2017), where the worsening and criticality of his condition became clear. He was diagnosed with progressive cervical myelopathy, associated with acutely ruptured (C3/C4, C4/C5) and bulging (C5/C6) intervertebral discs. His condition was judged to be grave. He underwent emergent surgery the next day at the Hospital for Special Surgery (Mother's Day, Sunday, May 14, 2017), to decompress the spinal cord and to fuse the vertebrae adjacent to the ruptured discs. That is, he underwent anterior decompression and fusion of the cervical vertebrae, C3 through C5. . . . After the surgery, Plaintiff's symptoms were improved but not resolved and then worsened again, such that a second surgery was required (June 5, 2019). The second surgery included posterior cervical laminoplasty and laminectomies (C3 through C7).

(Pltfs. Exhibit "S", at 6).

28.    When the ride was over, Dr. Fabricant did not report that he had felt pain during the ride to the Six Flags ride attendants, his son, or his wife. Exhibit H at 149:9–17, 150:4–24.

**Response:**

**Denied**.  In answer to counsel's very direct question, Dr. Fabricant testified he did not report to any SFGA employee *that he was injured* – "I didn't know that I was injured. I knew I had pain. He further testified that he did not report to any SFGA employee "that

6

you had *a very severe pain for the duration of the ride*", in the words of counsel's yes-or-no question.  (Exhibit "T", Tr. 149:8-17, emphasis supplied).

29.    Dr. Fabricant allegedly began to experience pain in his neck about a week and half after riding Kingda Ka. Exhibit N at 247:10–15.

   **Response:**

   **Denied.**  Dr. Fabricant's Deposition, where cited, says no such thing.

30.    Ultimately, Dr. Fabricant claims that as a result of the single ride on Kingda Ka, he ruptured two intervertebral discs in his cervical spine, which resulted in three surgeries. Exhibit D at ¶ 26.

   **Response: Admitted.**

31.    Dr. Fabricant's surgeries were on May 14, 2017, June 2019, and June 2021.  Exhibit D at ¶ 26; Exhibit N at 250:5–13.

   **Response:  Denied** that the Amended Complaint or Plaintiff's 4/8/21 Deposition, where cited, say any such thing.

32.    After speaking with an attorney about a possible personal injury claim, Dr. Fabricant returned to the park in the fall of 2017 to conduct a personal investigation of "what posted warnings were present at the roller coaster."  *See* June 3, 2021, Deposition of Dr. Christopher J. Fabricant, attached hereto as Exhibit O at 426:14–24, 427:1–24, 428:16–19.

   **Response:  Admitted in part.**  Plaintiff also returned to the park to comply with the wishes of his son Tebow.  (Dfdt. Exh. O, 6/3/21 Tr. 426:14-20).

33.    Dr. Fabricant returned again to the park with his two sons in April of 2019, to gather information for his lawyer. Exhibit H at 171:13–22.

   **Response:  Admitted.**

34.    Dr. Fabricant and his sons brought a GoPro HERO camera and cell phones for the purpose of taking photographs and videos of the Kingda Ka rollercoaster's signage and notices. Dr. Fabricant also was photographed by one of his teenage sons sitting in the Kingda Ka test seat during this visit. [Dfdts' FN:  Notably, this single photograph is used as the sole basis for both of Plaintiff's liability experts and their reports.]  Exhibit H at 173:12–24, 174:12–20.

   **Response:**

   **Denied** that Plaintiff and his sons brought cell phones "for the purpose of taking photographs and videos of the Kingda Ka rollercoaster's signage and notices."  Plaintiff did not testify that.  **Denied** that "this single photograph is used as the sole basis for both

7

SA455

of Plaintiff's liability experts and their reports", which is unsupported by the record cited or indeed by anything in the discovery record herein.

35.      Dr. Fabricant testified that the photograph his son took reflected his recollection of "what the Kingda Ka seat that [he was] seated in during [his] ride on April 23rd, 2017 looked like." *See* Expert Report of Edward Pribonic attached hereto as Exhibit A at 10. Exhibit H at 200:1–13.

      **Response: Admitted.**

36.      On April 30, 2019, Plaintiffs filed a Complaint in New Jersey Superior Court. *See* Dkt. 1, Exhibit A (Original Complaint).

      **Response:**

      **Denied**.  The Complaint was filed April 18, 2019, OCN-L-000974-19 , Trans ID: LCV2019690556.

37.      On May 15, 2019, Plaintiffs filed an Amended Complaint in New Jersey Superior Court. *See* Dkt. 1, Exhibit B (Amended Complaint).

      **Response: Admitted**.

38.      On May 24, 2019, Defendant Six Flags filed a Notice of Removal to remove the case to the U.S. District Court of New Jersey. Dkt. 1.

      **Response:**

      **Response: Admitted**.

39.      On June 14, 2019, Defendants Intamin and Intaride filed a Motion to Dismiss Plaintiffs' Amended Complaint. Dkt. 8.

      **Response:**

      **Denied**.  On that date Defendant Interide LLC filed a Motion for dismissal.

40.      On June 20, 2019, Plaintiffs filed a Motion to Remand. Dkt. 10-5. All Defendants opposed this Motion. Dkt. 13, 14. The Court denied Plaintiffs' Motion to Remand on July 24, 2019. Dkt. 23, 24.

      **Response:**

      **Admitted**, except that the Opposition to Motion to Remand was filed on behalf of Defendant Interide LLC.

SA456

41.    On July 11, 2019, Plaintiffs filed a Motion for Leave to File a Second Amended Complaint. Dkt. 19. The Court granted this Motion on August 12, 2019. Dkt. 30.

      **Response:**

      **Admitted, except** that the same Order also Denied Defendant's Motion to Dismiss which was based on "statute of repose" grounds.  (Id.).

42.    Plaintiffs filed the Second Amended Complaint on August 13, 2019. Dkt. 32. The Second Amended Complaint (SAC) is the basis for the current litigation.

      **Response:  Admitted.**

43.    In the SAC, against Defendants Intamin and Intaride, Plaintiffs alleged that Kingda Ka had a defect in design or manufacture because it uses "harness devices with an unrestricted capacity to 'lock down'" and because its seats are "insufficient in their size and design to protect individuals . . . whose upper bodies extend *above* the rear of the seat backs." Exhibit D at ¶¶ 31–33.

      **Response:  Admitted.**

44.    Further, Plaintiffs alleged that Defendants Intamin and Intaride failed to warn riders "with larger and taller body frames" that they could not safely ride Kingda Ka. Exhibit D at ¶¶ 35–36.

      **Response:**

      **Denied**.  Plaintiffs allege failure to supply *"adequate"* warnings (Dfdt. Exh. D ¶ 35).

45.    Plaintiffs also alleged against Defendants Intamin and Intaride breaches of express and implied warranties. Exhibit D at ¶¶ 41–42.

      **Response:  Admitted.**

46.    Additionally, Mrs. Fabricant asserted a loss of consortium claim. Exhibit D at ¶ 44.

      **Response:  Admitted.**

47.    On August 27, 2019, Defendants Intamin and Intaride filed a Motion to Dismiss the SAC. Dkt. 34.

      **Response:  Admitted.**

SA457

48.      On January 23, 2020, Intamin's Motion to Dismiss was granted in part, dismissing Plaintiffs' warranty claims, and Mrs. Fabricant's loss of consortium claim.  Dr. Fabricant is the only remaining Plaintiff. Dkt. 43.

  **Response:  Admitted** (Dkt # 44).

49.      On April 23, 2023, the parties engaged in Arbitration before Gerard H. Hanson over Plaintiff's two remaining claims—design defect and failure to warn. Dkt. 102.

  **Response:  Admitted,** except that arbitration took place April 6, 2023.

50.      On October 27, 2023, Plaintiff wrote a letter to the Court demanding a Trial De Novo. Dkt. 103.

  **Response:  Admitted.**

51.      On January 24, 2024, the Court entered an order stipulating the dismissal with prejudice of Plaintiff's alleged economic damages arising from loss of wages, income, future earnings, future earning capacity, and household services. Dkt. 111.

  **Response:  Admitted.**

52. The Parties have engaged in discovery, including depositions of expert witnesses.

  **Response:  Admitted.**

53.      Plaintiff relies on Edward Pribonic to support his argument that Kingda Ka's seats and restraints are defectively designed. *See* Expert Report of Edward Pribonic attached hereto as Exhibit A.

  **Response:  Admitted,** except that Plaintiffs also rely on the opinions and conclusions of Col. John H. Smith, PE.

54.      Plaintiff also relies on Colonel John Smith to support his design defect argument. *See* Expert Report of John Smith attached hereto as Exhibit E.

  **Response:  Admitted,** except that Plaintiffs also rely on the opinions and conclusions of Edward M. Pribonic, PE.

55.      Mr. Pribonic admits he has no knowledge, exposure, or experience with the development and production of Intamin's seats and restraint systems.  *See* July 9, 2024, Deposition of Edward M. Pribonic attached hereto as Exhibit C at 166:17–24.

  **Response:**

SA458

**Denied**. Pribonic, where quoted, testified he had never personally *participated* in "production" of roller coaster seats, but testified at length about his knowledge of the process. He said *nothing*, where cited by Defendant, about his knowledge of "development" of Kingda Ka seats. (Exhibit "L", Tr. 164:25-166:24). The testimony ran thus:

> Q. Do you have any experience in the production of roller coaster seats?
> A. Roller coaster seats? No. I thought you said roller coasters.
> Q. No. I said roller coaster seats. The whole question was roller coaster seats.
> A. No, I have never produced a roller coaster seat.
> Q. So, I guess, let's circle back to -- you commented that it was a broad question. What do you know about the production of roller coaster seats?
> A. I know the general process.
> Q. Okay. What is that?
> A. Well, it depends on the type of seat. You have got wooden bench seats. We have aluminum padded seats. We have fiberglass lay-up seats. We can vacuum formed seats. It's a whole variety of things. I mean, you have got to be a little more specific. I will tell you whether I know anything about it.
> Q. Do you know anything about the production of Kingda Ka seats?
> A. Nothing in particular, other than it appears to be a lay-up of fiberglass. There aren't any indications on the drawings of how they want it produced.
> Q. What do you know about the production of restraint systems?
> A. Pretty much the same. I know generally how they work. I know how they are produced. I have inspected them, disassembled some. Their production is the same as all machine parts. It goes into a shop, parts are fabricated, fitted together, assembled, tested.
> Q. Have you ever been to Intamin's manufacturing facilities?
> A. No.
> Q. Do you have any knowledge, exposure or experience with the development and production of the seats and restraint systems at Intamin?
> A. No, and I would imagine it would depend on where Intamin is having it produced. Because they produce their parts all over Europe.

    (Id.).

56.    Mr. Pribonic admits to knowing "[n]othing in particular" about the production of Kingda Ka's seats. Exhibit C at 165:25.

**Response: Denied.** Defendant seems intent on conflating manufacture and design into its pet mushword "production". Moreover, this is a half-quote. Pribonic's statement runs as follows:

Q. Do you know anything about the production of Kingda Ka seats?
A. Nothing in particular, *other than it appears to be a lay-up of fiberglass.* There aren't any indications on the drawings of how they want it produced.
Q. What do you know about the production of restraint systems?

11

SA459

A. Pretty much the same. I know generally how they work. *I know how they are produced. I have inspected them, disassembled some.  Their production is the same as all machine parts.* It goes into a shop, parts are fabricated, fitted together, assembled, tested.

(Dfdt. Exh. C, Tr. 165:25-166:13, emphasis supplied).

57.     More broadly, Mr. Pribonic has no experience in the production of rollercoaster seats. Exhibit C at 165:2–7. Mr. Pribonic has similarly limited knowledge of the production of restraint systems. Exhibit C at 166:4–6.

**Response:**

This proposition is too vague to allow of affirmance or denial ("experience in the production[sic]", "similarly limited knowledge"), but seems to rely on Defnedants' pet mushword "production" and on cherrypicked half-quotes from Pribonic's Deposition. Please see immediately preceding response for fuller answer.

58.     Despite this being his second case regarding Kingda Ka, Mr. Pribonic never inspected the rollercoaster, nor did he perform any testing or analysis to determine its dynamics. Exhibit C at 57:7–16.

**Response:**

**Denied**.  Where cited here, Pribonic testified that he did not travel to SFGA to inspect the coaster for this case.  As to Engineer Pribonic's analysis of Kingda Ka seat back and restraint design defects, alternative seat and restraint designs currently on the market, and Defendants' violations of New Jesey statute and regulations, please see Plaintiffs' Brief at 10-14, 21-22.

59.     Perhaps due to his limited knowledge and investigation, Mr. Pribonic's report offers only vague and scientifically unsupported conclusions that "[e]xtending the seat height is an obvious and simple solution. Taller seats exist on many other roller coasters around the world." Exhibit A at 13.

**Response:**

Plaintiffs cannot affirm or deny Defendants' vague opinions "limited knowledge and investigation" and "vague and scientifically unsupported conclusions".  **Denied** that Pribonic's analysis of alternative coaster seat back designs is limited to the statements Defendants cherry-pick here.  Please see Dfdts. Exh. A, at 13-14, analyzing the differences between Kingda Ka and the seat backs on El Loco in Law Vegas, NV; Pribonic 8/16/24 Decl. ¶ 6, regarding the stark difference in neck injuries from Kingda Ka and the taller seat backs on El Loco from 2011 to 2018; and Pltfs. Exhibit "K", Tr. 70:1-71:25 (admission of Intamin President Sandor Kernacs that El Loco's seats are visibly taller and that Intamin could have easily provided taller seat backs at little

12

SA460

additional cost but chose not to).  Additional taller roller coaster seat backs already in use in the real world are filed herewith as Plaintiffs' Exhibits                    .

60.    Col. Smith offers similarly vague conclusions that Dr. Fabricant would not have sustained his alleged injuries "[h]ad the seat supported [his] entire head."  Exhibit E at 9. He offers no feasible alternatives. *See* Exhibit E at 6.

**Response:**

**Denied** that Colonel Smith's conclusions were "vague".  To the contrary (quoting Colonel Smith's 6/3/22 "Conclusions" *only* and omitting his preceding lengthy and rigorous analysis):

1.  The motion of Dr. Fabricant is dictated by the Laws of Physics. One law that specifically applies is Newton's First Law of Motion. This effectively states an object at rest remains at rest unless acted upon by an outside force and an object in motion remains in motion unless acted upon by an outside force.
    Originally, Dr. Fabricant was an object at rest and his head and neck were at rest relative to each other. As the ride began, the seat was propelled into Dr. Fabricant's torso. Due to his size, his head was not fully supported. As the seat was projected forward and Dr. Fabricant's head obeyed Newton's First Law of Motion this placed him next into extension. The seat does not appear to be perfectly vertical. This alignment would bring the seat in as an inclined plane which results in ramping and increased the flexion.
    At the end of the extension phase, the head is put into motion and continues in motion until acted upon by an outside force. As the torso is projected forward, the restraint system retards the movement and the head that has been put into motion overtakes the torso. At this point, the head and neck move into flexion.
    During the extension phase the back of the neck is in compression and the front of the neck is in tension. The spinal segments do not all move as a rigid object resulting in localized shearing and torquing. During the flexion phase the back of the neck is in tension and the front of the neck is in compression. The spinal segments do not all move as a rigid object resulting in localized shearing and torquing. Had the seat supported Dr. Fabricant's entire head, the extension/flexion process would either not have occurred or would have been greatly reduced in severity. As an example, research by Emori revealed that whiplash injuries were more pronounced when there was not a proper headrest in a vehicle.
2.  As a result of the lack of support to his head, Dr. Fabricant was subjected to forces much more severe than those normally encountered. [Footnote omitted]. The injuries reported are consistent with the locations of applied forces in this collision and the types of injuries known to occur in events with displacement from the rear. (The referenced data is merely one of numerous sources available.) [Footnote omitted,]
    <u>Cervical</u>
    The diagnosed cervical injury matches the applied forces that occur during the extension/flexion process. During this process, the cervical pivoted about the top of

13

SA461

the seat. The adjacent areas were also stressed to different degrees based on the Dr. Fabricant's position.

During the event, Dr. Fabricant's entire cervical column was subjected to tension, compression and shearing. Cervical injuries, including herniated discs, are associated with impacts from the rear.

This motion has been extensively studied in rear impacts with a similar type of motion. [References to 22 authorities listed in Appendix omitted.]

3. The severity of the event was aggravated by the motion of the ride after the initial flexion and extension as the cars went around the curves. The initial acceleration was the most severe. However, as the ride continued forces were imposed on structures that had already been subjected to a variety of forces including shearing, compression and tension. If a region has been previously damaged, injured or has degeneration, it requires less energy to damage the region again. [References to 4 authorities in Appendix omitted.]

4. The testimony of Mr. Kernacs indicates his firm did not evaluate the safety in terms of biomechanics. [Footnote omitted.] Mr. Kernacs state that is not required and never has been done because "we are measuring accelerations and forces with accelerator meters in accordance with the ASTM standards." [Footnote omitted.] This demonstrates a lack of adequate attention to safety. It should have been obvious to anyone with the proper background that the entire head need to be supported under the rapid acceleration. If the builder is relying on peak acceleration values, this oversimplifies the effect on the rider and is insufficient to determine issues of safety.

(Defendants' Exh. E, at 9-10).

61.    Mr. Pribonic did *not* produce**[sic]** a design that would support these seat height extensions, claiming that "[t]here is no design necessary to support [his assertion]." Exhibit C at 170:15–18, 172:17–20. He further testified:

Q: Is there any schematic or drawing that [you] Ed Pribonic drafted or put together?
A: No.
Q: Is there anything that you designed that would show or demonstrate the extension of a seat height?
A: No.
Exhibit C at 172:10–20.

**Response:**

**Denied**. Defendants rely, again, on the mushword "produce" to conflate *discovery production* of alternative designs with personally *creating* alternative designs. Engineer Pribonic repeatedly admitted that he himself did not design an alternative roller coaster seat or restraint harness, but described at length in his report (with pictures) a superior alternative design that has been in use for years in the real world, namely El Loco in Las Vegas, NV. (Exhibit "F", at 14). Details of the vastly safer performance of this seat design (which uses no shoulder straps or restraints) are found in Exhibits C – D to Mr. Pribonic's 8/16/24 Declaration filed herewith (Exhibit "J").

14

SA462

62. Mr. Pribonic also failed to consider whether the design risks of Kingda Ka's seats outweigh their utility or the effects of an extended seat on the utility of the ride. He testified:

> Q: Did you do any kind of utility analysis as to the risk that would happen if the seat was extended?
> A: No.
> Q: Did you conduct a rider track analysis of extended seat backs?
> A: No. All of that is not my job; that's the job of Intamin.

Exhibit C at 173:2–9.

**Response:**

**Denied.** Mr. Pribonic treated the risk and utility of Kingda Ka's seats versus those on El Loco in his report (Dfdt. Exh. A, at 11-16). To the degree Defendants did perform such an analysis (Intamin President Sandor Kernacs admitted under oath that El Loco's seats are visibly taller thank Kingda Ka), Defendants determined that Intamin could have easily provided taller seat backs at little additional costn but chose not to (Exhibit "K", Tr. 70:1-71:25). Additional taller roller coaster seat backs already in use in the real world are filed herewith as Plaintiffs' Exhibit "M". Creating a safer seat back was, as Pribonic, testified, the task of Defendants, who chose not to do it. (Id.).

63. Mr. Pribonic's expert analysis consisted only of a comparison of a schematic of another rollercoaster and the single photo of Plaintiff in the test seat, over which he imposed a few red lines. Exhibit A at 14.

**Response:**

**Denied**. The following is only a summary of the materials Engineer Pribonic reviewed and analysis he performed in arriving at his opinions:

a. Mr. Pribonic's lengthy analysis of Defendants' violation of industry standards, New Jersey state regulations and Defendants' own safety guidelines (Exhibit "F", at 6, 8-11, 16);

b. Mr. Pribonic's recitation of the precise G forces on Plaintiff's head and neck during his Kingda Ka ride (id. at 15), and of Defendants' *refusal* to produce their existing analyses of Kingda Ka seats and rider harnesses as requested in discovery (id. at 15-16);

c. his photographic comparison between a Kingda Ka seat with Plaintiff in it, on the one hand, to adult male riders on "El Loco" in Las Vegas (id. at 14); and

d. his reference to the uncontroverted 8/9/21 causation opinion of Plaintiff's spine surgeon, Todd J. Albert, M.D. (Exhibit "F", at 5; Exhibit "N" at 2).

15

SA463

Plaintiffs shredded Defendants' silly pretense in much greater detail over 11 pages of their 8/20/24 Brief (Dkt #123) in opposition to Defendants' Motion to bar Pribonic's testimony and opinions.  Please see.

64.     Mr. Pribonic only offered the reductive conclusion that, because one other rollercoaster has higher seat backs, so, therefore, could and should the Kingda Ka:

> Q. Is your report limited, when it comes to this alternative design, to putting the schematic for an El Loco seat next to a picture of Christopher Fabricant in a Kingda Ka seat?
> A. That's all I put in the report.

Exhibit C at 172:21–25, 173:1.

**Response:**

**Admitted** that El Loco is the only roller coaster seat design with higher (and safer) backs which Pribonic put in his report.  **Denied** that (as Defendants insinuate) there are no other such designs (including those by Defendants!).  Please see Plaintiffs' Exhibit "M".

65.     Equally unsupported[sic] is Mr. Pribonic's conclusion that "the Intamin restraint contains un-necessary shoulder straps which provide no safety purpose and can prevent proper positioning of the lap bar due to its defective design."  Exhibit A at 16.

**Response:**

**Denied**.  As they frequently do, Defendants ignore the record.  See Exhibit "F", at 6-7, 10, 16, giving Mr. Pribonic's reasons for concluding that Kingda Ka's shoulder restraints were excessively restrictive and likely to prevent proper positioning of the riders' lap bars, which *were* necessary restraints.  (Id.).

66.     Mr. Pribonic claims that his diagrams "illustrate the obvious shortcoming of the Kingda Ka…restraints." Exhibit A at 11. The figures and their accompanying discussion, however, focus on the seat height and never[sic] discuss the harness restraints. *See* Exhibit A at 11–14.

**Response:**

**Denied**.  *See* Exhibit "F", at 6-7, 10, 16, giving Mr. Pribonic's reasons for concluding that Kingda Ka's shoulder restraints were excessively restrictive and likely to prevent proper positioning of the riders' lap bar, which in his opinion *was* necessary to keep him properly placed in his seat, with his head in contact with the headrest and seat back. (Exhibit "L", Pribonic Tr. 151:18-22).

67.     In any case, Mr. Pribonic agreed that the tightness of the restraints would have no effect on Dr. Fabricant's neck:

> Q. Isn't it true that the tightness of the shoulder restraint is completely unrelated to the forces experienced on the neck?

A. Yes.

Q. And, again, is there anything that you read in your appendix, any of the medical records, any of the deposition testimony that indicate any injuries whatsoever to plaintiff's shoulders?

A. No.

Exhibit C at 150:13–22.

**Response:**

**Admitted** that Pribonic so testified in his Deposition. **Denied** that Mr. Pribonic is a biomechanical engineer, or that Plaintiff's very real shoulder injuries (see Smith 6/3/21 report, Dfdts. Exhibit E, at 3, 7) had no role in producing his pain, neurological injuries and sequelae.

68.    Mr. Pribonic further testified:

Q: So is it your opinion that the restraint had no impact on his head and neck?

A. Yes.

Exhibit C at 152:12–14.

**Response:**

**Admitted** that Pribonic so testified in his Deposition. **Denied** that Mr. Pribonic is a biomechanical engineer, or that Plaintiff's very real shoulder injuries (see Smith 6/3/21 report, Dfdts. Exhibit E, at 3, 7) had no role in producing his pain, neurological injuries and sequelae.

69.    When asked about the design defects of restraints in his deposition, Mr. Pribonic initially addressed only the seatback:

Q. Now, you state in your report – we just talked about this -- on page 15 and 16, the language you use is: It's my opinion that Intamin failed to perform the required testing for the seats and restraints as required by the NJAC and ASTM standards. Do you agree -- actually, let me pull it up just for ease of reference. I am on page 16 of exhibit 1. Do you see that, Mr. Pribonic?

A. Yes.

Q. So, again: It is my opinion that Intamin failed to perform required testing for the seats and restraints. These defects render the seats and restraints unreasonably dangerous and defective. What defects are you talking about?

A. The seat back is too low for the 77-inch individual.

Exhibit C at 137:5–24.

**Response:**

SA465

**Admitted** that Mr. Pribonic so testified where quoted, in his Deposition. **Denied** as to Defendants' insinuation that Engineer Pribonic did not analyze or opine on the upper body restraints on Kingda Ka. *See* Exhibit "F", at 6-7, 16, giving Mr. Pribonic's reasons for concluding that Kingda Ka's shoulder restraints were excessively restrictive and likely to prevent proper positioning of the riders' lap bar, which in his opinion *was* necessary to keep him properly placed in his seat, with his head in contact with the headrest and seat back. (Exhibit "L", Pribonic Tr. 151:18-22).

70.     Further, Mr. Pribonic offered no design alternative for the restraints:
Q: What's a class 5 restraint?
A. Class 5 restraint is an individual restraint device that
has confirmation locking required and can only be locked
and unlocked by the attendants and some other criteria in
involved.
Q. Are class 5 restraints at issue here?
A. No.
Q. Not at all?
A. The restraint that's on Kingda Ka would classify as a
class 5 restraint. Whether a class 4 restraint would be
acceptable would be something that has to be determined
by the ride analysis, which wasn't done and not presented.
Q. And not something you did either?
A. No. I am not designing this coaster for Intamin.
Q. And you're also not designing a feasible alternative
either. We can agree on that, right?
MR. MEYERS: Objection.
THE WITNESS: I did not design an alternative.
Exhibit C at 176:3–25, 177:1–2.

**Response:**

**Denied** as to Defendants' insinuation that, because Mr. Pribonic did not personally *design* alternative restraints, he did not "*offer*" a "design alternative". To the contrary, he testified, "I presented an alternative that was already designed and exists" (Exhibit "L", Tr. 177:2-3) -- namely, restraints with upper body clearance calculated to fit persons stated by Defendants to be within their body size envelope (Exhibit "F", at 6, 7, 10). If more is needed, El Loco in Las Vegas,NV has <u>no</u> shoulder straps. (<u>Id</u>. at 14). If still more is needed, further pictures of roller coasters without shoulder straps can be found at Plaintiffs' Exhibit "M".

71.     Intamin experts mechanical engineer John Yannacone and biomechanical engineer Steven Rundell repeatedly debunk Mr. Pribonic's specious conclusions. *See* Expert Report of John Yannacone attached hereto as 6–7, 8–10. *See also* Expert Report of Steven Rundell attached hereto as Exhibit G at 39–44.

18

SA466

**Response:**

This proposition contains no assertion of fact which Plaintiffs can affirm or deny.

72.    Mr. Yannacone and Mr. Rundell both personally visited the Kingda Ka rollercoaster to perform an inspection to prepare their expert reports. Exhibit I at 2; Exhibit G at 9.

**Response:**

Plaintiffs lack personal knowledge on which to base an affirmation or denial of this proposition.

73.    On December 2, 2021, Mr. Rundell performed a comprehensive[sic] inspection and analysis on the Kingda Ka rollercoaster to determine the forces implicated and potential hazards. Exhibit G at 9.

**Response:**

Plaintiffs lack personal knowledge on which to base an affirmation or denial of this proposition  However, if Mr. Rundell cherrypicked the available record as Defendants have in their present Motions, it is highly unlikely any inspection and analysis by him is "comprehensive"[sic].

74.    During the inspection, his team took photographs, measurements, and a 3D laser scan of the rollercoaster's cars and the track in which the cars run. Exhibit G at 9.

**Response:**

Plaintiffs lack personal knowledge sufficient to affirm or deny this proposition.

75.    They[sic] also conducted ride testing with human volunteers on that same date. The purpose of the testing was to collect "ride vehicle accelerations and head accelerations of differently-sized, properly-restrained occupants." The testing included one "large" subject who measured 73 inches tall. Exhibit G at 12–13.

**Response:**

Plaintiffs lack personal knowledge on which to base an affirmation or denial of this proposition  However, the photographs of Mr. Rundell's specimen "large" rider in figs. 5 and 6 of his report (Dfdts. Exh. G, at 13-14) clearly show a man whose head rests *downward* on the Kingda Ka headrest, thereby buttressing Plaintiffs' case.  (Id.).

76.     Mr. Rundell used the data from this testing, along with a simulated full 3D motion model, to investigate the occupant dynamics experienced by Plaintiff during his ride on Kingda Ka. Exhibit G at 23.

SA467

**Response:**

Plaintiffs lack personal knowledge on which to base an affirmation or denial of this proposition, or its relevance to the gravamen of this case.  The critique by Col. John J. Smith, PE of Mr. Rundell's junk numbers and junk science (over strenuous objection by Defendants' counsel) can be found e.g. at Plaintiffs' Exhibit "H", Tr. 9:9-23, 11:8-12:1, 44:18-45:14, 63:9-17, 65:7-69:13, 121:24-123:5, 131:3-134:11.

77.    Mr. Rundell concluded that the compression and hyper-flexion of the spine required to cause or contribute to the type of disc bulge or herniation Plaintiff experienced "would not be forcibly induced by the subject ride." Exhibit G at 37.

**Response:**

Plaintiffs lack personal knowledge on which to base an affirmation or denial of this proposition, or its relevance to the gravamen of this case.  Col. John J. Smith, PE's pungent critique of Mr. Rundell's "junk science" (over strenuous objection by Defendants' counsel) can be found e.g. at Plaintiffs' Exhibit "H", Tr. 9:9-23, 11:8-12:1, 44:18-45:14, 63:9-17, 65:7-69:13, 121:24-123:5, 131:3-134:11.

78.    Mr. Rundell also concluded that the forces and motions experienced by Plaintiff during the ride are consistent with noninjurious physical activity such as "plopping in a chair." Exhibit G at 38.

**Response:**

Admitted that this is what Rundell says.  Accounts of blackouts experienced by Kingda Ka riders due to its extreme G forces can be found at Plaintiffs' Exhibit "Q".  Rundell also admits the max vertical acceleration on KK is 3g and the maximum back-to-front is 5g.  (Dfdts. Exh. G, at 15, 16).  This is greater than forces experienced by fighter pilots launching from Navy carriers wearing G suits.  (Exhibit "R", https://aviation.stackexchange.com/questions/25084/what-is-the-force-exerted-by-the-catapult-on-aircraft-carriers).

79.    On the other hand, Mr. Pribonic's conclusions, albeit few in number, as to the height of a rider and alleged defect are erroneously based on a study from 2000, on 40-year-old men in the general population, despite the injury happening nearly 20 years after the study and the Plaintiff being well over 50 years of age:
    Q. If I am reading this on page 12: The body size of a 40-yearold
    American male for year 2000 in one gravity conditions.
    That's what you just cited to as the basis for your deduction that
    he had a sitting height of 39.2 inches, right?
    A. Yes.
    Q. Okay. So this is a chart from the year 2000, relying on gravity
    conditions in the year 2000, for the body of a 40-year-old
    American male, right?

20

SA468

A. Yes.

Exhibit C at 105:20–25, 106:1–6**.**

**Response:**

This proposition lacks sense.  Plaintiffs **Deny** Defendants' absurd insinuation that American men, on average, grew or shrank significantly in 17 years or that a 10-year difference in age affects the safety guidelines pertaining to Kingda Ka riders of all ages.

80.    Mr. Pribonic's calculations also are derived from an "erect" individual as opposed to an individual's normal seated height for his data, which results in an increase in the seated height reported in the data. Exhibit G at 43.

**Response:**

**Denied**.  Pribonic based his conclusions on seated persons.  (Dfdt. Exh. A at 12-13).

81.    Both of Plaintiff's experts admit that they are unqualified to speak to the causal connection between Kingda Ka's seat design and restraint system and Dr. Fabricant's alleged injuries. [Citing *no record*]

**Response:**

**Denied**.  Colonel Smith stated he was not qualified to *diagnose* Plaintiff's injuries. (Exhibit "H", Tr. 158:5-6).  Regarding injury *causation*, Colonel Smith matched Plaintiffs' injuries – diagnosed by his treating physicians -- to his Kingda Ka experience:

> . . . if you look at the injuries that have been diagnosed, it's a common extension and/or flexion injury, very common.  And if you look at where he sits in that seat, he is going to go through extension and flexion. So yes, all those fit together, but whether or not he has an injury is a medical decision.

(Exhibit "H", Tr. 42:10-16).

82.    Mr. Pribonic conceded: "I don't evaluate injuries. I am not a biomechanical engineer. I don't offer biomechanical opinions." Exhibit C at 24:18–20. Biomechanical engineers, he explained, "evaluate specific injury. For instance, in this case, cervical areas injured and how that can occur and what sort of forces are necessary to induce that injury…I don't do that type of work." Exhibit C at 25:15–20.

**Response:  Admitted.**

83.    Mr. Smith made a similar concession: "I'm not going to opine on his injuries, but I can tell you what the laws of physics require…" *See* March 18, 2024, Deposition of John Smith attached hereto as Exhibit F at Smith at 159:5-7.

SA469

**Response:**

**Denied**.  Colonel Smith says no such thing where cited here.  Colonel Smith testified he was not qualified to *diagnose* Plaintiff's injuries.  (Exhibit "H", Tr. 158:5-6).  Regarding injury *causation*, Colonel Smith matched Plaintiffs' injuries – diagnosed by his treating physicians -- to his Kingda Ka experience:

> . . . if you look at the injuries that have been diagnosed, it's a common extension and/or flexion injury, very common.  And if you look at where he sits in that seat, he is going to go through extension and flexion. So yes, all those fit together, but whether or not he has an injury is a medical decision.

(Exhibit "H", Tr. 42:10-16).

84.    The Department of Community Affairs ("DCA") never found any deficiencies or violations regarding the warnings and instructions for potential Kingda Ka riders. *See* production from the New Jersey Department of Community Affairs, attached hereto as Exhibit J.

**Response:**

Plaintiffs lack personal knowledge to admit or deny Defendants' assertion that "deficiencies or violations regarding the warnings and instructions for potential Kingda Ka riders" were "*never*[sic] found".

85.    One month before the incident, an inspection found the signage to be acceptable. *See* March 23, 2017, New Jersey Department of Community Affairs Amusement Ride Report, attached hereto as Exhibit K.

**Response:  Admitted.**

86.    After the incident, signage alone was explicitly[sic] assessed and inspected and found to be compliant. *See* July 16, 2018, New Jersey Department of Community Affairs Amusement Ride Report, attached hereto as Exhibit L.

**Response:**
**Denied**.  Defendants' Exhibit L indicates that a State of New Jersey inspection over a year after Plaintiff's injury prompted the notation, "Check ride for all required signage."

Dated:  September 16, 2024              By:  */s/ G. Martin Meyers*
                                            G. MARTIN MEYERS (5833)

SA470

EXHIBIT 1
ANSI Z535.2

SA471



ANSI Z535.2-2011

Revision of ANSI Z535.2-2007

# American National Standard

# Environmental and Facility Safety Signs

Copyright National Electrical Manufacturers Association
Provided by IHS under license with NEMA
No reproduction or networking permitted without license from IHS

Sold to:EXPONENT, INC., W1192650
Not for Resale,2011/11/7 17:5:34 GMT

SA472

Copyright National Electrical Manufacturers Association
Provided by IHS under license with NEMA
No reproduction or networking permitted without license from IHS

Sold to:EXPONENT, INC., W1192660
Not for Resale,2011/11/7 17:5:34 GMT



**ANSI Z535.2-2011**
Revision of
ANSI Z535.2-2007

American National Standard

**Environmental and Facility Safety Signs**

Secretariat:

**National Electrical Manufacturers Association**

Approved July 19, 2011
Published September 15, 2011

**American National Standards Institute, Inc.**

Copyright National Electrical Manufacturers Association
Provided by IHS under license with NEMA
No reproduction or networking permitted without license from IHS

Sold to:EXPONENT, INC., W1192660
Not for Resale,2011/11/7 17:5:34 GMT

ANSI Z535.2-2011

## DISCLAIMER

The information in this publication was considered technically sound by the consensus of persons engaged in the development and approval of the document at the time it was developed. Consensus does not necessarily mean that there is unanimous agreement among every person participating in the development of this document.

ANSI standards and guideline publications, of which the document contained herein is one, are developed through a voluntary consensus standards development process. This process brings together volunteers and/or seeks out the views of persons who have an interest in the topic covered by this publication. While NEMA administers the process to promote fairness in the development of consensus, it does not write the document and it does not independently test, evaluate, or verify the accuracy or completeness of any information or the soundness of any judgments contained in its standards and guideline publications.

NEMA disclaims liability for any personal injury, property, or other damages of any nature whatsoever, whether special, indirect, consequential, or compensatory, directly or indirectly resulting from the publication, use of, application, or reliance on this document. NEMA disclaims and makes no guaranty or warranty, express or implied, as to the accuracy or completeness of any information published herein, and disclaims and makes no warranty that the information in this document will fulfill any of your particular purposes or needs. NEMA does not undertake to guarantee the performance of any individual manufacturer or seller's products or services by virtue of this standard or guide.

In publishing and making this document available, NEMA is not undertaking to render professional or other services for or on behalf of any person or entity, nor is NEMA undertaking to perform any duty owed by any person or entity to someone else. Anyone using this document should rely on his or her own independent judgment or, as appropriate, seek the advice of a competent professional in determining the exercise of reasonable care in any given circumstances. Information and other standards on the topic covered by this publication may be available from other sources, which the user may wish to consult for additional views or information not covered by this publication.

NEMA has no power, nor does it undertake to police or enforce compliance with the contents of this document. NEMA does not certify, test, or inspect products, designs, or installations for safety or health purposes. Any certification or other statement of compliance with any health or safety-related information in this document shall not be attributable to NEMA and is solely the responsibility of the certifier or maker of the statement.

Copyright National Electrical Manufacturers Association
Provided by IHS under license with NEMA
No reproduction or networking permitted without license from IHS

Sold to:EXPONENT, INC., W1192860
Not for Resale,2011/11/7 17:5:34 GMT

ANSI Z535.2-2011

# AMERICAN NATIONAL STANDARD

Approval of an American National Standard requires verification by ANSI that the requirements for due process, consensus, and other criteria for approval have been met by the standards developer.

Consensus is established when, in the judgment of the ANSI Board of Standards Review, substantial agreement has been reached by directly and materially affected interests. Substantial agreement means much more than a simple majority, but not necessarily unanimity. Consensus requires that all views and objections be considered, and that a concerted effort be made toward their resolution.

The use of American National Standards is completely voluntary; their existence does not in any respect preclude anyone, whether he has approved the standards or not, from manufacturing, marketing, purchasing, or using products, processes, or procedures not conforming to the standards.

The American National Standards Institute does not develop standards and will in no circumstances give an interpretation of any American National Standard. Moreover, no person shall have the right or authority to issue an interpretation of an American National Standard in the name of the American National Standards Institute. Requests for interpretations should be addressed to the secretariat or sponsor whose name appears on the title page of this standard.

This American National Standard may be revised or withdrawn at any time. The procedures of the American National Standards Institute require that action be taken periodically to reaffirm, revise, or withdraw this standard. Purchasers of American National Standards may receive current information on all standards by calling or writing the American National Standards Institute.

Published by

**National Electrical Manufacturers Association**
**1300 North 17th Street, Rosslyn, VA  22209**

© Copyright 2011 by National Electrical Manufacturers Association
All rights reserved including translation into other languages, reserved under the Universal Copyright Convention, the Berne Convention for the Protection of Literary and Artistic Works, and the International and Pan American Copyright Conventions.

No part of this publication may be reproduced in any form, in an electronic retrieval system or otherwise, without the prior written permission of the publisher.

Printed in the United States of America

Copyright National Electrical Manufacturers Association
Provided by IHS under license with NEMA
No reproduction or networking permitted without license from IHS

Sold to:EXPONENT, INC., W1192660
Not for Resale,2011/11/7 17:5:34 GMT

i

ANSI Z535.2-2011

**This page intentionally left blank.**

Copyright National Electrical Manufacturers Association
Provided by IHS under license with NEMA
No reproduction or networking permitted without license from IHS

Sold to:EXPONENT, INC., W1192660
Not for Resale,2011/11/7 17:5:34 GMT

SA477

ANSI Z535.2-2011

# Contents

Foreword ....................................................................................................................................... vii

1    Introduction ......................................................................................................................... 1

2    Scope and purpose .............................................................................................................. 1

    2.1    Scope ........................................................................................................................ 1

    2.2    Purpose ..................................................................................................................... 1

        2.2.1    Existing American National Standards ............................................................ 1

3    Application and exceptions .................................................................................................. 1

    3.1    Application ................................................................................................................. 1

    3.2    Exceptions ................................................................................................................. 2

4    Definitions ............................................................................................................................ 2

5    Use of signal words .............................................................................................................. 4

    5.1    Hazard classification ................................................................................................. 4

    5.2    Signal word selection ................................................................................................ 4

    5.3    Multiple hazard signs ................................................................................................ 4

        5.3.1    One sign ........................................................................................................... 4

        5.3.2    Signal word for multiple hazard signs ............................................................. 4

6    Sign format ........................................................................................................................... 4

    6.1    Panels ....................................................................................................................... 4

    6.2    Panel arrangement .................................................................................................... 5

        6.2.1    Panel format .................................................................................................... 5

        6.2.2    Panel placement .............................................................................................. 5

    6.3    Safety alert symbol ................................................................................................... 5

    6.4    Word message .......................................................................................................... 5

        6.4.1    Multiple messages ........................................................................................... 5

7    Safety sign colors ................................................................................................................. 5

    7.1    Standard colors ......................................................................................................... 5

    7.2    Signal word panel colors ........................................................................................... 5

        7.2.1    DANGER .......................................................................................................... 5

        7.2.2    WARNING ........................................................................................................ 5

        7.2.3    CAUTION ......................................................................................................... 5

        7.2.4    NOTICE ............................................................................................................ 5

        7.2.5    SAFETY INSTRUCTIONS ............................................................................... 6

        7.2.6    Safety equipment location signs ...................................................................... 6

        7.2.7    Fire equipment location signs .......................................................................... 6

        7.2.8    Safety alert symbol .......................................................................................... 6

Copyright National Electrical Manufacturers Association
Provided by IHS under license with NEMA
No reproduction or networking permitted without license from IHS

Sold to:EXPONENT, INC., W1192660
Not for Resale,2011/11/7 17:5:34 GMT

SA478

ANSI Z535.2-2011

7.3    Message panel colors ........................................................................... 6

     7.3.1   Hazard alerting signs, safety notice signs, and safety instruction signs ............... 6

     7.3.2   Safety equipment location signs ................................................... 6

     7.3.3   Fire safety equipment location signs ............................................. 6

7.4    Symbol panel colors ........................................................................... 6

     7.4.1   Hazard alerting signs, safety notice signs, and safety instruction signs ............... 6

     7.4.2   Safety equipment location signs ................................................... 6

     7.4.3   Fire equipment location signs ..................................................... 6

8    Letter style and size ................................................................................. 6

8.1    Letter style ................................................................................... 7

     8.1.1   Signal words ...................................................................... 7

     8.1.2   Message panel lettering ........................................................... 7

8.2    Letter size for hazard alerting signs ....................................................... 7

     8.2.1   Lettering .......................................................................... 7

     8.2.2   Determination of safe viewing distance ........................................... 7

     8.2.3   Signal word letter height .......................................................... 7

8.3    Letter size for safety notice, safety instruction, safety equipment location, and fire equipment location signs ........................................................... 7

     8.3.1   Lettering .......................................................................... 7

     8.3.2   Signal word letter height for safety notice and safety instruction signs ............... 7

9    Safety symbols ..................................................................................... 7

9.1    Conveyed message .......................................................................... 7

9.2    Use with and without corresponding word messages ...................................... 7

10    Sign materials, expected life, and maintenance .................................................. 7

10.1    Sign materials ............................................................................... 7

10.2    Expected life ................................................................................ 8

10.3    Maintenance ................................................................................. 8

10.4    Replacement ................................................................................. 8

11    Sign placement ..................................................................................... 8

11.1    Hazard alerting signs ....................................................................... 8

11.2    Safety signs—placement requirements ..................................................... 8

11.3    Safety signs—placement prohibitions ...................................................... 8

11.4    Environmental/facility safety signs ........................................................ 8

12    Illumination ........................................................................................ 8

13    Normative references .............................................................................. 8

13.1    General ...................................................................................... 8

13.2    American National Standards ............................................................... 9

iv

Copyright National Electrical Manufacturers Association
Provided by IHS under license with NEMA
No reproduction or networking permitted without license from IHS

Sold to:EXPONENT, INC., W1192860
Not for Resale,2011/11/7 17:5:34 GMT

SA479

ANSI Z535.2-2011

## Tables

B1    Examples of Word Message Letter Heights and Minimum Safe Viewing Distances.....................17

## Figures

1    The Safety Alert Symbol .......................................................................................................3
2    Examples of Use of Color ................................................................................................... 10
3    Three Panel Sign in Vertical Format................................................................................... 11
4    Two Panel Sign in Vertical Format...................................................................................... 11
5    Three Panel Sign in Horizontal Format............................................................................... 11
6    Two Panel Sign in Horizontal Format ................................................................................. 11
7    Two Panel Sign in Shortened  Signal Word Panel Format .................................................. 11
8    Two Panel Sign in Side-by-Side Format ............................................................................. 12
9    Three Panel Sign in Horizontal Format with Symbol Panel on Right ................................. 12
10   Three Panel Sign in Horizontal Format with Message Panel and Symbol Panel Separated by Line........................................................................................................................... 12
11   Three Panel Sign in Horizontal Format with Message Panel and Symbol Panel Separated by White Space.......................................................................................................... 12
12   Two Panel Sign in Horizontal Format with Word Panel and Symbol Panel.......................... 12
13   Safety Sign Incorporating a Safety Instruction Panel ......................................................... 13
14   Additional Safety Sign Formats that may be Used for Safety Equipment and Fire Equipment Location Signs.............................................................................................. 13
B1   Examples of Correct Signal Word and Safety Alert Symbol Placement........................................ 17
B2   Examples of Incorrect Signal Word and  Safety Alert Symbol Placement.................................... 17
B3   Word Message with  Hazard Description First ..................................................................... 18
B4   Word Message with  Hazard Avoidance Message First ....................................................... 18
B5   Headline Style Message ..................................................................................................... 18
B6   Non-Headline Style Message ............................................................................................. 18
B7   Examples of Action Statements .......................................................................................... 19
B8   Examples of Concise Hazard Description Statements ......................................................... 19
B9   Examples of Consequence Statements............................................................................... 19
B10  Examples of Active Voice vs. Passive Voice Messages...................................................... 20
B11  Examples of Prepositional and Non-Prepositional Phrases ................................................ 20
B12  Examples of Ways to Emphasize Portions of a Word Message........................................... 20
B13  Outline Format .................................................................................................................. 21
B14  Outline with Bullet Format ................................................................................................. 21
B15  Continuous Format............................................................................................................ 21
B16  Left Aligned Ragged Right Text ......................................................................................... 21
B17  Centered Text ................................................................................................................... 21

Copyright National Electrical Manufacturers Association
Provided by IHS under license with NEMA
No reproduction or networking permitted without license from IHS

Sold to:EXPONENT, INC., W1192660
Not for Resale,2011/11/7 17:5:34 GMT

v

SA480

ANSI Z535.2-2011

B18    Justified Text ............................................................................................................ 21
B19    Mixed Case Lettering ................................................................................................ 22
B20    All Upper Case .......................................................................................................... 22
B21    Selective Use of Upper Case .................................................................................... 22
B22    Examples of Correct and Incorrect Type Spacing .................................................... 22
B23    Examples of Type Color Choice ................................................................................ 23
B24    Long Message, Vertical Format ................................................................................ 25
B25    Long Message, Horizontal Format ............................................................................ 25
B26    Short Message Format .............................................................................................. 25
B27    Multiple Symbols  on Top .......................................................................................... 26
B28    Multiple Symbols  on Left .......................................................................................... 26
B29    Two-Symbol Alternative Format ................................................................................ 26
B30    Symbols on Left ........................................................................................................ 26
B31    Symbols on Right ...................................................................................................... 26
B32    Example of Safety Instruction Sign ........................................................................... 27
B33    Example of Safety Instruction Sign as Part of Hazard Alerting Sign ........................ 27
D1     Model of the Possible Results of a Hazardous Situation .......................................... 30
D2     Signal Word Selection Process ................................................................................. 33

## Annexes

A     Guidelines for Increasing Recognition of Safety Sign Components ............................. 15
B     Principles and Guidelines for the Design of Environmental  and Facility Safety Signs ................. 17
C     Previous Formats for Signal Word Panels ................................................................... 28
D     Risk Estimation and Signal Word Selection ................................................................. 29
E     Informative References ................................................................................................ 34

Copyright National Electrical Manufacturers Association
Provided by IHS under license with NEMA
No reproduction or networking permitted without license from IHS

Sold to:EXPONENT, INC., W1192660
Not for Resale,2011/11/7 17:5:34 GMT

vi

SA481

ANSI Z535.2-2011

## Foreword

In 1979, the ANSI Z535 Committee on Safety Colors was combined with the ANSI Z535 Committee on Safety Signs to form the ANSI Z535 Committee on Safety Signs and Colors. The Z535 Committee has the following scope:

> To develop standards for the design, application, and use of signs, colors, and symbols intended to identify and warn against specific hazards and for other accident prevention purposes.

While the basic mission and fundamental purpose of the ANSI Z535 Committee is to develop, refine, and promote a single, uniform graphic system used for communicating safety and accident prevention information, the Z535 Committee recognizes that this information can also be effectively communicated using other graphic systems.

The Z535 Committee created subcommittees to update the Z53 and 35 standards and to write new standards. To date, the following six standards comprise the ANSI Z535 series:

ANSI Z535.1    *Safety Colors* [ANSI Z53.1-1979 was updated and combined into this standard in 1991]

ANSI Z535.2    *Environmental and Facility Safety Signs* [ANSI Z35.1-1972 and Z35.4-1972 were updated and combined into this standard in 1991]

ANSI Z535.3    *Criteria for Safety Symbols* [new in 1991]

ANSI Z535.4    *Product Safety Signs and Labels* [new in 1991]

ANSI Z535.5    *Safety Tags and Barricade Tapes (for Temporary Hazards)* [ANSI Z35.2-1974 was updated and combined into this standard in 1991]

ANSI Z535.6    *Product Safety Information in Product Manuals, Instructions, and Other Collateral Materials* [new in 2006]

Together, these six standards contain the information needed to specify formats, colors, and symbols for safety signs used in environmental and facility applications, in product and product literature applications, and in temporary safety tag and barricade tape applications.

Published separately is the ANSI Z535 Safety Color Chart. This chart gives the user a sample of each of the safety colors: red, orange, yellow, green, blue, purple, brown, grey, white, and black. It also describes each color's ink formulation and closest PANTONE® color.

This ANSI Z535.2 standard was prepared by Subcommittee Z535.2 on Environmental and Facility Safety Signs. The foreword and all annexes in this standard are considered to be informative and not normative. In the vocabulary of writing standards, the word "informative" is meant to convey that the information presented is for informational purposes only and is not considered to be mandatory. The body of this standard is "normative," meaning that this information is considered to be mandatory.

This standard was formulated to provide a visual alerting system to aid in identifying potential hazards known to exist in facilities and in the environment. Together, ANSI Z535.1, Z535.2, and Z535.3 contain information needed to specify formats, colors, and symbols for safety signs used in environmental and facility applications. The ANSI Z535.4 and Z535.5 standards are harmonized with this standard to provide appropriate hazard avoidance information for products that might be encountered in the environment (ANSI Z535.4) or temporary changes to the environment (ANSI Z535.5). It is desirable that new signs, symbols, and colors for environmental and facility safety signs specified after the approval of this standard comply with this standard.

The ANSI Z35 Committee on Safety Signs and ANSI Z53 Committee on Safety Colors were combined in 1979 to form the ANSI Z535 Committee on Safety Signs and Colors. The ANSI Z535.4 standard addresses the design of safety signs and labels for application to products, and was first published in 1991. In that standard, the format specified for the signal word panel was a simple rectangle. The rectangle contained the safety alert symbol and a signal word (DANGER, CAUTION, or WARNING), and specific safety colors were designated to be used with those signal words (DANGER / Safety Red;

Copyright National Electrical Manufacturers Association
Provided by IHS under license with NEMA
No reproduction or networking permitted without license from IHS

Sold to:EXPONENT, INC., W1192660
Not for Resale,2011/11/7 17:5:34 GMT

SA482

ANSI Z535.2-2011

WARNING / Safety Orange; CAUTION / Safety Yellow). This contrasted with the longstanding format of the black rectangle with red oval and white letters used for danger signs. The initial impetus for the new ANSI Z535.4-1991 header format was that products often had limited space for a sign or label and omitting the older format allowed for bigger letters for the signal word. The ANSI Z535.2-1991 standard retained the longstanding DANGER heading format and created a similar format (using a truncated diamond) for the new warning sign head. Z535.2-1991 allowed the user to use the format of Z535.4-1991 and vice versa.

The ANSI Z535.2-1998 standard showed the preferred format for environmental and safety signs to be the simple header style of the ANSI Z535.4 standard for product safety signs and labels; both standards included the older system. The ANSI Z535.2-1998 standard also stated a preference to use a white background for the message panel in order to increase contrast and viewing distance. Like the ANSI Z535.4 standard, the Z535.2-1998 standard also required the sign to give information of the consequences of not avoiding the hazard, if the consequence is not obvious.

The ANSI Z535.2-1998 standard was carefully crafted so that the new requirements scheduled to become mandatory in the 2002 edition were stated as *preferred* in the 1998 edition. As of the 2002 standard, the older format is no longer included; the simple header with larger letters and more referential color is set forth.

ANSI Z535.2-2007 included definitional changes and safety alert symbol formats intended to clarify the distinction between signal words and improve harmonization with international standards. The 2007 edition added a new annex of informative references and a new annex on risk estimation and choice of signal words. The 2007 edition also started the process of eliminating the use of the CAUTION signal word panel without the safety alert symbol for procedures not related to physical safety, such as property damage. The preferred signal word is NOTICE. The use of CAUTION for that purpose is phased out in the 2011 edition.

The 2011 edition of this standard is revised to better harmonize with the ANSI Z535.4, Z535.5, and Z535.6 standards. The standard is also reorganized to better describe the five types of safety signs used in facilities and in the environment (i.e., hazard alerting signs, notice signs, safety instruction signs, safety equipment location signs, and fire equipment location signs). In tandem with these changes, the definitions for "accident," "harm," and "incident" are refined to more clearly delineate a separation between physical injury and other safety-related issues (e.g., property damage, sanitation, housekeeping).

Due to differences in color printing technologies and color monitors, the appearance of colors in this standard may not be accurate. See the ANSI Z535-2011 Safety Color Chart for the purpose of viewing accurate colors.

This standard was processed and approved for submittal to ANSI by the Accredited Standards Committee Z535 on Safety Signs and Colors. Committee approval of this standard does not necessarily imply that all committee members voted for its approval. At the time it approved this standard, the Z535 Committee had the following members:

**Gary M. Bell, Chair**
Richard Olesen, Vice Chair
Greg Winchester, Secretary

| *Organization Represented:* | *Name of Representative:* |
|---|---|
| American Society of Safety Engineers | J. Paul Frantz |
| | Thomas F. Bresnahan (Alt.) |
| | Howard A. Elwell (Alt.) |
| American Welding Society | August F. Manz |

viii

Copyright National Electrical Manufacturers Association
Provided by IHS under license with NEMA
No reproduction or networking permitted without license from IHS

Sold to:EXPONENT, INC., W1192660
Not for Resale,2011/11/7 17:5:34 GMT

SA483

ANSI Z535.2-2011

| | |
|---|---|
| Applied Materials | Edward Karl<br>Carl Wong (Alt.) |
| Applied Safety and Ergonomics | Steve Hall<br>Stephen Young (Alt.) |
| Association for Manufacturing Technology | David Felinski |
| Association of Equipment Manufacturers | Michael Weber<br>Daniel Taylor (Alt.) |
| Browning Arms Company | Larry D. Nelson |
| Caterpillar, Inc. | Charles Crowell<br>Mark Steffen (Alt.) |
| Clarion Safety Systems, LLC | Geoffrey Peckham |
| Dorris and Associates International, LLC | Nathan T. Dorris<br>Alan Dorris (Alt.)<br>Kelly Burke (Alt.) |
| Eagle Crusher Co. | Ryan Parsell |
| Edison Electric Institute | David Young |
| Hale Color Consultants | William N. Hale |
| Human Factors and Ergonomics Society | Michael Kalsher<br>Michael S. Wogalter (Alt.) |
| Human Factors and Safety Analytics, Inc. | B. Jay Martin |
| Institute of Electrical and Electronics Engineers | Sue Vogel |
| International Safety Equipment Association | Janice Comer Bradley<br>Christine Fargo (Alt.) |
| International Staple, Nail, and Tool Association | John W. Kurtz |
| Lab Safety Supply, Inc. | Jim Versweyveld |
| Law Office of Mathew Kundinger | Mathew Kundinger |
| Marhefka & Associates | Russell E. Marhefka |
| National Association of Graphic and Product Identification Manufacturers | Russ Butchko<br>Donna Ehrmann (Alt.) |
| National Electrical Manufacturers Association | John Katzbeck |

ix

Copyright National Electrical Manufacturers Association<br>Provided by IHS under license with NEMA<br>No reproduction or networking permitted without license from IHS

Sold to:EXPONENT, INC., W7192660<br>Not for Resale,2011/11/7 17:53:44 GMT

SA484

ANSI Z535.2-2011

| | |
|---|---|
| National Spray Equipment Manufacturers Association | Angela Redlund-Spieker |
| P&G Duracell, Inc. | Linda Moquet<br>Steven Wicelinski (Alt.) |
| Power Tool Institute | Brett Cohen<br>Mark Hickok (Alt.)<br>Charles M. Stockinger (Alt.) |
| Rockwell Automation | Steven Chybowski |
| Rural Utilities Service | Trung Hiu |
| Safety and Forensic Enterprises, LLC | Loren Mills |
| Safety Behavior Analysis, Inc. | Shelley Waters Deppa |
| Sauder Woodworking | Gary Bell |
| Scaffold Industry Association | Dave Merrifield |
| Snap-on Tools | Dan Eggert |
| Standard Register Corporation | Amy Martin<br>Linda LeBlanc (Alt.) |
| System Safety Society | Robert J. Cunitz |
| Travelers Insurance Company | Karen Stetler |
| Underwriters Laboratories | Richard Olesen |
| Whirlpool Corporation | Deborah Sherman<br>Donald Grob (Alt.) |
| World Kitchen, LLC | Celeste Levindoski |

At the time it prepared this edition of ANSI Z535.2 for Z535 Committee vote, Subcommittee Z535.2 on Environmental and Facility Safety Signs had the following members:

**Geoffrey Peckham, Chair**
Paul Orr, Secretary

| | |
|---|---|
| Gary Bell | Sauder Woodworking Company |
| Thomas F. Bresnahan | American Society of Safety Engineers |
| Donna Ehrmann | National Association of Graphic and Product Identification Manufacturers |
| J. Paul Frantz | American Society of Safety Engineers |
| Steve Hall | Applied Safety and Ergonomics |

x

Copyright National Electrical Manufacturers Association
Provided by IHS under license with NEMA
No reproduction or networking permitted without license from IHS

Sold to:EXPONENT, INC., W7192680
Not for Resale,2011/11/7 17:5:34 GMT

SA485

ANSI Z535.2-2011

Linda Moquet          P&G Duracell, Inc.
Geoffrey Peckham      Clarion Safety Systems, LLC
Karen Stetler         Travelers Insurance Company

xi

Copyright National Electrical Manufacturers Association
Provided by IHS under license with NEMA
No reproduction or networking permitted without license from IHS

Sold to:EXPONENT, INC., W1192660
Not for Resale,2011/11/7 17:5:34 GMT

SA486

ANSI Z535.2-2011

**This page intentionally left blank.**

Copyright National Electrical Manufacturers Association
Provided by IHS under license with NEMA
No reproduction or networking permitted without license from IHS

Sold to:EXPONENT, INC., W1192660
Not for Resale,2011/11/7 17:5:34 GMT

SA487

| AMERICAN NATIONAL STANDARD | ANSI Z535.2-2011 |
|---|---|

**Environmental and Facility Safety Signs**

## 1    Introduction

The basic mission and fundamental purpose of the ANSI Z535 Committee is to develop, refine, and promote a single uniform graphic system used for presenting safety and accident prevention information. Such an approach assists standard users in the efficient development of environmental and facility safety signs and assists sign viewers in recognizing signs as being related to safety.

This standard sets forth a system for presenting safety and accident prevention information through environmental and facility safety signs. It consolidates a number of previous graphic approaches into a common design direction selected to present hazard information in an orderly and visually consistent manner.

This standard sets forth a hazard communication system that is designed to complement the ANSI Z535.4-2011, ANSI Z535.5-2011, and ANSI Z535.6-2011 standards. While these standards are similar in many respects, they each address different physical and visual requirements. As a result, the Z535 Committee has recognized and affirmed the need for these separate standards.

## 2    Scope and purpose

### 2.1    Scope

This standard sets forth requirements for the design, application, and use of safety signs in facilities and in the environment.

### 2.2    Purpose

The purposes of this standard are to:

    a.  establish a uniform and consistent visual layout for safety signs to be located in facilities and in the environment;

    b.  minimize the proliferation of designs for environmental and facility safety signs; and

    c.  establish a national uniform system for signs that communicate safety information.

### 2.2.1    Existing American National Standards

There are a number of existing American National Standards that are recognized for particular industries or specific uses. Compliance with these standards may be considered for the particular industry or use. It is not the intent of ANSI Z535.2 to replace existing standards or regulations that are uniquely applicable to a specific industry or use. It is the intent to encourage adoption of this standard in subsequent revisions of other standards and regulations.

## 3    Application and exceptions

### 3.1    Application

This standard provides guidance for industries, commercial establishments, property owners, employers, and others who place safety signs in the environment or facility under their control.

Copyright National Electrical Manufacturers Association
Provided by IHS under license with NEMA
No reproduction or networking permitted without license from IHS

Sold to:EXPONENT, INC., W1192660
Not for Resale,2011/11/7 17:5:34 GMT

1

SA488

ANSI Z535.2-2011

### 3.2    Exceptions

**3.2.1**    Should any of the requirements of this standard conflict with federal, state, or municipal regulations, such conflict shall not invalidate other sections of this standard.

**3.2.2**    These requirements do not include labels or signs for products (which are covered by ANSI Z535.4), containers of chemicals and chemical mixtures and hazardous substances, in-plant vehicular movement and way-finding, public streets and highways, railroads, air transport, marine operations, exit signs, identification of piping or process valves, or safety bulletins and posters.

## 4    Definitions

**4.1**    **accident:** An incident that results in harm, property damage, or both.

**4.1.1**    **harm:** Any degree of physical injury, including death.

**4.1.2**    **incident:** An unintended or undesired event.

**4.2**    **color:** Colors specified in this standard shall conform to ANSI Z535.1-2011.

**4.3**    **decal:** (See safety sign, Section 4.10)

**4.4**    **hazard:** A potential source of harm.

**4.5**    **intent**

**4.5.1**    **may:** This word is understood to be permissive.

**4.5.2**    **shall:** This word is understood to be mandatory.

**4.5.3**    **should:** This word is understood to be advisory.

**4.5.4**    **informative:** Refers to those portions of this standard provided only for purposes of clarification, illustration, and general information. Those portions of the standard considered informative do not contain mandatory requirements. The Foreword and all of the annexes are considered informative.

**4.5.5**    **normative:** Refers to those portions of this standard containing the mandatory requirements (shall), as well as recommended practices (should). The body of this standard is considered normative.

**4.6**    **label:** (See safety sign, Section 4.10)

**4.7**    **minimum safe viewing distance:** The closest distance a person can be to a safety sign and still have time to follow the safety sign's message to avoid the hazard.

**4.8**    **panel:** The area of a safety sign having a distinctive background color different from adjacent areas of the sign or which is clearly delineated by a line, border, or white space. There are three (3) types of panels a safety sign may use are signal word, message, and safety symbol (see Figures 2 through 14).

**4.8.1**    **signal word panel:** Area of a safety sign that contains the signal word or words, and, when used, the safety alert symbol.

**4.8.2**    **message panel:** Area of the safety sign that contains the word message.

**4.8.3**    **safety symbol panel:** Area of a safety sign that contains the safety symbol.

**4.9**    **safety alert symbol:** A symbol that indicates a hazard (see Figure 1 and Annex A1.1). It is composed of an equilateral triangle surrounding an exclamation mark. The safety alert symbol is only used on hazard alerting signs. It is not used on safety notice, safety instruction, safety equipment location, and fire equipment location signs.

2

Copyright National Electrical Manufacturers Association
Provided by IHS under license with NEMA
No reproduction or networking permitted without license from IHS

Sold to:EXPONENT, INC., W1192660
Not for Resale,2011/11/7 17:5:34 GMT

SA489

ANSI Z535.2-2011

    

A          B          C          D          E

**(A) for use with DANGER signal word;** (safety white triangle, safety red exclamation mark, safety red background)

**(B) for use with WARNING signal word;** (safety black triangle, safety orange exclamation mark)

**(C) for use with CAUTION signal word;** (safety black triangle, safety yellow exclamation mark)

**(D) and (E) for use with DANGER, WARNING, or CAUTION signal words;** ([D] is a safety yellow triangle with a safety black border and safety black exclamation mark; [E] is a safety yellow triangle with a safety black exclamation mark and a safety yellow border around a safety black band)

NOTE—(D) and (E) are provided to allow for consistency with certain ISO standards such as ISO 3864-1 and ISO 3864-2.

**Figure 1**
**The Safety Alert Symbol**

**4.10    safety sign:** A visual alerting device in the form of a sign, label, decal, placard, or other marking that provides safety information.

**4.10.1  environmental/facility safety sign:** Sign in a workplace or public area that provides safety information.

**4.10.1.1    hazard alerting sign:** Sign directly related to a hazard that identifies the hazard, the degree or level of hazard seriousness, the probable consequence of involvement with the hazard, and how the hazard can be avoided. When information on consequence, avoidance, or type of hazard is readily inferred, this information may be omitted from the message panel. (See Annex B3.1.)

**4.10.1.2    safety notice sign:** Sign that gives notice of safety practices not directly related to physical injury.

**4.10.1.3    safety instruction sign:** Sign that identifies specific safety-related instructions or procedures. This type of sign may be used to supplement a hazard alerting sign by providing a place to convey lengthy safety-related instructional information.

**4.10.1.4    safety equipment location sign:** Sign that identifies the direction to, or the location of, safety equipment (e.g., first aid equipment, emergency eyewash, safety shower).

**4.10.1.5    fire equipment location sign:** Sign that identifies the direction to, or the location of, fire equipment (e.g., fire alarm, fire hose, fire extinguisher).

**4.10.2  product safety sign:** Sign, label, cord tag, or decal affixed to a product that provides safety information about that product.

**4.11    signal words:** The words used in the signal word panel. The signal words for hazard alerting signs are "DANGER," "WARNING," and "CAUTION." Safety notice signs use the signal word "NOTICE." Safety instruction signs use signal words that are specific to the situation. Safety and fire equipment location signs may use signal words that identify the equipment. See Annex D for guidance in selecting a signal word.

**4.11.1  DANGER:** Indicates a hazardous situation that, if not avoided, will result in death or serious injury. This signal word is to be limited to the most extreme situations.

**4.11.2  WARNING:** Indicates a hazardous situation that, if not avoided, could result in death or serious injury.

**4.11.3  CAUTION:** Indicates a hazardous situation that, if not avoided, could result in minor or moderate injury.

Copyright National Electrical Manufacturers Association
Provided by IHS under license with NEMA
No reproduction or networking permitted without license from IHS

Sold to:EXPONENT, INC., W1192680
Not for Resale,2011/11/7 17:5:34 GMT

SA490

ANSI Z535.2-2011

**4.11.4 NOTICE:** Indicates information considered important but not hazard-related. The safety alert symbol shall not be used with this signal word. For environmental/facility signs, NOTICE is typically the choice of signal word for messages relating to property damage, security, sanitation, and housekeeping rules.

**4.11.5 SAFETY INSTRUCTIONS or similar words:** Indicates a type of safety sign, or a separate panel on a safety sign, where specific safety-related instructions or procedures are described. More definitive signal words are encouraged, where practical, (e.g., SAFE SHUTDOWN PROCEDURE, SAFETY OPERATING PROCEDURES, BOILER SHUTDOWN PROCEDURE, LOCKOUT PROCEDURE, EMERGENCY SHUTDOWN INSTRUCTIONS). The safety alert symbol shall not be used with this classification of signal word. This signal word may also be used as a heading for a safety instruction panel incorporated into a hazard alerting sign to convey lengthy instructional information. See Sections B3.3.6 and B7.

**4.11.6 SAFETY/FIRE EQUIPMENT:** If a safety equipment or fire equipment location sign includes a signal word, definitive signal word(s) may be used (e.g., EYEWASH, FIRE EXTINGUISHER, or for multiple items, SAFETY EQUIPMENT or FIRE EQUIPMENT.

**4.12 surround / surround shape:** A geometric configuration around the symbol that can convey additional safety information (see ANSI Z535.3-2011).

**4.13 safety symbol:** A graphic representation intended to convey a safety message without the use of words (see ANSI Z535.3-2011, ISO 7010:2011, and NFPA 170-2009 for examples of safety symbols appropriate for environmental and facility safety signs).

# 5 Use of signal words

## 5.1 Hazard classification

Hazard alerting signs are classified according to the relative seriousness of the hazardous situation. The classification is based on the probability of being injured if the hazard is not avoided and on the severity of the resulting injury. For hazard alerting signs, there are three hazard classifications that are denoted by the signal words "DANGER," "WARNING," and "CAUTION."

## 5.2 Signal word selection

When no federal, state, or local government code, regulation, standard, or guideline specifies a particular signal word, selection of the signal word shall be made in accordance with the definitions provided in Section 4.

## 5.3 Multiple hazard signs

### 5.3.1 One sign

When more than one hazard exists in an area, either in close proximity to each other, or that might be preventable from a common location, one hazard alerting sign may be used, provided that the information addresses each hazard.

### 5.3.2 Signal word for multiple hazard signs

When multiple hazardous situations are addressed on one hazard alerting sign and the hazards are classified at different levels of seriousness, the signal word corresponding to the greatest level of seriousness (i.e., DANGER, WARNING, or CAUTION) shall be used.

# 6 Sign format

## 6.1 Panels

Hazard alerting, safety instruction, and notice safety signs consist of a signal word panel plus a message panel. On hazard alerting signs, in addition to a message panel, a safety instruction panel may be incorporated as a place to convey lengthy instructional information. (See Figure 13.) A safety symbol

4

Copyright National Electrical Manufacturers Association
Provided by IHS under license with NEMA
No reproduction or networking permitted without license from IHS

Sold to:EXPONENT, INC., W1192660
Not for Resale,2011/11/7 17:5:34 GMT

SA491

ANSI Z535.2-2011

panel may be used to communicate parts, or all, of the elements of a message panel (see Annex B3.1). Safety equipment and fire equipment location signs consist of a signal word panel that identifies the equipment and/or a symbol panel and may include a message panel or safety instruction panel to convey additional information (e.g., how to put on a life jacket, or a type of fire extinguisher for a specific use).

### 6.2    Panel arrangement

### 6.2.1    Panel format

The sign panels may be in a horizontal or vertical format. See Figures 2 through 14 for examples.

### 6.2.2    Panel placement

For hazard alerting, safety instruction, and notice safety signs, the relative placement of the signal word and message panels should be such that the signal word panel precedes all text in the message panel. When vertical space in particular is limited, the panel arrangement shown in Figure 8 may be used. An option for a larger symbol panel is shown in Figure 9. Figure 12 is an example of a panel arrangement where the symbol panel completely replaces the message panel. Figure 13 is an example of how a safety instruction panel may be incorporated into a hazard alerting sign.

For safety and fire equipment location signs, the optional signal word panel that identifies the equipment may be located above or below the symbol panel. The optional signal word panel on equipment location signs should be placed such that it precedes all text in the optional message panel and/or safety instruction panel (see Figures 2 to 13).

### 6.3    Safety alert symbol

A safety alert symbol, when used with the signal word, shall precede the signal word. The base of the safety alert symbol shall be on the same horizontal line as the base of the letters of the signal word. The height of the safety alert symbol shall equal or exceed the signal word letter height.

### 6.4    Word message

The word message should be concise and readily understood.

### 6.4.1    Multiple messages

Multiple messages should be provided with sufficient space between them, when feasible, to prevent them from visually blending together.

## 7    Safety sign colors

### 7.1    Standard colors

Safety colors shall conform to ANSI Z535.1-2011.

### 7.2    Signal word panel colors

### 7.2.1    DANGER

The word DANGER shall be in safety white letters on a safety red background.

### 7.2.2    WARNING

The word WARNING shall be in safety black letters on a safety orange background.

### 7.2.3    CAUTION

The word CAUTION shall be in safety black letters on a safety yellow background.

### 7.2.4    NOTICE

The word NOTICE shall be in italicized safety white letters on a safety blue background.

Copyright National Electrical Manufacturers Association
Provided by IHS under license with NEMA
No reproduction or networking permitted without license from IHS

Sold to:EXPONENT, INC., W1192660
Not for Resale,2011/11/7 17:5:34 GMT

SA492

ANSI Z535.2-2011

### 7.2.5   SAFETY INSTRUCTIONS

The signal word SAFETY INSTRUCTIONS or its equivalent shall be in safety white letters on a safety green background.

### 7.2.6   Safety equipment location signs

When used, the signal words used to identify safety equipment on safety equipment location signs shall be in safety white letters on a safety green background.

### 7.2.7   Fire equipment location signs

When used, the signal words used to identify fire equipment on fire equipment location signs shall be in safety white letters on a safety red background.

### 7.2.8   Safety alert symbol

The solid triangle portion shall be the same color as the signal word lettering, and the exclamation mark portion shall be the same color as the signal word panel background. Or, as an alternative, the safety alert symbol may consist of a safety black triangle band and safety black exclamation mark on a safety yellow triangle (see Figure 1).

### 7.3   Message panel colors

### 7.3.1   Hazard alerting signs, safety notice signs, and safety instruction signs

The message panel for hazard alerting, safety notice, and safety instruction signs should have either safety black lettering on a safety white background or safety white lettering on a safety black background.

### 7.3.2   Safety equipment location signs

The message panel for safety equipment location signs should have either safety white lettering on a safety green background or safety green or safety black letters on a safety white background.

### 7.3.3   Fire safety equipment location signs

The message panel for fire safety equipment location signs should have either safety white letters on a safety red background or safety red or safety black letters on a safety white background.

### 7.4   Symbol panel colors

### 7.4.1   Hazard alerting signs, safety notice signs, and safety instruction signs

When used, symbols appearing on hazard alerting, safety notice, and safety instruction signs should have a safety black symbol on a safety white background. Other colors may be used for safety symbol emphasis, such as safety red for fire, etc., or if surround shapes are used (see ANSI Z535.3-2011 for recommended surround shapes and colors).

### 7.4.2   Safety equipment location signs

Safety equipment location signs shall have safety white safety symbols on a safety green background or safety green or safety black symbols on a white background.

### 7.4.3   Fire equipment location signs

Fire equipment location signs shall have safety white safety symbols on a safety red background or safety red symbols on a white background.

# 8   Letter style and size

NOTE—For additional reference on letter style and size, see Annex B.

6

Copyright National Electrical Manufacturers Association
Provided by IHS under license with NEMA
No reproduction or networking permitted without license from IHS

Sold to:EXPONENT, INC., W1192660
Not for Resale,2011/11/7 17:5:34 GMT

SA493

**8.1    Letter style**

**8.1.1    Signal words**

Signal words shall be in sans serif letters in upper case only. The signal word NOTICE shall appear in italicized sans serif letters in upper case only.

**8.1.2    Message panel lettering**

Message panel lettering should be a combination of upper and lower case letters. Upper case only lettering may be used for short messages or emphasis of individual words.

**8.2    Letter size for hazard alerting signs**

**8.2.1    Lettering**

Lettering shall be of a size that enables a person with normal vision, including corrected vision, to read the safety sign message panel text at a safe viewing distance from the hazard (see Annex B3.3.14 and Table B1).

**8.2.2    Determination of safe viewing distance**

Determination of safe viewing distance for the message panel text shall take into consideration a reasonable hazard avoidance reaction time.

**8.2.3    Signal word letter height**

Signal word letter height should be at least 50 percent greater than the height of a capital H in the majority of the message panel wording.

**8.3    Letter size for safety notice, safety instruction, safety equipment location, and fire equipment location signs**

**8.3.1    Lettering**

Lettering shall be of a size that enables a person with normal vision, including corrected vision, to read the safety sign from the expected viewing distance.

**8.3.2    Signal word letter height for safety notice and safety instruction signs**

Signal word letter height should be at least 50 percent greater than the height of a capital H in the majority of the message panel wording.

# 9    Safety symbols

**9.1    Conveyed message**

Safety symbols should be readily understood and should effectively communicate the message. See ANSI Z535.3-2011 *American National Standard for Criteria for Safety Symbols.*

**9.2    Use with and without corresponding word messages**

Safety symbols may be used to clarify, supplement, or substitute for a portion or all (see Figure 12) of a word message found in the message panel. When used with a word message, safety symbols shall be compatible with the word message. A symbol may only be used to substitute for a portion or all of a word message if it has been demonstrated to be satisfactorily comprehended (see Annex B of ANSI Z535.3) or if there is a means (e.g., instructions, training materials, manuals, etc.) to inform people of the symbol's meaning.

# 10    Sign materials, expected life, and maintenance

**10.1    Sign materials**

Signs shall be made of durable materials with colors in accordance with the technical specifications set forth in ANSI Z535.1-2011.

Copyright National Electrical Manufacturers Association
Provided by IHS under license with NEMA
No reproduction or networking permitted without license from IHS

Sold to:EXPONENT, INC., W1192660
Not for Resale,2011/11/7 17:5:34 GMT

SA494

ANSI Z535.2-2011

**10.2    Expected life**

Environmental/facility safety signs shall have a reasonable expected life with good color stability, symbol legibility, and word message legibility when viewed at a safe viewing distance as described in Section 8.2. Reasonable expected life shall take into consideration the foreseeable environment of use.

**10.3    Maintenance**

Environmental/facility safety signs should be periodically inspected and cleaned as necessary to maintain good legibility at a safe viewing distance as described in Section 8.2.

**10.4    Replacement**

Environmental/facility safety signs should be replaced when they no longer meet the legibility requirements at a safe viewing distance as described in Section 8.2.

## 11    Sign placement

**11.1    Hazard alerting signs**

Hazard alerting signs shall be placed to alert and inform the viewer from a safe viewing distance. Safety and fire equipment location signs shall be visibly placed in the immediate vicinity of the equipment or, when used with supplementary directional arrows, in locations leading to the equipment.

NOTE—Section 4.7, Sections 8.2.1 through 8.3.2, and Annex B provide guidance for determining "legibility" and "safe viewing distance."

**11.2    Safety signs—placement requirements**

Safety signs shall be placed so that they are legible, non-distracting, and not hazardous in themselves.

**11.3    Safety signs—placement prohibitions**

Safety signs shall not be located in areas where they may be removed by the motion of the hazardous device, or rendered ineffective by situational conditions of the hazard. These alerting devices shall not be blocked by moveable panels such as doors, windows, racks, gates, etc.

**11.4    Environmental/facility safety signs**

When feasible, placement of environmental/facility safety signs should protect the signs from foreseeable visual obstruction and damage (e.g., fading from exposure to ultraviolet radiation, abrasion, or degradation from substances such as lubricants, chemicals, and dirt).

## 12    Illumination

**12.1**    Safety signs shall be displayed with illumination or retro-reflectorization as needed for adequate legibility under normal operating conditions. Where illumination is inadequate or colors are not recognizable, use supplemental illumination (see Annex E, Reference 13).

NOTE—Supplemental illumination includes portable illumination such as flashlights.

Consideration should be given for situations other than normal operating conditions, such as emergency conditions, power failure, etc. Where illumination may be interrupted, the sign should be made with photoluminescent and/or retro-reflective materials, and/or equipped with emergency lighting.

## 13    Normative references

**13.1    General**

This standard shall be used in conjunction with the American National Standards listed in 13.2. Other standards and publications listed in Annex E contain additional information that can be useful in completing the requirements of this standard.

8

Copyright National Electrical Manufacturers Association
Provided by IHS under license with NEMA
No reproduction or networking permitted without license from IHS

Sold to:EXPONENT, INC., W1192860
Not for Resale,2011/11/7 17:5:34 GMT

SA495

### 13.2 American National Standards

When the following American National Standards are superseded by a revision approved by the American National Standards Institute, the revision shall apply.

1. ANSI Z535.1-2006 (R2011), *American National Standard Safety Colors* (American National Standards Institute, 2011).

2. ANSI Z535.3-2011, *American National Standard Criteria for Safety Symbols* (American National Standards Institute, 2011).

3. ANSI Z535.4-2011, *American National Standard Product Safety Signs and Labels* (American National Standards Institute, 2011).

4. ANSI Z535.5-2011, *American National Standard Safety Tags and Barricade Tapes (for Temporary Hazards)* (American National Standards Institute, 2011).

5. ANSI Z535.6-2011, *American National Standard Product Safety Information in Product Manuals, Instructions, and Other Collateral Materials* (American National Standards Institute, 2011).

Copyright National Electrical Manufacturers Association
Provided by IHS under license with NEMA
No reproduction or networking permitted without license from IHS

Sold to:EXPONENT, INC., W1192660
Not for Resale,2011/11/7 17:5:34 GMT

SA496

ANSI Z535.2-2011



**Figure 2**
**Examples of Use of Color**

NOTE—See Figures 3 through 14 for various panel arrangement options.

10

Copyright National Electrical Manufacturers Association
Provided by IHS under license with NEMA
No reproduction or networking permitted without license from IHS

Sold to:EXPONENT, INC., W1192660
Not for Resale,2011/11/7 17:5:34 GMT

SA497

ANSI Z535.2-2011



**Figure 3**
**Three Panel Sign in Vertical Format**

**Figure 4**
**Two Panel Sign in Vertical Format**

**Figure 5**
**Three Panel Sign in Horizontal Format**



**Figure 6**
**Two Panel Sign in Horizontal Format**



**Figure 7**
**Two Panel Sign in Shortened Signal Word Panel Format**

Copyright National Electrical Manufacturers Association
Provided by IHS under license with NEMA
No reproduction or networking permitted without license from IHS

Sold to:EXPONENT, INC., W1192660
Not for Resale,2011/11/7 17:5:34 GMT

SA498

ANSI Z535.2-2011

| SIGNAL WORD | Word message ── ── ── ── ── ── ── ── ── ── |
|---|---|

**Figure 8**
**Two Panel Sign in Side-by-Side Format**



**Figure 9**
**Three Panel Sign in Horizontal Format with Symbol Panel on Right**

**Figure 10**
**Three Panel Sign in Horizontal Format with Message Panel and Symbol Panel Separated by Line**



**Figure 11**
**Three Panel Sign in Horizontal Format with Message Panel and Symbol Panel Separated by White Space**

**Figure 12**
**Two Panel Sign in Horizontal Format with Word Panel and Symbol Panel**

12

Copyright National Electrical Manufacturers Association
Provided by IHS under license with NEMA
No reproduction or networking permitted without license from IHS

Sold to:EXPONENT, INC., W1192660
Not for Resale,2011/11/7 17:5:34 GMT

SA499

ANSI Z535.2-2011



**Figure 13**
**Safety Sign Incorporating a Safety Instruction Panel**

NOTE—In the examples in Figures 3 through 13, any of the signal word and safety alert symbol combinations can be used.



**Figure 14**
**Additional Safety Sign Formats that may be Used for Safety Equipment**
**and Fire Equipment Location Signs**

Copyright National Electrical Manufacturers Association
Provided by IHS under license with NEMA
No reproduction or networking permitted without license from IHS

Sold to:EXPONENT, INC., W1192680
Not for Resale,2011/11/7 17:5:34 GMT

13

SA500

ANSI Z535.2-2011

**This page intentionally left blank.**

Copyright National Electrical Manufacturers Association
Provided by IHS under license with NEMA
No reproduction or networking permitted without license from IHS

Sold to:EXPONENT, INC., W1192860
Not for Resale,2011/11/7 17:5:34 GMT

SA501

ANSI Z535.2-2011

# Annex A
## Guidelines for Increasing Recognition of Safety Sign Components
(informative)

## A1    Scope

It is important that the meaning of a safety sign is clearly understood by those who may come in contact with the hazard. To increase the understanding of a safety sign's components, the ANSI Z535 Committee encourages safety sign manufacturers and owners of facilities to publish and exhibit the following information on safety posters, safety bulletins, or the like. Doing so will assist in the objective of achieving a national uniform system for the recognition of physical injury hazards and accident prevention.

### A1.1    The safety alert symbol

Explain the meaning of the safety alert symbol. The following artwork may be used for this purpose.



**This is the safety alert symbol. It is used to alert you to potential physical injury hazards. Obey all safety messages that follow this symbol to avoid possible injury or death.**

### A1.2    The signal words

Explain the meaning of the different signal words as defined by ANSI Z535.2. Such training is necessary to increase understanding of the meaning of signal words. The following artwork may be used for this purpose.

NOTE—The use of the appropriate color for each signal word panel is desirable. See ANSI Z535.1.



**DANGER** indicates a hazardous situation which, if not avoided, will result in death or serious injury



**WARNING** indicates a hazardous situation which, if not avoided, could result in death or serious injury



**CAUTION** indicates a hazardous situation which, if not avoided, could result in minor or moderate injury



*NOTICE* is used to address practices not related to physical injury



Safety instruction (or equivalent) signs indicate specific safety-related instructions or procedures

15

Copyright National Electrical Manufacturers Association
Provided by IHS under license with NEMA
No reproduction or networking permitted without license from IHS

Sold to:EXPONENT, INC., W1192660
Not for Resale,2011/11/7 17:5:34 GMT

SA502

ANSI Z535.2-2011

### A1.3    Safety symbols

Explain the meaning of the safety symbols used on your safety signs. This enables viewers to better understand the meaning of the graphics and makes future recognition of the safety symbols more instantaneous. See ANSI Z535.3, ISO 3864-1, ISO 3864-3, ISO 7010, and NFPA 170 for more information about safety symbol selection, design, and testing.

16

Copyright National Electrical Manufacturers Association
Provided by IHS under license with NEMA
No reproduction or networking permitted without license from IHS

Sold to:EXPONENT, INC., W1192860
Not for Resale,2011/11/7 17:5:34 GMT

SA503

ANSI Z535.2-2011

# Annex B
## Principles and Guidelines for the Design of Environmental and Facility Safety Signs
### (informative)

## B1    Scope

Good, consistent visual design helps to effectively communicate hazard information. The purpose of this annex is to provide the designer with information on widely recognized principles that can aid in the development of effective safety signs.

NOTE—Every safety sign must be considered on its own terms. Limitations on space or other unique conditions may justify variance from these principles. Examples of word messages are provided to illustrate how principles related to grammatical structure, writing style, and print layout can enhance the safety sign. These examples are not intended to prescribe standardized word messages for the hazards mentioned in the examples.

## B2    Signal word panel arrangement

For those signal words that require the use of the safety alert symbol (i.e., DANGER, WARNING, and CAUTION), the safety alert symbol and signal word should be positioned close together and centered in the signal word panel. See Figures B1 and B2. For those signal words that do not require the safety alert symbol (e.g., NOTICE, SAFETY INSTRUCTIONS, signal words referring to safety equipment location or fire equipment location), the signal word should be positioned in the center of the signal word panel.



**Figure B1**
**Examples of Correct Signal Word and Safety Alert Symbol Placement**



**Figure B2**
**Examples of Incorrect Signal Word and Safety Alert Symbol Placement**

## B3    Developing the word message

### B3.1    The content of the word message

The word message on a safety sign typically communicates information to an observer on the type of hazard, the consequence of not avoiding the hazard, and how to avoid the hazard. Many factors must be considered when determining whether to omit consequence, avoidance, or type of hazard information in the word message. Factors to consider include whether the message can be inferred from a symbol, other text messages, the target audience's training, or the context in which the safety sign is used.

### B3.2    Ordering the content of the word message

The order in which the content appears in the message panel is flexible. Factors to consider when determining the order of a word message's content include the target audience's degree of prior knowledge of the hazard and the reaction time required to avoid the hazard.

The information required on a safety sign should be arranged to provide the most important information first. Where reaction time is an issue, the action statement will be the most important portion of the word message and should be placed first. In other cases, the hazard description statement will be the most important information to communicate first. The statement concerning the consequences of interaction with the hazard is generally best understood when placed after the hazard description statement, or used

17

Copyright National Electrical Manufacturers Association
Provided by IHS under license with NEMA
No reproduction or networking permitted without license from IHS

Sold to:EXPONENT, INC., W1192860
Not for Resale,2011/11/7 17:5:34 GMT

SA504

ANSI Z535.2-2011

integrally with the hazard description statement. As a general rule, the hazard message should come first when there are many feasible action/avoidance alternatives. However, action/avoidance messages should come first when there are few avoidance alternatives.

Figure B3 illustrates a word message that explains the type of hazard and consequences of interaction with the hazard *before* it describes the hazard avoidance information. Placing the information in this order would be appropriate if it is found that the audience needs to know what the hazard *is* before they would follow the avoidance information presented on the sign. This format assumes that there is time to read the entire word message and still avoid the hazard.

Figure B4 illustrates a word message that places the hazard avoidance information first. Ordering the word message in this way would be appropriate if a person needs to immediately follow the avoidance information in order to prevent interaction with the hazard.

| *Type of Hazard and Consequence Statement* *Avoidance Statements* | **Moving parts can crush and cut** **Keep out during operation** **Lockout power before entering** | **Keep Out** **Hazardous voltage inside** **Can shock, burn, or cause death** | *Avoidance Statement* *Type of Hazard Statement* *Consequence Statement* |
|---|---|---|---|

**Figure B3**
**Word Message with**
**Hazard Description First**

**Figure B4**
**Word Message with**
**Hazard Avoidance Message First**

### B3.3    Formatting the word message

There are many issues that must be considered when developing a word message, from sentence structure to typesetting specifications. The length of the word message depends on the amount of information that needs to be communicated to a person to allow them to understand and avoid the hazard. Once this information is determined, it should be written and formatted in a manner that is concise and easily understood. The following are several principles that can be applied to the word message to achieve this objective.

### B3.3.1   Use headline style

Write in a "headline style." Compare the sample word messages shown in Figures B5 and B6. The "headline style" example of Figure B5 eliminates nonessential words and omits pronouns ("this," "that," "they"), articles ("a," "the," "an"), and forms of the verb "to be" ("is," "are," "were"). Avoid hyphenation when at all possible.

| **Hazardous voltage.** **Keep out!** **Keep access door locked.** | **Hazardous voltage is very danger-ous and should be avoided at all times. Keep the access door closed at all times and do not enter this area.** |
|---|---|

**Figure B5**
**Headline Style Message**

**Figure B6**
**Non-Headline Style Message**

Copyright National Electrical Manufacturers Association
Provided by IHS under license with NEMA
No reproduction or networking permitted without license from IHS

Sold to:EXPONENT, INC., W1192660
Not for Resale,2011/11/7 17:5:34 GMT

SA505

ANSI Z535.2-2011

**B3.3.2  Use succinct statements**

Safety signs are intended to communicate appropriate information to the viewer fast enough to allow the viewer to comprehend the information and take the necessary actions to avoid the hazard. Faster reaction times are promoted by using succinct statements.

**B3.3.2.1  Action statement**

The action statement gives the viewer instructions on how to avoid the hazard. The statement should be simple, direct, and applicable to the hazard. Figure B7 contains examples of action statements.

| | | |
|---|---|---|
| Keep Out! | Wear hard hats | No smoking |
| Keep away | Call before you dig | Do not operate |

**Figure B7**
**Examples of Action Statements**

**B3.3.2.2  Hazard description statement**

The hazard description statement identifies the specific hazard in clear, simple language. Where the desired action and the consequence of not avoiding the hazard are obvious from the hazard description statement (such as "Slippery when wet"), the action and consequence statements may be omitted. Figure B8 contains examples of concise hazard description statements.

| | | |
|---|---|---|
| Hazardous voltage inside | Confined space | Biological hazard |
| Laser radiation | Hot pipes above | Buried fiber optic cable |

**Figure B8**
**Examples of Concise Hazard Description Statements**

**B3.3.2.3  Consequence statement**

The consequence statement tells the viewer in clear, simple language what will happen if the warning is ignored. Figure B9 contains examples of consequence statements.

| | | |
|---|---|---|
| Will burn | Can cause serious burns or death | Can irritate skin |
| Can cause infertility | Will disrupt electrical service to critical equipment | |
| Exposure can cause nausea, dizziness, and a headache | | |

**Figure B9**
**Examples of Consequence Statements**

**B3.3.2.4  Emergency information / contact information**

Where it is important for the target audience to be able to contact those responsible for the particular environment or facility, contact information should be placed after the action, hazard description, and consequence statements.

**B3.3.3  Use active voice**

Write sentences in the active voice rather than the passive voice. This means placing the subject of the sentence first, the action (verb) next, and the object (noun) last. Often the subject "you" or "your" can be

Copyright National Electrical Manufacturers Association
Provided by IHS under license with NEMA
No reproduction or networking permitted without license from IHS

Sold to:EXPONENT, INC., W1192860
Not for Resale,2011/11/7 17:5:34 GMT

SA506

ANSI Z535.2-2011

inferred from the sentence and is unnecessary. Figure B10 contrasts active voice with passive voice messages.

| Active Voice Messages | Passive Voice Messages |
|---|---|
| Keep hands away from rotating blade. | Your hands must be kept away from rotating blade. |
| Lock out power before servicing equipment. | Power must be locked out before servicing equipment. |
| Replace guards immediately after repair or adjustment. | After repair of adjustment, immediately replace guards. |

**Figure B10**
**Examples of Active Voice vs. Passive Voice Messages**

**B3.3.4  Avoid prepositional phrases**

Avoid the use of prepositional phrases. Prepositional phrases can often be eliminated or replaced with one word. Figure B11 contrasts messages with and without prepositional phrases.

| Messages Without Prepositional Phrases | Messages With Prepositional Phrases |
|---|---|
| Disconnect power before servicing equipment. | Disconnect power in order to service equipment. |
| Turn off power if jam occurs. | Turn off power in the event a jam occurs. |

**Figure B11**
**Examples of Prepositional and Non-Prepositional Phrases**

**B3.3.5  Emphasizing desired action or other message**

Where room is available and it is desired to emphasize the desired action or other message, key words may be shown in larger letters, in all capital letters, in bolder letters, in a different typeface, with an exclamation mark, or with a combination thereof. Figure B12 contains examples of ways to emphasize portions of a word message.

| Hazardous voltage inside.<br><br>Keep Out!<br><br>Keep access door locked.<br><br>*Example A* | Hazardous voltage inside.<br><br>KEEP OUT!<br><br>Keep access door locked.<br><br>*Example B* | Hazardous voltage inside.<br><br>KEEP OUT!<br><br>Keep access door locked.<br><br>*Example C* |
|---|---|---|

**Figure B12**
**Examples of Ways to Emphasize Portions of a Word Message**

**B3.3.6    Refer to another source**

Keep only essential hazard-related information in the safety sign. If necessary, consideration can be given to referring the viewer to another source for additional safety information or for permission to

20

Copyright National Electrical Manufacturers Association
Provided by IHS under license with NEMA
No reproduction or networking permitted without license from IHS

Sold to:EXPONENT, INC., W1192660
Not for Resale,2011/11/7 17:5:34 GMT

SA507

ANSI Z535.2-2011

proceed. Examples of such sources include safety instruction signs, Material Safety Data Sheets (MSDS), operation manuals, service manuals, operating procedures, and safety bulletins.

**B3.3.7  Separation of word message content**

To enhance readability, arrangements of the word message in an outline format should be considered, as in Figure B13. The addition of bullets may also be considered to help separate portions of the word message, as in Figure B14. The use of continuous format, as in Figure B15, is sometimes necessary for product safety labels and temporary tags (see ANSI Z535.4 and Z535.5), but is rarely necessary or appropriate for environmental and facility safety signs.

| **Moving parts can crush and cut.**<br><br>**Keep out during operation.**<br><br>**Lockout power before entering.** | **Moving parts can crush and cut.**<br><br>● **Keep out during operation.**<br><br>● **Lockout power before entering.** | **Moving parts can crush and cut. Keep out during operation. Lockout power before entering.** |
|---|---|---|
| **Figure B13**<br>**Outline Format** | **Figure B14**<br>**Outline with Bullet Format** | **Figure B15**<br>**Continuous Format** |

**B3.3.8  Text justification**

Left aligned "ragged right" text should be used for all but one-line text messages, which can be either left aligned (see Figure B16) or centered. Left alignment aids in readability (compared to centered text; see Figure B17) by creating a vertical line that the eye naturally locates when searching for the next line of text. Justified text should be avoided because the added space between words makes it more difficult to read (see Figure B18).

| **Moving parts can crush and cut.**<br><br>**Keep out during operation.**<br><br>**Lockout power before entering.** | **Moving parts can crush and cut.**<br><br>**Keep out during operation.**<br><br>**Lockout power before entering.** | **Moving parts can crush and cut.**<br><br>**Keep out during operation.**<br><br>**Lockout power before entering.** |
|---|---|---|
| **Figure B16**<br>**Left Aligned Ragged Right Text** | **Figure B17**<br>**Centered Text** | **Figure B18**<br>**Justified Text** |

**B3.3.9  Upper and lower case letters**

The preferred format for text is the use of mixed upper and lower case where only the first letter of the first word in a sentence is capitalized (see Figure B19). The use of all upper case letters for the word message is discouraged because it is more difficult to read quickly than lower case type (see Figure B20). On occasion, a single word or phrase may be set in upper case letters to provide emphasis (see Figure B21).

21

Copyright National Electrical Manufacturers Association
Provided by IHS under license with NEMA
No reproduction or networking permitted without license from IHS

Sold to:EXPONENT, INC., W1192660
Not for Resale,2011/11/7 17:5:34 GMT

SA508

ANSI Z535.2-2011

| | | |
|---|---|---|
| Moving parts can crush and cut.<br><br>Keep out during operation.<br><br>Lockout power before entering. | MOVING PARTS CAN CRUSH AND CUT.<br><br>KEEP OUT DURING OPERATION.<br><br>LOCKOUT POWER BEFORE ENTERING. | Moving parts can <u>CRUSH and CUT.</u><br><br><u>KEEP OUT</u> during operation.<br><br><u>LOCKOUT POWER</u> before entering. |
| **Figure B19<br>Mixed Case<br>Lettering** | **Figure B20<br>All Upper Case** | **Figure B21<br>Selective Use of<br>Upper Case** |

### B3.3.10    Choice of type style

Sans serif typestyles are preferred. The important specification to look for when choosing a typestyle is the stroke "width-to-height" ratio. This ratio refers to the width of the letter and the strokes used to create the letter. For black type on a white background, the stroke width-to-height ratio should be 1:6–1:8. For white type on a black background, the stroke width-to-height ratio should be 1:8–1:10. See Annex E, Reference 17.

### B3.3.11    Choice of type spacing

The correct spacing between lines of text, between words, and between letters helps to make a word message easier to read. The amount of space between lines of text is called leading. Lines of text should be separated by leading that is approximately 120% of the type point size (e.g., 10 point type should have 12 point leading, 14 point type should have 16.8 point leading, etc.). Additional leading can be added to separate portions of a word message, as shown in the outline format illustrated in Section B3.3.7. The space between words and between letters is called tracking. For purposes of legibility, it is important to use proper word and letter spacing when typesetting the word message (see Figure B22).

| | | |
|---|---|---|
| This is an example of a word message with proper leading and word/letter spacing.<br><br>**Example A— Proper leading and spacing** | This is an example of a word message with too much leading and too much word/letter spacing.<br><br>**Example B—Too much leading and spacing** | This is an example of a word message with not enough leading and not enough word/letter spacing.<br><br>**Example C—Not enough leading and spacing** |

**Figure B22<br>Examples of Correct and Incorrect Type Spacing**

### B3.3.12    Choice of type color

The word message's type can be black on a white background or white on a black background. This choice should be based on which is more legible. Legibility is dependent on more than type color. Factors such as type size, amount of text, reading distance, contrast with the mounting surface, and lighting conditions must all be considered (see Figure B23).

22

Copyright National Electrical Manufacturers Association
Provided by IHS under license with NEMA
No reproduction or networking permitted without license from IHS

Sold to:EXPONENT, INC., W1192660
Not for Resale,2011/11/7 17:5:34 GMT

SA509

ANSI Z535.2-2011

*Black type on a white background*

| Moving parts can crush and cut. |
| --- |
| Keep out during operation. |
| Lockout power before entering. |

**Moving parts can crush and cut.**

**Keep out during operation.**

**Lockout power before entering.**

*White type on a black background*

**Figure B23**
**Examples of Type Color Choice**

### B3.3.13    Letter size

Legibility of the word message at the minimum safe viewing distance determines the proper letter size for the word messages. The letter size / safe viewing distance guidelines in Table B1 define the type size required to achieve legibility at the given viewing distance. The height of the capital letter "H" identifies the type's letter size. Note that the type sizes shown in column two and column three of Table B1 indicate the *minimum* word message letter size for favorable light conditions and the *recommended* letter size for unfavorable reading conditions, respectively. Letter size may need to be larger than the values in column two for various reasons, including the following:

    a.   to be conspicuous from other information displayed in the area;

    b.   to facilitate legibility under low light or other unfavorable viewing conditions;

    c.   to warn persons at distances greater than the minimum safe viewing distance;

    d.   to convey special emphasis for portions of the message; and

    e.   to facilitate legibility for populations that have difficulty reading small text (e.g., senior citizens).

A formatted sign with the selected letter size for word messages should be visually examined in the environment expected for actual use (lighting, background, angle, etc.) and tested for legibility in that environment by persons representative of the target audience. It is advisable to test different letter sizes to determine the optimum size for legibility at the desired viewing distance.

### B3.3.14    Minimum letter height calculations

Type size is defined in "points," a term used to describe the space required for lead type characters. Point sizes measure from the top of the capital letters to the bottom of the lower case letters with descenders (e.g., the bottom of the letter "g" or "j"). One point equals 0.01384 inches, or approximately 1/72 of an inch. Although typefaces vary slightly, a practical guide for defining type size is based on using the capital letter "H" for measurement purposes. Since the character "H" has no descender, it is possible to use a conversion factor of 0.01 inches = 1 point of type size. Thus, 12 point type yields a capital "H" approximately 0.12 inches high. For metric purposes, use a conversion factor of 3.9 points =1 mm of height for a capital "H."

Copyright National Electrical Manufacturers Association
Provided by IHS under license with NEMA
No reproduction or networking permitted without license from IHS

Sold to:EXPONENT, INC., W1192660
Not for Resale,2011/11/7 17:5:34 GMT

SA510

ANSI Z535.2-2011

### Table B1
### Examples of Word Message Letter Heights and Minimum Safe Viewing Distances

| Minimum Safe Viewing Distance[1] | | Minimum Letter Height for FAVORABLE Reading Conditions | | | Recommended Letter Height for UNFAVORABLE Reading Conditions | | |
|---|---|---|---|---|---|---|---|
| (ft) | (m) | (point size) | (in) | (cm) | (point size) | (in) | (cm) |
| ≤4 | ≤1.2 | 16[2] | 0.16[2] | 0.4[2] | 33 | 0.33 | 0.8 |
| 6 | 1.8 | 24 | 0.24 | 0.6 | 50 | 0.50 | 1.3 |
| 8 | 2.4 | 32 | 0.32 | 0.8 | 66 | 0.66 | 1.7 |
| 10 | 3.0 | 40 | 0.40 | 1.0 | 83 | 0.83 | 2.1 |
| 15 | 4.6 | 60 | 0.60 | 1.5 | 127 | 1.27 | 3.2 |
| 20 | 6.1 | 80 | 0.80 | 2.0 | 168 | 1.68 | 4.3 |
| 30 | 9.1 | 120 | 1.20 | 3.0 | 251 | 2.51 | 6.4 |
| 40 | 12.2 | 160 | 1.60 | 4.1 | 336 | 3.36 | 8.5 |
| 60 | 18.3 | 240 | 2.40 | 6.1 | 504 | 5.04 | 12.8 |
| 80 | 24.4 | 320 | 3.20 | 8.1 | 672 | 6.72 | 17.1 |
| 100 | 30.5 | 400 | 4.00 | 10.2 | 840 | 8.40 | 21.3 |
| 125 | 38.1 | 500 | 5.00 | 12.7 | 1049 | 10.49 | 26.6 |
| 150 | 45.7 | 600 | 6.00 | 15.2 | 1258 | 12.58 | 32.0 |
| 200 | 61.0 | 800 | 8.00 | 20.3 | 1679 | 16.79 | 42.7 |

[1] The minimum safe viewing distance refers to the closest distance a person can be to the sign and still have time to follow the safety sign's message to avoid the hazard.

[2] 16 point (.16 in, 0.4 cm) type is the suggested minimum type size for use on environmental and facility safety signs.

**B3.3.15    Comprehension**

The word message should be written so that it can be understood by the target audience (i.e., those who are expected to be in the vicinity of the hazard). This means choosing words that accurately describe the specific hazard and avoidance information in terms the intended audience will understand.

## B4    Use of safety symbols

Well-designed safety symbols can often communicate hazard information quickly and across language and literacy barriers. Although this standard allows word message—only formats for safety signs, the use of safety symbols is encouraged whenever practical. See ANSI Z535.3-2011 for additional information concerning symbol selection, design, and testing.

## B5    Multilingual formats

The selection of additional languages for safety signs is an extremely complex issue. Experts suggest that nearly 150 languages are spoken in the United States and millions of Americans speak a language other than English in their homes. If it is determined that additional languages are desired on a safety sign, the following formats should be considered. In all examples, the use of symbols is strongly encouraged in order to better communicate the sign's hazard information across language barriers. White type on a black background is used in these examples only to differentiate the placement of safety symbol and word message panels.

Copyright National Electrical Manufacturers Association
Provided by IHS under license with NEMA
No reproduction or networking permitted without license from IHS

Sold to:EXPONENT, INC., W1192660
Not for Resale,2011/11/7 17:5:34 GMT

SA511

ANSI Z535.2-2011

### B5.1    Vertical formats

The vertical bilingual format shown in Figure B24 can be modified to include a longer word message by lengthening the word message panels.

### B5.2    Horizontal formats

Figures B25 and B26 illustrate horizontal formats for bilingual safety signs. In Figure B25, the English word message and signal word may appear on either the right or left side. The text and signal word panels may be widened to accommodate longer word messages.





**Figure B25**
**Long Message, Horizontal Format**



**Figure B26**
**Short Message Format**

**Figure B24**
**Long Message, Vertical Format**

### B5.3    Signal word panel arrangement

The safety alert symbol and signal word should be positioned close together and centered in each signal word panel of a bilingual safety sign (see Section B2).

## B6    Multi-hazard formats

If multiple hazards exist at one location on a product or if there is only enough space for a single safety sign, a multi-hazard sign may need to be considered. The use of symbols in multi-hazard formats is optional but encouraged. Additional symbols can be added to these formats as needed. The signal word corresponding to the hazard with the greatest seriousness level should be used. The hazard with the greatest seriousness level should be ordered first in the word message. White type on a black background is used in these examples only to differentiate the placement of safety symbol and word message panels. The following options can be considered when designing multi-hazard signs.

Copyright National Electrical Manufacturers Association
Provided by IHS under license with NEMA
No reproduction or networking permitted without license from IHS

Sold to:EXPONENT, INC., W1103860
Not for Resale,2011/11/7 17:5:34 GMT

25

SA512

ANSI Z535.2-2011

### B6.1    Three-panel formats

Use one of the standard three-panel formats (see Figures 3, 5, 9, 10 and 11) and use a single symbol to communicate the most important hazard. Use the outline format to separate the various hazard word messages (see Section B3.3.7).

### B6.2    Two-panel formats

Use the two-panel signal word / word message formats (see Figures 4, 6, 7, 8 and 12). Use the outline format to separate the various hazard word messages (see Section B3.3.7).

### B6.3    Multi-symbol formats

Use one of the multi-symbol formats shown in Figures B27 through B31. In the formats in Figures B27 and B28, place the most important hazard symbol in the upper left panel so that it is "read" first and order the word message segments so they correspond to the order of the symbol ("reading" the symbols from left to right or top to bottom). If the format shown in Figure B28 is used, arrange the word message segments so they line up opposite the appropriate symbol panel.



**Figure B27
Multiple Symbols
on Top**



**Figure B28
Multiple Symbols
on Left**



**Figure B29
Two-Symbol Alternative Format**

Figures B30 and B31 illustrate the multi-hazard/multi-signal word formats. In these formats, each hazard is ordered according to its seriousness level and placed below the appropriate signal word. Additional pictorials or word messages may be located under each signal word as needed. Use the outline format to separate portions of the word message with additional lines and/or bullets (see Section B3.3.7).



**Figure B30
Symbols on Left**



**Figure B31
Symbols on Right**

26

Copyright National Electrical Manufacturers Association
Provided by IHS under license with NEMA
No reproduction or networking permitted without license from IHS

Sold to:EXPONENT, INC., W7292660
Not for Resale,2011/11/7 17:53:34 GMT

SA513

ANSI Z535.2-2011

**B7**  **Safety instruction sign formats**

When designing hazard alerting signs, there are times when it is desirable to separate lengthy procedures or instructions from essential "need to know quickly" hazard-related safety information. A safety instruction sign is useful for this purpose, thereby allowing the message panel of a hazard alerting sign to remain short and concise.

**B7.1**  **Specific wording for the instructional signal word**

The signal word classification "SAFETY INSTRUCTIONS" or similar words (Section 4.11.5) encourages the use of more definitive words where practical. More definitive words are intended to briefly identify the type of information in the safety instruction panel, much like a headline for a news article. Examples of more descriptive word choices include:

> SAFE OPERATING PROCEDURES
>
> BOILER SHUTDOWN PROCEDURE
>
> LOCKOUT PROCEDURE
>
> SAFE INSTALLATION INSTRUCTIONS
>
> EMERGENCY SHUTDOWN INSTRUCTIONS

**B7.2**  **Format Options**

Separating instructional safety information can be accomplished in one of two ways:

a.  Separate safety instruction sign (see Figure B32);

b.  A safety instruction sign included as part of a hazard alerting sign. (see Figure B33).



**Figure B32**
**Example of Safety Instruction Sign**

**Figure B33**
**Example of Safety Instruction Sign as Part of Hazard Alerting Sign**

Copyright National Electrical Manufacturers Association
Provided by IHS under license with NEMA
No reproduction or networking permitted without license from IHS

Sold to:EXPONENT, INC., W1192660
Not for Resale,2011/11/7 17:5:34 GMT

27

SA514

ANSI Z535.2-2011

## Annex C
## Previous Formats for Signal Word Panels
(informative)

The following formats for signal word panels were used in earlier editions of this standard and were included as an alternate to the preferred panel format in the 1998 edition. They were not included in the 2002 and 2007 versions of this standard, nor are they included in this edition. Existing signs in use that use the older format may continue to be used.







28

Copyright National Electrical Manufacturers Association
Provided by IHS under license with NEMA
No reproduction or networking permitted without license from IHS

Sold to:EXPONENT, INC., W1192660
Not for Resale,2011/11/7 17:5:34 GMT

SA515

ANSI Z535.2-2011

# Annex D
## Risk Estimation and Signal Word Selection
### (informative)

## D1    Scope

Signal words for hazard alerting signs are selected based on the risk that results from not following the safety message. The level of risk determines signal words and safety colors. This annex provides guidance for estimating risk and selecting signal words.

## D2    Definitions

**D2.1    Accident:** An incident that results in harm, property damage, or both.

**D2.2    Harm:** Any degree of physical injury, including death.

**D2.3    Hazard:** A potential source of harm.

**D2.4    Hazardous Situation:** A condition or act that is contrary to the implicit or explicit instructions of a safety sign and that produces an increased risk of harm. The presence of the condition or performance of the act may be intentional or unintentional. However, conditions or acts that are implemented with the intention of causing harm are not considered hazardous situations within the scope of this standard.

**D2.5    Incident:** An unintended or undesired event.

**D2.6    Risk:** A combination of the probability of occurrence of harm and the severity of that harm.

## D3    Risk estimation

### D3.1    General

Risk estimation involves (a) considering the probability and severity of outcomes that can result from a hazardous situation and (b) combining these estimates to determine the risk. While quantitative risk assessment is possible in certain limited circumstances, only qualitative risk estimates are possible in most cases. For the purpose of hazard alerting classification (i.e., assigning a signal word and safety color), qualitative risk estimation is commonplace and generally appropriate.

There are numerous methods for estimating the risk posed by a hazardous situation. This section outlines one method that is specifically designed to assist in assigning signal words according to the definitions in this standard. For information about other risk estimation methods or models, see the references at the end of this annex.

### D3.2    Hazardous situation

Hazard alerting signs provide instructions, explicit or implicit, regarding how to avoid hazardous situations. In order to select the appropriate signal word, risk must be estimated for the particular hazardous situation or situations.

Note that, for the purposes of signal word selection, it does not matter why a hazard alerting sign might not be followed (e.g., failure to read the sign, conscious decision to ignore the sign); the hazardous situation associated with a sign is the same, regardless of why the sign is not followed.

When a safety sign addresses more than one hazardous situation, the risk associated with each hazardous situation should be estimated. In these cases, the signal word corresponding to the greatest risk level is used.

### D3.3    Model of events resulting from a hazardous situation

Figure D1 shows the possible results of a hazardous situation.

Copyright National Electrical Manufacturers Association
Provided by IHS under license with NEMA
No reproduction or networking permitted without license from IHS

Sold to:EXPONENT, INC., W1192860
Not for Resale,2011/11/7 17:5:34 GMT

SA516

ANSI Z535.2-2011



**Figure D1**
**Model of the Possible Results of a Hazardous Situation**

The hazardous situation (i.e., the result of not following a sign) either results in an accident or in no accident. If an accident occurs, it can result in harm. The harm can be classified by severity.

**D3.4    Severity**

**D3.4.1  Classification of severity**

As shown in the model above, in the selection of signal words, there are two classifications for severity of harm.

**D3.4.1.1    Death or serious injury:** Injury to humans that is more severe than minor or moderate injury.

Serious injuries typically have one or more of the following characteristics:

    a.  results in permanent loss of function or significant disfigurement

    b.  requires substantial and prolonged medical treatment

    c.  involves long periods of disability

    d.  involves considerable pain and suffering over long periods of time

Examples of serious injuries include amputations, severe burns, and loss or impairment of vision or hearing.

**D3.4.1.2    Moderate or minor injury:** Injury to humans, not including death or serious injury.

Minor or moderate injuries do not typically result in permanent disability or significant disfigurement or pain. Examples of minor or moderate injuries include cuts, scratches, and irritation.

**D3.4.2  Hazardous situations resulting in multiple harms**

When the outcome of an event includes results falling into more than one of the severity classifications, the most severe classification should be used. For example, an event that results in both minor injury to one body part and serious injury to another should be classified as "serious injury or death."

30

Copyright National Electrical Manufacturers Association
Provided by IHS under license with NEMA
No reproduction or networking permitted without license from IHS

Sold to:EXPONENT, INC., W1192660
Not for Resale,2011/11/7 17:5:34 GMT

ANSI Z535.2-2011

### D3.4.3  Worst credible severity

A hazardous situation can result in a variety of outcomes, each with varying likelihood. When selecting a signal word, it is necessary to determine the worst credible severity that can result from a hazardous situation. Only outcomes that are credible possibilities should be considered.

### D3.5    Probability of harm

For the purpose of signal word selection, probability includes the probability of an accident and the probability of the worst credible severity occurring if there is an accident.

The probability of the safety sign not being followed should not be included in an estimate of risk for the purpose of signal word selection.

### D3.5.1  Probability of accident

The probability of an accident if a hazardous situation exists (i.e., if the safety sign is not followed) should be estimated. The probability of an accident includes the probability of accidents of any severity.

### D3.5.2  Probability of worst credible severity

The probability of the worst credible severity occurring *if an accident occurs* should be estimated. To estimate the probability of the worst credible severity, it is necessary to include not only the likelihood of the worst credible severity, but also the likelihood of all other outcomes that fall within the worst credible severity category (e.g., if the worst credible severity is death, then include all outcomes that are in the category of death or serious injury).

### D3.5.3  Estimating Probability

For the purposes of assigning signal words, probability need not be determined quantitatively or with great precision. Signal words are assigned based on estimates of probability using two qualitative categories:

**D3.5.3.1 Will:** Indicates an event that is expected to happen with near certainty.

**D3.5.3.2 Could:** Indicates an event that is possible but not nearly certain.

## D4    Signal word selection

For hazard alerting signs, the signal word is selected according to the risk presented by the hazardous situation that the safety sign addresses. That is, signal word selection is based on the risk posed *if the safety sign is not followed.*

The risk is determined based on:

    a.  worst credible severity if an accident occurs;

    b.  probability of an accident if the hazardous situation occurs (i.e., if the safety sign is not followed);

    c.  probability of the worst credible severity occurring.

### D4.1    Signal word selection matrices

The following matrices show the signal words, colors, and presence or absence of a safety alert symbol that are assigned for each combination of accident probability, worst credible harm, and probability of worst credible harm.

Copyright National Electrical Manufacturers Association
Provided by IHS under license with NEMA
No reproduction or networking permitted without license from IHS

Sold to:EXPONENT, INC., W1192660
Not for Resale,2011/11/7 17:5:34 GMT

SA518

ANSI Z535.2-2011

If the worst credible severity is death or serious injury:

| | | Probability of Accident if Hazardous Situation is Not Avoided | |
|---|---|---|---|
| | | Will | Could |
| Probability of Death or Serious Injury if Accident Occurs | Will | ⚠ **DANGER** | ⚠ **WARNING** |
| | Could | ⚠ **WARNING** | ⚠ **WARNING** |

If the worst credible severity is minor or moderate injury:

| For all Probabilities | ⚠ **CAUTION** |
|---|---|

If there is no credible risk of physical injury:

| For all Probabilities | **NOTICE** |
|---|---|

Copyright National Electrical Manufacturers Association
Provided by IHS under license with NEMA
No reproduction or networking permitted without license from IHS

Sold to:EXPONENT, INC., W1192860
Not for Resale,2011/11/7 17:5:34 GMT

SA519

ANSI Z535.2-2011

**D4.2    Signal word selection process**



**Figure D2**
**Signal Word Selection Process**

Copyright National Electrical Manufacturers Association
Provided by IHS under license with NEMA
No reproduction or networking permitted without license from IHS

Sold to:EXPONENT, INC., W1192660
Not for Resale,2011/11/7 17:5:34 GMT

SA520

ANSI Z535.2-2011

# Annex E
# Informative References
(informative)

1. ANSI Z535.4-2011, *American National Standard Product Safety Signs and Labels* (American National Standards Institute, 2011).

2. ANSI Z535.5-2011, *American National Standard Safety Tags and Barricade Tapes (for Temporary Hazards)* (American National Standards Institute, 2011).

3. ANSI Z535.6-2011, *American National Standard Product Safety Information in Product Manuals, Instructions, and Other Collateral Materials* (American National Standards Institute, 2011).

4. ANSI C95.2-1982 (R1988), *Radio Frequency Radiation Hazard Warnings Symbol* (American National Standards Institute, 2011).

5. ANSI N2.1-1989, *Radiation Symbol* (American National Standards Institute, 1989).

6. ANSI Z400.1 / Z129.1-2010, *Hazardous Workplace Chemicals—Hazard Evaluation and Safety Data Sheet and Precautionary Labeling Preparation* (American National Standard Institute, 2010).

7. Federal Highway Administration, *Manual on Uniform Traffic Control Devices for Streets and Highways,Millennium Edition* (U.S. Department of Transportation, 16 December 2009). http://mutcd.fhwa.dot.gov/

8. ANSI/NFPA 70-2005, *National Electrical Code* (National Fire Protection Association, 2005).

9. ANSI/NFPA 170-2009, *Fire Safety and Emergency Symbols* (National Fire Protection Association, 2009).

10. ANSI/NFPA 178-1986, *Symbols for Fire Fighting* (National Fire Protection Association, 1986).

11. ANSI/SAE S276.2, *Slow Moving Vehicle Identification Symbol* (Society of Automotive Engineers, June 1968).

12. ISO 3864-1:2011, *Graphical symbols—Safety colours and safety signs—Part 1: Design principles for safety signs in workplaces and public areas* (International Organization for Standardization, 2011).

13. ISO 3864-3:2006, *Graphical symbols—Safety colours and safety signs—Part 3: Design principles for graphical symbols used in safety signs* (International Organization for Standardization, 2006).

14. ISO 7010:2011, *Graphical symbols—Safety colours and safety signs—Safety signs used in workplaces and public areas* (International Organization for Standardization, 2011).

15. Smith, Sidney L., "Letter Size and Legibility," *Human Factors*, vol. 21(6) (December 1979), pp 661-670.

16. Collins, B.L., Kuo, B.Y., Mayerson, S.E., Worthey, J.A., and Howett, G.L., *Safety Color Appearance Under Selected Light Sources,* (National Bureau of Standards, NBSIR 86-3493, December 1986).

17. Howett, Gerald L., *Size of Letters Required for Visibility as a Function of Viewing Distance and Observer Visual Acuity* (National Bureau of Standards, 1983).

34

Copyright National Electrical Manufacturers Association
Provided by IHS under license with NEMA
No reproduction or networking permitted without license from IHS

Sold to:EXPONENT, INC., W1192660
Not for Resale,2011/11/7 17:5:34 GMT

SA521

ANSI Z535.2-2011

## 2016 Revisions

The ANSI Accredited Standards Committee Z535 plans to issue the next revisions of the Z535 standards (Z535.1 through Z535.6) in December 2016. In order to meet that deadline, the committee developed the following tentative timetable:

| | |
|---|---|
| All proposed changes are due: | June 30, 2014 |
| Revisions will be finalized for letter balloting: | April 15, 2015 |
| Letter balloting will be completed by: | July 15, 2015 |
| Public reviews will be completed by: | March 1, 2016 |
| Drafts will be ready to submit to the publisher: | May 31, 2016 |
| Published: | December 15, 2016 |

**All proposed changes must be submitted by June 30, 2014.** Any proposals received after that date will be deferred to subsequent revisions. In order to facilitate the next revision, proposed changes must be submitted on a form for that specific purpose, which is on the next page. Please send this form to:

Secretary, ANSI Committee Z535
National Electrical Manufacturers Association
1300 North 17th Street, Suite 1752
Rosslyn, VA 22209

Copyright National Electrical Manufacturers Association
Provided by IHS under license with NEMA
No reproduction or networking permitted without license from IHS

Sold to:EXPONENT, INC., W1192660
Not for Resale,2011/11/7 17:5:34 GMT

35

SA522

ANSI Z535.2-2011

# ANSI Accredited Standards Committee Z535
# on Safety Signs and Colors

## FORM FOR PROPOSALS

Return to:    Secretary, ANSI Committee Z535
National Electrical Manufacturers Association
1300 North 17th Street, Suite 1752
Rosslyn, VA 22209

Name _____    Date _____

Address _____

Representing _____
(Please indicate organization or self)

E-mail Address _____    Telephone _____

1.    a.    Standard Title _____

b.    Section/Paragraph_____

2.    Proposal recommends (check one):        New Text
Revised Text
Deleted Text

3.    Proposal (Include the proposed new or revised text, or identify the words to be deleted.
Underline additions and strikethrough deletions.)

4.    Statement of the Problem or Reason for the Proposal

5.    Check one.    This proposal is original material.
This proposal is not original material; its source is as follows:

_____

_____

This original material is the submitter's own idea based upon his/her own experience, thought, or research, and to the best of his/her knowledge, is not copied from another source.

I agree to give NEMA all and full rights, including rights of copyright, in this proposal, and I understand that I acquire no rights in any standards publication in which this proposal in this or another similar or analogous form is used.

_____
Signature

Please do not write in the space below.

| Date Received: | Log # |
|---|---|

36

Copyright National Electrical Manufacturers Association
Provided by IHS under license with NEMA
No reproduction or networking permitted without license from IHS

Sold to:EXPONENT, INC., W1192680
Not for Resale,2011/11/7 17:5:34 GMT

SA523

EXHIBIT 3
Treatise

SA524

# WHAT IS A WARNING AND WHEN WILL IT WORK?

Thomas J. Ayres, Madeleine M. Gross, Christine T. Wood, Donald P. Horst, Roman R. Beyer, and J. Neil Robinson
Failure Analysis Associates, Inc.

The term warning is applied to a variety of stimuli. From a safety standpoint, the most appropriate definition of warning ties it to any information that has the potential to change behavior and prevent accidents. The results of an extensive literature review suggest that warnings are unlikely to be effective unless a series of conditions are met. The failure of many intended warnings, including most on-product warning labels, to reduce accidents reflects the difficulty of overcoming the problems inherent in their use.

## INTRODUCTION

This paper addresses two questions: "What do we mean by a *warning*?" and "When will a warning work to prevent accidents?" Although, as we will show, the overall picture of when warnings do *vs.* do not work is clear, the literature has generated a considerable amount of confusion. We believe this has occurred largely because the term "warning" is used to apply to a broad, complex, and somewhat amorphous concept.

The solution is not, we believe, to try to reach a consensus on a single, narrow definition of a "*warning*," but rather to develop a clear understanding of the many variations that this concept encompasses; to understand the potential impacts of different forms of warnings on different people in different contexts; and to avoid simplistic answers to the question "When do warnings work?"

## WHAT IS A WARNING?

### Definitions

*Generic definition.* We define a warning generically as information about a possible negative consequence -- a message that something undesirable may occur to someone or something as a result of taking (or failing to take) some action.

*Multiple definitions.* Communication theory, which addresses the transmission and use of information, provides a critical distinction for defining a warning. From this perspective, communication involves a sender (or source, or stimulus), a message (and a channel for transmission), and a receiver (and response) (Driver, 1987; McGuire, 1981). Each component can provide a possible definition of a warning:

> Sender: A warning is any message intended by the sender to provide information about possible negative consequences of an action (or inaction).

> Message/Channel: A warning is any message about possible negative consequences of an action (or inaction) that meets some criteria of message content and/or form.

> Receiver: A warning is any message interpreted by the receiver as providing information about possible negative consequences of an action (or inaction).

Given that our concern is the prevention of accidents, only the definition of a warning from the perspective of the receiver is relevant. That is, no matter what the intentions of the sender and no matter how closely the message conforms to some guideline or standard, the important question is what, if anything, did the receiver get out of the message.

*"Effective" Warnings.* By an effective warning, we mean one that changes behavior in a way that results in a net reduction in the relevant negative consequences. The question of when people understand and remember warnings is considered here only insofar as it is relevant to understanding the potential effects of warnings on behavior and accident reduction.

### Inappropriate Distinctions

*Safety warnings versus other warnings.* A distinction is often made between messages about possible injury or death (safety warnings) and messages about other negative consequences such as property damage, social disapproval, loss of time or money, or penalties imposed by police, employers, parents, or other authorities. The rationale is that concern about physical injury is uniquely motivating to people in that no one would willingly risk physical injury or death. However, both common experience and formal research provide abundant evidence that this rationale is false. The threat of physical injury or death is of little concern unless the likelihood of injury or death is perceived as quite high. For example, few people worry about the very real, but low-probability, threat of death when traveling in a car, but many avoid using a pay phone that says "out of order," even though the negative consequence, if true, is only the loss of a few cents (Godfrey, et.al., 1985). Thus, it is important to keep in mind that, for purposes of understanding when warnings work, the distinction between the remote chance of personal injury and other negative consequences is generally unimportant.

*Instructions versus warnings.* Instructions are sometimes distinguished from warnings on the grounds that they are not intended or designed to alert a user to the possibility of negative consequences. With respect to the impact on the receiver, however, the distinction may be irrelevant. On the one hand, warnings often include instructions, at least by implication, on how to avoid the negative consequences. On the other, instructions often convey, at least implicitly, some information about negative consequences if the instructions are not followed. Whether or not a safety message acts as a warning depends more on the person and the situation than on message content.

*Rules versus warnings.* A final distinction to consider concerns the difference between rules and warnings. This is an important practical distinction, because a sign saying simply "Do Not Do X," with the implication that it is a rule of someone with authority, may have more impact on behavior than a sign that says "Doing X May Cause Injury. To Avoid Any Risk of Injury, Do Not Do X."

As we have defined warnings, however, a rule is simply a warning involving a special category of negative consequences. Instead of (or in addition to) possible injury,

1

the consequences stated or implied by the "rule" may include offending the relevant authority and/or a possibility of various penalties. Thus, rules might be viewed as a variation of warnings in which some of the negative consequences derive from displeasing or disobeying the rule makers.

## WHEN WILL IT WORK?

The research bearing on the effectiveness of on-product warning labels was reviewed by McCarthy et.al., (1984a), who found no demonstrated impact of on-product warning labels on behavior or accidents. Studies reported subsequently showed that certain forms of warnings, predominantly other than on-product warning labels, had at least some impact on human behavior in the laboratory (e.g., Godfrey, et.al., 1985), although no actual reduction in accidents or injuries was demonstrated.

In 1986, two reviews of the warnings research literature incorporated the new results and addressed the general question of when warnings of various kinds might work and when they will not (Lehto and Miller, 1986; Horst, et.al., 1986). Since 1986, additional studies of warning effectiveness, many of which are referenced below, have been published. These studies, taken in the context of the large bodies of research in the broader fields of human communication and behavior, provide an increasingly clear and consistent picture of the effects, if any, of warnings on human behavior.

In order for a warning to prevent an accident, a complex chain of events must occur . To simplify considerably, the person who is the target of the message must process the message, and the information that is extracted, when added to knowledge acquired over a lifetime of experience plus additional information extracted from the immediate environment, must motivate the person to change behavior in some way that will prevent an accident (see also Lehto and Miller, 1986). These events, together with some conditions that affect whether the events take place or not, are summarized in Figure 1 and discussed below.

Organization and data. Many of the conditions are well established through common experience and a wealth of research in the behavioral sciences. In most cases, we have also cited relevant studies that have addressed warnings directly, with special emphasis on studies published from 1986 to present. References are restricted primarily to studies showing impacts of warnings on behavior, rather than studies where only subjects' opinions are reported, because opinions have proven to be poor predictors of warning effectiveness (McCarthy, et.al, 1987; Wogalter et.al., 1987).

Limitations. It is important to emphasize two limitations of the list of factors presented in Figure 1. First, aside from highway safety research, most of the actual behavioral tests of the effectiveness of safety messages have involved laboratory experiments (in which the participants knew that they were being observed). Any generalization of findings to the real world must be made cautiously when social behavior such as

Figure 1. Conditions for possible safety impact of warnings.

| WHEN MIGHT A WARNING WORK? | |
|---|---|
| A WARNING (SIGN OR LABEL) MIGHT CHANGE BEHAVIOR IF A PERSON: | |
| 1. Reads and understands the warning, and | 2. Is motivated and able to change behavior. |
| **Person:**<br>Is alert and sober, and<br>Is seeking information, and<br>   *Feels need for information, based on past experience*<br>   *Hazards suspected, but not observable*<br>Doesn't filter out the warning<br>   *Not overloaded with information*<br>   *Not previously exposed to excessive, unnecessary warnings*<br><br>**Sign or label:**<br>Is present (only) when and where needed, and<br>Includes (only) the information needed, and<br>Is in an appropriate format<br>   *Noticeable, at person's level of information seeking*<br>   *Brief, legible and understandable* | **Person:**<br>Would not know there was a hazard without the warning, and<br>Believes the warning, and<br>   *Warning information is consistent with past experience*<br>   *Conduct of others is consistent with warning*<br>   *Source is credible*<br>Does not accept the risk, and<br>   *Consequences seen as highly likely [or severe and*<br>     *moderately likely]*<br>   *Does not believe hazard is under his/her control*<br>   *Risk outweighs the attraction of the activity*<br>   *Risk outweighs the social pressure to take risk*<br>   *Risk outweighs the cost/effort of avoidance*<br>Is capable of making an appropriate change, and<br>Remembers to change. |
| CHANGES IN BEHAVIOR MAY IMPROVE SAFETY IF: | |
| 1. The right people change, and | 2. The changes reduce accidents. |

2

SA526

response to persuasive or instructional messages is involved (e.g., Cronbach, 1975), and it should be noted that on-product warning labels have been much more successful in laboratory experiments than in the field.

Second, the research literature suggests that there may be other important factors that have not yet been explicitly discussed and tested with respect to warnings. For example, in some situations people may resent and deliberately disobey threatening messages (Pennebaker & Sanders, 1976), and people sometimes respond to the form of social communication without considering its content (Langer et.al., 1978). These phenomena may place further limits on the ability of a warning to promote safe behavior.

### PROCESSING THE MESSAGE

In order for a warning to have any chance of influencing behavior, key information from the warning must be processed by the receiver. This in turn depends heavily on the attitude and actions of the person who is involved, on the context within which it is encountered, and on the message itself. Within broad limits, the format and exact wording of the message may play little or no role in affecting behavior.

#### Person

Alertness. Warnings may have little or no effect on a tired, distracted, or intoxicated audience. There is abundant evidence of decrements in cognitive, perceptual, and motor performance under those conditions.

Information seeking. Results of recent warnings studies are consistent with the communication theory principle that people who not are looking for a particular type of information (be it instructions or warnings) are unlikely to notice and use that information if they encounter it (deTurck & Goldhaber, 1988; Dorris & Purswell, 1977; Friedmann, 1988; Strawbridge, 1986; Wright, 1979).

Filtering. Safety messages in familiar situations on familiar products are likely to be filtered out. Reading (self-reported and actual) and complying with safety information has consistently been found lower for familiar or recently-used products (Nikmorad, 1985; Otsubo, 1988; Purswell et.al., 1986). Constant exposure to excessive, unnecessary warnings can be expected to produce habituation. Warnings may be filtered out even in unfamiliar situations, especially in a context of information overload, or under stress when the amount of information or the number of response alternatives considered is reduced (Keinan, 1987). Widespread use of warnings probably reduces their potential effectiveness by decreasing their prominence, similar to the effect of embedding important information in surrounding text (Strawbridge, 1986).

#### Sign or Label

Time and place. The message must be available at an appropriate time and place, generally where behavior needs to change. People learn to filter out stimuli that are not consistently relevant to their behavior, making it difficult for an ever-present safety message to have any impact, even as a reminder. Even a dynamic warning, such as the audible backing-up alarm on a mining vehicle, can lose its value through habituation simply because it is presented so frequently (Duchon & Laage, 1986).

Content. Often, much of the required safety information is included in the preexisting knowledge of the reader, so a warning need include only enough information to trigger the appropriate response. In unfamiliar laboratory tasks, subjects

were unlikely to use available protective equipment unless instructed or warned to do so (Otsubo, 1988; Wogalter et.al., 1987). However, addition of warning elements (signal word, hazard and consequence statements) to explicit instructions may not produce significantly greater behavior change than do instructions alone (Strawbridge, 1986), and may be outweighed by a loss of clarity in the instructions (McCarthy et.al., 1987). If the remedy or appropriate behavior is obvious, then explicit instructions are unnecessary and may in fact be unwise, because they are likely to produce increased filtering of warnings in general.

Format. Obviously, a warning sign or label must be sufficiently conspicuous, legible, understandable, and brief for the audience to process and retain the key information. These minimal requirements have been extensively documented in the general experimental and safety literature. In recent laboratory studies, where subjects were actively seeking information but were confronted with a relatively heavy information load, more prominent instructions or warnings have had greater impacts on behavior in some situations (Desaulniers, 1987; Strawbridge, 1986; Wogalter et.al., 1987; Zlotnik, 1982). Even a very conspicuous label can be completely ignored, however, (Dorris & Purswell, 1977; Gill et.al., 1987), and an attractive label on a "toxic" container can have the undesired effect of increasing contact by small children (Schneider, 1977; Culver-Dickinson et.al., 1982).

### MOTIVATION AND ABILITY TO CHANGE

Receiving the information from a warning sign or label is only a preliminary link in the chain of events required for a warning to affect behavior. If the information is to change a person's behavior, it must add something substantial to what the person already knew (i.e., not available from past experience or the present context). The information perceived as new must then motivate the person to change, and the person must be able to act as recommended and remember to do so.

Non-redundant information. We start with the assumption that the target of a warning sign or label would be doing something if the warning were not there and may be highly motivated to proceed. If the person perceives nothing substantially new in the information extracted from a sign or label, there is no reason to change.

Credibility. Communications research shows that when a message conflicts with experience, it is the message, rather than the person's experience, that is discredited, unless the message comes from a highly credible source (Aronson, et.al., 1963; Hovland & Weiss, 1951).

Consequences. People accept some risk in all activities (Slovic et.al., 1980), and are unlikely to heed a warning unless the perceived risks of noncompliance are excessive. Laboratory subjects who complied with warnings on chemicals perceived the products as more hazardous than did non-compliers (Friedmann, 1988). Compliance appears to depend primarily on perceived likelihood of injury (Friedmann, 1988; Godfrey, 1985), rather than on expected severity of injury, for which mixed results have appeared (Otsubo, 1988; Stern et.al., 1975).

Control. The issue of perceived control is complex. Someone who feels helpless in the face of a threat will not take any avoidance action (Stern et.al., 1975). On the other hand, a person who feels that the situation is already under control does not feel any need to comply with the recommendations of a warning (Friedmann, 1988; Weinstein, 1984). Unless the recommended remedy is perceived as being both necessary (mere caution is not enough) and sufficient (able to protect),

3

SA527

compliance with the warning is apt to be low (Laner & Sell, 1960; Otsubo, 1988).

Attractive risk. A potentially hazardous activity may be attractive, either in its own right (enjoyable, addictive) or for its very riskiness (exciting). Several studies have found low compliance with warnings associated with higher scores on a risk-taking questionnaire (Nikmorad, 1985; Purswell et.al., 1986). Other evidence for risk attraction includes the observation that adolescent males, who have the highest scores on sensation-seeking scales (Zuckerman et.al., 1978), are more likely than older or female respondents to drink and are less likely to wear seat belts while driving (Bradstock et.al., 1987).

Conformity. Social example or pressure is known to play a major role in attitude change and behavior. Complying with a safety message in the presence of complying peers could afford perceived social approval, whereas complying in the presence of non-complying peers could yield social disapproval. Experimental results are consistent with this view (Wogalter et.al., 1989).

Cost. Compliance with recommendations decreases with greater perceived cost (discomfort or effort) of the remedy (Wogalter et.al., 1987; Wogalter et.al., 1989). It is likely that people implicitly compare the cost with the perceived risk of not using the remedy (Stern et.al., 1975). However, even a trivial "cost" (e.g., fastening a seat belt) may outweigh the remote possibility of serious injury or death for many people.

Ability to Change. A person who wants to change behavior must be able to do so. This is probably not a major factor in most situations involving warning signs and labels, but may become important when complex skills or physical strength are involved, or when recommended equipment is unavailable.

Memory. Research on memory for warnings has concentrated on the ability of subjects to recall the content of a warning when later asked to do so. Although a recall or recognition measure may be useful to ascertain that the message was processed and stored, the more crucial issue is whether the message is recalled at the time it is needed. Studies of absent-mindedness (Reason & Mycielska, 1982) and of response to warnings (Strawbridge, 1988) reveal the frequent failure of such timely recall.

ACCIDENT REDUCTION

There are at least two ways that a warning can fail to have a positive impact on safety despite measurably changing behavior.

Inappropriate Target Audiences. If the people who are most likely to be involved in accidents do not change their behavior, then a warning can have little effect. Some campaigns to encourage wearing of seat belts appear to produce no noticeable decrease in highway accident fatality rates, apparently because those drivers most likely to be involved in traffic accidents are least likely to wear seat belts (vonBuseck et.al., 1980; McCarthy et.al., 1984b).

Inappropriate Changes. A warning sign could produce a change in behavior which increases or leaves unchanged the frequency or severity of accidents, either because the recommended course of action is not the one actually adopted, or because it turns out to be inappropriate. For example, male adolescents reported greater likelihood of diving in a pool where a no-diving sign was posted (Goldhaber & deTurck), and installation of stop signs can increase accident rates (as described below).

## APPLICATION TO EXAMPLES OF WARNINGS

Relating these principles to two familiar categories of warnings -- on-product warning labels and stop signs -- illustrates why some warnings have more impact and others have none.

On-Product Warning Labels

The user of a consumer product is unlikely to be seeking information, and is likely to filter out a warning label. If the user does read and understand a warning, it is unlikely to be informative, since such products generally have few non-obvious hazards. Unexpected hazards are often so unlikely that the typical person is willing to accept whatever risks are represented. If the warning conflicts with previous experience or the examples set by others, it may not be believed; manufacturers may have little or no credibility, given the clutter of continuously-present warning labels, many prompted by litigation.

An example of a possible (though unproven) exception is a product container, such as for medicine, paint, or a cleaner. A person unfamiliar with the contents of a container may in some instances be seeking instructions and respond to information an a label, whether or not it is presented in a warning format. However, where a person believes he or she is familiar with the product, it is unlikely that anything beyond the product name will affect behavior.

Stop Signs

Often cited inappropriately to demonstrate that warning signs in general are effective in modifying behavior, stop signs indicate situations with highly likely negative consequences, including social disapproval and potential penalties. People are trained to look for and respond to stop signs, and the information-seeking process becomes almost automatic. These signs also illustrate that it is not necessary to meet format standards (eg., signal words, hazard and consequence identification, detailed instructions) in order for a warning sign to affect behavior, even though proposed standards for warning signs and labels require all of these features (ANSI Z535).

Stop signs also illustrate that behavioral changes may not produce the desired outcome. Field research has shown that most drivers do not come to a full stop at stop signs (Stockton et.al., 1981), and that upgrading intersections from yield to stop signs can increase the number of accidents (Polus, 1985).

## SUMMARY AND RECOMMENDATIONS

The potential effectiveness of a warning for changing behavior depends on diverse factors. Some of the influences have been specifically studied in a warnings context; others can be extrapolated from research and theory in related areas of human behavior. An important direction for future research will be to develop more realistic laboratory studies and to accumulate an increasing body of real world data. In the meantime, results of laboratory experiments, field studies, and accident analyses continue to demonstrate the difficulty of enhancing safety through warnings. On-product warnings and other common safety messages typically fail to meet minimal requirements for effectiveness due to limitations inherent in their use.

4

SA528

*Human Factors Perspectives on Warnings*

# REFERENCES

ANSI Z535.4 Product Safety Signs and Labels. American National Standards Institute, Draft January 1987.

Aronson, E., Turner, J. A. & Carlsmith, J. M. (1963). Communicator credibility and communication discrepancy as determinants of opinion change. Journal of Abnormal and Social Psychology, 67 (1), 31-36.

Bradstock, M. K., Marks, J. S., Forman, M. R., Gentry, E. M., Hogelin, G. C. Binkin, N. J. & Trowbridge, F. L. (1987). Drinking-driving and health lifestyle in the United States: Behavioral risk factors surveys. Journal of Studies on Alcohol, 48 (2), 147-152.

Cronbach, L. J. (1975). Beyond the two disciplines of scientific psychology. American Psychologist, 30, 116-127.

Culver-Dickinson, P., Vernberg, D. D. & Spyker, D. A. (1982). The deterrent value of "Mr. Yuk" stickers. International Congress of Clinical Toxicology.

Desaulniers, D. R. (1987). Layout, organization, and the effectiveness of consumer product warnings. Proceedings of the Human Factors Society, 56-60.

deTurck, M. A. & Goldhaber, G. M. (1988). Consumers' information processing objectives and effects of product warnings. Proceedings of the Human Factors Society, 445-449.

Dorris, A. L. & Purswell, J. L. (1977). Warnings and human behavior: Implications for the design of product warnings. Journal of Products Liability, 1, 255-264.

Driver, R. W. (1987). A communication model for determining the appropriateness of on-product warnings. IEEE Transactions on Professional Communication, PC 30 (3), 157-163.

Duchon, J. C. & Laage, L. W. (1986). The consideration of human factors in the design of a backing-up warning system. Proceedings of the Human Factors Society, 261-264.

Friedmann, K. (1988). The effect of adding symbols to written warning labels on user behavior and recall. Human Factors, 30 (4), 507-515.

Gill, R. T., Barbera, C. & Precht, T. (1987). A comparative evaluation of warning label design. Proceedings of the Human Factors Society, 476-478.

Godfrey, S. S., Rothstein, P. R. & Laughery, K. P. (1985). Warnings: Do they make a difference? Proceedings of the Human Factors Society, 669-673.

Goldhaber, G. M. & deTurck, M. A. Effectiveness of warning signs: Gender and familiarity effects. Manuscript.

Horst, D. P., McCarthy, G. E., Robinson, J. N., McCarthy, R. L. & Krumm-Scott, S. (1986). Safety information presentation: Factors influencing the potential for changing behavior. Proceedings of the Human Factors Society, 111-115.

Hovland, C. I. & Weiss, W. (1951). The influence of source credibility on communication effectiveness. Public Opinion Quarterly, 15, 635-650.

Keinan, G. (1987). Decision making under stress: Scanning of alternatives under controllable and uncontrollable threats. Journal of Personality and Social Psychology, 52 (3), 639-644.

Laner, S., & Sell, R. G. (1960). An experiment on the effect of specially designed safety posters. Occupational Psychology, 34(3), 153-169.

Langer, E., Blank, A. & Chanowitz, B. (1978). The mindlessness of ostensibly thoughtful action: The role of "placebic" information in interpersonal interaction. Journal of Personality and Social Psychology, 36 (6), 635-642.

Lehto, M. R. & Miller, J. M. (1986). Warnings Volume 1, Fundamentals, Design, and Evaluation Methodologies. Ann Arbor, MI: Fuller Technical Publications.

McCarthy, R. L., Finnegan, J. P., Krumm-Scott, S. & McCarthy, G. E. (1984a). Product information presentation, user behavior, and safety. Proceedings of

the Human Factors Society, 81-85.

McCarthy, R. L., Taylor, R. K., Sanford, S. B. & Lange, R. C. (1984b). Seat belts: Effectiveness of mandatory use requirements. SAE Technical Paper Series, No. 840329.

McCarthy, G. E., Horst, D. P., Beyer, R. R., Robinson, J. N. & McCarthy, R. L. (1987). Measured impact of a mandated warning on user behavior. Proceedings of the Human Factors Society, 479-483.

McGuire, W. J. (1981). Theoretical foundations of campaigns. In R. E. Rice & W. J. Paisley (Eds.), Public Communication Campaigns. Beverly Hills: Sage Publications.

Nikmorad, H. (1985). A study of behavioral responses in regard to the warning labels on consumer products. Unpublished master thesis, University of Oklahoma.

Otsubo, S. M. (1988). A behavioral study of warning labels for consumer products: Perceived danger and use of pictographs. Proceedings of the Human Factors Society, 536-540.

Pennebaker, J. W. & Sanders, D. Y. (1976). American graffiti: Effects of authority and reactance arousal. Personality and Social Psychology Bulletin, 2 (3), 264-267.

Polus, A. (1985). Driver behavior and accident records at unsignalized urban intersections. Accident Analysis and Prevention, 17 (1), 25-32.

Purswell, J. L., Schlegel, R. E. & Kejriwal, S. K. (1986). A prediction model for consumer behavior regarding product safety. Proceedings of the Human Factors Society, 1202-1205.

Reason, J. & Mycielska, K. (1982). Absent-Minded? The Psychology of Mental Lapses and Everyday Errors. New York: Prentice-Hall.

Schneider, K. C. (1977). Prevention of accidental poisoning through package and label design. Journal of Consumer Research, 4, 67-74.

Slovic, P., Fischoff, B. & Lichtenstein, S. (1980). Facts and fears: Understanding perceived risk. In R. C. Schwing & W. A. Albers, Societal Risk Assessment: How Safe is Safe Enough? New York: Plenum Press.

Stern, G. S., Blyth, D. P., Kreye, M. W. & Coons, C. E. (1975). Perceived aversiveness of recommended solution and locus of control as determinants of response to danger. Journal of Research in Personality, 9, 37-47.

Stockton, W. R., Brackett, R. Q. & Mounce, J. M. (1981). Stop, Yield, and No Control at Intersections. Federal Highway Administration, Report No. FHWA-RD-81/084.

Strawbridge, J. A. (1986). The influence of position, highlighting, and imbedding on warning effectiveness. Proceedings of the Human Factors Society, 716-720.

von Buseck, C., Evans, L., Schmidt, D. & Wasielewski, P. (1980). Seat belt usage and risk taking in driving behavior. Presented at the Society of Automotive Engineers Congress.

Weinstein, N. D. (1984). Why it won't happen to me: Perceptions of risk factors and susceptibility. Health Psychology, 3 (5), 431-457.

Wogalter, M. S., Godfrey, S. S., Fontenelle, G. A., Desaulniers, D. R., Rothstein, P. R & Laughery, K. R. (1987). Human Factors, 29 (5), 599-612.

Wogalter, M. S., Allison, S. T. & McKenna, N. A. (1989). Effects of cost and social influence on warning compliance. Human Factors, 31 (2), 133-140.

Wright, P. (1979). Concrete action plans in TV messages to increase reading of drug warnings. Journal of Consumer Research, 6, 256-269.

Zlotnik, M. A. (1982). The effects of warning message highlighting on novel assembly task performance. Proceedings of the Human Factors Society, 93-97.

Zuckerman, M., Eysenck, S. & Eysenck, H. J. (1978). Sensation seeking in England and America: Cross-cultural, age, and sex comparisons. Journal of Consulting and Clinical Psychology, 46 (1), 139-149.

SA529

Selections from
Human Factors
and Ergonomics
Society
Annual
Meetings
1980-1993



# HUMAN FACTORS PERSPECTIVES ON
# WARNINGS

Edited by
**Kenneth R. Laughery, Sr.**
**Michael S. Wogalter**
and
**Stephen L. Young**



Published by
the Human Factors
and Ergonomics
Society

SA530